# EXHIBIT 1

1  ALDEN F. ABBOTT

2  General Counsel

   ELIZABETH JONES SANGER (WI 1080449)

3  esanger@ftc.gov; (202) 326-2757

4  JAMES A. PRUNTY (OR 84128)

   jprunty@ftc.gov; (202) 326-2438

5  EDWIN RODRIGUEZ (DC 446457)

6  erodriguez@ftc.gov; (202) 326-3147

   SHIRA D. MODELL (DC 358757)

7  smodell@ftc.gov; (202) 326-3116

8  Federal Trade Commission

   600 Pennsylvania Ave., NW

9  Washington, DC 20580

10 Fax: (202) 326-3259

11 STACY PROCTER (Local Counsel) (CA 221078)

12 sprocter@ftc.gov

   Federal Trade Commission

13 10990 Wilshire Blvd., Suite 400

14 Los Angeles, CA 90024

   Tel: (310) 824-4300

15 Fax: (310) 824-4380

16 ATTORNEYS FOR PLAINTIFF

17              UNITED STATES DISTRICT COURT

18              CENTRAL DISTRICT OF CALIFORNIA

19

20 _____  )

21 **FEDERAL TRADE COMMISSION** )  **FILED UNDER SEAL**

                                   )  Case No. ED18CV02104-JGB(KKx)
22      Plaintiff,                  )

                                   )
23      v.                         )  **COMPLAINT FOR**
                                   )  **PERMANENT**
24                                  )  **INJUNCTION AND**
   **JASON CARDIFF**, individually   )  **OTHER EQUITABLE**
25      and as an owner, officer,   )  **RELIEF**
26      director, or member of      )
   REDWOOD SCIENTIFIC              )
27 TECHNOLOGIES, INC., a           )

28

                                    1

---

**FILED**
CLERK, U.S. DISTRICT COURT

10/10/2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ER_____ DEPUTY

---

**LODGED**
CLERK, U.S. DISTRICT COURT

10/3/2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ER_____ DEPUTY

|  |  |
|---|---|
| California corporation; | ) |
| REDWOOD SCIENTIFIC | ) |
| TECHNOLOGIES, Inc., a | ) |
| Nevada corporation; | ) |
| REDWOOD SCIENTIFIC | ) |
| TECHNOLOGIES, Inc., a | ) |
| Delaware corporation; | ) |
| IDENTIFY, LLC, a Wyoming | ) |
| limited liability company; | ) |
| ADVANCED MEN'S | ) |
| INSTITUTE PROLONGZ | ) |
| LLC, d/b/a AMI, a California | ) |
| limited liability company; and | ) |
| RUN AWAY PRODUCTS, | ) |
| LLC, a New York limited | ) |
| liability company; and | ) |
| both general and limited | ) |
| partner of | ) |
| CAROLS PLACE LIMITED | ) |
| PARTNERSHIP, an Arizona | ) |
| limited liability partnership; | ) |
|  | ) |
| **EUNJUNG CARDIFF**, a/k/a | ) |
| Eunjung Lee, a/k/a Eunjung | ) |
| No, individually and as an | ) |
| owner, officer, director, or | ) |
| member of | ) |
| REDWOOD SCIENTIFIC | ) |
| TECHNOLOGIES, INC., a | ) |
| California corporation; | ) |
| REDWOOD SCIENTIFIC | ) |
| TECHNOLOGIES, Inc., a | ) |
| Nevada corporation; | ) |
| REDWOOD SCIENTIFIC | ) |
| TECHNOLOGIES, Inc., a | ) |
| Delaware corporation; | ) |
| IDENTIFY, LLC, a Wyoming | ) |
| limited liability company; | ) |
| ADVANCED MEN'S | ) |
| INSTITUTE PROLONGZ | ) |

2

LLC, d/b/a AMI, a California
limited liability company; and
RUN AWAY PRODUCTS,
LLC, a New York limited
liability company; and
both general and limited
partner of
CAROLS PLACE LIMITED
PARTNERSHIP, an Arizona
limited liability partnership;

**DANIELLE CADIZ**, a/k/a Danielle
Walker, individually;

**REDWOOD SCIENTIFIC
TECHNOLOGIES, INC.,** a
California corporation, also
d/b/a Rengalife;

**REDWOOD SCIENTIFIC
TECHNOLOGIES, INC.,** a
Nevada corporation;

**REDWOOD SCIENTIFIC
TECHNOLOGIES, INC.,** a
Delaware corporation;

**IDENTIFY, LLC**, a Wyoming
limited liability company;

**ADVANCED MEN'S INSTITUTE
PROLONGZ LLC**, d/b/a
AMI, a California limited
liability company;

**RUN AWAY PRODUCTS, LLC**, a
New York limited liability
company; and

**CAROLS PLACE LIMITED**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

3

**PARTNERSHIP**, an Arizona
limited liability partnership,                    )
                                                 )
                                                 )
Defendants.                                      )

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Section 13(b) of the Federal Trade
Commission Act ("FTC Act"), 15 U.S.C. § 53(b), Section 5 of the Restore Online
Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, Section 918(c) of the
Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c), and Section 6 of
the Telemarketing and Consumer Fraud and Abuse Prevention Act (the
"Telemarketing Act"), 15 U.S.C. § 6105, to obtain temporary, preliminary, and
permanent injunctive relief, rescission or reformation of contracts, restitution, the
refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief
for Defendants' acts or practices in violation of Sections 5(a) and 12 of the FTC
Act, 15 U.S.C. §§ 45(a) and 52, Section 4 of ROSCA, 15 U.S.C. § 8403, Section
907(a) of EFTA, 15 U.S.C. § 1693e(a), Section 1005.10(b) of EFTA's
implementing Regulation E, 12 C.F.R. § 1005.10, and Section 310.4(b)(1)(v) of
the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(v), in
connection with their false and unsubstantiated claims for dissolvable film strips
advertised for smoking cessation, weight loss, and male sexual performance; a
related autoship continuity program resulting in unauthorized shipments and
charges; abusive telemarketing through robocalls; and unsubstantiated earnings
claims for a multi-level marketing scheme.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345; 15 U.S.C. §§ 45(a) and 53(b); 15 U.S.C. § 8404(a); and 15 U.S.C. § 1693o(c).

3.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.    The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce, and Section 12, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-8405, which prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers, including providing clear and conspicuous disclosure of all material terms of the transaction prior to obtaining the consumer's billing information, and obtaining the consumer's express informed consent before charging the consumer; EFTA, 15 U.S.C. §§ 1693-1693r, and its implementing Regulation E, 12 C.F.R. Part 1005, which regulate the rights, liabilities, and responsibilities of participants in electronic fund transfer systems; and the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5.    The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, ROSCA, EFTA, Regulation E, and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of

monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b) and 56(a)(2)(A); 15 U.S.C. § 8404(a); and 15 U.S.C. § 1693o(c).

## SUMMARY OF THE CASE

6.     Individual Defendants Jason Cardiff, Eunjung Cardiff, and Danielle Cadiz have for years operated a fraudulent multi-pronged scheme that has bilked consumers out of millions of dollars through baseless advertising claims for products that purport to alleviate serious health conditions, while also enrolling consumers in unwanted autoship programs that have resulted in millions of dollars in unauthorized charges.

7.     Defendants' evolving business operation injures consumers in multiple ways.  First, Defendants' marketing of their dissolvable film strips relies on false or unsubstantiated claims for TBX-FREE (stop smoking aid), Eupepsia Thin (appetite suppressant), and Prolongz (men's sexual performance), including claims that those products were proven to work.  Defendants also make false claims that their film strips are made in the United States and are sold with money-back guarantees.  Then, Defendants enroll consumers – without prior notice and authorization and, in some cases, notwithstanding consumers' or Defendants' clear statements to the contrary – in autoship continuity plans that bill consumers monthly for unwanted products.  Defendants also make it difficult for consumers to cancel those plans and get their money back.  More recently, Defendants have turned to abusive telemarketing practices by delivering prerecorded marketing messages to millions of consumers.  Finally, Defendants recently launched a multi-level marketing scheme for which they make false or unsubstantiated earnings claims.

8.     Individual Defendants have operated the scheme through a web of interrelated companies, using Corporate Defendants as their alter egos.  Corporate Defendants form a common enterprise, and include three corporations with the

6

same name – Redwood Scientific Technologies, Inc., a California Corporation; Redwood Scientific Technologies, Inc. a Nevada Corporation; Redwood Scientific Technologies, Inc., a Delaware Corporation  – and at least 4 other entities, Identify, LLC; Advanced Men's Institute Prolongz LLC; Run Away Products, LLC; and Carols Place Limited Partnership.

## **CORPORATE DEFENDANTS**

9.      Corporate Defendant Redwood Scientific Technologies, Inc. ("Redwood California"), also doing business as Rengalife, is a California corporation with its principal place of business at 820 North Mountain Ave., Suite 100, Upland, CA 91786.  It has undergone name changes.  Redwood California was initially Advanced Men's Institute Prolongz LLC, which subsequently became Redwood Scientific Technologies LLC, and then finally the corporation Redwood California.  Redwood California transacts or has transacted business in this district and throughout the United States.  At times material to this Complaint, acting alone or in concert with others, Redwood California has advertised, marketed, distributed, or sold dissolvable film strips, including TBX-FREE, Eupepsia Thin, and Prolongz, to consumers throughout the United States.

10.      Corporate Defendant Redwood Scientific Technologies, Inc. ("Redwood Nevada") was, until December 2017, a Nevada corporation whose registered agent was located at 202 N. Carson Street, Carson City, NV 89701. Redwood Nevada was the parent of Redwood California, and it transacted business in this district and throughout the United States.

11.      Corporate Defendant Redwood Scientific Technologies, Inc. ("Redwood Delaware") is a Delaware corporation with its principal place of business at 820 North Mountain Ave., Suite 100, Upland, CA 91786.  Redwood Delaware was established in December 2017 as part of a merger between Greenway Design Group, Inc. and Redwood Nevada, thus becoming the parent of

7

Redwood California.  Through its subsidiaries, including Redwood California, Redwood Delaware has advertised, marketed, distributed, or sold dissolvable film strips, including TBX-FREE, Eupepsia Thin, and Prolongz, to consumers throughout the United States.

12.     Corporate Defendant Identify, LLC ("Identify") is a Wyoming limited liability company.  Identify has reserved multiple trade names in Wyoming, including TBX-FREE, Redwood Scientific Technologies, Advanced Men's Institute, and Runaway Products.  At times material to this Complaint, acting alone or in concert with others, Identify has advertised, marketed, distributed, or sold dissolvable film strips, including TBX-FREE, Eupepsia Thin, and Prolongz, to consumers throughout the United States.  Currently, Identify is the primary seller of TBX-FREE, Eupepsia Thin, and Prolongz, and receives revenue from the sales of those products.  Identify's bank accounts receive funds for activities conducted by other Corporate Defendants.

13.     Corporate Defendant Advanced Men's Institute Prolongz LLC ("AMI") was a California limited liability company formed in 2014 by Individual Defendant Eunjung Cardiff.  The managing member of AMI is Corporate Defendant Run Away Products, LLC.  At times material to this Complaint, acting alone or in concert with others, AMI has advertised, marketed, distributed, or sold Prolongz to consumers throughout the United States.

14.     Corporate Defendant Run Away Products, LLC ("Run Away") is a New York limited liability company formed on March 10, 2009 by Individual Defendant Eunjung Cardiff.  Run Away has at various times placed advertising for Prolongz, and been responsible for meeting payroll for Corporate Defendant Redwood California's employees.

15.     Corporate Defendant Carols Place Limited Partnership is an Arizona asset management limited partnership formed on January 23, 2017.  Carols Place

Limited Partnership holds 69% of the Common Shares of Redwood Delaware for the benefit of Individual Defendants Jason and Eunjung Cardiff.  The two partners of Carols Place Limited Partnership are Carols Place Trust and Extension First, LLC, a Wyoming company formed on January 13, 2017 and owned by Individual Defendants Jason and Eunjung Cardiff.  Carols Place Trust is a bridge trust formed on January 17, 2017 under Nevada law.  Carols Place Trust owns the Cardiffs' home.  The only two settlors and trustees of Carols Place Trust are Individual Defendants Jason Cardiff and Eunjung Cardiff.  Carols Place Limited Partnership has received funds from Corporate Defendant Identify.

## INDIVIDUAL DEFENDANTS

### INDIVIDUAL DEFENDANT JASON CARDIFF

16.    Individual Defendant Jason Cardiff is the Founder, President, Chief Executive Officer, and a member of the Board of Directors of Corporate Defendant Redwood California, and the President, Chief Executive Officer, Secretary, Treasurer, and a Director of Corporate Defendant Redwood Delaware.  Mr. Cardiff owns more than 150 million shares of Corporate Defendant Redwood Delaware common stock and controls all 2.5 million shares of Redwood Delaware's Series A Super Voting Preferred Shares, accounting for 96.6 percent of Redwood Delaware's voting securities.  He was the President of Corporate Defendant Redwood Nevada before its December 2017 dissolution.  Mr. Cardiff is also the managing member and has held himself out as an owner of Corporate Defendant Identify; he has held himself out as the owner of Corporate Defendant AMI; Mr. Cardiff is also a member of Corporate Defendant Run Away.  Mr. Cardiff is a signatory on bank accounts of Corporate Defendants, as well as a trustee for Carols Place Trust.

17.    Individual Defendant Jason Cardiff participated in the creation and dissemination of advertising for TBX-FREE, Eupepsia Thin, and Prolongz.  Mr.

9

Cardiff has appeared in videos promoting TBX-FREE and Eupepsia Thin, in which he touts the products' efficacy. Mr. Cardiff also appeared in multiple videos promoting Defendant Redwood California's new multi-level marketing program (Rengalife), in which he claimed that Rengalife members are likely to earn substantial income. Mr. Cardiff negotiated with a telemarketing company to deliver millions of prerecorded messages, commonly known as robocalls, to consumers promoting Defendants' products, and his voice is used by Defendants in those calls. In addition, Mr. Cardiff appears to have been routinely copied on internal and external company emails, making him generally aware of company operations.

18.     Individual Defendant Jason Cardiff at all times material to this Complaint, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Corporate Defendants, including the acts and practices set forth in this Complaint. Mr. Cardiff resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

**INDIVIDUAL DEFENDANT EUNJUNG CARDIFF**

19.     Individual Defendant Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, is the Secretary, Director of Marketing, and a member of the Board of Directors of Corporate Defendant Redwood California, as well as its registered agent. She is the Chief Operating Officer, Chief Marketing Officer, and a Director of Corporate Defendant Redwood Delaware, and she owns 550,800 shares of that company's Common Stock. She was the Secretary of Corporate Defendant Redwood Nevada before its December 2017 dissolution. Ms. Cardiff organized Corporate Defendant AMI; is the managing member of Corporate Defendant Run

Away; and has signed financial documents identifying herself as an owner of Corporate Defendant Identify.

20. Individual Defendant Eunjung Cardiff is identified as part of the Management Team on the website of Corporate Defendant Redwood California, and her profile says that:

> At Redwood Scientific Technologies, Inc., [Ms. Cardiff] serves as the Marketing Director, in which she oversees management's activities. Eunjung also supervises the company's research and development activities – the bread and butter of Redwood. As all management personnel reports [sic] to Eunjung, she has the best insights into the company's marketing strategy. Eunjung's focus on ensuring that the company "meets" its financial targets, especially "acquisition cost per new customer," guarantee[s] [t]he the company's success and profitability. She also works [closely] with Jason to constitute, layout, and execute the company's success strategy.

21. Individual Defendant Eunjung Cardiff, who is married to Individual Defendant Jason Cardiff, participated in the dissemination of advertising for TBX-FREE, Eupepsia Thin, and Prolongz. She was the principal person responsible for buying media for the three products. She participated in responding to requests for advertising claim substantiation during the television advertising clearance process for TBX-FREE. Ms. Cardiff also monitored the call centers receiving calls from consumers to purchase TBX-FREE, Eupepsia Thin, and Prolongz. Ms. Cardiff also assisted Individual Defendant Jason Cardiff in filming some of the Facebook Live videos promoting Rengalife. Ms. Cardiff's voice also is used by Defendants in robocalls to consumers, and she paid for robocall expenses. She has applied for multiple merchant accounts on behalf of several Corporate Defendants and she is a signatory on several of their checking accounts, as well as a trustee for Carols

Place Trust.

22.     Individual Defendant Eunjung Cardiff, at all times material to this Complaint, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Corporate Defendants, including the acts and practices set forth in this Complaint. Ms. Cardiff resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## INDIVIDUAL DEFENDANT DANIELLE CADIZ

23.     Individual Defendant Danielle Cadiz, a/k/a Danielle Walker, has served as Corporate Defendant Redwood California's Director of Operations since December 2016 and as its Business Manager since January 2015. Ms. Cadiz's Linkedin.com profile describes her responsibilities at Corporate Defendant Redwood California as "leading day to day business operations, office management, [Accounts Payable/Accounts Receivable], cash flow, Human Resources and strategic planning."  Ms. Cadiz executes virtually all of the activities of Corporate Defendants and has actual and implied authority to make decisions on behalf of Corporate Defendants.

24.     In the course of her official responsibilities, Individual Defendant Danielle Cadiz receives information about consumer complaints.  She also has communicated with the foreign manufacturers of the Defendants' film strip products and appeared in a video promoting the film strip technology, entitled "The End of the Pill," where she was identified as Corporate Defendant Redwood California's "Operations Manager."  Ms. Cadiz, along with Individual Defendant Jason Cardiff, negotiated with a telemarketing company to deliver millions of robocalls to consumers promoting several of Defendants' products.  Ms. Cadiz

12

signed the contract for services with the telemarketing company and monitored the company's performance under the contract.

25.    Individual Defendant Danielle Cadiz, at all times material to this Complaint, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Corporate Defendants, including the acts and practices set forth in this Complaint. Ms. Cadiz resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMON ENTERPRISE

26.    Corporate Defendants have operated as a common enterprise while engaging in the illegal acts and practices alleged in the Complaint.  Individual Defendants Jason Cardiff, Eunjung Cardiff, and Danielle Cadiz have conducted the alleged deceptive practices described herein through the interrelated network of Corporate Defendants, which share a business purpose, business functions, and employees; are commonly controlled by Individual Defendants; and have commingled funds.  Defendants have been able to delay detection of chargeback activity from credit card companies and merchant card banks by using multiple company names, bank accounts, and merchant accounts virtually interchangeably since 2014.  Because Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

1

## **ALTER EGO**

27. There is such a unity of interest between Corporate Defendants and Individual Defendants Jason Cardiff and Eunjung Cardiff that they are alter egos. Corporate Defendants are all dominated and controlled by Individual Defendants Jason Cardiff and Eunjung Cardiff and were used to further the deceptive scheme described herein. Individual Defendants Jason and Eunjung Cardiff use personal credit cards to pay for expenses of Corporate Defendants and hold their stock in Redwood Nevada and Redwood Delaware in the name of Corporate Defendant Carols Place Limited Partnership. Corporate Defendant Carols Place Limited Partnership is comprised of Carols Place Trust and Extension First, LLC, which are both owned by the Cardiffs; Carols Place Trust also owns the Cardiffs' home.

28. Failure to disregard the Corporate Defendants' corporate forms would sanction a fraud and injustice by shielding and safeguarding them from liability for their roles in a deceptive scheme that has caused millions of dollars in consumer injury, and would unjustly enrich them by permitting them to keep moneys obtained from consumers through fraud.

## **COMMERCE**

29. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## **DEFENDANTS' BUSINESS ACTIVITIES**

30. Defendants have manufactured, labeled, advertised, marketed, promoted, offered for sale, sold, and distributed to consumers dissolvable film strip products, including strips sold under the brand names TBX-FREE, Eupepsia Thin, and Prolongz.

14

31.     TBX-FREE, Eupepsia Thin, and Prolongz are manufactured in China or India.

32.     Defendants market TBX-FREE, Eupepsia Thin, and Prolongz as over-the-counter homeopathic drugs that consumers place on their tongues and then press against the roofs of their mouths.

33.     According to its package label, the active ingredient in TBX-FREE is "Laburnum anagyroides 1X" and its purpose is the "Homeopathic treatment of chronic nicotinism."

34.     According to its package label, the active ingredient in Eupepsia Thin is "Paullinia Cupana H.B.K. 1X" and its purpose is as a "Homeopathic appetite suppressant."

35.     According to its package label, the active ingredients in Prolongz are "Damiana Extract 1X (10 mg) … and Ginseng Extract 1X (10 mg)" and its purpose is as a "Homeopathic Sexual Enhancement Strip."

36.     Defendants have sold Prolongz since at least 2014, TBX-FREE since at least 2015, and Eupepsia Thin since at least 2017.  Defendants have sold Prolongz, TBX-FREE, and Eupepsia Thin on multiple websites.  Defendants have charged $49.95 for a box of TBX-FREE containing 120 film strips, and $49.95 for a box of Eupepsia Thin containing 60 film strips.  Defendants have offered a box of Prolongz containing 60 film strips for a 15-day free-trial upon the payment of $4.98 in shipping and handling, and have charged $89.95 upon the expiration of the trial period.

**TBX-FREE ADVERTISING**

37.     Defendants have advertised TBX-FREE through a national television infomercial campaign and on the Internet, including websites and Facebook Live videos.  The core messages of this advertising have been that TBX-FREE enables users to quit smoking, that it is clinically proven to do so, and that it is superior to

other smoking cessation aids.  These materials contain the following statements and depictions, among others:

        A.     Excerpts from tbxfree.com website (captured 03/16/2017):

             Revolutionary New Stop Smoking Product

             More effective than the Patch and Gum

             #1 Choice by Smokers

<div align="center">***</div>

<div align="center">

**88% Success Rate**

</div>

<div align="center">***</div>

In clinical studies cited in The New England Journal of Medicine, the active ingredient in TBX-FREE™ has an 88% cure care [sic] compared to the patch and gum combined.

<div align="center">***</div>

  

**CLINICALLY PROVEN IN:**  JOHNS HOPKINS UNIVERSITY  The NEW ENGLAND JOURNAL of MEDICINE  Harvard Health Publications HARVARD MEDICAL SCHOOL  *Trusted advice for a healthier life*

<div align="center">***</div>

<div align="center">

**PROVEN IN RESEARCH STUDIES TO HELP**

**SMOKERS QUIT THEIR ADDICTION!**

</div>

<div align="center">***</div>

<div align="center">

**The Breakthrough**
## **Stop Smoking Aid**
**That Calms Cigarette Cravings!**
**Proven in research studies to
help smokers quit their addiction!**

</div>

        B.     TBX-FREE Facebook Live post (posted 02/24/2017):

1    PRESENTER [DEFENDANT JASON CARDIFF]: . . . So I'm
2    going to show you what we've done . We've developed the
3    most successful stop-smoking product on the market, period,
4    plain and simple. I challenge anybody that tells me they have a
5    more successful stop-smoking product. It doesn't exist.

                              ***

7    If you've tried to stop smoking, if you want to stop
8    smoking, if you want to quit, if you want to make that change,
9    this is the product for you. And what you get and how it works
10   and the magic is it has no nicotine in it, first off. But it does
11   have an active ingredient in it.

                              ***

13   And how this works is what's really important. . . .
14   [T]his little strip here, you put it on your tongue, and it releases
15   a chemical to the brain, which is naturally found in nature, and
16   it makes you feel like you've had a cigarette.
17   Now, that's the most important part. We've replaced the
18   feeling of smoking with a non-nicotine-based product. And in
19   five short days -- five days -- you get all the nicotine out of
20   your system. You now have the nicotine out of your system
21   and you have the chance to become and live a smoke-free life.
22   And that is how the product works. That is why it has an 88
23   percent success rate, and we can look here, we have an -- we
24   have a proven track record of over an 88 percent success rate
25   from some of the greatest medical institutions and universities
26   in the United States and the U.K. And that's why it works so
27   well -- no nicotine in your system.

28

                              17

***

What does one month supply, an entire month, of TBX-Free -- it comes with two of these packets, two of them, okay? A whole month supply, it's 120 strips, which if you follow the direction should be more than you ever need.

I don't really understand. You know you've tried to stop. You've tried to stop five, six, seven, ten times. This product will do it for you. You can quit smoking with TBX-Free. Here's the best part, right? We offer a lifetime, money-back guarantee. . . . Lifetime, money-back guarantee for any reason, okay? If the product doesn't work for you or you become a smoker again, not only will we either give you your money back or we'll send you another box, whatever you want. We want the highest quality customer experience possible. You know the patches and gums won't give you any guarantee because they know they don't work. . . . So lifetime, money-back guarantee. You have nothing to lose, everything to gain, the number, right here. . . . You get a one-month supply for [$]49.95, and you don't pay shipping. Just think about it. Just what have you got to lose? It's what you spend on cigarettes in a week. Can you imagine? You're -- all of a sudden you're smoke-free?

C. Excerpts from TBX-FREE infomercial (captured 03/27/ 2018):

SPOKESMAN: This amazing strip delivers the same calming effect but with no tar, no tobacco, no nicotine, no ashes, no odor, huh, and my favorite, Taylor, no secondhand smoke.

18

***

SPOKESWOMAN:  To be able to break the chain of addiction with smokers, we have developed a product that gives you the freedom to not be addicted to any type of nicotine product.  TBX-FREE is unique among stop-smoking products because of the delivery technology and it contains no nicotine.  This nicotine-free system allows you to successfully stop smoking and at the same time you do not become addicted to TBX-FREE – like you might with the nicotine gum or patch.

NARRATOR:  Have you ever wanted to quit smoking but didn't think you could?  Now, you can.  Imagine living a smoke-free, nicotine-free life.  Because of TBX-FREE, thousands of people are breaking the addiction of cigarettes.  People around the world have discovered this amazing breakthrough and, now, through this TV offer -- Redwood Scientific Technologies is giving you an opportunity of a lifetime.  TBX-FREE is a fast-acting, dissolvable strip that is setting cigarette smokers -- free for life.  With TBX-FREE, you control the habit, the habit doesn't control you.

***

SPOKESWOMAN:  TBX-FREE is a fast strip delivery technology.  You just place it on your tongue and it dissolves instantly and your nicotine craving disappears.  And the moment it hits your system, you have the same satisfaction as if you had just finished a cigarette.

***

19



\*\*\*

UNIDENTIFIED FEMALE: I smoked about a pack a day for ten years. I tried the patch first and I would still smoke. You know, I was wearing the patch, I would still smoke cigarettes. When I was chewing the gum, I would still smoke cigarettes. And then I tried the e-cig -- e-cigarettes and even those, still nicotine, you know, I kind of said, you know, I need to try something that's, you know, not nicotine. And I was really surprised how TBX works.

UNIDENTIFIED FEMALE: TBX-FREE is the only thing that works. I've tried the gum, the patch, nothing works. And, plus, no side effects. What could be better?

D.   TBX-FREE Facebook Live post (posted 01/09/2017):

PRESENTER [DEFENDANT JASON CARDIFF]: We have an 88% effective rate in long-term cure in long-term

smokers.  A long-term smoker is someone who's been smoking more than 5 years, more than a pack or around a pack a day on average.

Our clinical data on TBX-FREE have done [sic] by some of the greatest medical and scientific institutions anywhere that we know of, including, not limited to the New England Journal of Medicine, which ranks our product ten times more effective than nicotine-replacement therapy to stop smoking.  That's who's giving us this data.

E.    TBX-FREE Facebook Live post (posted 02/07/2017):

PRESENTER [DEFENDANT JASON CARDIFF]:  I want to share with you what is TBX-Free, how does it work, what is the secret to learn how to stop smoking cigarettes fast.  I mean really fast, within a week, within ten days.

We have long-term smokers that have learned this secret, that have been smoking for 30-plus years, two packs a day or more, and they no longer smoke cigarettes.  If you've tried the patch and the gum, maybe you've tried hypnosis, maybe you've tried Chantix, and you're a long-term smoker, I need your attention, just a little bit of your attention.

***

Now, you should never need more than one month.  After five days of use, all the nicotine will be cleansed out of your system... And people say, well, does it work?  Well, we have an 88 percent success rate.  We have a lifetime money-back guarantee.

***

21

But first you have to stop smoking. You have to stop smoking, and you're addicted to something we believe internally as a group and a company, cigarettes are the most -- one of the most harmful killers of America -- of Americans. And -- and, you know, we're an American-based company. We have an American-based product. We're here, located in Southern California. We have an all-U.S.-based team here at our laboratories, and we're here for you.

38.     Jason Cardiff is the "Presenter" appearing in the TBX-FREE Facebook Live posts quoted above.

## EUPEPSIA THIN ADVERTISING

39.     Defendants have advertised Eupepsia Thin through a national television infomercial campaign and on the Internet, including websites and Facebook Live videos. The core message of this advertising has been that Eupepsia Thin causes or enables substantial weight loss without users having to diet, increase their exercise, or make other lifestyle changes. These materials contain the following statements and depictions, among others:

A.     Excerpts from bethinrx.com website (captured 02/05/2018):



LIVE THE

## EUPEPSIA

**LIFESTYLE!**

→ NO DIETS
→ NO GIVING UP FOOD
→ NATURAL AND EFFECTIVE

\*\*\*

FDA Registered.
Natural, homeopathic and wholesome.
Proven active ingredient is an effective appetite suppressant.

\*\*\*



\*\*\*

- Eupepsia Thin™ contains a clinically proven super ingredient called Paullinia cupana H.B.K.
- Eupepsia Thin™'s incredible active ingredient sends the brain the sensation of fullness.
- Once Eupepsia Thin™ mouth strip dissolve [sic] on your tongue, the active ingredient hits your blood stream sending the feeling of fullness which lasts for hours which in turn controls caloric intake.

\*\*\*

Studies show the new product, Eupepsia Thin, gives people a chance to live a more active lifestyle and keep weight off.

\*\*\*

23

> **Safe & Effective Weight-Loss**
> Current calorie reduction and meal plans have less than 5% success rate while the new product, Eupepsia Thin™, has a substantially higher success rate.  Until now there was no better way to shed the weight other than going through a huge lifestyle change.
>
> \*\*\*
>
> **Lose up to 15 pounds**
> your first month with **Eupepsia Thin** oral strips without diets or changing your food or lifestyle choices.
>
> \*\*\*
>
> **What is the price of Eupepsia Thin™?**
> If you would like to **lose 8-20 lbs** – our one month supply at **69.95** will work for you.
> If you would like to **lose 20-50 lbs** – our three month supply at **169.95** will work for you.
> If you would like to **lose 50-70 lbs** – our six month supply at **239.95** will work for you.
> If you would like to **lose 70-100 lbs** – our one year supply at **456.95** will work for you.
>
> \*\*\*
>
> **Is Eupepsia Thin™ 100% natural?**
>> Unlike most diets and supplements on the market, Eupepsia Thin™ is all natural and FDA registered, without fillers or dangerous ingredients, eliminating side effects or withdrawals.

      B.    Excerpts from Eupepsia Thin infomercial (captured 07/24/2017):

> ON SCREEN:  ARE YOU READY TO LOSE
>> BEFORE and AFTER PHOTOS
>
>     10 lbs
>     20 lbs

24

1           100 lbs

2           WITHOUT GIVING UP YOUR FAVORITE FOODS!

3      NARRATOR:  Are you ready to lose 10, 20, even 100 pounds

4      without giving up your favorite foods or adding any exercise?

5                    ***

6      NARRATOR:  The ingredients in Eupepsia will begin to

7      activate in your system in less than 20 seconds.  In minutes,

8      you'll feel your appetite suppress, giving you control over how

9      much you eat.

10                   ***

11     NARRATOR:  This is exactly what you've been waiting for to

12     help you shed those unwanted pounds.

13       ON SCREEN:  Before photo

14       Danny Lost 45 lbs!

15       From 230 lbs to 185 lbs!

16     DANNY:  Forty-five pounds.  I went from 230 back to 185.

17     ON SCREEN:  Before photo

18     Tricia Lost 20 lbs!

19     From 135 lbs to 115 lbs!

20     TRICIA:  My current weight today is 115 pounds and I feel

21     absolutely amazing.  I am able to, you know, just eat whatever I

22     want and still drink wine as well.

23                   ***

24     ON SCREEN:  YOU HAVE NOTHING TO LOSE.

25     But The Weight!

26     NARRATOR:  With Eupepsia, you have nothing to lose but the

27     weight.

28

25

SPOKESWOMAN 2:  . . .  This one-of-a-kind product will help you lose weight without stepping one foot in the gym or giving up any of your favorite foods.

ON SCREEN:  NO COUNTING CALORIES OR TRACKING FOOD!

SPOKESWOMAN 2:  No counting calories or tracking food and no expensive gym memberships to pay.

                              ***

SPOKESMAN 1: We are so confident that Eupepsia will work for you, it comes with a lifetime guarantee.



                              ***

ON SCREEN:  Before photo 240 lbs
    Karen Lost 90 lbs!
    Now 150 lbs!

KAREN:  I'm half the size I used to be.  I can get in half of these jeans.  That's quite an accomplishment.

                              ***

26

1    ON SCREEN:  Before photo

2    Todd Lost 132 lbs!

3    From 360 lbs to 228 lbs!

4    TODD:  I tell you what, ever since I got the Eupepsia

5    product, I have been amazed.  I lost -- actually, I weighed 360

6    pounds.  I lost 132 pounds on it.  Very easy to do.  And, now,

7    I'm at 228 pounds.

8        And I tell you what, I've never felt better. I feel so good.

9    My body is extremely different now.  I don't fight to breathe.

10   My kidney level is back to normal.  I have no diabetes

11   whatsoever.  I used to take five insulin shots a day.  I no longer

12   have to take nothing for diabetes.  My kidneys are at a good

13   function and I just -- I tell you what, Eupepsia has been

14   awesome.

15          C.    Eupepsia Thin package labeling:

16          •    **Oral Strip**
17               **EASY WEIGHT LOSS**

18               _____

19               **Safe & Effective**
20               Still eat your favorite foods
21               No change in exercise required

22          •    Made in USA
23          •    Clinically proven to help suppress appetite between
24               meals.

25   40.    At least some of the people who provided testimonials in the Eupepsia

26   Thin infomercial were actors who had been paid to appear in the infomercial and

27   

28   

27

who had not used Eupepsia Thin to lose the weight they discussed in their testimonials.

## PROLONGZ ADVERTISING

41.     Defendants have advertised Prolongz through a national television infomercial campaign and on the Internet.  The core message of this advertising has been that Prolongz boosts men's sexual performance, including by lengthening the duration of sex and preventing premature ejaculation.  These materials contain the following statements and depictions, among others:

A.     Excerpts from 2014 Prolongz infomercial:

ON SCREEN:



NARRATOR: Through this special offer, Advanced Men's Institute is giving men the opportunity of a lifetime.

ON SCREEN:          [blinking lights and font]



NARRATOR:  Do you want longer lasting sex?  Do you want more time being intimate with your partner?

NARRATOR:   Do you want to satisfy your partner like never before?  Now it's possible.

ON SCREEN:



NARRATOR:  Thanks to a new first of a kind sexual performance product called Prolongz.

29

B. Excerpts from 2015 prolongz.com website (captured May 16, 2018):

**30 DAY MONEY BACK GUARANTEE!**

**Prolongz is guaranteed to increase your ejaculatory control levels and overall sexual performance. …**

***

LONGER
LASTING
SEX
PROLONGZ

LEVEL THE PLAYING FIELD
WITH PROLONGZ
15-40 Minute Average
2-5 Minute Average
Minutes to reach sexual climax.
20
15
10
5
Male
Female

Extremely effective:
ALL NATURAL - ACTIVE INGREDIENTS
STRIP DELIVERY TECHNOLOGY
PROLONGZ USES ORAL STRIP DELIVERY TECHNOLOGY TO COMBINE A HIGH DOSAGE BLAST OF GINSENG EXTRACT & DAMIANA EXTRACT - WHICH CHANGES PROTEINS IN THE BRAIN THAT INCREASE CONTROL OVER MALE EJACULATION.
The proprietary blend of ingredients in Prolongz reacts with the chemicals in the brain that control the major parts of sexual excitement. Current products on the market are topical anesthetics which don't treat the problem; they only treat the symptom. Prolongz is a FDA registered Over-The-Counter Homeopathic Drug, the strips dissolve in 20 Seconds; combining a high % dosage blast of Damiana & Ginseng.
FAST-ACTING & EASY-TO-USE
NO PRESCRIPTION NEEDED
LONGER LASTING SEX
INCREASED EJACULATION CONTROL TIME
Drug Facts
Active Ingredients (in each strip) Purpose
Damiana Extract 1X (10 mg) ..............Stimulant
Click here to view the complete Drug Facts Panel.
Prolongz™ is a FDA registered OTC homeopathic drug, which helps in the prevention of Premature Ejaculation (PE). It is a first of its kind product which uses Oral (sublingual) dissolvable Strip delivery technology for the treatment of PE.

The proprietary blend of ingredients in Prolongz reacts with the chemicals in the brain that control the major parts of sexual excitement. Current products on the market are topical anesthetics which don't treat the problem; they only treat the symptom. Prolongz is a FDA registered Over-The-Counter Homeopathic Drug, the strips dissolve in 20 Seconds; combining a high % dosage blast of Damiana & Ginseng.

Click here to view the complete Drug Facts Panel.
Prolongz™ is a FDA registered OTC homeopathic drug, which helps in the prevention of Premature Ejaculation (PE). It is a first of its kind product which uses Oral (sublingual) dissolvable Strip delivery technology for the treatment of PE.

C. Excerpts from 2016 prolongz.com website (captured May 16, 2018):



**DEFENDANTS' DECEPTIVE SALES AND BILLING PRACTICES IN
CONNECTION WITH TBX-FREE, EUPEPSIA THIN, AND PROLONGZ**

42.     Defendants' advertising, including websites, infomercials, and social media, lists both website links and toll-free numbers that consumers can use to place orders for TBX-FREE, Eupepsia Thin, and Prolongz ("the Products"). Consumers then purchase the Products through inbound sales calls and website orders.

**Defendants' Failure to Disclose Autoship Programs
at the Time of the Initial Sale**

43.     When consumers order the Products and provide their payment information, Defendants have routinely enrolled them in a continuing autoship program, which is commonly known as a continuity plan, without disclosing, or disclosing adequately, to those consumers either the enrollment, or the terms and conditions of the autoship program.  Defendants' autoship program then makes additional shipments to consumers at regular intervals and Defendants charge the credit or debit cards that consumers provided for their initial purchase for the subsequent shipments.  Thus, if a consumer placed an order for a supply of any of the Products, the Defendants have often repeatedly, and on a continuing basis, charged the consumer for additional product without further authorization.  In numerous instances, Defendants have not disclosed, or have not disclosed adequately, these material terms to consumers before consumers provide their credit or debit card information, and therefore have not obtained consumers' express informed consent to the autoship program and the additional charges.

44.     In the case of website orders for TBX-FREE, Defendants' websites have not disclosed, or have not disclosed adequately, the negative option feature of their autoship program, whereby they interpret consumers' silence or failure to contact them as consumers' tacit acceptance of enrollment and of the receipt of

additional shipments and charges. In numerous instances, when consumers have proceeded to the shopping cart, provided their billing information, and completed the purchase, there has been no adequate disclosure about Defendants' autoship program or that any additional charges would be placed on a consumer's credit or debit card.

45. For telephone orders for the Products, in numerous instances, Defendants' call center representatives similarly have not disclosed that Defendants will enroll consumers automatically into a continuing autoship program that will result in additional shipments and charges to consumers' credit or debit cards. In many cases, consumers have specifically asked not to be enrolled in an autoship program but Defendants did so anyway. In many cases, Defendants' call center employees assured consumers they will not be enrolled in an autoship program but Defendants did so anyway.

46. At the time of the initial sale, Defendants do not disclose, or do not adequately disclose, their terms and conditions for cancellation and refunds for autoshipments before obtaining consumers' billing information. Instead, consumers are later advised by Defendants' customer service representatives that they must request cancellation, obtain a return merchandise authorization ("RMA") number, and mail products back to Defendants at their own expense.

47. In cases in which consumers pay for their initial purchase using debit cards, Defendants have debited consumers' bank accounts for the additional periodic shipments. Defendants did not obtain written authorization signed or similarly authenticated from consumers authorizing the recurring electronic fund transfers from their accounts, and did not subsequently provide consumers with a copy of such a written authorization.

33

**Consumers' Post-Sale Experiences – Unauthorized Charges**

48.     Defendants ship their Products to consumers on a periodic basis and charge their credit or debit cards without consumers' consent for any charge other than the initial purchase.

49.     Consumers must contact Defendants to reject additional shipments and charges and to cancel their undisclosed and unauthorized enrollment in the autoship program.

50.     Defendants' mechanisms for stopping recurring shipments and charges are often not effective.  Consumers are often not able to reach Defendants when they call to stop recurring shipments and charges.  On many occasions when consumers do cancel their enrollment in the autoship program, Defendants continue sending additional shipments and placing additional charges on consumers' credit and debit cards.

51.     Defendants do not honor their money-back guarantees.  Consumers who seek a refund are often told that the charges are not refundable.

**DEFENDANTS' ILLEGAL TELEMARKETING CAMPAIGN**

52.     In February 2018, Defendants caused prerecorded messages, commonly known as robocalls, to be delivered to consumers.  Defendants planned robocall campaigns for multiple products.

53.     Defendants' initial contract with the telemarketing company provided for "ringless voicemails" to be delivered to 1,500,000 consumers.

54.     Defendants disseminated robocalls to targeted groups of consumers, such as men over the age of 40 in the state of California, and delivered prerecorded messages, some of which featured the voice of Individual Defendant Jason Cardiff.

55.     Defendants also conducted a robocall campaign for TBX-FREE using messages featuring the voice of Individual Defendant Eunjung Cardiff.

34

56.     Hundreds of consumers have complained about receiving unsolicited prerecorded messages for Defendants' products.

## DECEPTIVE RENGALIFE EARNINGS CLAIMS

57.     In March 2018, Defendants launched Rengalife, a multi-level marketing program.

58.     Rengalife members advance up the line from Executive to Director, and then to Vice President and Senior Vice President, based on the number of recruits in their downline networks, all of whom are making monthly purchases of at least $199.80 of Redwood Scientific dissolvable film strips via autoship. Members earn "commissions" on the monthly purchases of Redwood products made by recruits who are one, two, and three levels below them in their network, including a 30 percent "commission" on purchases by those team members one level down whom they recruited directly.

59.     Defendants promoted Rengalife through a variety of media, including, but not limited to, online videos featuring Defendant Jason Cardiff.  Defendants' advertising made strong earnings claims for the Rengalife program, including the following statements, among others:

A.     Rengalife.com/network-marketing:

> "**Finally your dreams can become real!**
> It all begins by signing up as a Rengalife member.
> By becoming part of the Rengalife family, you will be on the path to creating your ideal life.  Whether you are looking for a few extra dollars or pursuing an opportunity to replace a full time income, Rengalife has the way."

B.     "Get Started Today" Facebook Live video (posted 4/4/2018):

> PRESENTER [JASON CARDIFF]:  So you pick a package, and if I told you that you could make $2,000 a month, $5,000 a

month, $100,000 a month, we have somebody on pace to make
. . . $100,000 a year.  We've only been live a week and a half.
If I told you you had to make a little tiny investment in product
for yourself to get to the executive level, if I showed you how
to spend $199.80 and you could make [$]5,000 a month, $6,000
a month, is that a good investment?  And you would say, yes, it
is, it's a very good investment.

60.    Defendants represented that Directors are guaranteed a "Minimum
monthly Paid commission [of] $600," Vice Presidents $2,600 per month, and
Senior Vice Presidents $12,600 per month.

61.    Individual Defendant Jason Cardiff put these guarantees in terms of
annual earnings:

Rengalife "New Levels" Vimeo video (captured May 25, 2018):

PRESENTER [JASON CARDIFF]:  . . . That takes you from
executive to director.  That also locks in your annual salary at a
minimum -- a very minimum of $7,200 a year once you go
from that level of executive to director.

***

And at a vice president level, not only do you start to enjoy
some of the super first class bucket list travel, but you also lock
in your annual income at a minimum of over $30,000.

***

The next level is a senior vice president level. . . .  This means
. . . you've locked in your income at $144,000 a year. You're
also receiving the three weeks of first class travel.

62.     Rengalife also promises one-time bonuses as members advance through the ranks.  New Directors receive a $500 bonus, new Vice Presidents $1,200, and new Senior Vice Presidents $10,000.

63.     A Rengalife member must have ten people in his or her network to become a Director, 110 to become a Vice President, and 1,100 to become a Senior Vice President.

64.     Defendants did not have actual earnings data for Rengalife members at the time they made their earnings claims, nor did they have any basis for earnings claims based on the sale of Redwood film strips, because those products have never been sold without deceptive and unfair practices.

65.     The Rengalife program is structured such that, if members follow Defendants' instructions for advancing through the program by recruiting new members, the vast majority of participants will lose money, not earn substantial income.

## VIOLATIONS OF THE FTC ACT

66.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

67.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

68.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.  For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, TBX-FREE, Eupepsia Thin, and Prolongz are "drugs" as defined in Section 15(b) of the FTC Act, 15 U.S.C. § 55(b).

37

## <u>UNSUBSTANTIATED EFFICACY CLAIMS AND FALSE CLAIMS THAT TBX-FREE, EUPEPSIA THIN, AND PROLONGZ ARE CLINICALLY PROVEN TO BE EFFECTIVE</u>

### COUNT I

### FALSE OR UNSUBSTANTIATED EFFICACY CLAIMS FOR TBX-FREE

69.     Through the means described in Paragraph 37, Defendants have represented, directly or indirectly, expressly or by implication, that:

  A.    TBX-FREE is an effective smoking cessation product;

  B.    TBX-FREE is more effective than either nicotine patches or nicotine gum in enabling cigarette smokers to stop smoking;

  C.    TBX-FREE enables many cigarette smokers to quit in seven to ten days;

  D.    TBX-FREE has an 88 percent success rate, including among people who have smoked cigarettes for more than five years; and

  E.    Smokers should not need to purchase more than one month of TBX-FREE.

70.     The representations set forth in Paragraph 69 are false or misleading or were not substantiated at the time the representations were made.

71.     Therefore, the making of the representations as set forth in Paragraph 69 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

**COUNT II**

**FALSE PROOF CLAIMS FOR TBX-FREE**

72. Through the means described in Paragraph 37, Defendants have represented, directly or indirectly, expressly or by implication, that:

A. Clinical studies have been conducted on TBX-FREE, and have shown that TBX-FREE is an effective smoking cessation product;

B. TBX-FREE has been proven in clinical studies to be more effective than nicotine patches or nicotine gum in enabling smokers to stop smoking;

C. Clinical studies of TBX-FREE conducted on 10,600 people have shown that TBX-FREE has an "88% success rate";

D. The New England Journal of Medicine ("NEJM"), Harvard Health Publications, and Johns Hopkins University have published clinical studies proving that TBX-FREE is an effective smoking cessation product; and

E. NEJM's clinical studies showed that TBX-FREE is ten times more effective for smoking cessation than nicotine replacement therapy.

73. The representations set forth in Paragraph 72 are false.

74. Therefore, the making of the representations as set forth in Paragraph 72 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

# COUNT III

## FALSE OR UNSUBSTANTIATED EFFICACY CLAIMS
## FOR EUPEPSIA THIN

75.     Through the means described in Paragraph 39, Defendants have represented, directly or indirectly, expressly or by implication, that:

      A.    Eupepsia Thin is an effective appetite suppressant and weight loss aid;

      B.    Eupepsia Thin starts working in less than 20 seconds, and suppresses a user's appetite within minutes;

      C.    Eupepsia Thin enables users to lose 10, 20, or even 100 pounds without dieting, giving up their favorite foods, or increasing their exercise;

      D.    Eupepsia Thin users can lose 15 pounds their first month without dieting or changing their food or lifestyle;

      E.    Eupepsia Thin users can lose as much as 20 pounds in one month and as much as 50 pounds in three months;

      F.    Eupepsia Thin is more effective at causing weight loss than conventional calorie reduction and meal plans; and

      G.    Eupepsia Thin enables consumers to avoid gaining back weight they lose, without any lifestyle changes.

76.     The representations set forth in Paragraph 75 are false or misleading or were not substantiated at the time the representations were made.

77.     Therefore, the making of the representations as set forth in Paragraph 75 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

**COUNT IV**

**FALSE PROOF CLAIMS FOR EUPEPSIA THIN**

78.    Through the means described in Paragraph 39, Defendants have represented, directly or indirectly, expressly or by implication, that clinical studies have been conducted on Eupepsia Thin and those studies show that it is an effective appetite suppressant and weight loss aid.

79.    The representations set forth in Paragraph 78 are false.

80.    Therefore, the making of the representations as set forth in Paragraph 78 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

**COUNT V**

**FALSE OR UNSUBSTANTIATED EFFICACY**

**CLAIMS FOR PROLONGZ**

81.    Through the means described in Paragraph 41, Defendants have represented, directly or indirectly, expressly or by implication, that:

        A.    Prolongz substantially increases ejaculation control and the duration of sex; and

        B.    Prolongz treats or prevents premature ejaculation.

82.    The representations set forth in Paragraph 81 are false or misleading or were not substantiated at the time the representations were made.

83.    Therefore, the making of the representations as set forth in Paragraph 81 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

1

2

## COUNT VI

## FALSE PROOF CLAIMS FOR PROLONGZ

3

4

84.     Through the means described in Paragraph 41, Defendants have represented, directly or indirectly, expressly or by implication, that Prolongz is clinically proven to increase ejaculation control and the duration of sex for more than 97% of users.

5

6

7

8

85.     The representations set forth in Paragraph 84 are false.

9

86.     Therefore, the making of the representations as set forth in Paragraph 84 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

10

11

12

## ADDITIONAL VIOLATIONS OF THE FTC ACT

13

## COUNT VII

14

## FALSE CLAIMS THAT EUPEPSIA THIN

15

## IS MADE IN THE UNITED STATES

16

17

87.     Through the means described in Paragraph 39, Defendants have represented, directly or indirectly, expressly or by implication, that Eupepsia Thin is made in the United States.

18

19

88.     The representation set forth in Paragraph 87 is false.

20

89.     Therefore, the making of the representation as set forth in Paragraph 87 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

21

22

23

24

25

26

27

28

42

# COUNT VIII

## FALSE CLAIMS THAT TBX-FREE, EUPEPSIA THIN, AND PROLONGZ ARE SOLD WITH MONEY-BACK GUARANTEES

90.    Through the means described in Paragraphs 37, 39, and 41, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who are not satisfied with the Products will get their money back.

91.    The representations set forth in Paragraph 90 are false.  Many consumers who request their money back from Defendants are denied refunds.

92.    Therefore, the making of the representations as set forth in Paragraph 90 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

# COUNT IX

## DECEPTIVE TESTIMONIALS

93.    Through the means described in Paragraph 39, Defendants have represented, directly or indirectly, expressly or by implication, that the product users depicted in the Eupepsia Thin infomercial were actual persons who had successfully used Eupepsia Thin to lose substantial amounts of weight.

94.    In truth and in fact, at least some of the testimonialists who appeared in the infomercial were actors who had been recruited and paid for brief on-screen appearances, and had not used Eupepsia Thin to lose the weight they discussed in the advertising.

95.    Therefore, the making of the representation as set forth in Paragraph 93 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

<center>COUNT X</center>

<center>**FAILURE TO DISCLOSE ADEQUATELY AUTOMATIC ENROLLMENTS**</center>

<center>**IN CONTINUITY PLANS**</center>

96.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Products, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who provide their billing information are placing a product order.

97.     In numerous instances in which Defendants made the representation set forth in Paragraph 96, Defendants failed to disclose, or disclose adequately, that consumers who provided their billing information for a product order would be enrolled automatically in a continuity plan for future autoshipments of the Products that would be charged to their credit or debit cards.  This additional information would be material to consumers in their decision to purchase Defendants' products.

98.     Defendants' failure to disclose, or disclose adequately, the material information described in Paragraph 97, in light of the representation set forth in Paragraph 96, constitutes a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

<center>COUNT XI</center>

<center>**MISREPRESENTATIONS – CONTINUING AUTOSHIP PROGRAM**</center>

99.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Products, Defendants have represented, directly or indirectly, expressly or by implication, that consumers will not be enrolled in an autoship program and that their credit or debit card will be charged only for a one-time purchase of the Products.

100.   The representations set forth in Paragraph 99 are false.  In numerous instances where Defendants have told consumers they will not be enrolled in an autoship program, Defendants have enrolled consumers in an autoship program,

<center>44</center>

charging consumers' credit or debit cards for additional shipments they did not agree to purchase.

101.   Therefore, the making of the representations as set forth in Paragraph 99 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT XII

## UNFAIRLY CHARGING CONSUMERS WITHOUT AUTHORIZATION

102.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of the Products, Defendants have caused charges to be submitted for payment to the credit and debit cards of consumers without the express informed consent of those consumers.

103.   Defendants' acts or practices as set forth in Paragraph 102 cause or are likely to cause substantial injury to consumers that those consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

104.   Therefore, Defendants' acts or practices as set forth in Paragraph 102 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and 45(n).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT (ROSCA)

105.   In 2010, Congress passed ROSCA, 15 U.S.C. §§ 8401-05, which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  15 U.S.C. § 8401.

106.   Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the TSR, 16 C.F.R. § 310.2(w), unless the seller:  (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides a simple mechanism to stop recurring charges.  *See* 15 U.S.C. § 8403.

107.   The TSR defines a negative option feature as:  "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

108.   As described above in Paragraphs 42 through 47, Defendants advertise and sell their Products to consumers through a negative option feature as defined by the TSR.  *See* 16 C.F.R. § 310.2(w).

109.   Under Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT XIII**

**VIOLATIONS OF ROSCA**

110.   In numerous instances, in connection with the selling of TBX-FREE on the Internet through a negative option feature, Defendants have failed to:

    A.    Clearly and conspicuously disclose all material terms of the negative option feature of the Product purchase before obtaining the consumer's billing information;

B. Obtain the consumer's express informed consent to the negative option feature before charging the consumer's credit card or debit card; and/or

C. Provide simple mechanisms for a consumer to stop recurring charges to the consumer's credit card or debit card.

111. Defendants' practices as set forth in Paragraph 110 are a violation of Section 4 of ROSCA, 15 U.S.C. § 8403, and are therefore a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT AND REGULATION E

112. Section 907(a) of the EFTA, 15 U.S.C. § 1693(a), provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." Section 903(10) of EFTA, 15 U.S.C. § 1693a(10), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

113. Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

114. Section 1005.10(b) of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E ("Official Staff Commentary to Regulation E"), 12 C.F.R. § 1005.10(b), Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization."

47

*Id.* ¶ 10(b), cmt. 5.  The Official Staff Commentary to Regulation E further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." *Id.* ¶ 10(b), cmt. 6.

115.   Pursuant to Section 918(c) of EFTA, 15 U.S.C. § 1693o(c), every violation of EFTA and Regulation E constitutes a violation of the FTC Act.

## COUNT XIV

## EFTA AND REGULATION E VIOLATIONS – UNAUTHORIZED DEBITING FROM CONSUMERS' ACCOUNTS

116.   In numerous instances, Defendants debit consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated from consumers for preauthorized electronic fund transfers from their accounts, thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

117.   In numerous instances, Defendants debit consumers' bank accounts on a recurring basis without providing to the consumer a copy of a written authorization signed or similarly authenticated by the consumer for preauthorized electronic fund transfers from the consumer's account, thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

118.   By engaging in violations of EFTA and Regulation E as set forth in Paragraphs 116 and 117, the Defendants have engaged in violations of the FTC Act.  15 U.S.C. § 1693o(c).

## <u>VIOLATIONS OF THE TELEMARKETING SALES RULE</u>

119.   Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively

amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

120.   Under the TSR, a "telemarketer" is any person who, in connection with telemarketing, initiates or receives telephone calls to or from a consumer or donor.  16 C.F.R. § 310.2(ff).

121.   Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.  16 C.F.R. § 310.2(x).

122.   As amended, effective September 1, 2009, the TSR prohibits initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service.  16 C.F.R. §310.4(b)(1)(v).  Calls delivering prerecorded messages are commonly called "robocalls."

123.   Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT XV

## UNLAWFUL PRERECORDED MESSAGES

124.   Through the means described in Paragraphs 52 through 56, as applicable, in numerous instances in connection with telemarketing, Defendants have engaged in initiating or causing the initiation of outbound telephone calls that delivered prerecorded messages to induce the sale of goods or services, in violation of 16 C.F.R. § 310.4(b)(1)(v).

**RENGALIFE**

**COUNT XVI**

**MISREPRESENTATIONS REGARDING EARNINGS**

125.  Through the means described in Paragraphs 57 through 65, Defendants have represented, directly or indirectly, expressly or by implication, that people who become Rengalife members are likely to earn substantial income.

126.  The representation set forth in Paragraph 125 is false, misleading, or was not substantiated at the time the representation was made.

127.  Therefore, the making of the representation as set forth in Paragraph 125 of this Complaint constitutes a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**CONSUMER INJURY**

128.  Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, EFTA, Regulation E, and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

129.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 5 of ROSCA, 15 U.S.C. § 8404, Section 918(c) of EFTA, 15 U.S.C. § 1693o(c), Section 6 of the Telemarketing Act, 15 U.S.C. § 6105, and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access to all corporate premises, and appointment of a receiver.

B.     Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, EFTA, Regulation E, and the TSR, by Defendants;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, ROSCA, EFTA, Regulation E, and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  October 3, 2018

ELIZABETH SANGER
esanger@ftc.gov
JAMES A. PRUNTY

51

1   jprunty@ftc.gov
2   EDWIN RODRIGUEZ
    erodriguez@ftc.gov
3   SHIRA D. MODELL
    smodell@ftc.gov
4   Federal Trade Commission
5   600 Pennsylvania Ave., NW
    Washington, DC 20580
6

7   STACY PROCTER (Local Counsel)
    sprocter@ftc.gov
8   Federal Trade Commission
9   10990 Wilshire Blvd., Suite 400
    Los Angeles, CA 90024
10

11  Attorneys for Plaintiff
12  FEDERAL TRADE COMMISSION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28