# EXHIBIT 3

JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **Federal Trade Commission**, | No. ED CV 18-2104-DMG (PLAx) |
| Plaintiff, | |
| v. | FINAL JUDGMENT INCLUDING PERMANENT INJUNCTION AS TO DEFENDANTS JASON CARDIFF AND EUNJUNG CARDIFF |
| **Jason Cardiff**, et al., | |
| Defendants. | |

On October 3, 2018, Plaintiff, the Federal Trade Commission ("FTC" or the "Commission"), filed its Complaint for Permanent Injunction and Other Equitable Relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401-8405, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, and moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining

order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants Jason Cardiff, Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, Danielle Cadiz, a/k/a Danielle Walker, Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership. [Doc. # 1.]

This Court entered a temporary restraining order ("TRO") on October 10, 2018. [Doc. # 29.] On October 24, 2018, the Court extended the TRO as to Defendants Jason Cardiff and Eunjung Cardiff ("the Cardiffs"). [Doc. # 48.] On November 8, 2018, the Court entered a Preliminary Injunction as to Defendants Jason Cardiff and Eunjung Cardiff. [Doc. # 59.]

On August 6, 2020, the Commission moved for summary judgment as to Defendants Jason Cardiff and Eunjung Cardiff on all counts of the Complaint. [Doc. # 423.] On October 9, 2020, the Court granted summary judgment against the Cardiffs on all sixteen counts in the Commission's Complaint. [Doc. # 511.] The Commission filed a proposed Final Judgment on September 3, 2021. [Doc. # 651.]

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

1.     This Court has jurisdiction over this matter and over the Cardiffs and venue in this district is proper under 15 U.S.C. § 53(b) and 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d).

2.     At all relevant times, the Cardiffs' activities as alleged in the Commission's Complaint were in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

3.     The Complaint charged that Defendants, including Jason Cardiff and Eunjung Cardiff, participated in deceptive and unfair acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, Section 4 of

ROSCA, 15 U.S.C. § 8403, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), Section 1005.10(b) of EFTA's implementing Regulation E, 12 C.F.R. § 1005.10(b), and Section 310.4(b)(1)(v) of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(v), in the marketing of Defendants' oral film strips and the Rengalife multilevel marketing program. The Complaint sought both permanent injunctive relief and equitable monetary relief for the challenged acts or practices.

4.     The Complaint stated a claim upon which relief can be granted against the Cardiffs.

5.     The Cardiffs violated Sections 5(a) and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a) and 52, by making:

    a.     False or unsubstantiated efficacy clams and false proof claims for their oral film strips TBX-FREE, Eupepsia Thin, and Prolongz;

    b.     False money-back guarantee claims for those oral film strips;

    c.     False claims that Eupepsia Thin oral film strips were made in the United States, and that testimonialists appearing in advertising for Eupepsia Thin had used the product to lose weight; and

    d.     False claims that consumers would not be enrolled in an autoship program and that their credit or debit card would be charged only for a one-time purchase of oral film strips.

6.     The Cardiffs violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by:

    a.     Failing to disclose, or disclose adequately, that consumers who provided their billing information for a product order would be enrolled automatically in a continuity plan for future

autoshipments of oral film strips that would be charged to their credit or debit cards; and

     b.    Making false and unsubstantiated claims that people who became Rengalife members were likely to earn substantial income.

7.    The Cardiffs violated Sections 5(a) and 5(n) of the FTC Act, 15 U.S.C. §§ 45(a), 45(n), by causing charges to be submitted for payment to consumers' credit and debit cards without the express informed consent of those consumers.

8.    The Cardiffs violated Section 4 of ROSCA, 15 U.S.C. § 8403, by charging consumers for TBX-FREE oral film strips sold over the Internet through a negative option feature as defined in the TSR, 16 C.F.R. §3102(w) without: (a) clearly and conspicuously disclosing all material terms of the transaction before obtaining the consumer's billing information; (b) obtaining the consumer's express informed consent before making the charge; and (c) providing a simple mechanism to stop recurring charges.

9.    The Cardiffs violated Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), by debiting consumers' bank accounts without first obtaining written authorizations signed or similarly authorized by those consumers for preauthorized electronic fund transfers from their accounts, or providing those consumers a copy of a written authorization signed or similarly authenticated by them.

10.    The Cardiffs violated the TSR by initiating or causing the initiation of outbound telephone calls that delivered prerecorded messages intended to induce the purchase of oral film strips.

11.    The Cardiffs operated the Corporate Defendants as a common enterprise, and the Corporate Defendants were "all involved in the sale of the Products [with] money, products, and employees flow[ing] freely between them." Summary Judgment Order at 20-21 [Doc. # 511]. The Cardiffs were the

"beneficiaries and masterminds" of the common enterprise, and "had knowledge of the misrepresentations in advertising or were recklessly indifferent to the falsity of the misrepresentations." *Id*.

12.    At all times material to the Complaint, both Jason Cardiff and Eunjung Cardiff formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in Findings 5 to 11, above, and both of them are therefore liable for injunctive relief.

13.    At all times material to the Complaint, both Jason Cardiff and Eunjung Cardiff knew of or were recklessly indifferent to the acts and practices set forth in Findings 5 to 11, above.

14.    The danger of future violations by Jason Cardiff and Eunjung Cardiff justifies the issuance of permanent injunctive relief, including banning them from engaging in certain activities.

15.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue injunctive relief for the Defendants' law violations. Section 19 of the FTC Act, § 57b, empowers the Court to grant such relief as it finds necessary to redress injury to consumers from the Defendants' violations of ROSCA and the TSR, including rescission or reformation of contracts and refund of money.

16.    This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

17.    Pursuant to Federal Rule of Civil Procedure 65(d), the provisions of this Order are binding upon Jason Cardiff and Eunjung Cardiff, their successors and assigns, and their officers, agents, employees and attorneys, and upon those persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

18.    Entry of this Order is in the public interest, and there being no just reason for delay, the Clerk is directed to enter judgment in favor of Plaintiff Federal Trade Commission immediately.

**THEREFORE, IT IS ORDERED** as follows:

**DEFINITIONS**

For the purpose of this Order, the following definitions shall apply:

A.     "**Acquirer**" or "**Acquiring Bank**" means a business organization, Financial Institution, or an agent of a business organization or Financial Institution that has authority from an organization that operates or licenses a credit card system (e.g., Visa, MasterCard, American Express or Discover) to authorize Merchants to accept, transmit, or process payment by credit card through the credit card system for money, products, or anything else of value.

B.     "**Billing Information**" means any data that enables any person to access a consumer's account, such as a credit card, debit card, checking, savings, share or similar account, utility bill, or mortgage loan account.

C.     "**Business Venture**" means any written or oral business arrangement, however denominated, whether or not covered by 16 C.F.R. Part 437, that consists of the payment of any consideration for the right or means to offer, sell, or distribute Goods or Services. The definition of Business Venture includes multilevel marketing programs.

D.     "**Charge(s),**" "**Charged,**" **or** "**Charging**" means any attempt to collect money or other consideration from a consumer, including, but not limited to, causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

E.     "**Clear(ly) and conspicuous(ly)**" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

       1.     In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television

6

advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.  A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.  An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.  In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.  The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6.  The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7.  The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8.  When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

F.  "**Covered Product**" means any Dietary Supplement, Food, Drug, or Device.

7

G.    **"Credit Card Laundering"** means: (a) presenting or depositing into, or causing or allowing another to present or deposit into, the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; (b) employing, soliciting, or otherwise causing or allowing a Merchant, or an employee, representative, or agent of a Merchant, to present to or deposit into the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; or (c) obtaining access to the credit card system through the use of a business relationship or an affiliation with a Merchant, when such access is not authorized by the Merchant Account agreement or the applicable credit card system.

H.    **"Credit Card Sales Draft"** means any record or evidence of a credit card transaction.

I.    **"Corporate Defendant(s)"** means Redwood Scientific Technologies, Inc. (CA); Redwood Scientific Technologies, Inc. (NV); Redwood Scientific Technologies, Inc. (DE); Identify, LLC; Advanced Men's Institute Prolongz LLC; Run Away Product, LLC; and Carols Place Limited Partnership, individually, collectively, or in any combination.

J.    **"Defendant(s)"** means all of the named Defendants, individually, collectively, or in any combination.

K.    **"Device"** means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them; (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in humans or other animals; or (3) intended to affect the structure or any function of the body of humans or other

animals; and which does not achieve any of its principal intended purposes through chemical action within or on the body of humans or other animals and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes.

L. "**Dietary Supplement**" means:  (1) any product labeled as a Dietary Supplement or otherwise represented as a Dietary Supplement; or (2) any pill, tablet, capsule, powder, softgel, gelcap, liquid, or other similar form containing one or more ingredients that are a vitamin, mineral, herb or other botanical, amino acid, probiotic, or other dietary substance for use by humans to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of any ingredient described above, that is intended to be ingested, and is not represented to be used as a conventional Food or as a sole item of a meal or the diet.

M. "**Drug**" means:  (1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of humans or other animals; and (4) articles intended for use as a component of any article specified in (1), (2), or (3); but does not include devices or their components, parts, or accessories.

N. "**Essentially Equivalent Product**" means a product that contains the identical ingredients, except for inactive ingredients (e.g., binders, colors, fillers, excipients) in the same form and dosage, and with the same route of administration (e.g., orally, sublingually), as the Covered Product; *provided that* the Covered Product may contain additional ingredients if reliable scientific evidence generally accepted by experts in the field indicates that the amount and combination of

additional ingredients is unlikely to impede or inhibit the effectiveness of the ingredients in the Essentially Equivalent Product.

O.  "**Financial Institution**" means any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956 (12 U.S.C. § 1843(k)). An institution that is significantly engaged in financial activities is a Financial Institution.

P.  "**Food**" means:  (1) any article used for food or drink for humans or other animals; (2) chewing gum; and (3) any article used for components of any such article.

Q.  "**Good(s) or Service(s)**" includes merchandise, products, plans, or programs.

R.  "**Investment Opportunity**" means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

S.  "**Made in the United States**" means any representation, express or implied, that a product, or a specified component thereof, is of U.S.-origin, including a representation that such product is "made," "manufactured," "built," or "produced" in the United States or in America, or any other U.S.-origin claim.

T.  "**Merchant**" means (a) any person or entity engaged in the sale or marketing of any goods or services, or soliciting a charitable contribution, or (b) any person or entity who applies for or obtains Payment Processing services.

U.  "**Merchant Account**" means any account with an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables an individual, a business, or other organization to accept payments of any kind.

V.  "**Negative Option Feature**" means, in an offer or agreement to sell or provide any Good or Service, a provision under which the consumer's silence or

failure to take affirmative action to reject a Good or Service, or to cancel the agreement, is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

W.    "**Payment Processing**" means providing a person or entity, directly or indirectly, with the means used to charge or debit accounts through the use of any payment method or mechanism, including, but not limited to, remotely created payment orders, remotely created checks, ACH debits, or debit, credit, prepaid, or stored value cards. Whether accomplished through the use of software or otherwise, Payment Processing includes, among other things: (a) reviewing and approving Merchant applications for payment processing services; (b) providing the means to transmit sales transactions data from Merchants to Acquiring Banks or other Financial Institutions; (c) clearing, settling, or distributing proceeds of sales transactions from Acquiring Banks or Financial Institutions to Merchants; or (d) processing chargebacks or returned remotely created payment orders, remotely created checks, or ACH checks.

X.    "**Person**" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

Y.    "**Preauthorized Electronic Fund Transfer**" means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

Z.    "**Receiver**" means Robb Evans & Associates, LLC.

## ORDER

## I.    BAN ON NEGATIVE OPTION SALES

**IT IS ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined

11

from the advertising, marketing, promotion, offering for sale, or sale of any Good or Service with a Negative Option Feature.

## II.   BAN ON ROBOCALLS AND RINGLESS VOICEMAILS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from initiating telephone calls delivering prerecorded messages, including ringless voicemails.

## III.   BAN ON MULTILEVEL MARKETING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, facilitating, or advising, are permanently restrained and enjoined from engaging or participating in any multilevel marketing program.

## IV.   BAN ON THE ADVERTISING, MARKETING, PROMOTION, OFFERING FOR SALE, OR SALE OF DISSOLVABLE ORAL FILM STRIPS TO END-USER CONSUMERS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from the advertising, marketing, promotion, offering for sale, or sale of any dissolvable oral film strip to end-user consumers.

## V.   PROHIBITED REPRESENTATIONS:  HEALTH-RELATED CLAIMS REQUIRING HUMAN CLINICAL TESTING FOR SUBSTANTIATION

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling,

advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation that such product:

    A.    Helps users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

    B.    Causes or assists in causing weight loss, including any specific representation about the amount of weight loss;

    C.    Suppresses or helps suppress appetite;

    D.    Causes or assists in causing weight loss without dieting or any change in food or lifestyle;

    E.    Helps users avoid gaining back any weight they lost;

    F.    Increases ejaculation control or the duration of sex;

    G.    Treats or prevents premature ejaculation;

    H.    Cures, mitigates, or treats any disease; or

    I.    Is comparable or superior to other treatments for quitting smoking, weight loss, or sexual performance, or in curing, mitigating, or treating any disease,

unless the representation is non-misleading, and, at the time of making such representation, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable scientific evidence substantiating that the representation is true. For purposes of this Section, competent and reliable scientific evidence must consist of human clinical testing of the product, or of an Essentially Equivalent Product, that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true. Such testing must be: (1) randomized, double-blind, and placebo-controlled; and (2) conducted

13

by researchers qualified by training and experience to conduct such testing. In addition, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as described in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission. Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VI. PROHIBITED REPRESENTATIONS: OTHER HEALTH-RELATED CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation, other than representations covered under the Section of this Order entitled Prohibited Representations: Health-Related Claims Requiring Human Clinical Testing For Substantiation, about the health benefits, performance, efficacy, safety, or side effects of the product, unless the representation is non-misleading, and, at the time of making such representation, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

For purposes of this Section, competent and reliable scientific evidence means tests, analyses, research, or studies (1) that have been conducted and evaluated in an objective manner by experts in the relevant disease, condition, or function to which the representation relates; (2) that are generally accepted by such experts to yield accurate and reliable results; and (3) that are randomized, double-blind, and placebo-controlled human clinical testing of the Covered Product, or of an Essentially Equivalent Product, when such experts would generally require such human clinical testing to substantiate that the representation is true. In addition, when such tests or studies are human clinical tests or studies, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as set forth in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission. Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VII. PRESERVATION OF RECORDS RELATING TO COMPETENT AND RELIABLE HUMAN CLINICAL TESTS OR STUDIES

**IT IS FURTHER ORDERED** that, with regard to any human clinical test or study ("test") upon which Jason Cardiff or Eunjung Cardiff rely to substantiate any claim covered by this Order, they shall secure and preserve all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of the test, including:

A.   All protocols and protocol amendments, reports, articles, write-ups, or other accounts of the results of the test, and drafts of such documents reviewed by the test sponsor or any other person not employed by the research entity;

B.   All documents referring or relating to recruitment; randomization; instructions, including oral instructions, to participants; and participant compliance;

15

C.      Documents sufficient to identify all test participants, including any participants who did not complete the test, and all communications with any participants relating to the test; all raw data collected from participants enrolled in the test, including any participants who did not complete the test; source documents for such data; any data dictionaries; and any case report forms;

D.      All documents referring or relating to any statistical analysis of any test data, including any pretest analysis, intent-to-treat analysis, or between-group analysis performed on any test data; and

E.      All documents referring or relating to the sponsorship of the test, including all communications and contracts between any sponsor and the test's researchers.

*Provided, however*, the preceding preservation requirement does not apply to a reliably reported test, unless the test was conducted, controlled, or sponsored, in whole or in part by: (1) Jason Cardiff or Eunjung Cardiff; (2) their officers, agents, representatives, or employees; (3) any other person or entity in active concert or participation with Jason Cardiff or Eunjung Cardiff; (4) any person or entity affiliated with or acting on behalf of Jason Cardiff or Eunjung Cardiff; (5) any supplier of any ingredient contained in the product at issue to any of the foregoing or to the product's manufacturer; or (6) the supplier or manufacturer of such product.

For purposes of this Section, "reliably reported test" means a report of the test has been published in a peer-reviewed journal, and such published report provides sufficient information about the test for experts in the relevant field to assess the reliability of the results.

For any test conducted, controlled, or sponsored, in whole or in part, by or on behalf of, Jason Cardiff or Eunjung Cardiff, they must establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of any personal information collected from or about participants.  These procedures must

16

be documented in writing and must contain administrative, technical, and physical safeguards appropriate to the size and complexity of the entity sponsoring the test, the nature and scope of that entity's activities, and the sensitivity of the personal information collected from or about the participants.

## VIII.  PROHIBITED REPRESENTATIONS:  TESTS, STUDIES, OR OTHER RESEARCH

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration:

    A.    That the product is clinically proven to:

        1.    Help users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

        2.    Cause or assist in causing weight loss, including any specific representation about the amount of weight loss;

        3.    Suppress or help suppress appetite;

        4.    Cause or assist in causing weight loss without dieting or any change in food or lifestyle;

        5.    Help users avoid gaining back any weight they lost;

        6.    Increase ejaculation control or the duration of sex;

        7.    Treat or prevent premature ejaculation; or

        8.    Be comparable or superior to other treatments for quitting smoking.

    B.    That the performance or benefits of the product are scientifically or

clinically proven or otherwise established; or

C.    The existence, contents, validity, results, conclusions, or interpretations of any test, study, or other research.

## IX.    FDA-APPROVED CLAIMS

**IT IS FURTHER ORDERED** that nothing in this Order prohibits Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, or all other persons in active concert or participation with any of them from:

A.    For any Drug product, making a representation that is approved for inclusion in labeling for such Drug product under a new drug application or biologics license application approved by the Food and Drug Administration, or, for any nonprescription Drug product authorized by Section 505G of the Food, Drug, and Cosmetics Act, 21 U.S.C. § 355h, ("FDCA") to be marketed without an approved new drug application, making a representation that is permitted or required to appear in its labeling in accordance with Section 505G(a)(1)-(3) of the FDCA, 21 U.S.C. § 355h(a)(1)-(3), or a final administrative order under Section 505G(b) of the FDCA, 21 U.S.C. § 355h(b); and

B.    For any product, making a representation that is specifically authorized for use in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990 or permitted under Sections 303-304 of the Food and Drug Administration Modernization Act of 1997.

## X.    PROHIBITED MISREPRESENTATIONS:  ENDORSEMENTS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from making, or assisting others

18

in making, any misrepresentation, expressly or by implication, (1) about the status of any endorser or person providing a review of the Good or Service, including a misrepresentation that the endorser or reviewer is an independent or ordinary user of the Good or Service, or (2) that any person or organization has endorsed any Good or Service.

## XI.     PROHIBITED MISREPRESENTATIONS:  U.S. ORIGIN CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, or any other product, are permanently restrained and enjoined from making, or assisting others in making, any representation, expressly or by implication, that it is Made in the United States unless:

A.     The final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States; or

B.     A Clear and Conspicuous qualification appears immediately adjacent to the representation that accurately conveys the extent to which the product contains foreign parts, ingredients or components, and/or processing; or

C.     For a claim that a product is assembled in the United States, the product is last substantially transformed in the United States, the product's principal assembly takes place in the United States, and United States assembly operations are substantial.

## XII.     PROHIBITED REPRESENTATIONS:  EARNINGS CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert

or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, or sale of any Good or Service, including Business Ventures or Investment Opportunities, are permanently restrained and enjoined from:

A.　Misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, any material fact, including:

1.　That participants will or are likely to achieve substantial sales or earn substantial income or profit;

2.　The amount of sales, income, or profit that participants have actually earned;

3.　The amount of time or effort required to earn an amount of compensation or to advance; or

4.　The total costs or any material restrictions, limitations, or conditions;

B.　Making any representation, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, regarding the amount of sales, income, or profit that a participant can expect to earn, including that participants will or are likely to achieve substantial sales or earn substantial income or profit, unless the representation is non-misleading, and, at the time it is made, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable evidence that is sufficient to substantiate that the representation is true.

## XIII.　PROHIBITED MISREPRESENTATIONS:　OTHER MATERIAL FACTS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert

or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration, any material fact concerning such Good or Service, including:

    A.     The success rate or rate of customer satisfaction;

    B.     The total costs;

    C.     Any refund policy;

    D.     Any material restrictions, limitations, or conditions, including any conditions that might limit certain consumers' ability to obtain the full benefits of the proffered Good or Service;

    E.     Any material aspect of its performance, efficacy, nature, or central characteristics, including that the benefits of the proffered Good or Service can be obtained quickly or easily;

    F.     Any cost to the consumer to purchase, receive, use, or return the Good or Service;

    G.     That the consumer will not be Charged for any Good or Service;

    H.     That a Good or Service is offered on a "free," "trial," "sample," "bonus," "gift," "no obligation," or "discounted" basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge;

    I.     The timing or manner of any Charge or bill;

    J.     That the consumer can obtain a Good or Service for a processing, service, shipping, handling, or administrative fee with no further obligation;

K.   The purpose(s) for which the consumer's Billing Information will be used;

L.   The date by which the consumer will incur any obligation or be Charged unless the consumer takes affirmative steps to prevent or stop such a Charge;

M.   That a transaction has been authorized by the consumer; or

N.   Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the Good or Service.

## XIV.  PROHIBITIONS CONCERNING REFUNDS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from failing to honor a refund, return, or cancellation request that complies with any policy to make refunds or allow returns or cancellations.

## XV.  PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.   Credit Card Laundering;

B.   Making, or assisting others in making, directly or by implication, any false or misleading statement in order to obtain Payment Processing services;

C.   Failing to disclose to an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables a person to accept payments of any kind any material

22

information related to a Merchant Account including, but not limited to, the identity of any owner, manager, director, or officer of the applicant for or holder of a Merchant Account, and any connection between an owner, manager, director, or officer of the applicant for or holder of a Merchant Account and any third person who has been or is placed in a Merchant Account monitoring program, had a Merchant Account terminated by a payment processor or a Financial Institution, or has been fined or otherwise disciplined in connection with a Merchant Account by a payment processor or a Financial Institution; and

       D.     Engaging in any tactics to avoid fraud-and-risk-monitoring programs established by any Financial Institution, Acquiring Bank, or the operators of any payment system, including, but not limited to, tactics such as balancing or distributing sales transactions among multiple Merchant Accounts or merchant billing descriptors; splitting a single sales transaction into multiple smaller transactions; or using a shell company to apply for a Merchant Account.

## XVI. PROHIBITION AGAINST UNAUTHORIZED CHARGES

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, promotion, offering for sale, or sale of any Good or Service, are permanently restrained and enjoined from Charging, causing to be Charged, assisting others in Charging, or attempting to Charge any consumer, without obtaining the consumer's express informed consent to the Charge and having created and maintained a record of such consent.

## XVII. PROHIBITION AGAINST DEBITING CONSUMERS' BANK ACCOUNTS WITHOUT AUTHORIZATION

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether

acting directly or indirectly, in connection with the sale of any Good or Service, are permanently restrained and enjoined from:

        A.     Failing to timely obtain written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account before initiating any Preauthorized Electronic Fund Transfer; and

        B.     Failing to provide to the consumer a copy of a valid written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account.

## XVIII.   CUSTOMER INFORMATION

        **IT IS FURTHER ORDERED** that:

        A.     Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

              1.     Disclosing, using, or benefitting from, or assisting others in disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that Corporate Defendants obtained prior to entry of this Order in connection with the advertising, promotion, offering for sale, or sale of Defendants' oral film strips or Rengalife; and

              2.     Failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after entry of this Order.

*Provided, however*, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

B.     Upon termination of the receivership, the Receiver shall not return any customer information to the Defendants.

## XIX.  ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff obtain acknowledgments of receipt of this Order:

A.     Jason Cardiff and Eunjung Cardiff, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.     For 20 years after entry of this Order, Jason Cardiff and Eunjung Cardiff for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, must deliver a copy of this Order  to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which Jason Cardiff or Eunjung Cardiff delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XX.  COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff make timely submissions to the Commission:

A.     One year after entry of this Order, Jason Cardiff and Eunjung Cardiff must each submit a compliance report, sworn under penalty of perjury.  Each of them must:

1.     Identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences;

2.     Identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest;

3.     Describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership;

4.     Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

5.     Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

6.     Describe the activities of each business, including the Goods or Services offered, the means of manufacturing, labeling, advertising, promotion, offering for sale, sale or distribution, and the involvement of any other Defendant (which Jason Cardiff and Eunjung Cardiff must describe if they know or should know due to their own involvement);

7.     Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

8.     Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.     For 20 years after entry of this Order, Jason Cardiff and Eunjung Cardiff must each submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.    Name, including aliases or fictitious name, or residence address;

2.    Title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity;

3.    Any designated point of contact; or

4.    The structure of any entity that such Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.    Jason Cardiff and Eunjung Cardiff must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.    Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.    Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The subject line must begin:  FTC v. Jason Cardiff, et al., X190001.

27

## XXI.  RECORDKEEPING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff must create certain records for 20 years after entry of the Order, and retain each such record for 5 years.  Specifically, Jason Cardiff and Eunjung Cardiff, for any business that such Defendant, individually or collectively with any other Defendants, is a majority owner or controls directly or indirectly, must create and retain the following records:

> A.  Accounting records showing the revenues from all Goods or Services sold;

> B.  Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

> C.  Records of all consumer complaints and refund requests concerning the subject matter of this Order, whether received directly or indirectly, such as through a third party, and any response;

> D.  All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

> E.  A copy of each unique advertisement or other marketing material.

## XXII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Jason Cardiff and Eunjung Cardiff's compliance with this Order:

> A.  Within 14 days of receipt of a written request from a representative of the Commission, Jason Cardiff and Eunjung Cardiff each must:  submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.  The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of

Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.    For matters concerning this Order, the Commission is authorized to communicate directly with Jason Cardiff and Eunjung Cardiff.  Jason Cardiff and Eunjung Cardiff must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview.  The person interviewed may have counsel present.

C.    The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D.    Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Jason Cardiff and Eunjung Cardiff, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## XXIII.   EXPIRATION OF PRELIMINARY INJUNCTION PROVISIONS

A.    Upon entry of this Order, the provisions of the Preliminary Injunction [Doc. # 59], including the asset freeze and receivership, shall expire, except to the extent provided in the Court's February 28, 2022 Order regarding discharge of the Receiver [Doc. # 702].  Upon the Receiver's completion of the tasks described in paragraphs 5 through 11 of that Order, and the Court's approval of the Receiver's final report, the Receiver will be discharged for all purposes.

## XXIV.   RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this 1st day of March, 2022.**

**DOLLY M. GEE**
**UNITED STATES DISTRICT JUDGE**