Stephen G. Larson (SBN 145225)
slarson@larsonllp.com
Hilary Potashner (SBN 167060)
hpotashner@larsonllp.com
Jonathan Gershon (SBN 306979)
jgershon@larsonllp.com
**LARSON LLP**
555 South Flower Street, 30th Floor
Los Angeles, California 90071
Telephone:(213) 436-4888
Facsimile: (213) 623-2000

Attorneys for Defendant
JASON EDWARD THOMAS CARDIFF

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 5:23-CR-00021-JGB |
|---|---|
| Plaintiff, | **EXHIBIT NOS. 72-90 TO DECLARATION OF STEPHEN G. LARSON IN SUPPORT OF MOTION TO DISMISS INDICTMENT WITH PREJUDICE** |
| vs. | |
| JASON EDWARD THOMAS CARDIFF, | **VOLUME 5 OF 5** |
| Defendant. | [*Filed concurrently with Motion to Dismiss Indictment with Prejudice; Declaration of Stephen G. Larson; and [Proposed] Order*] |
| | Date:        May 6, 2024<br>Time:        2:00 p.m.<br>Courtroom:    1 |

**INDEX OF EXHIBITS TO DECLARATION OF STEPHEN G. LARSON IN SUPPORT OF MOTION TO DISMISS INDICTMENT WITH PREJUDICE**

| EXH. NO. | DESCRIPTION |
|---|---|
| 1 | ████████████████████████████████████████ dated July 17, 2018 to October 2, 2022. |
| 2 | ██████████████████████████████████ Bates Number GOV005_00000495. |
| 3 | ███████████████████████████████████████████, Bates Number GOV005_00000376. |
| 4 | █████████████ Bates Number GOV005_00000475. |
| 5 | █████████████████████, Bates Number GOV005_00000378. |
| 6 | █████████████████████, Bates Number GOV005_00000498. |
| 7 | █████████████████████, Bates Number GOV005_00000539. |
| 8 | ██████████████████████, Bates Number GOV005_00000507. |
| 9 | ██████████████████████, Bates Number GOV005_00000509. |
| 10 | ██████████████████████, Bates Number GOV_MOI_001552–53. |
| 11 | FTC's Complaint for Permanent Injunction and Other Equitable Relief, filed on October 10, 2018, Case No. 5:18-cv-02104-DMG-PLA ("FTC Action"), ECF No. 1. |
| 12 | ████████████████████████████ Bates Number GOV005_00000424. |

| EXH. NO. | DESCRIPTION |
|---|---|
| 13 | FTC's Ex Parte Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief, filed on October 10, 2018, FTC Action, ECF No. 29. |
| 14 | Excerpt of Receiver's Declarations of Brick Kane and Craig A. Welin in Support of Application for Receiver's Counsel's Fees and Expenses, filed on January 7, 2019, FTC Action, ECF No. 81-1. |
| 15 | ███████████████████████████████████, Bates Number GOV005_00000425. |
| 16 | ██████████████████████████, Bates Number GOV_MOI_001092–93. |
| 17 | FTC's Preliminary Injunction with Asset Freeze, Receiver, and Other Equitable Relief Against Jason Cardiff and Eunjung Cardiff, filed on November 8, 2018, FTC Action, ECF No. 59. |
| 18 | ███████████████████████, Bates Number GOV005_00000513. |
| 19 | Receiver's Notice of Application and Application for Order Approving Receiver's Counsel's Fees and Expenses, FTC Action, ECF No. 81. |
| 20 | ████████████████████████████████, Bates Number GOV005_00000453. |
| 21 | ██████████████████████████, Bates Number GOV005_00000451. |
| 22 | ██████████████████████ Bates Number GOV005_00000448. |
| 23 | ██████████████████████C, Bates Number GOV005_00000426. |
| 24 | ██████████████████████████████████ Bates Number GOV005_00000477. |
| 25 | ████████████████████████████, Bates Number GOV005_00000579. |

LARSON
LOS ANGELES

| EXH. NO. | DESCRIPTION |
|---|---|
| 26 | Joint Motion for Protective Order filed on September 23, 2019, FTC Action, FTC Action, ECF No. 218. |
| 27 | Stipulated Protective Order filed on September 24, 2019, FTC Action, FTC Action, ECF No. 219. |
| 28 | ██████████████████████ Bates Number GOV005_00000061. |
| 29 | ███████████████████████████████ ██████, Bates Number GOV005_00000375. |
| 30 | ████████████████, Bates Number GOV005_00000377. |
| 31 | ██████████████████████████████, Bates Number GOV005_00000086. |
| 32 | ████████████████████████████, Bates Number GOV005_00000063. |
| 33 | ████████████████████████████, Bates Number GOV005_00000121. |
| 34 | ███████████████████, Bates Number GOV005_00000073. |
| 35 | ████████████████████████ Bates Number GOV005_00000155. |
| 36 | ███████████████████████████, Bates Number GOV005_00000096. |
| 37 | █████████████████████, Bates Number GOV005_00000131. |
| 38 | ██████████████████████████, Bates Number GOV005_00000002. |
| 39 | ████████████████ Bates Number GOV005_00000038. |
| 40 | █████████████████████, Bates Number GOV_MOI_000972. |

EXHIBITS TO DECLARATION OF STEPHEN LARSON IN SUPPORT OF MOTION TO DISMISS INDICTMENT WITH PREJUDICE

| EXH. NO. | DESCRIPTION |
|---|---|
| 41 | ████████████████████, Bates Number GOV005_00000199. |
| 42 | ██████████████████████ Bates Number GOV005_00000005. |
| 43 | ████████████████████████, Bates Number GOV005_00000168. |
| 44 | ███████████████████████, Bates Number GOV005_00000198. |
| 45 | ████████████████████, Bates Number GOV005_00000006. |
| 46 | ████████████████████████, Bates Number GOV005_00000565. |
| 47 | ██████████████████████ Bates Number GOV005_00000191. |
| 48 | Excerpt of Cardiff's Ex Parte Opposed Application filed on July 13, 2020, FTC Action, ECF No. 391. |
| 49 | FTC's Opposition to Ex Parte Application filed on July 14, 2020, FTC Action, ECF No. 395. |
| 50 | ███████████████████████, Bates Number GOV005_00000190. |
| 51 | Order Denying Ex Parte Application filed on July 16, 2020, FTC Action, ECF No. 403. |
| 52 | █████████████████████ Bates Number GOV005_00000233. |
| 53 | ███████████████████████, Bates Number GOV001_00010766–71. |
| 54 | ████████████████, Bates Number GOV001_00001876–82. |
| 55 | ██████████████████, Bates Number GOV001_00014341–45. |

LARSON
LOS ANGELES

| EXH. NO. | DESCRIPTION |
|---|---|
| 56 | ██████████████████████████████████████, Bates Number GOV001_00002003–23. |
| 57 | ██████████████████████████████████, Bates Number GOV001_00002203–26. |
| 58 | ████████████████████████████████████, Bates Number GOV001_00010849–69. |
| 59 | ████████████ Bates Number GOV001_00011061–62. |
| 60 | ██████████ Bates Number GOV005_00000201. |
| 61 | ██████████ Bates Number GOV005_00000018. |
| 62 | ███████████████████ Bates Number GOV005_00000051. |
| 63 | ████████████ Bates Number GOV005_00000020. |
| 64 | █████████████████████████████ Bates Number GOV005_00000140. |
| 65 | Receiver's Declarations of Brick Kane and Michael Gerard Fletcher, filed on September 2, 2020, FTC Action, ECF No. 479-1. |
| 66 | █████████████████████████, Bates Number GOV005_00000186. |
| 67 | ██████████████████████████████, Bates Number GOV005_00000182. |
| 68 | In Chambers—Order re Cross-Motions for Summary Judgment filed on October 9, 2020, FTC Action, ECF No. 511. |
| 69 | █████████████████████████████████, Bates Number GOV005_00000117. |
| 70 | ███████████████████████████, Bates Number GOV005_00000144. |

LARSON
LOS ANGELES

| EXH. NO. | DESCRIPTION |
|---|---|
| 71 | Receiver's Declarations of Brick Kane and Michael Gerard Fletcher, filed on January 8, 2021, FTC Action, ECF No. 537-1. |
| 72 | ███████████████████████ Bates Number GOV005_00000181. |
| 73 | ██████████████████████, Bates Number GOV005_00000029. |
| 74 | ████████████████████████████ Bates Number GOV005_00000266. |
| 75 | ███████████████████████, Bates Number GOV_MOI_000310. |
| 76 | ██████████████████████████████, Bates Number GOV001_00029793–29811. |
| 77 | In Chambers - Order re Remedies filed on June 29, 2021, FTC Action, ECF No. 627. |
| 78 | ███████████████████████, Bates Number GOV005_00000290. |
| 79 | ██████████████████████, Bates Number GOV_MOI_001077–91. |
| 80 | ████████████████████████████ Bates Number GOV_MOI_001794–95. |
| 81 | In Chambers—Order Setting Dates filed August 26, 2021, FTC Action, ECF No. 650. |
| 82 | FTC's [Proposed] Final Judgment Including Permanent Injunction filed on September 3, 2021, FTC Action, ECF No. 651. |
| 83 | ███████████████████████ Bates Number GOV005_00000285. |
| 84 | Final Judgment Including Permanent Injunction as to Defendants Jason Cardiff and Eunjung Cardiff filed on March 1, 2022, FTC Action, ECF No. 706. |

| EXH. NO. | DESCRIPTION |
|---|---|
| 85 | Receiver's Final Report and Accounting, and Notice of Receiver's Final Fee Application filed on September 14, 2022, FTC Action, ECF No. 715. |
| 86 | Receiver's Declarations of Antia Jen and Michael Gerard Fletcher filed on September 14, 2022, FTC Action, ECF No. 715-1. |
| 87 | ███████████████████████, Bates Number GOV005_00000270. |
| 88 | Order Approving the Receiver's Final Report and Accounting filed on September 30, 2022, FTC Action, ECF No. 716. |
| 89 | ███████████████████████████, Bates Number GOV005_00000269. |
| 90 | Plaintiff's Memorandum in Support of its Motion for Summary Judgment filed on August 6, 2020, FTC Action, ECF No. 423-2. |

# EXHIBIT 72
## TO THE DECLARATION OF STEPHEN G. LARSON

[Redacted - Document Conditionally Filed Under Seal]

# EXHIBIT 73
## TO THE DECLARATION OF STEPHEN G. LARSON

[Redacted - Document Conditionally Filed Under Seal]

# EXHIBIT 74
## TO THE DECLARATION
## OF STEPHEN G. LARSON

[Redacted - Document Conditionally Filed Under Seal]

# EXHIBIT 75
## TO THE DECLARATION OF STEPHEN G. LARSON

[Redacted - Document Conditionally Filed Under Seal]

# EXHIBIT 76
## TO THE DECLARATION OF STEPHEN G. LARSON

[Redacted - Document Conditionally Filed Under Seal]

# EXHIBIT 77

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 1 of 13 |
|---|---|---|---|

Present: The Honorable    DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Appellant(s) | Attorneys Present for Appellee(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER RE REMEDIES IN PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [423] AND JASON AND EUNJUNG CARDIFF'S MOTION FOR SUMMARY JUDGMENT [441]**

**I.**
**INTRODUCTION**

On October 9, 2020, the Court granted summary judgment to Plaintiff the Federal Trade Commission ("FTC") on all 16 counts of the FTC's Complaint against Defendants Jason Cardiff and Eunjung Cardiff under the FTC Act, Restore Online Shoppers' Confidence Act ("ROSCA"), Electronic Fund Transfer Act ("EFTA"), and the Telemarketing Sales Rule ("TSR"). Motion for Summary Judgment ("MSJ") Order at 27-28 [Doc. # 511.][1] The Court reserved ruling on the appropriate remedies until after the United States Supreme Court decided the consolidated appeals in *F.T.C. v. Credit Bureau Center*, 937 F.3d 764 (7th Cir. 2019), *cert. granted*, 2020 WL 3865251 (U.S. July 9, 2020), and *F.T.C. v. AMG Capital Management, LLC*, 910 F.3d 417 (9th Cir. 2018), *cert. granted*, 2020 WL 3865250 (U.S. July 9, 2020), and thus the remedies portions of both the FTC's and the Cardiffs' MSJs remain pending. *See* FTC MSJ [Doc. # 423]; Cardiff MSJ [Doc. # 441]. Also pending is the FTC's Motion for Default Judgment against Defendants Redwood Scientific Technologies Inc. (CA); Redwood Scientific Technologies (NV); Redwood Scientific Technologies (DE); Identify, LLC; Advanced Mens Institute Prolongz LLC; Run Away Products LLC; Carols Place Limited Partnership (the "Entity Defendants"), business entities controlled by the Cardiffs. [Doc. # 422.]

On April 22, 2021, the Supreme Court issued its decision on the consolidated appeals in *AMG Capital Management v. F.T.C.* ("*AMG*"), 141 S. Ct. 1341 (2021), holding that the FTC cannot seek equitable monetary relief such as restitution or disgorgement under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). *See AMG*, 141 S. Ct. at 1352. But the Court in *AMG* also specified that "[n]othing" in its opinion "prohibits the Commission from using its authority under § 5 and §

---

[1] All page references herein are to page numbers inserted by the CM/ECF system.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | June 29, 2021 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 2 of 13 |

19 [of the FTC Act] to obtain restitution on behalf of consumers." *Id.* And the FTC still "may use § 13(b) to obtain injunctive relief . . . when it seeks only injunctive relief." *Id.* at 1349.

In light of the *AMG* ruling, the FTC no longer seeks any monetary relief under Section 13(b). But the parties dispute whether the FTC may seek monetary relief under Section 19 of the FTC Act and what injunctive relief is still available. In accordance with the briefing schedule the Court set on May 4, 2021, the FTC filed its supplemental brief regarding remedies on May 21, 2021. [Doc. # 596.] The Cardiffs filed their response on June 8, 2021. [Doc. # 607.] Also responding to the FTC are non-parties True Pharmastrip, Inc. ("TPI") and Jacques Poujade [Doc. # 604] and Inter/Media Time Buying Corporation ("Inter/Media") [Doc. # 606]. The FTC filed its reply on June 21, 2021. [Doc. # 620.] The Court held a hearing on June 28, 2021.

For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** each side's MSJ with respect to remedies.

## II.
## DISCUSSION

### A.      ROSCA and Sections 18 and 19 of the FTC Act

The FTC asserts that it may seek, and the Court may award, injunctive and monetary relief for the Cardiffs' violations of ROSCA. As the Court noted in its MSJ order, Congress passed ROSCA, 15 U.S.C. §§ 8401-05, to promote consumer confidence in online commerce. MSJ Order at 26 [Doc. # 511]. Section 4 of ROSCA generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, which is defined as "an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w); *see* 15 U.S.C. § 8403. A seller may only use a negative option feature if the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides a simple mechanism to stop recurring charges. 15 U.S.C. § 8403. The Court found no genuine dispute of material fact that the Cardiffs and their companies employed a negative option feature in which consumers were enrolled in a monthly autoship program that shipped the smoking cessation product TBX-FREE to them without consent. Consumers had to take an affirmative step to cancel the autoship program, and even when they took such a step, they

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | | Date | June 29, 2021 |
|---|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | | Page | 3 of 13 |
|---|---|---|---|---|

were not always able to effectuate a cancellation. Accordingly, the Court granted summary judgment to the FTC on its cause of action for violation of ROSCA. MSJ Order at 26.

ROSCA authorizes the FTC to enforce ROSCA and to treat violations of the statute as a rule violation under Section 18 of the FTC Act, 15 U.S.C. § 57a, which authorizes the FTC to prescribe rules defining unfair or deceptive acts or practices. 15 U.S.C. § 8404(a). When consumers are injured by violations of rules prescribed by Rule 18, the FTC may pursue recovery for those consumers in a suit under Section 19 of the FTC Act, 15 U.S.C. § 57b.

Section 19, in turn, specifies when the FTC may bring suit against individuals or entities for unfair or deceptive acts or practices and what relief the FTC may seek. The FTC may commence a civil action against any person or entity that violates a *rule* respecting unfair or deceptive acts or practices prescribed by the FTC, without first issuing a cease-and-desist letter. 15 U.S.C. § 57b(a)(1). The FTC may also commence a civil action against a person or entity committing *any* unfair or deceptive act or practice, but only after first issuing a cease-and-desist letter. *Id.* § 57b(a)(2). Because Congress designated a violation of ROSCA as a rule violation under the FTC Act, it may be enforced via a direct suit under the language of Section 19, without the need for a final cease-and-desist letter. *Id.* at §§ 8404(a) and 57b(a)(1).

Section 19 provides that a court in an enforcement action may "grant such relief as the court finds necessary to redress injury to consumers . . . resulting from the rule violation." *Id.* § 57b(b). The available relief is broadly defined:

> Such relief may include, but shall not be limited to, *rescission or reformation of contracts, the refund of money or return of property, the payment of damages,* and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages.

*Id.* (emphasis added). This language plainly authorizes the FTC to seek equitable monetary relief to redress consumer injury resulting from ROSCA violations.

The key questions now are whether the FTC adequately pled or waived its request for equitable monetary relief under Section 19 for ROSCA violations, and whether it may rely on late-disclosed evidence at a trial on damages.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 4 of 13 |

**B.     Availability of ROSCA Remedies**

The Cardiffs argue that remedies for ROSCA violations are unavailable because the FTC (1) failed to specifically invoke Section 19 remedies in its Complaint; (2) failed to timely disclose its damages calculations and new witnesses under Federal Rule of Civil Procedure 26, thereby justifying sanctions under Rule 37; and (3) is judicially estopped from altering its position expressed in oral argument before the Ninth Circuit. Cardiff Br. at 10-22 [Doc. # 607]. The Court first determines whether the ROSCA remedies are adequately pled or judicially estopped before turning to the impact of the FTC's late disclosure of evidence.

**1.     Adequacy of Pleading**

The Complaint gave notice of the facts underlying the FTC's ROSCA claim and specifies that a ROSCA claim qualifies as a rule violation under Section 18 of the FTC Act. Compl. at ¶¶ 109, 111 [Doc. # 1]. Although the Complaint does not cite the portion of Section 18 that authorizes the FTC to file an action and seek relief under Section 19, the Prayer for Relief specifically mentions Section 5 of ROSCA, 15 U.S.C. § 8404, as authority for a permanent injunction to prevent future violations of ROSCA, as well as "rescission or reformation of contacts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies." *Id*. at 51 (Prayer for Relief). Because Section 19 merely provides for methods of enforcement and the nature of relief for violations under Section 18, the FTC did not need to specifically cross-reference Section 19 to put Defendants on notice of the factual basis for the ROSCA claim and the remedy sought thereunder. *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) (holding that notice pleading requires a plaintiff to set forth claims for relief, not to cite specific statutes or legal theories). The Complaint therefore sufficiently ties the FTC's factual allegations and claims for relief to the ROSCA violation, and invocation of Section 18 put Defendants on notice of the methods of enforcement and nature of relief available under Section 19. Moreover, Federal Rule of Civil Procedure 54 provides that "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c); *see Cabrera v. Martin*, 973 F.2d 735, 745 (9th Cir. 1992).

No pleading deficiency bars the FTC from seeking rescission of autoship and damages from the Cardiffs under Section 19 of the FTC Act.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 5 of 13 |

### 2. Judicial Estoppel

The Cardiffs argue that the FTC is judicially estopped from pursuing remedies under Section 19 due to statements made by its appellate counsel Mark Hegedus before the Ninth Circuit. During the oral argument of Jason Cardiff and Intervenor VPL Medical, Inc.'s ("VPL") appeal of the preliminary injunction against VPL, a member of the panel asked Hegedus if the FTC had invoked Section 19 in the case as a "safety net." *FTC v. Cardiff*, Recording of Oral Argument, No. 20-55858, at 20:00, (9th Cir. March 2, 2021) available at https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000018909 (last accessed June 25, 2021). He responded, "We have not invoked Section 19 in this, Your Honor." *Id.* at 20:10. Although the Cardiffs characterize Hegedus' statement as a "judicial admission," judicial admissions are generally conceded issues of fact, not of law. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) (*en banc*) ("[S]tatements of fact contained in a brief may be considered admissions of the party in the discretion of the district court.").

Hegedus' statement is more accurately analyzed under the doctrine of judicial estoppel, which prohibits a party from assuming a certain position in a legal proceeding, succeeding in maintaining that position, and then adopting a contrary position after his interests have changed. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The rule "generally prevents a party from *prevailing* in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n.8 (2000) (emphasis added). Courts have discretion to apply judicial estoppel and are generally guided by three factors: (1) the party's later position must be "clearly inconsistent" with its earlier position; (2) judicial acceptance of an inconsistent later position would "create the perception that either the first or the second court was misled"; and (3) the party asserting the inconsistent position would derive an "unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51 (citations omitted).

It is not clear that judicial estoppel applies in this context, where the FTC did not prevail in that appeal. In addition, ROSCA remedies were identified in the Complaint and, if anything, the appellate attorney's representation at oral argument was inconsistent with the Complaint. The FTC also argues that its new emphasis on Section 19 is in response to *AMG*'s change in law. The Ninth Circuit and numerous other courts permit a party to alter its theory of recovery or otherwise change its position in response to a change in law. *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1215 (9th Cir. 1984); *see also Longaberger Co. v. Kolt*, 586 F.3d 459, 470 (6th Cir. 2009), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136 (2016) (collecting cases).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 6 of 13 |

Absent a stronger showing of the usual factors supporting judicial estoppel, the Court's acceptance of the FTC's current position does not "undermin[e] the integrity of the judicial process" in any way. *New Hampshire*, 532 U.S. 742, 755 (2001).

### 3. The FTC's Failure to Timely Disclose Evidence

There is no question that the FTC relies on a late-disclosed witness and evidence to support its ROSCA damages calculation. The Cardiffs correctly note that the FTC cites only to Section 13(b) of the FTC Act, not Sections 18 or 19, in the parties' initial Joint Rule 26 Disclosure and the FTC's Supplemental Rule 26 Disclosure served on March 13, 2020. *See* Joint Rule 26 Report at 12 [Doc. # 101]; Cochell Decl., Ex. 1 (FTC Supp. Rule 26 Disclosure) at 13 [Doc. # 607-1] (computing the monetary relief for the FTC Act violations as "the total amount consumers paid for TBX-Free, Prolongz, Eupepsia Thin, and the Rengalife program"). The FTC did not offer a separate calculation of damages for violations of ROSCA or any other statutes or rules aside from the FTC Act. Furthermore, only in May 2021, long after the close of discovery, did the FTC request and then receive Defendant Redwood Scientific's customer relationship management ("CRM") database from Redwood Scientific's third-party CRM vendor, Limelight, even though such databases also appear relevant to the FTC's Section 13(b) damages calculation. Bernat Decl. at ¶¶ 2-3. Then, on May 21, 2021, the FTC disclosed for the first time its data analyst Elizabeth Miles as a witness for the ROSCA damages calculation, relying on the CRM database provided to the FTC by Limelight. *See* Sands Decl. at ¶¶ 2-7, Att. 1 [Doc. # 596-4]; Miles Decl. at ¶¶ 1-7 [Doc. # 96-5].

Under Rule 37(c), if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party cannot "use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). Rule 26(a) imposes a duty to disclose "a computation of *each category of damages* claimed by the disclosing party" and to "make available for inspection and copying . . . the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(A)(iii). Rule 26(e) requires a party to supplement or correct its disclosure in a timely manner if its disclosure is incomplete. Fed. R. Civ. P. 26(e)(1)(A). The burden is on the party facing sanctions for belated disclosure to prove that its failure to comply was substantially justified or harmless. *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). Some of the factors that courts consider to determine whether a violation of a discovery deadline is justified or harmless are: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 7 of 13 |

likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010).

The Court is not persuaded by the FTC's arguments that its late disclosure of the CRM database and Miles' calculations regarding ROSCA damages is substantially justified or harmless. First, the FTC asserts that the change in law with respect to Section 13(b) remedies announced in *AMG* substantially justifies their failure to provide a computation of the smaller amount of damages associated only with the ROSCA violation. FTC Reply at 17-19 [Doc. # 620]. It is true that in some situations, as a matter of fairness, "it would be unjust to allow [a party's] mistake about a previously unsettled point of law to be the *coup de grâce* to her case." *Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011). But the change in law regarding remedies under Section 13(b) had no effect on the availability of ROSCA Section 19 remedies in this case.

As discussed above, the FTC pled the ROSCA theory of liability and damages in its Complaint, and it obtained summary judgment on ROSCA liability. Under similar circumstances, Ninth Circuit has held that plaintiffs were not substantially justified in failing to disclose individualized computation of damages for their state-law causes of action, even though the law was unsettled regarding the need to disclose individualized computation of damages for their central federal cause of action. *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008), *as amended* (Sept. 16, 2008). The Ninth Circuit therefore affirmed the district court's exclusion of previously undisclosed individualized damages computations under Rule 37. *Id.* Analogizing to this case, the FTC was required to timely disclose computations of damages for all causes of action, including the ROSCA violation, notwithstanding that the law changed with respect to the computation of damages for equitable monetary relief under its wholly separate and distinct Section 13(b) cause of action. In other words, as the Cardiffs put it, the FTC should not have "put all its eggs in the Section 13(b) basket." Cardiff Br. at 18. The omission of the computation of ROSCA damages under Rule 26(a)(iii) may have been a tactical decision, but it was not substantially justified or harmless.

Second, the FTC argues that failing to disclose the CRM database to Defendants is harmless, since they are Defendants' own sales records. FTC Reply at 17. But Rule 26(a) does not relieve a party of its duty to disclose evidence or documents underlying its computation of damages merely because that evidence is or was once in the other side's possession. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii). In any event, under the terms of the 2018 TRO, the Receiver took physical possession of all documents related to the Cardiffs' businesses, and Jason Cardiff states that he

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 8 of 13 |

was not provided a copy of the CRM spreadsheets after the Receivership was imposed. Cardiff Decl. at ¶ 3 [Doc. # 607-3]. His counsel also attests that they never received copies of the CRM records. Cochell Decl. at ¶ 2 [Doc. # 607-1]; White Decl. at ¶ 2 [Doc. # 607-2]. The FTC also fails to explain why relying on a previously undisclosed witness, who was never made available to the Cardiffs for discovery, is harmless.[2] In fact, the Cardiffs argue that additional document discovery and depositions are necessary to defend against the FTC's ROSCA damages calculation. Cardiff Br. at 14-15. Where late disclosure of damages would likely require the Court "to create a new briefing schedule and perhaps re-open discovery, rather than simply set a trial date," a failure to disclose is not harmless. *Hoffman*, 541 F.3d at 1180; *see also Yeti by Molly*, 259 F.3d at 1107 (finding harm to party that would have had to depose and prepare to question late-disclosed expert witness one month before trial). Thus, the FTC's late disclosure is not harmless.[3]

At the hearing, the FTC argued that the Court must also apply a five-factor test to determine whether the "drastic" Rule 37 sanction of excluding late-disclosed evidence is proper, citing to *Wendt v. Host Int'l, Inc.*, 125 F.3d 806 (9th Cir. 1997). *See id.* at 814 (holding that exclusion of expert testimony as a sanction for late disclosure of expert witnesses and damages calculations was not proper where "[l]ess drastic sanctions are available" and no prejudice ensued to the other party because the expert disclosure process had been reopened). *Wendt* relied on *Wanderer v.*

---

[2] It is true that Federal Rule of Evidence 1006 permits a government witness to summarize documents, but only if the opposing party has had an opportunity to examine or copy the original documents, "at a reasonable time and place." Fed. R. Evid. 1006; *see F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 608 (9th Cir. 1993). The FTC has not provided the CRM database to the Cardiffs for examination and copying, and it has not shown that the timing of introducing summary evidence at this late juncture is reasonable.

[3] In its July 7, 2020 Order, the Court noted that "[a]t that pre-discovery stage, the FTC provided sufficient notice of the basis of its equitable monetary relief, given the 'evidence necessary to determine Defendants' gross receipts for the purpose of assessing disgorgement was in the hands of Defendants.'" July 7, 2020 Order at 6 [Doc. # 388] (quoting *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1254 (10th Cir. 2020)). That finding applied *pre-discovery*. Now that one year has passed and discovery has closed without any indication that the FTC would rely on this ROSCA damages calculation, it is not harmless to require Defendants to reopen discovery and litigate this new theory of damages.

Furthermore, the Court disagrees with the FTC that *RaPower-3* stands for the proposition that Rule 26 is not applicable to the government's calculation of equitable remedies. As the Tenth Circuit noted, "the advisory committee note to the 1993 amendments to Rule 26 (addressing 26(a)(1)(C), which became 26(a)(1)(A)(iii) in the 2007 amendment restyling the Rule) says: 'A party claiming damages *or other monetary relief* must, in addition to disclosing the calculation of such damages, make available the supporting documents for inspection and copying . . . .'" *Id.* at 1253 (quoting Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment (emphasis added)). The court noted that Rule 26 therefore appeared to require disclosures of calculations of equitable monetary relief. *Id.*

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | ED CV 18-2104-DMG (PLAx) | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 9 of 13 |
|---|---|---|---|

*Johnston*, 910 F.2d 652 (9th Cir. 1990), to set forth the five factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Wendt*, 125 F.3d at 814. Subsequent Ninth Circuit cases do not always apply these factors under similar circumstances. *See, e.g.*, *Yeti by Molly*, 259 F.3d at 1106 (noting that Rule 37(c)(1) sanctions are designed to be "harsh," and "[c]ourts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded."). But even if the factors apply here, all of them except perhaps the availability of less drastic sanctions weigh in favor of excluding the late damages evidence. The public's interest in expeditious resolution of this litigation and the Court's interest in managing its docket weigh decisively in favor of excluding the late-blooming ROSCA damages evidence. The Cardiffs would be prejudiced by reopening discovery at this late date, when the only remaining issue for trial should have been the amount of damages on the existing record. The public's interest in resolving this case on the merits has already been vindicated, as the Court has ruled in the FTC's favor on all 16 counts it brought against the Cardiffs. *See id.* While a lesser sanction, such as requiring the FTC to pay for reopened discovery, is theoretically available here, the Court finds, as a practical matter, that it would not be cost effective to require the expenditure of more money and time on litigating damages in a case where any actual monetary recovery for consumers will be substantially offset by the cost of the Receivership. Thus, even the *Wendt* factors weigh in favor of granting the Rule 37 sanctions.[4]

For the foregoing reasons, under Rule 37, the FTC cannot rely on the CRM database or the calculations based on that data by FTC analyst Miles in any briefing or at trial. The FTC may proceed to trial on damages for ROSCA violations based only on evidence and witnesses that have been properly disclosed. Because none of the FTC's prior disclosures described its computation of damages for ROSCA violations, however, it appears that the FTC has no evidence to present at trial to support its nascent theory of damages. In the absence of any other theory of monetary relief

---

[4] An argument the FTC did not raise, but the Court nonetheless addresses, is whether exclusion of ROSCA damages "amount[s] to dismissal of a claim," and therefore requires the Court to consider whether the FTC acted willfully, with fault, or in bad faith. *See R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1247 (9th Cir. 2012); *see also Yeti by Molly*, 259 F.3d at 1107 (noting that a district court must identify willfulness, fault, or bad faith before dismissing a case outright as a discovery sanction). The Court does not find that excluding evidence of ROSCA damages is equivalent to dismissing the case outright, where the FTC has already prevailed on liability and will obtain a broad permanent injunction against the Cardiffs in their future unfair or deceptive practices. Regardless, as discussed above, the FTC is not blameless in failing to timely disclose its computations of damages and conducting relevant discovery within the ample period of time allotted for discovery.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | | Date | June 29, 2021 |
|---|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | | Page | 10 of 13 |
|---|---|---|---|---|

after *AMG*, the Court concludes that the FTC cannot recover damages for consumers in this action. No issues regarding monetary relief remain for trial.

## C.     Permanent Injunction

Lastly, the Cardiffs argue that the FTC cannot seek a permanent injunction against them or, at the least, that the proposed permanent injunction should be narrowed.

### 1.   Administrative Proceeding Requirement

The Cardiffs assert that Section 13(b) does not authorize a permanent injunction in this case because the FTC did not file an administrative complaint "within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction." 15 U.S.C. § 53(b)(2). But that subsection also provides "[t]hat in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." *Id.* And the Ninth Circuit has long held that Section 13(b)'s language "does not on its face condition the issuance of a permanent injunction upon the initiation of administrative proceedings." *F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107, 1110 (9th Cir. 1982).

The Supreme Court in *AMG* did not directly address this interpretation of the "permanent injunction" proviso. It merely stated, in *dicta*, that the "permanent injunction" proviso "might also be read, for example, as granting authority for the Commission to go one step beyond the provisional and ('in proper cases') *dispense with administrative proceedings to seek what the words literally say (namely, an injunction).*" *AMG*, 141 S. Ct. at 1348 (emphasis added). Indeed, although the *AMG* holding eliminated the use of Section 13(b) to obtain *monetary* relief without first initiating administrative proceedings, the Court affirmatively stated that "the Commission may use § 13(b) to obtain injunctive relief while administrative proceedings are foreseen or in progress, *or when it seeks only injunctive relief*." *Id*. at 1349 (emphasis added); *see also id.* at 1357 ("Our task here is not to decide whether this substitution of § 13(b) for the administrative procedure contained in § 5 and the consumer redress available under § 19 is desirable."). In addition, after the *AMG* decision, a Ninth Circuit panel considering an FTC action for monetary and injunctive relief under Section 13(b) cited *Singer* approvingly for the proposition that the FTC can obtain injunctive relief without first initiating administrative proceedings. *F.T.C. v. Hoyal & Assocs.*, No. 19-35668/35669, -- F. App'x ---, 2021 U.S. App. LEXIS 17481 at *5-6 (9th Cir. June 9, 2021). The court affirmed the permanent injunction while vacating the monetary relief in light of *AMG*. *Id.*

---

CV-90                                **CIVIL MINUTES—GENERAL**                Initials of Deputy Clerk <u>KT</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | June 29, 2021 |
|---|---|---|---|

| Title | **_Federal Trade Commission v Jason Cardiff, et al._** | Page | 11 of 13 |

Because _Singer_'s holding is undisturbed, the FTC may still seek a permanent injunction against the Cardiffs under Section 13(b) without first initiating administrative proceedings.

### 2. Scope of Injunction

_Singer_ also established that Section 13(b) gave the district court authority to grant a permanent injunction against "violations of any provisions of law enforced by the Commission." 668 F.2d at 1113; _see_ 15 U.S.C. § 53(b)(1) (authorizing the FTC to seek a temporary restraining order or preliminary injunction whenever it has reason to believe that any person "is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission"). But injunctions under this section cannot be used to remedy past behavior and can only be granted where wrongdoing is ongoing or likely to recur. _F.T.C. v. Evans Prod. Co._, 775 F.2d 1084, 1087 (9th Cir. 1985).

The Court's MSJ Order has already made the factual finding that the Cardiffs' unfair and deceptive acts relating to the sales of untested thinstrip products are likely to recur. _See_ MSJ Order at 19-20. Indeed, the Cardiffs' plans to continue in the thinstrip manufacturing and distribution business are well documented, and they now argue that the permanent injunction should not bar them from engaging in the manufacture and distribution of thinstrip products to sophisticated business entities, in addition to barring the Cardiffs from direct retail sales and advertisement to consumers. They request that the Court permit them to work on the manufacturing and wholesale side of the thinstrip industry, so long as they perform proper testing of thinstrip products before distributing to retailers. Cardiff Br. at 26-27.

In response, the FTC argues that the Cardiffs' thinstrip retail business was wholly fraudulent, as evidenced by the judgment against them on 16 separate counts, and they "simply cannot be trusted" to make truthful claims about thinstrip products to any purchasers, sophisticated or not. FTC Reply at 27. The Court agrees that the Cardiffs' prior business practices and history of contempt in this litigation do not inspire much confidence in their future endeavors. But the FTC's proposed permanent injunction bans the Cardiffs from making any misrepresentations or unsubstantiated claims about any products and also requires the Cardiffs to engage in randomized, double-blind, and placebo-controlled testing by qualified researchers for any products they sell. These provisions, combined with a ban on the Cardiffs' participation in any direct-to-consumer sales of thinstrip products, appear sufficiently tailored to prevent unfair or deceptive acts or practices from recurring.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | June 29, 2021 |
|---|---|---|---|

| Title | *Federal Trade Commission v Jason Cardiff, et al.* | Page | 12 of 13 |
|---|---|---|---|

Accordingly, the Court will slightly narrow the FTC's proposed preliminary injunction such that the Cardiffs' participation in the manufacture and distribution of thinstrip products is not categorically banned—only the unfair, deceptive, and fraudulent manufacture and distribution of thinstrip products without scientific substantiation.

**D.     Asset Freeze, Receivership, and Stays of Actions**

Finally, the Court turns to the contentious Asset Freeze, Receivership, and Stay of Actions provisions of the 2018 Preliminary Injunction.  [Doc. # 59.]  In light of the lack of available monetary relief, the Court must resolve the Poujade/TPI motion, determine whether any of the Poujade/TPI funds are part of the Receivership Estate, resolve the pending motion for default judgment against defaulting entities, and then order the Receiver to commence the claims process and wind up the Receivership prior to the entry of judgment.

Upon the entry of judgment and the permanent injunction, the Asset Freeze will be dissolved, and the Stay of Action will also be lifted, permitting movant Inter/Media to enforce its claims against Defendants.

In the interim, the Court **DENIES** the Cardiffs' request for the Receiver to pay their living expenses from the portion of Jason Cardiff's VPL salary held as part of the Receivership Estate. The language of the Court's November 20, 2020 Order assumes that the living expenses will be released from each monthly salary as it is paid by VPL (as stipulated to by the parties and the Receiver), not from the withheld portion.  [Doc. # 525.]  But because the Preliminary Injunction over VPL has been dissolved, any future salary Jason Cardiff receives from VPL will not be part of the Receivership Estate and can be used to pay the Cardiffs' living expenses.

**III.
CONCLUSION**

In light of the foregoing, the Court **ORDERS** the following:

1.  Under Rule 37(c), the FTC is barred from relying on its newly disclosed evidence and witness in support of monetary relief for the Cardiffs' ROSCA violation.  Finding no other evidence or grounds for monetary relief, the Court concludes that no triable issues remain as to monetary damages.  The Cardiffs' MSJ, stayed with respect to remedies, is **GRANTED in part** to the extent that the FTC cannot obtain a monetary award. [Doc. # 441.]  The FTC's MSJ is **DENIED in part** as to monetary relief.  [Doc. # 423.]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | | Date | June 29, 2021 |
|---|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 13 of 13 |
|---|---|---|---|

2. Because the FTC has authority to pursue a permanent injunction and has shown the likelihood of recurrence of violations of the FTC Act, the Court **GRANTS in part** the FTC's MSJ to the extent it seeks a permanent injunction against future enumerated unfair and deceptive acts or practices by the Cardiffs. The Court also **GRANTS in part** the Cardiffs' MSJ to the extent it seeks to narrow the permanent injunction to permit them to engage in the manufacture and distribution of thinstrip products as wholesalers, provided they comply with other provisions of the permanent injunction.

3. The parties and the Receiver shall meet and confer forthwith about what personal effects of the Cardiffs currently held as part of the Receivership Estate, such as passports, personal papers, and costume jewelry, may be released by mutual agreement without need for briefing.

4. Because the FTC and the Cardiffs have not substantively responded to Poujade/TPI's contention in their motion for release of deposited funds [Doc. # 576] that the Poujade/TPI funds held by the Receiver were never controlled by or belonged to the Cardiffs, the Court orders the FTC and the Cardiffs to file supplemental responses on the merits of that argument by **July 7, 2021**. Poujade/TPI may file a supplemental reply, if any, by **July 14, 2021**. Thereafter, the Court will determine whether the Poujade/TPI funds are part of the Receivership Estate and issue its ruling on Poujade/TPI's motion. If the Court deems an evidentiary hearing necessary to resolve the issue, such a hearing will be scheduled.

5. After the Court issues its ruling on the Poujade/TPI motion, the Receiver shall commence the final claims process and shall file its final fee application and accounting, which shall take into account the Court's ruling on the Poujade/TPI's motion and delineate to whom various assets in the Receivership Estate shall be disbursed, and in what amounts. The Receiver may opine, if it wishes, on what party or parties should be responsible for paying its final fees and costs and whether prior fees paid solely by VPL should be allocated *pro rata* to any other funds determined to be available in the Receivership Estate. The Court will set a briefing schedule for that process at the time it issues its ruling on the Poujade/TPI motion.

6. The Court will rule on the pending Motion for Default Judgment against the Entity Defendants and enter Judgment and the Permanent Injunction, including dissolution of the Asset Freeze and Stay of Actions, after resolving the Receiver's final accounting.

**IT IS SO ORDERED.**

# EXHIBIT 78

## TO THE DECLARATION OF STEPHEN G. LARSON

[Redacted - Document Conditionally Filed Under Seal]

# EXHIBIT 79
## TO THE DECLARATION OF STEPHEN G. LARSON

[Redacted - Document Conditionally Filed Under Seal]

# EXHIBIT 80

## TO THE DECLARATION OF STEPHEN G. LARSON

[Redacted - Document Conditionally Filed Under Seal]

# EXHIBIT 81

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | August 26, 2021 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 1 of 2 |
|---|---|---|---|

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Appellant(s) | Attorneys Present for Appellee(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER SETTING DATES FOR BRIEFING SCHEDULE AND RESCHEDULING STATUS CONFERENCE**

The Court has reviewed and considered the responses to the Court's August 5, 2021 Order requesting supplemental briefing on a final claims process and resolution of this case. [Doc. ## 640, 641, 645, 647.] In light of the parties' responses, the Court finds that there will be no monetary judgment and a claims process will not be necessary. The Court therefore **ORDERS** the following:

1. By **September 3, 2021**, the FTC shall submit a Proposed Judgment and shall propose a date by which the preliminary injunction and receivership will end. Defendants may submit any objections or responses to the Proposed Judgment by **September 10, 2021**.

2. By **September 8, 2021**, the Receiver shall file a detailed final accounting of:

    a. The Receiver's outstanding fees and costs;

    b. The assets remaining in the Receivership Estate; and

    c. The Receiver's recommendations for disbursal of the remaining assets in the Receivership Estate, taking into account the Court's prior May 24, 2021 and August 5, 2021 Orders [Doc. ## 598, 640].

    The parties and interested non-parties shall file any objections or responses to the Receiver's accounting by **September 15, 2021**.

3. On **September 17, 2021 at 9:30 a.m.**, the Court will hold a status conference regarding the Receiver's accounting, any objections or responses thereto, and the Proposed Judgment.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk KT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **ED CV 18-2104-DMG (PLAx)** | Date | August 26, 2021 |
|---|---|---|---|

| Title | ***Federal Trade Commission v Jason Cardiff, et al.*** | Page | 2 of 2 |
|---|---|---|---|

    4.  The August 27, 2021 status conference is **VACATED**.

**IT IS SO ORDERED.**

# EXHIBIT 82

1  ELIZABETH JONES SANGER (*pro hac vice*)
   esanger@ftc.gov; (202) 326-2757
2  JAMES A. PRUNTY (*pro hac vice*)
   jprunty@ftc.gov; (202) 326-2438
3  EDWIN RODRIGUEZ (*pro hac vice*)
   erodriguez@ftc.gov; (202) 326-3147
4  SHIRA D. MODELL (*pro hac vice*)
5  smodell@ftc.gov; (202) 326-3116
   Federal Trade Commission
6  600 Pennsylvania Ave., NW
7  Washington, DC 20580
   Fax: (202) 326-3259
8

9
10 STACY PROCTER (Local Counsel) (CA 221078)
   sprocter@ftc.gov; (310) 824-4300
11 Federal Trade Commission
12 10990 Wilshire Blvd., Suite 400
   Los Angeles, CA 90024
13 Fax: (310) 824-4380
14 ATTORNEYS FOR PLAINTIFF
15

16       **UNITED STATES DISTRICT COURT**
         **CENTRAL DISTRICT OF CALIFORNIA**
17

18 |                                    | No. ED 18-CV-02104 DMG (PLAx)
19 | **Federal Trade Commission**,      |
20 |                   Plaintiff,       | **FEDERAL TRADE COMMISSION'S**
   |                                    | **[PROPOSED] FINAL JUDGMENT**
21 |                   v.               | **INCLUDING PERMANENT**
   |                                    | **INJUNCTION AS TO JASON**
22 | **Jason Cardiff, et al.**,         | **CARDIFF AND EUNJUNG CARDIFF**
   |                                    | **AND [PROPOSED] DEFAULT**
23 |                   Defendants.      | **JUDGMENT INCLUDING**
24 |                                    | **PERMANENT INJUNCTION AS TO**
   |                                    | **THE CORPORATE DEFENDANTS,**
25 |                                    | **PURSUANT TO THE COURT'S**
26 |                                    | **AUGUST 26, 2021 ORDER**
27
28

Pursuant to the Court's August 26, 2021 Order (Dkt. 650), the Federal Trade Commission ("FTC" or "Commission") submits herewith a [Proposed] Final Judgment including permanent injunction in favor of Plaintiff FTC as to Jason and Eunjung Cardiff ("the Cardiffs"),[1] and a [Proposed] Default Judgment including permanent injunction in favor of Plaintiff FTC as to the Corporate Defendants.[2] The Commission also provides its recommendations as to when the Preliminary Injunctions over the Cardiffs (Dkt. 59) and the Corporate Defendants (Dkt. 46), as well as the asset freeze and receivership created by those Preliminary Injunctions, should be lifted.

## I. Proposed Final Judgment and Proposed Default Judgment

Both proposed judgments implement the Court's determination that although the Cardiffs should be banned from marketing or selling oral film strips to consumers, they need not be prohibited from the manufacturing and wholesale distribution of those products. Dkt. 627, p. 11-12. The FTC has effectuated the Court's decision by limiting the ban in Part IV of its [Proposed] Final Judgment including permanent injunction as to the Cardiffs and [Proposed] Default Judgment including permanent injunction as to the Corporate Defendants to activities directed to "end-user consumers."

---

[1] On October 9, 2020, the Court granted summary judgment on liability in the FTC's favor against the Cardiffs on all sixteen Complaint counts. Dkt. 511.

[2] On March 5, 2019, the Commission filed an Application for the Clerk to Enter Defaults Against the Corporate Defendants Pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. Dkts. 89, 89-1. The Clerk entered defaults against the seven Corporate Defendants between March 5, 2019 and March 7, 2019. Dkts. 91, 92, 96.

On August 6, 2020, the Commission moved for entry of a default judgment against all seven Corporate Defendants pursuant to Federal Rule of Civil Procedure 54(b) and 55(b)(2). Dkt. 422 – 422-3.

The proposed judgments state (Part XVIII.B) that the Receiver will not return the Defendants' customer information to them upon termination of the receivership.  These provisions were added because the Cardiffs' repeated contempts of this Court's Orders raise a significant risk that they would not destroy customer data – as otherwise required by the Customer Information provision – if it was returned to them.

In light of the Supreme Court's decision in *AMG Capital Management v. FTC*, 141 S. Ct. 1341 (2021), and this Court's imposition of a Rule 37 sanction barring the FTC from using the Defendants' own CRM database to establish a monetary remedy for their violations of ROSCA, or to conduct a claims process, neither proposed judgment includes a monetary judgment.  Submitting these judgments in compliance with the Court's instructions should not be interpreted as a waiver by the FTC of its right to appeal the imposition of the Rule 37 sanction.

## II.   Expiration of Preliminary Injunctions and Receivership

Absent specific Court action to the contrary, the two Preliminary Injunctions would expire when the Court enters its final judgments as to the Cardiffs and the Corporate Defendants.  The conduct provisions contained in those Preliminary Injunctions – Parts I through VI – must not be lifted before then.  As the Court noted recently, "the Cardiffs' prior business practices and history of contempt in this litigation do not inspire much confidence in their future endeavors."  Dkt. 627, p. 11.  Therefore, to protect consumers, there must not be any interval during which the Cardiffs and the web of corporations they operated as a Common Enterprise (*see* Dkt. 511, p. 20) are not covered by injunctive provisions addressing business practices that the Court has found to have violated the FTC Act, ROSCA, the Electronic Fund Transfer Act, and the Commission's Telemarketing Sales Rule.  The [Proposed] Final Judgment as to the Cardiffs and the [Proposed] Default Judgment as to the Corporate Defendants thus both specifically provide

(Part XXIII) that except for the asset freeze and receivership provisions, each PI will expire when those judgments are entered.

The Commission respectfully submits that the Preliminary Injunctions' asset freeze and receivership provisions need to remain in force until the Court approves the Receiver's final report, including confirmation of the distribution of funds from the Receivership Estate pursuant to the Court's direction. The FTC recommends that this be done through a separate order, rather than incorporated into the [Proposed] Final Judgment as to the Cardiffs and [Proposed] Default Judgment as to the Corporate Defendants. Accordingly, the FTC presumes that this direction will be contained in a subsequent Court order, and the two proposed judgments reflect this presumption.

The FTC respectfully submits that it cannot specify a date certain by which these events should occur because they are not within the FTC's control. However, it would appear reasonable to assume that 30 days after the Court's approval of the Receiver's proposed distribution plan would be sufficient.

Respectfully submitted,

Dated: September 3, 2021

s/ Elizabeth Jones Sanger
ELIZABETH JONES SANGER
esanger@ftc.gov; (202) 326-2757
JAMES A. PRUNTY
jprunty@ftc.gov; (202) 326-2438
EDWIN RODRIGUEZ
erodriguez@ftc.gov; (202) 326-3147
SHIRA D. MODELL
smodell@ftc.gov; (202) 326-3116
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Fax: (202) 326-3259

STACY PROCTER (Local Counsel)
sprocter@ftc.gov; (310) 824-4300
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Fax: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**Certificate of Service**

I hereby certify that on September 3, 2021, I served the foregoing Federal Trade Commission's [Proposed] Final Judgment as to Jason Cardiff And Eunjung Cardiff and [Proposed] Default Judgment as to the Corporate Defendants, Pursuant to the Court's August 26, 2021 Order as follows:

James White, Esq., counsel, on behalf of Defendants Jason Cardiff and Eunjung Cardiff and non-party VPL Medical, Inc.
By ECF

Stephen R. Cochell, Esq., counsel, on behalf of Defendants Jason Cardiff and Eunjung Cardiff and non-party VPL Medical, Inc.
By ECF

Robb Evans & Associates, Receiver, through counsel, Frandzel Robins Bloom & Csato, L.C., Attorneys at Law
By ECF to Hal D. Goldflam Esq., Michael Gerard Fletcher, Esq., and Craig A. Welin, Esq.


s/ Elizabeth Jones Sanger
ELIZABETH JONES SANGER

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **Federal Trade Commission**, | No. ED 5:18-cv-02104-DMG-PLAx |
| Plaintiff, | |
| v. | [PROPOSED] FINAL JUDGMENT INCLUDING PERMANENT INJUNCTION AS TO DEFENDANTS JASON CARDIFF AND EUNJUNG CARDIFF |
| **Jason Cardiff**, et al., | |
| Defendants. | |

On October 3, 2018, Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), filed its Complaint for Permanent Injunction and Other Equitable Relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401-8405, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, and moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining

1

order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants Jason Cardiff, Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, Danielle Cadiz, a/k/a Danielle Walker, Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership. (Dkt. 1)

This Court entered a temporary restraining order ("TRO") on October 10, 2018. (Dkt. 29) On October 24, 2018, the Court extended the TRO as to Defendants Jason Cardiff and Eunjung Cardiff ("the Cardiffs"). (Dkt. 48) On November 8, 2018, the Court entered a Preliminary Injunction as to Defendants Jason Cardiff and Eunjung Cardiff. (Dkt. 59)

On August 6, 2020, the Commission moved for summary judgment as to Defendants Jason Cardiff and Eunjung Cardiff on all counts of the Complaint. On October 9, 2020, the Court granted summary judgment against the Cardiffs on all sixteen counts in the Commission's Complaint (Dkt. 511).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

1.      This Court has jurisdiction over this matter and over the Cardiffs and venue in this district is proper under 15 U.S.C. § 53(b) and 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d).

2.      At all relevant times, the Cardiffs' activities as alleged in the Commission's Complaint were in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

3.      The Complaint charged that Defendants, including Jason Cardiff and Eunjung Cardiff, participated in deceptive and unfair acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, Section 4 of ROSCA, 15 U.S.C. § 8403, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), Section 1005.10(b) of EFTA's implementing Regulation E, 12 C.F.R. §

1005.10(b), and Section 310.4(b)(1)(v) of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(v), in the marketing of Defendants' oral film strips and the Rengalife multilevel marketing program.  The Complaint sought both permanent injunctive relief and equitable monetary relief for the challenged acts or practices.

4.     The Complaint stated a claim upon which relief can be granted against the Cardiffs.

5.     The Cardiffs violated Sections 5(a) and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a) and 52, by making:

    a.     False or unsubstantiated efficacy clams and false proof claims for their oral film strips TBX-FREE, Eupepsia Thin, and Prolongz;

    b.     False money-back guarantee claims for those oral film strips;

    c.     False claims that Eupepsia Thin oral film strips were made in the United States, and that testimonialists appearing in advertising for Eupepsia Thin had used the product to lose weight; and

    d.     False claims that consumers would not be enrolled in an autoship program and that their credit or debit card would be charged only for a one-time purchase of oral film strips.

6.     The Cardiffs violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by:

    a.     Failing to disclose, or disclose adequately, that consumers who provided their billing information for a product order would be enrolled automatically in a continuity plan for future autoshipments of oral film strips that would be charged to their credit or debit cards; and

3

b.  Making false and unsubstantiated claims that people who became Rengalife members were likely to earn substantial income.

7.  The Cardiffs violated Sections 5(a) and 5(n) of the FTC Act, 15 U.S.C. §§ 45(a), 45(n), by causing charges to be submitted for payment to consumers' credit and debit cards without the express informed consent of those consumers.

8.  The Cardiffs violated Section 4 of ROSCA, 15 U.S.C. § 8403, by charging consumers for TBX-FREE oral film strips sold over the Internet through a negative option feature as defined in the TSR, 16 C.F.R. §3102(w) without:  (a) clearly and conspicuously disclosing all material terms of the transaction before obtaining the consumer's billing information; (b) obtaining the consumer's express informed consent before making the charge; and (c) providing a simple mechanism to stop recurring charges.

9.  The Cardiffs violated Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), by debiting consumers' bank accounts without first obtaining written authorizations signed or similarly authorized by those consumers for preauthorized electronic fund transfers from their accounts, or providing those consumers a copy of a written authorization signed or similarly authenticated by them.

10.  The Cardiffs violated the TSR by initiating or causing the initiation of outbound telephone calls that delivered prerecorded messages intended to induce the purchase of oral film strips.

11.  The Cardiffs operated the Corporate Defendants as a common enterprise, and the Corporate Defendants were "all involved in the sale of the Products [with] money, products, and employees flow[ing] freely between them." Dkt. 511, p. 20-21.  The Cardiffs were the "beneficiaries and masterminds" of the common enterprise, and "had knowledge of the misrepresentations in advertising or were recklessly indifferent to the falsity of the misrepresentations." *Id*.

12.     At all times material to the Complaint, both Jason Cardiff and Eunjung Cardiff formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in Findings 5 to 11, above, and both of them are therefore liable for injunctive relief.

13.     At all times material to the Complaint, both Jason Cardiff and Eunjung Cardiff knew of or were recklessly indifferent to the acts and practices set forth in Findings 5 to 11, above.

14.     The danger of future violations by Jason Cardiff and Eunjung Cardiff justifies the issuance of permanent injunctive relief, including banning them from engaging in certain activities.

15.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue injunctive relief for the Defendants' law violations. Section 19 of the FTC Act, § 57b, empowers the Court to grant such relief as it finds necessary to redress injury to consumers from the Defendants' violations of ROSCA and the TSR, including rescission or reformation of contracts and refund of money.

16.     This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

17.     Pursuant to Federal Rule of Civil Procedure 65(d), the provisions of this Order are binding upon Jason Cardiff and Eunjung Cardiff, their successors and assigns, and their officers, agents, employees and attorneys, and upon those persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

18.     Entry of this Order is in the public interest, and there being no just reason for delay, the Clerk is directed to enter judgment in favor of Plaintiff Federal Trade Commission immediately.

**THEREFORE, IT IS ORDERED** as follows:

**DEFINITIONS**

For the purpose of this Order, the following definitions shall apply:

A.    "**Acquirer**" or "**Acquiring Bank**" means a business organization, Financial Institution, or an agent of a business organization or Financial Institution that has authority from an organization that operates or licenses a credit card system (e.g., Visa, MasterCard, American Express or Discover) to authorize Merchants to accept, transmit, or process payment by credit card through the credit card system for money, products, or anything else of value.

B.    "**Billing Information**" means any data that enables any person to access a consumer's account, such as a credit card, debit card, checking, savings, share or similar account, utility bill, or mortgage loan account.

C.    "**Business Venture**" means any written or oral business arrangement, however denominated, whether or not covered by 16 C.F.R. Part 437, that consists of the payment of any consideration for the right or means to offer, sell, or distribute Goods or Services.  The definition of Business Venture includes multilevel marketing programs.

D.    "**Charge(s),**" "**Charged,**" or "**Charging**" means any attempt to collect money or other consideration from a consumer, including, but not limited to, causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account telephone bill, or other account.

E.    "**Clear(ly) and conspicuous(ly)**" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

    1.    In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if

the representation requiring the disclosure is made in only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

F.     "**Covered Product**" means any Dietary Supplement, Food, Drug, or Device.

G.     "**Credit Card Laundering**" means: (a) presenting or depositing into, or causing or allowing another to present or deposit into, the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result

7

of a credit card transaction between the cardholder and the Merchant; (b) employing, soliciting, or otherwise causing or allowing a Merchant, or an employee, representative, or agent of a Merchant, to present to or deposit into the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; or (c) obtaining access to the credit card system through the use of a business relationship or an affiliation with a Merchant, when such access is not authorized by the Merchant Account agreement or the applicable credit card system.

H.    "**Credit Card Sales Draft**" means any record or evidence of a credit card transaction.

I.    "**Corporate Defendant(s)**" means Redwood Scientific Technologies, Inc. (CA); Redwood Scientific Technologies, Inc. (NV); Redwood Scientific Technologies, Inc. (DE); Identify, LLC; Advanced Men's Institute Prolongz LLC; Run Away Product, LLC; and Carols Place Limited Partnership, individually, collectively, or in any combination.

J.    "**Defendant(s)**" means all of the named Defendants, individually, collectively, or in any combination.

K.    "**Device**" means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them; (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in humans or other animals; or (3) intended to affect the structure or any function of the body of humans or other animals; and which does not achieve any of its principal intended purposes through chemical action within or on the body of humans or other animals and which is not

dependent upon being metabolized for the achievement of any of its principal intended purposes.

L.    "**Dietary Supplement**" means:  (1) any product labeled as a Dietary Supplement or otherwise represented as a Dietary Supplement; or (2) any pill, tablet, capsule, powder, softgel, gelcap, liquid, or other similar form containing one or more ingredients that are a vitamin, mineral, herb or other botanical, amino acid, probiotic, or other dietary substance for use by humans to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of any ingredient described above, that is intended to be ingested, and is not represented to be used as a conventional Food or as a sole item of a meal or the diet.

M.    "**Drug**" means:  (1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of humans or other animals; and (4) articles intended for use as a component of any article specified in (1), (2), or (3); but does not include devices or their components, parts, or accessories.

N.    "**Essentially Equivalent Product**" means a product that contains the identical ingredients, except for inactive ingredients (e.g., binders, colors, fillers, excipients) in the same form and dosage, and with the same route of administration (e.g., orally, sublingually), as the Covered Product; *provided that* the Covered Product may contain additional ingredients if reliable scientific evidence generally accepted by experts in the field indicates that the amount and combination of additional ingredients is unlikely to impede or inhibit the effectiveness of the ingredients in the Essentially Equivalent Product.

O.  **"Financial Institution"** means any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956 (12 U.S.C. § 1843(k)). An institution that is significantly engaged in financial activities is a Financial Institution.

P.  **"Food"** means:  (1) any article used for food or drink for humans or other animals; (2) chewing gum; and (3) any article used for components of any such article.

Q.  **"Good(s) or Service(s)"** includes merchandise, products, plans, or programs.

R.  **"Investment Opportunity"** means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

S.  **"Made in the United States"** means any representation, express or implied, that a product, or a specified component thereof, is of U.S.-origin, including a representation that such product is "made," "manufactured," "built," or "produced" in the United States or in America, or any other U.S.-origin claim.

T.  **"Merchant"** means (a) any person or entity engaged in the sale or marketing of any goods or services, or soliciting a charitable contribution, or (b) any person or entity who applies for or obtains Payment Processing services.

U.  **"Merchant Account"** means any account with an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables an individual, a business, or other organization to accept payments of any kind.

V.  **"Negative Option Feature"** means, in an offer or agreement to sell or provide any Good or Service, a provision under which the consumer's silence or failure to take affirmative action to reject a Good or Service, or to cancel the

10

agreement, is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

W.     "**Payment Processing**" means providing a person or entity, directly or indirectly, with the means used to charge or debit accounts through the use of any payment method or mechanism, including, but not limited to, remotely created payment orders, remotely created checks, ACH debits, or debit, credit, prepaid, or stored value cards. Whether accomplished through the use of software or otherwise, Payment Processing includes, among other things: (a) reviewing and approving Merchant applications for payment processing services; (b) providing the means to transmit sales transactions data from Merchants to Acquiring Banks or other Financial Institutions; (c) clearing, settling, or distributing proceeds of sales transactions from Acquiring Banks or Financial Institutions to Merchants; or (d) processing chargebacks or returned remotely created payment orders, remotely created checks, or ACH checks.

X.     "**Person**" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

Y.      "**Preauthorized Electronic Fund Transfer**" means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

Z.      "**Receiver**" means Robb Evans & Associates, LLC.


## ORDER

## I.     BAN ON NEGATIVE OPTION SALES

**IT IS ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from the advertising, marketing, promotion, offering for sale, or sale of any Good or Service with a Negative Option Feature.

11

## II.  BAN ON ROBOCALLS AND RINGLESS VOICEMAILS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from initiating telephone calls delivering prerecorded messages, including ringless voicemails.

## III.  BAN ON MULTILEVEL MARKETING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, facilitating, or advising, are permanently restrained and enjoined from engaging or participating in any multilevel marketing program.

## IV.  BAN ON THE ADVERTISING, MARKETING, PROMOTION, OFFERING FOR SALE, OR SALE OF DISSOLVABLE ORAL FILM STRIPS TO END-USER CONSUMERS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from the advertising, marketing, promotion, offering for sale, or sale of any dissolvable oral film strip to end-user consumers.

## V.  PROHIBITED REPRESENTATIONS:  HEALTH-RELATED CLAIMS REQUIRING HUMAN CLINICAL TESTING FOR SUBSTANTIATION

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from making, or assisting others

in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation that such product:

A.   Helps users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

B.   Causes or assists in causing weight loss, including any specific representation about the amount of weight loss;

C.   Suppresses or helps suppress appetite;

D.   Causes or assists in causing weight loss without dieting or any change in food or lifestyle;

E.   Helps users avoid gaining back any weight they lost;

F.   Increases ejaculation control or the duration of sex;

G.   Treats or prevents premature ejaculation;

H.   Cures, mitigates, or treats any disease; or

I.   Is comparable or superior to other treatments for quitting smoking, weight loss, or sexual performance, or in curing, mitigating, or treating any disease,

unless the representation is non-misleading, and, at the time of making such representation, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable scientific evidence substantiating that the representation is true.  For purposes of this Section, competent and reliable scientific evidence must consist of human clinical testing of the product, or of an Essentially Equivalent Product, that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.  Such testing must be:  (1) randomized, double-blind, and placebo-controlled; and (2) conducted by researchers qualified by training and experience to conduct such testing.  In addition, all underlying or supporting data and documents generally accepted by

13

experts in the field as relevant to an assessment of such testing as described in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission.  Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VI.    PROHIBITED REPRESENTATIONS:  OTHER HEALTH-RELATED CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation, other than representations covered under the Section of this Order entitled Prohibited Representations:  Health-Related Claims Requiring Human Clinical Testing For Substantiation, about the health benefits, performance, efficacy, safety, or side effects of the product, unless the representation is non-misleading, and, at the time of making such representation, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

For purposes of this Section, competent and reliable scientific evidence means tests, analyses, research, or studies (1) that have been conducted and evaluated in an objective manner by experts in the relevant disease, condition, or

14

function to which the representation relates; (2) that are generally accepted by such experts to yield accurate and reliable results; and (3) that are randomized, double-blind, and placebo-controlled human clinical testing of the Covered Product, or of an Essentially Equivalent Product, when such experts would generally require such human clinical testing to substantiate that the representation is true.  In addition, when such tests or studies are human clinical tests or studies, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as set forth in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission. Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VII.  PRESERVATION OF RECORDS RELATING TO COMPETENT AND RELIABLE HUMAN CLINICAL TESTS OR STUDIES

**IT IS FURTHER ORDERED** that, with regard to any human clinical test or study ("test") upon which Jason Cardiff or Eunjung Cardiff rely to substantiate any claim covered by this Order, they shall secure and preserve all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of the test, including:

A.  All protocols and protocol amendments, reports, articles, write-ups, or other accounts of the results of the test, and drafts of such documents reviewed by the test sponsor or any other person not employed by the research entity;

B.  All documents referring or relating to recruitment; randomization; instructions, including oral instructions, to participants; and participant compliance;

C.  Documents sufficient to identify all test participants, including any participants who did not complete the test, and all communications with any participants relating to the test; all raw data collected from participants enrolled in

the test, including any participants who did not complete the test; source documents for such data; any data dictionaries; and any case report forms;

D.     All documents referring or relating to any statistical analysis of any test data, including any pretest analysis, intent-to-treat analysis, or between-group analysis performed on any test data; and

E.     All documents referring or relating to the sponsorship of the test, including all communications and contracts between any sponsor and the test's researchers.

*Provided, however*, the preceding preservation requirement does not apply to a reliably reported test, unless the test was conducted, controlled, or sponsored, in whole or in part by: (1) Jason Cardiff or Eunjung Cardiff; (2) their officers, agents, representatives, or employees; (3) any other person or entity in active concert or participation with Jason Cardiff or Eunjung Cardiff; (4) any person or entity affiliated with or acting on behalf of Jason Cardiff or Eunjung Cardiff; (5) any supplier of any ingredient contained in the product at issue to any of the foregoing or to the product's manufacturer; or (6) the supplier or manufacturer of such product.

For purposes of this Section, "reliably reported test" means a report of the test has been published in a peer-reviewed journal, and such published report provides sufficient information about the test for experts in the relevant field to assess the reliability of the results.

For any test conducted, controlled, or sponsored, in whole or in part, by or, Jason Cardiff or Eunjung Cardiff, they must establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of any personal information collected from or about participants.  These procedures must be documented in writing and must contain administrative, technical, and physical safeguards appropriate to the size and complexity of the entity sponsoring the test,

the nature and scope of that entity's activities, and the sensitivity of the personal information collected from or about the participants.

## VIII.  PROHIBITED REPRESENTATIONS: TESTS, STUDIES, OR OTHER RESEARCH

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration:

    A.    That the product is clinically proven to:

        1.    Help users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

        2.    Cause or assist in causing weight loss, including any specific representation about the amount of weight loss;

        3.    Suppress or help suppress appetite;

        4.    Cause or assist in causing weight loss without dieting or any change in food or lifestyle;

        5.    Help users avoid gaining back any weight they lost;

        6.    Increase ejaculation control or the duration of sex;

        7.    Treat or prevent premature ejaculation; or

        8.    Be comparable or superior to other treatments for quitting smoking.

    B.    That the performance or benefits of the product are scientifically or clinically proven or otherwise established; or

    C.    The existence, contents, validity, results, conclusions, or

17

interpretations of any test, study, or other research.

## IX.   FDA-APPROVED CLAIMS

**IT IS FURTHER ORDERED** that nothing in this Order prohibits Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, or all other persons in active concert or participation with any of them from:

A.     For any Drug product, making a representation that is approved for inclusion in labeling for such Drug product under a new drug application or biologics license application approved by the Food and Drug Administration, or, for any nonprescription Drug product authorized by Section 505G of the Food, Drug, and Cosmetics Act, 21 U.S.C. § 355h,  ("FDCA") to be marketed without an approved new drug application, making a representation that is permitted or required to appear in its labeling in accordance with  Section 505G(a)(1)-(3) of the FDCA, 21 U.S.C. § 355h(a)(1)-(3), or a final administrative order under Section 505G(b) of the FDCA, 21 U.S.C. § 355h(b); and

B.     For any product, making a representation that is specifically authorized for use in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990 or permitted under Sections 303-304 of the Food and Drug Administration Modernization Act of 1997.

## X.   PROHIBITED MISREPRESENTATIONS: ENDORSEMENTS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from making, or assisting others in making, any misrepresentation, expressly or by implication, (1) about the status of any endorser or person providing a review of the Good or Service, including a

misrepresentation that the endorser or reviewer is an independent or ordinary user of the Good or Service, or (2) that any person or organization has endorsed any Good or Service.

## XI. PROHIBITED MISREPRESENTATIONS: U.S. ORIGIN CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, or any other product, are permanently restrained and enjoined from making, or assisting others in making, any representation, expressly or by implication, that it is Made in the United States unless:

A.     The final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States; or

B.     A Clear and Conspicuous qualification appears immediately adjacent to the representation that accurately conveys the extent to which the product contains foreign parts, ingredients or components, and/or processing; or

C.     For a claim that a product is assembled in the United States, the product is last substantially transformed in the United States, the product's principal assembly takes place in the United States, and United States assembly operations are substantial.

## XII. PROHIBITED REPRESENTATIONS: EARNINGS CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing,

promotion, offering for sale, or sale of any Good or Service, including Business Ventures or Investment Opportunities, are permanently restrained and enjoined from:

      A.     Misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, any material fact, including:

            1.     That participants will or are likely to achieve substantial sales or earn substantial income or profit;

            2.     The amount of sales, income, or profit that participants have actually earned;

            3.     The amount of time or effort required to earn an amount of compensation or to advance; or

            4.     The total costs or any material restrictions, limitations, or conditions;

      B.     Making any representation, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, regarding the amount of sales, income, or profit that a participant can expect to earn, including that participants will or are likely to achieve substantial sales or earn substantial income or profit, unless the representation is non-misleading, and, at the time it is made, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable evidence that is sufficient to substantiate that the representation is true.

## XIII. PROHIBITED MISREPRESENTATIONS: OTHER MATERIAL FACTS

      **IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling,

advertising, promotion, offering for sale, sale, or distribution of any Good or Service are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration, any material fact concerning such Good or Service, including:

A. The success rate or rate of customer satisfaction;

B. The total costs;

C. Any refund policy;

D. Any material restrictions, limitations, or conditions, including any conditions that might limit certain consumers' ability to obtain the full benefits of the proffered Good or Service;

E. Any material aspect of its performance, efficacy, nature, or central characteristics, including that the benefits of the proffered Good or Service can be obtained quickly or easily;

F. Any cost to the consumer to purchase, receive, use, or return the Good or Service;

G. That the consumer will not be Charged for any Good or Service;

H. That a Good or Service is offered on a "free," "trial," "sample," "bonus," "gift," "no obligation," or "discounted" basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge;

I. The timing or manner of any Charge or bill;

J. That the consumer can obtain a Good or Service for a processing, service, shipping, handling, or administrative fee with no further obligation;

K. The purpose(s) for which the consumer's Billing Information will be used;

21

L.     The date by which the consumer will incur any obligation or be Charged unless the consumer takes affirmative steps to prevent or stop such a Charge;

M.     That a transaction has been authorized by the consumer; or

N.     Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the Good or Service.

## XIV.  PROHIBITIONS CONCERNING REFUNDS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from failing to honor a refund, return, or cancellation request that complies with any policy to make refunds or allow returns or cancellations.

## XV.  PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.     Credit Card Laundering;

B.     Making, or assisting others in making, directly or by implication, any false or misleading statement in order to obtain Payment Processing services;

C.     Failing to disclose to an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables a person to accept payments of any kind any material information related to a Merchant Account including, but not limited to, the identity of any owner, manager, director, or officer of the applicant for or holder of

22

a Merchant Account, and any connection between an owner, manager, director, or officer of the applicant for or holder of a Merchant Account and any third person who has been or is placed in a Merchant Account monitoring program, had a Merchant Account terminated by a payment processor or a Financial Institution, or has been fined or otherwise disciplined in connection with a Merchant Account by a payment processor or a Financial Institution; and

D.     Engaging in any tactics to avoid fraud-and-risk-monitoring programs established by any Financial Institution, Acquiring Bank, or the operators of any payment system, including, but not limited to, tactics such as balancing or distributing sales transactions among multiple Merchant Accounts or merchant billing descriptors; splitting a single sales transaction into multiple smaller transactions; or using a shell company to apply for a Merchant Account.

## XVI.  PROHIBITION AGAINST UNAUTHORIZED CHARGES

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, promotion, offering for sale, or sale of any Good or Service, are permanently restrained and enjoined from Charging, causing to be Charged, assisting others in Charging, or attempting to Charge any consumer, without obtaining the consumer's express informed consent to the Charge and having created and maintained a record of such consent.

## XVII. PROHIBITION AGAINST DEBITING CONSUMERS' BANK ACCOUNTS WITHOUT AUTHORIZATION

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any Good or Service, are permanently restrained and enjoined from:

A.       Failing to timely obtain written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account before initiating any Preauthorized Electronic Fund Transfer; and

B.       Failing to provide to the consumer a copy of a valid written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account.

## XVIII.   CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that:

A.       Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

1.       Disclosing, using, or benefitting from, or assisting others in disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that Corporate Defendants obtained prior to entry of this Order in connection with the advertising, promotion, offering for sale, or sale of Defendants' oral film strips or Rengalife; and

2.       Failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after entry of this Order.

*Provided, however*, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

B.     Upon termination of the receivership, the Receiver shall not return any customer information to the Defendants.

## XIX.  ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff obtain acknowledgments of receipt of this Order:

A.     Jason Cardiff and Eunjung Cardiff, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.     For 20 years after entry of this Order, Jason Cardiff and Eunjung Cardiff for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, must deliver a copy of this Order  to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which Jason Cardiff or Eunjung Cardiff delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XX.    COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff make timely submissions to the Commission:

A.     One year after entry of this Order, Jason Cardiff and Eunjung Cardiff must each submit a compliance report, sworn under penalty of perjury.  Each of them must:

1.      Identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences;

2.      Identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest;

3.      Describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership;

4.      Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

5.      Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

6.      Describe the activities of each business, including the Goods or Services offered, the means of manufacturing, labeling, advertising, promotion, offering for sale, sale or distribution, and the involvement of any other Defendant (which Jason Cardiff and Eunjung Cardiff must describe if they know or should know due to their own involvement);

7.      Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

8.      Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.      For 20 years after entry of this Order, Jason Cardiff and Eunjung Cardiff must each submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.      Name, including aliases or fictitious name, or residence address;

26

2.      Title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity;

3.      Any designated point of contact; or

4.      The structure of any entity that such Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.      Jason Cardiff and Eunjung Cardiff must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.      Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The subject line must begin:  FTC v. Jason Cardiff, et al., X190001.

## XXI.    RECORDKEEPING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff must

27

create certain records for 20 years after entry of the Order, and retain each such record for 5 years. Specifically, Jason Cardiff and Eunjung Cardiff, for any business that such Defendant, individually or collectively with any other Defendants, is a majority owner or controls directly or indirectly, must create and retain the following records:

A.    Accounting records showing the revenues from all Goods or Services sold;

B.    Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.    Records of all consumer complaints and refund requests concerning the subject matter of this Order, whether received directly or indirectly, such as through a third party, and any response;

D.    All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E.    A copy of each unique advertisement or other marketing material.

## XXII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Jason Cardiff and Eunjung Cardiff's compliance with this Order:

A.    Within 14 days of receipt of a written request from a representative of the Commission, Jason Cardiff and Eunjung Cardiff each must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B. For matters concerning this Order, the Commission is authorized to communicate directly with Jason Cardiff and Eunjung Cardiff. Jason Cardiff and Eunjung Cardiff must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C. The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D. Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Jason Cardiff and Eunjung Cardiff, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## XXIII. EXPIRATION OF PRELIMINARY INJUNCTION PROVISIONS

A. Upon entry of this Order, the provisions of the Preliminary Injunction (Dkt. 59) other than the asset freeze and receivership shall expire.

B. The Court will review the Receiver's September 8, 2021 proposed distribution plan and any objections thereto and issue an order regarding final distribution of funds. Upon the Court's approval of the Receiver's final report, including confirmation of distribution of funds from the Receivership Estate, the asset freeze and receivership shall terminate.

///

///

///

## XXIV.    RETENTION OF JURISDICTION

      **IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.


**SO ORDERED this**      **day of**            **, 2021.**




_____
**DOLLY M. GEE**
**UNITED STATES DISTRICT JUDGE**



1
2
3
4
5
6
7
8
9     **UNITED STATES DISTRICT COURT**
10    **CENTRAL DISTRICT OF CALIFORNIA**
11    _____  )  No. ED 5:18-cv-02104-DMG-PLA
12    **Federal Trade Commission**,    )
                                       )  [PROPOSED] DEFAULT JUDGMENT
13                   Plaintiff,        )  INCLUDING PERMANENT
                                       )  INJUNCTION AS TO REDWOOD
14         v.                          )  SCIENTIFIC TECHNOLOGIES, INC.
                                       )  (CA), REDWOOD SCIENTIFIC
15    **Jason Cardiff, et al.**,        )  TECHNOLOGIES, INC. (NV) REDWOOD
                                       )  SCIENTIFIC TECHNOLOGIES, INC.
16                   Defendants.       )  (DE), IDENTIFY, LLC, ADVANCED
                                       )  MEN'S INSTITUTE PROLONGZ LLC,
17                                     )  RUN AWAY PRODUCTS, LLC, AND
                                       )  CAROLS PLACE LIMITED
18                                     )  PARTNERSHIP
                                       )
19                                     )
                                       )
20                                     )
                                       )
21                                     )
                                       )
22    _____  )
23
24         On October 3, 2018, Plaintiff, the Federal Trade Commission ("FTC" or
25    "the Commission"), filed its Complaint for Permanent Injunction and Other
26    Equitable Relief pursuant to Section 13(b) of the Federal Trade Commission Act
27    ("FTC Act") 15 U.S.C. §53(b), the Restore Online Shoppers' Confidence Act
28    ("ROSCA"), 15 U.S.C. §§ 8401-8405, and the Electronic Fund Transfer Act

("EFTA"), 15 U.S.C. §§ 1693-1693r, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105 and moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants Jason Cardiff, Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, Danielle Cadiz, a/k/a Danielle Walker, and corporate defendants, Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership ("Corporate Defendants").  Dkt. 1.

This Court entered a temporary restraining order ("TRO") on October 10, 2018.  Dkt. 29.  On October 24, 2018, the Court entered a Preliminary Injunction with an asset freeze and appointed a receiver over the Corporate Defendants.  Dkt. 46.

On March 5, 2019, the Commission filed an Application for the Clerk to Enter Defaults Against the Corporate Defendants Pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.  Dkts. 89, 89-1.  The Clerk entered defaults against the seven Corporate Defendants between March 5, 2019 and March 7, 2019.  Dkts. 91, 92, 96.

On August 6, 2020, the Commission moved for entry of default judgments against all seven Corporate Defendants pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Rule 55-1.  Dkt. 422.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      This action was initiated by the FTC under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 5 of ROSCA, 15 U.S.C. § 8404, Section 918(c) of EFTA, 15 U.S.C. § 1693o(c), and Section 6 of the Telemarketing Act, 15 U.S.C. §

6105. The Commission's Complaint sought both permanent injunctive relief and equitable monetary relief for the acts and practices as alleged therein.

2. The Court has jurisdiction over this matter and over the Corporate Defendants and venue in this district is proper under 15 U.S.C. § 53(b) and 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d).

3. The Corporate Defendants' activities as alleged in the Commission's Complaint were in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4. The Commission's Complaint stated a claim upon which relief can be granted against the Corporate Defendants.

5. The Corporate Defendants had proper notice of this lawsuit. They never filed an answer to the Complaint.

6. The allegations in the Commission's Complaint are taken as true against the Corporate Defendants.

7. Those allegations and evidence supporting them established that between 2013 and October 12, 2018, the Corporate Defendants violated:

    a. Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, which prohibit unfair and deceptive acts or practices in or affecting commerce;

    b. Section 4 of ROSCA, 15 U.S.C. § 8403, which prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule, 16 C.F.R. § 310.2(w), unless the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the

charge; and (c) provides a simple mechanism to stop recurring charges;

    c.    Section 907(a) of EFTA, 15 U.S.C. § 1693e(a) and Section 1005.10(b) of EFTA's implementing Regulation E, 12 C.F.R. § 1005.10, which provides that a preauthorized electronic fund transfer (which is elsewhere defined as an electronic fund transfer authorized in advance to recur at substantially regular intervals) from a consumer's account may be authorized by the consumer only in a writing signed or similarly authenticated by the consumer, and require that a copy of such authorization shall be provided to the consumer when made; and

    d.    Section 310.4(b)(1)(v) of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(v).

8.    Jason Cardiff and Eunjung Cardiff operated the Corporate Defendants as a common enterprise. The Corporate Defendants "constitute[d] various iterations and shells of one another" and the Cardiffs and the Corporate Defendants were "all involved in the sale of the Products and . . . money, products, and employees flowed freely between them." Dkt. 511, p. 20.

9.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue injunctive relief against violations of the FTC Act. Section 19 of the FTC Act, § 57b, empowers the Court to grant such relief as it finds necessary to redress injury to consumers from the Defendants' violations of ROSCA and the TSR, including rescission or reformation of contracts and refund of money.

10.    The danger of future violations by the Corporate Defendants justifies the issuance of permanent injunctive relief, including banning them from engaging in certain activities.

11.     This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

12.     Pursuant to Federal Rule of Civil Procedure 65(d), this Order is binding upon the Corporate Defendants, their officers, agents, servants, employees, attorneys, wholly-owned subsidiaries, successors and assigns, and upon those persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

13.     Entry of this Order is in the public interest, and there being no just reason or delay, the Clerk is directed to enter judgment in favor of Plaintiff Federal Trade Commission immediately.

**THEREFORE, IT IS ORDERED** as follows:

**DEFINITIONS**

For the purpose of this Order, the following definitions shall apply:

A.     "**Acquirer**" or "**Acquiring Bank**" means a business organization, Financial Institution, or an agent of a business organization or Financial Institution that has authority from an organization that operates or licenses a credit card system (e.g., Visa, MasterCard, American Express or Discover) to authorize Merchants to accept, transmit, or process payment by credit card through the credit card system for money, products, or anything else of value.

B.     "**Billing Information**" means any data that enables any person to access a consumer's account, such as a credit card, checking, savings, share or similar account, utility bill, or mortgage loan account, or debit card.

C.     "**Business Venture**" means any written or oral business arrangement, however denominated, whether or not covered by 16 C.F.R. Part 437, that consists of the payment of any consideration for the right or

means to offer, sell, or distribute Goods or Services.  The definition of Business Venture includes multilevel marketing programs.

D.   **"Charge(s)," "Charged," or "Charging"** means any attempt to collect money or other consideration from a consumer, including, but not limited to, causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account telephone bill, or other account.

E.   **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.   In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.   A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.   An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.   In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

F. "**Covered Product**" means any Dietary Supplement, Food, Drug, or Device.

G. "**Credit Card Laundering**" means: (a) presenting or depositing into, or causing or allowing another to present or deposit into, the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; (b) employing, soliciting, or otherwise causing or allowing a Merchant, or an employee, representative, or agent of a Merchant, to present to or deposit into the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; or (c) obtaining access to the credit card system through the use of a business relationship or an affiliation with a Merchant, when such access is not authorized by the Merchant Account agreement or the applicable credit card system.

H. "**Credit Card Sales Draft**" means any record or evidence of a credit card transaction.

-7-

I.  "**Corporate Defendant(s)**" means Redwood Scientific Technologies, Inc. (CA); Redwood Scientific Technologies, Inc. (NV); Redwood Scientific Technologies, Inc. (DE); Identify, LLC; Advanced Men's Institute Prolongz LLC; Run Away Product, LLC; and Carols Place Limited Partnership, individually, collectively, or in any combination.

J.  **Defendant(s)** means Jason Cardiff, Eunjung Cardiff, and the Corporate Defendants, individually, collectively, or in any combination.

K.  "**Device**" means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them; (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in humans or other animals; or (3) intended to affect the structure or any function of the body of humans or other animals; and which does not achieve any of its principal intended purposes through chemical action within or on the body of humans or other animals and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes.

L.  "**Dietary Supplement**" means:  (1) any product labeled as a Dietary Supplement or otherwise represented as a Dietary Supplement; or (2) any pill, tablet, capsule, powder, softgel, gelcap, liquid, or other similar form containing one or more ingredients that are a vitamin, mineral, herb or other botanical, amino acid, probiotic, or other dietary substance for use by humans to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite,

constituent, extract, or combination of any ingredient described above, that is intended to be ingested, and is not represented to be used as a conventional Food or as a sole item of a meal or the diet.

M. **"Drug"** means: (1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of humans or other animals; and (4) articles intended for use as a component of any article specified in (1), (2), or (3); but does not include devices or their components, parts, or accessories.

N. **"Essentially Equivalent Product"** means a product that contains the identical ingredients, except for inactive ingredients (e.g., binders, colors, fillers, excipients) in the same form and dosage, and with the same route of administration (e.g., orally, sublingually), as the Covered Product; *provided that* the Covered Product may contain additional ingredients if reliable scientific evidence generally accepted by experts in the field indicates that the amount and combination of additional ingredients is unlikely to impede or inhibit the effectiveness of the ingredients in the Essentially Equivalent Product.

O. **"Financial Institution"** means any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956 (12 U.S.C. § 1843(k)). An institution that is significantly engaged in financial activities is a Financial Institution.

P.     **"Food"** means:  (1) any article used for food or drink for humans or other animals; (2) chewing gum; and (3) any article used for components of any such article.

Q.     **"Good(s) or Service(s)"** includes merchandise, products, plans, or programs.

R.     **"Investment Opportunity"** means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

S.     **"Made in the United States"** means any representation, express or implied, that a product, or a specified component thereof, is of U.S.-origin, including a representation that such product is "made," "manufactured," "built," or "produced" in the United States or in America, or any other U.S.-origin claim.

T.     **"Merchant"** means (a) any person or entity engaged in the sale or marketing of any goods or services, or soliciting a charitable contribution, or (b) any person or entity who applies for or obtains Payment Processing services.

U.     **"Merchant Account"** means any account with an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables an individual, a business, or other organization to accept payments of any kind.

V.     **"Negative Option Feature"** means, in an offer or agreement to sell or provide any Good or Service, a provision under which the consumer's silence or failure to take affirmative action to reject a Good or Service, or to cancel the agreement, is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

W.    "**Payment Processing**" means providing a person or entity, directly or indirectly, with the means used to charge or debit accounts through the use of any payment method or mechanism, including, but not limited to, remotely created payment orders, remotely created checks, ACH debits, or debit, credit, prepaid, or stored value cards. Whether accomplished through the use of software or otherwise, Payment Processing includes, among other things: (a) reviewing and approving Merchant applications for payment processing services; (b) providing the means to transmit sales transactions data from Merchants to Acquiring Banks or other Financial Institutions; (c) clearing, settling, or distributing proceeds of sales transactions from Acquiring Banks or Financial Institutions to Merchants; or (d) processing chargebacks or returned remotely created payment orders, remotely created checks, or ACH checks.

X.    "**Person**" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

Y.    "**Preauthorized Electronic Fund Transfer**" means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

Z.    "**Receiver**" means Robb Evans & Associates, LLC.

## ORDER

## I.  BAN ON NEGATIVE OPTION SALES

**IT IS ORDERED** that Corporate Defendants, whether acting directly or through an intermediary, are permanently restrained and enjoined from the advertising, marketing, promotion, offering for sale, or sale of any Good or Service with a Negative Option Feature.

-11-

## II. BAN ON ROBOCALLS AND RINGLESS VOICEMAILS

**IT IS FURTHER ORDERED** that Corporate Defendants, whether acting directly or through an intermediary, are permanently restrained and enjoined from initiating telephone calls delivering prerecorded messages, including ringless voicemails.

## III. BAN ON MULTILEVEL MARKETING

**IT IS FURTHER ORDERED** that Corporate Defendants, whether acting directly or through an intermediary, are permanently restrained and enjoined from engaging or participating in any multilevel marketing program.

## IV. BAN ON THE ADVERTISING, MARKETING, PROMOTION, OFFERING FOR SALE, OR SALE OF DISSOLVABLE ORAL FILM STRIPS TO END-USER CONSUMERS

**IT IS FURTHER ORDERED** that Corporate Defendants, whether acting directly or through an intermediary, are permanently restrained and enjoined from the advertising, marketing, promoting, or offering for sale of any dissolvable oral film strip to end-user consumers.

## V. PROHIBITED REPRESENTATIONS:  REGARDING HEALTH-RELATED CLAIMS REQUIRING HUMAN CLINICAL TESTING FOR SUBSTANTIATION

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation that such product:

A.    Helps users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

B.    Causes or assists in causing weight loss, including any specific representation about the amount of weight loss;

C.    Suppresses or helps suppress appetite;

D.    Causes or assists in causing weight loss without dieting or any change in food or lifestyle;

E.    Helps users avoid gaining back any weight they lost;

F.    Increases ejaculation control or the duration of sex;

G.    Treats or prevents premature ejaculation;

H.    Cures, mitigates, or treats any disease; or

I.    Is comparable or superior to other treatments for quitting smoking, weight loss, or sexual performance, or in curing, mitigating, or treating any disease,

unless the representation is non-misleading, and, at the time of making such representation, Corporate Defendants possess and rely upon competent and reliable scientific evidence substantiating that the representation is true.  For purposes of this Section, competent and reliable scientific evidence must consist of human clinical testing of the product, or of an Essentially Equivalent Product, that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.  Such testing must be:  (1) randomized, double-blind, and placebo-controlled; and (2) conducted by researchers qualified by training and experience to conduct such testing.  In addition, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as described in the Section entitled Preservation of Records Relating to Competent and Reliable

Human Clinical Tests or Studies must be available for inspection and production to the Commission.  Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VI.  PROHIBITED REPRESENTATIONS:  OTHER HEALTH-RELATED CLAIMS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation, other than representations covered under the Section of this Order entitled Prohibited Representations:  Regarding Health-Related Claims Requiring Human Clinical Testing For Substantiation, about the health benefits, performance, efficacy, safety, or side effects of the product, unless the representation is non-misleading, and, at the time of making such representation, Corporate Defendants possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

For purposes of this Section, competent and reliable scientific evidence means tests, analyses, research, or studies (1) that have been conducted and evaluated in an objective manner by experts in the relevant disease, condition, or function to which the representation relates; (2) that are generally accepted by such experts to yield accurate and reliable results; and (3) that are randomized, double-

-14-

blind, and placebo-controlled human clinical testing of the Covered Product, or of an Essentially Equivalent Product, when such experts would generally require such human clinical testing to substantiate that the representation is true. In addition, when such tests or studies are human clinical tests or studies, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as set forth in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission. Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VII. PRESERVATION OF RECORDS RELATING TO COMPETENT AND RELIABLE HUMAN CLINICAL TESTS OR STUDIES

**IT IS FURTHER ORDERED** that, with regard to any human clinical test or study ("test") upon which Corporate Defendants rely to substantiate any claim covered by this Order, they shall secure and preserve all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of the test, including:

A.     All protocols and protocol amendments, reports, articles, write-ups, or other accounts of the results of the test, and drafts of such documents reviewed by the test sponsor or any other person not employed by the research entity;

B.     All documents referring or relating to recruitment; randomization; instructions, including oral instructions, to participants; and participant compliance;

C.     Documents sufficient to identify all test participants, including any participants who did not complete the test, and all communications with any participants relating to the test; all raw data collected from participants enrolled in the test, including any participants who did not

complete the test; source documents for such data; any data
dictionaries; and any case report forms;

D.     All documents referring or relating to any statistical analysis of any
       test data, including any pretest analysis, intent-to-treat analysis, or
       between-group analysis performed on any test data; and

E.     All documents referring or relating to the sponsorship of the test,
       including all communications and contracts between any sponsor and
       the test's researchers.

*Provided, however*, the preceding preservation requirement does not apply to a
reliably reported test, unless the test was conducted, controlled, or sponsored, in
whole or in part by: (1) Corporate Defendants; (2) their officers, agents,
representatives, or employees; (3) any other person or entity in active concert or
participation with Corporate Defendants; (4) any person or entity affiliated with or
acting on behalf of Corporate Defendants; (5) any supplier of any ingredient
contained in the product at issue to any of the foregoing or to the product's
manufacturer; or (6) the supplier or manufacturer of such product.

       For purposes of this Section, "reliably reported test" means a report of the
test has been published in a peer-reviewed journal, and such published report
provides sufficient information about the test for experts in the relevant field to
assess the reliability of the results.

       For any test conducted, controlled, or sponsored, in whole or in part, by or,
Corporate Defendants, they must establish and maintain reasonable procedures to
protect the confidentiality, security, and integrity of any personal information
collected from or about participants. These procedures must be documented in
writing and must contain administrative, technical, and physical safeguards
appropriate to the size and complexity of the entity sponsoring the test, the nature
and scope of that entity's activities, and the sensitivity of the personal information
collected from or about the participants.

## VIII.  PROHIBITED REPRESENTATIONS:  TESTS, STUDIES, OR OTHER RESEARCH

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration:

A.      That the product is clinically proven to:

    1.   Help users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

    2.   Cause or assist in causing weight loss, including any specific representation about the amount of weight loss;

    3.   Suppress or help suppress appetite;

    4.   Cause or assist in causing weight loss without dieting or any change in food or lifestyle;

    5.   Help users avoid gaining back any weight they lost;

    6.   Increase ejaculation control or the duration of sex;

    7.   Treat or prevent premature ejaculation; or

    8.   Be comparable or superior to other treatments for quitting smoking.

B.      That the performance or benefits of the product are scientifically or clinically proven or otherwise established; or

C.      The existence, contents, validity, results, conclusions, or interpretations of any test, study, or other research.

-17-

# IX. FDA-APPROVED CLAIMS

**IT IS FURTHER ORDERED** that nothing in this Order prohibits Corporate Defendants, their officers, agents, employees, and attorneys, or all other persons in active concert or participation with any of them from:

A. For any Drug product, making a representation that is approved for inclusion in labeling for such Drug product under a new drug application or biologics license application approved by the Food and Drug Administration, or, for any nonprescription Drug product authorized by Section 505G of the Food, Drug, and Cosmetics Act, 21 U.S.C. § 355h, ("FDCA") to be marketed without an approved new drug application, making a representation that is permitted or required to appear in its labeling in accordance with Section 505G(a)(1)-(3) of the FDCA, 21 U.S.C. § 355h(a)(1)-(3), or a final administrative order under Section 505G(b) of the FDCA, 21 U.S.C. § 355h(b); and

B. For any product, making a representation that is specifically authorized for use in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990 or permitted under Sections 303-304 of the Food and Drug Administration Modernization Act of 1997.

# X. PROHIBITED MISREPRESENTATIONS: ENDORSEMENTS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from making, or assisting others in making, any misrepresentation, expressly or by implication, (1) about the status of any endorser or person providing a review of the Good or Service, including a misrepresentation that the endorser or reviewer is an independent or ordinary user

of the Good or Service, or (2) that any person or organization has endorsed any Good or Service.

## XI.   PROHIBITED MISREPRESENTATIONS:  U.S. ORIGIN CLAIMS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, or any other product, are permanently restrained and enjoined from making, or assisting others in making, any representation, expressly or by implication, that it is Made in the United States unless:

A.    The final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States; or

B.    A Clear and Conspicuous qualification appears immediately adjacent to the representation that accurately conveys the extent to which the product contains foreign parts, ingredients or components, and/or processing; or

C.    For a claim that a product is assembled in the United States, the product is last substantially transformed in the United States, the product's principal assembly takes place in the United States, and United States assembly operations are substantial.

## XII.   PROHIBITED REPRESENTATIONS:  EARNINGS CLAIMS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing,

-19-

promotion, offering for sale, or sale of any Good or Service, including Business Ventures or Investment Opportunities, are permanently restrained and enjoined from:

    A.    Misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, any material fact, including:

        1.    That participants will or are likely to achieve substantial sales or earn substantial income or profit;

        2.    The amount of sales, income, or profit that participants have actually earned;

        3.    The amount of time or effort required to earn an amount of compensation or to advance; or

        4.    The total costs or any material restrictions, limitations, or conditions;

    B.    Making any representation, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, regarding the amount of sales, income, or profit that a participant can expect to earn, including that participants will or are likely to achieve substantial sales or earn substantial income or profit, unless the representation is non-misleading, and, at the time such representation is made, Corporate Defendants possess and rely upon competent and reliable evidence that is sufficient to substantiate that the representation is true.

## XIII. PROHIBITED MISREPRESENTATIONS: OTHER MATERIAL FACTS

    **IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or

participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promoting, offering for sale, sale, or distribution of any Good or Service are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration, any material fact concerning such Good or Service, including:

    A.    The success rate or rate of customer satisfaction;

    B.    The total costs;

    C.    Any refund policy;

    D.    Any material restrictions, limitations, or conditions, including any conditions that might limit certain consumers' ability to obtain the full benefits of the proffered Good or Service;

    E.    Any material aspect of its performance, efficacy, nature, or central characteristics, including that the benefits of the proffered Good or Service can be obtained quickly or easily;

    F.    Any cost to the consumer to purchase, receive, use, or return the Good or Service;

    G.    That the consumer will not be Charged for any Good or Service;

    H.    That a Good or Service is offered on a "free," "trial," "sample," "bonus," "gift," "no obligation," or "discounted" basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge;

    I.    The timing or manner of any Charge or bill;

-21-

J. That the consumer can obtain a Good or Service for a processing, service, shipping, handling, or administrative fee with no further obligation;

K. The purpose(s) for which the consumer's Billing Information will be used;

L. The date by which the consumer will incur any obligation or be Charged unless the consumer takes affirmative steps to prevent or stop such a Charge;

M. That a transaction has been authorized by the consumer; or

N. Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the Good or Service.

## XIV. PROHIBITIONS CONCERNING REFUNDS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from failing to honor a refund, return, or cancellation request that complies with any policy of Corporate Defendants to make refunds or allow returns or cancellations.

## XV. PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order are permanently restrained and enjoined from:

A. Credit Card Laundering;

B. Making, or assisting others in making, directly or by implication, any false or misleading statement in order to obtain Payment Processing services;

C. Failing to disclose to an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables a person to accept payments of any kind any material information related to a Merchant Account including, but not limited to, the identity of any owner, manager, director, or officer of the applicant for or holder of a Merchant Account, and any connection between an owner, manager, director, or officer of the applicant for or holder of a Merchant Account and any third person who has been or is placed in a Merchant Account monitoring program, had a Merchant Account terminated by a payment processor or a Financial Institution, or has been fined or otherwise disciplined in connection with a Merchant Account by a payment processor or a Financial Institution; and

D. Engaging in any tactics to avoid fraud-and-risk-monitoring programs established by any Financial Institution, Acquiring Bank, or the operators of any payment system, including, but not limited to, tactics such as balancing or distributing sales transactions among multiple Merchant Accounts or merchant billing descriptors; splitting a single sales transaction into multiple smaller transactions; or using a shell company to apply for a Merchant Account.

## XVI.  PROHIBITION AGAINST UNAUTHORIZED CHARGES

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, promotion, offering

-23-

for sale, or sale of any Good or Service, are permanently restrained and enjoined from Charging, causing to be Charged, assisting others in Charging, or attempting to Charge any consumer, without obtaining the consumer's express informed consent to the Charge and having created and maintained a record of such consent.

## XVII. PROHIBITION AGAINST DEBITING CONSUMERS' BANK ACCOUNTS WITHOUT AUTHORIZATION

**IT IS FURTHER ORDERED** that Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any Good or Service, are permanently restrained and enjoined from:

A. Failing to timely obtain written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account before initiating any Preauthorized Electronic Fund Transfer; and

B. Failing to provide to the consumer a copy of a valid written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account.

## XVIII. CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that:

A. Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

1. Disclosing, using, or benefitting from, or assisting others in disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address,

-24-

social security number, other identifying information, or any
data that enables access to a customer's account (including a
credit card, bank account, or other financial account), that
Corporate Defendants obtained prior to entry of this Order in
connection with the advertising, promotion, offering for sale, or
sale of Defendants' oral film strips or Rengalife; and

2.   Failing to destroy such customer information in all forms in
their possession, custody, or control within 30 days after entry
of this Order.

*Provided, however*, that customer information need not be disposed
of, and may be disclosed, to the extent requested by a government
agency or required by law, regulation, or court order.

B.   Upon termination of the receivership, the Receiver shall not return
any customer information to the Defendants.

## XIX.  ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Corporate Defendants obtain
acknowledgments of receipt of this Order:

A.   Corporate Defendants, within 7 days of entry of this Order, must
submit to the Commission an acknowledgment of receipt of this Order
sworn under penalty of perjury.

B.   For 20 years after entry of this Order, Corporate Defendants for any
business that such Defendant, individually or collectively with any
other Defendants, is the majority owner or controls directly or
indirectly, must deliver a copy of this Order to:  (1) all principals,
officers, directors, and LLC managers and members; (2) all
employees having managerial responsibilities for conduct related to
the subject matter of the Order and all agents and representatives who
participate in conduct related to the subject matter of the Order; and

(3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.    From each individual or entity to which Corporate Defendants delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XX.    COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Corporate Defendants make timely submissions to the Commission:

A.    One year after entry of this Order, Corporate Defendants must each submit a compliance report, sworn under penalty of perjury.  Each of them must:

1.    Identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences;

2.    Identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest;

3.    Describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership;

4.    Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

5.    Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

6.    Describe the activities of each business, including the Goods or Services offered, the means of manufacturing, labeling, advertising, promotion, offering for sale, sale or distribution, and the involvement of any other Defendant (which Corporate Defendants must describe if they know or should know due to their own involvement);

7.    Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

8.    Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.    For 20 years after entry of this Order, Corporate Defendants must each submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.    Name, including aliases or fictitious name, or residence address;

2.    Title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity;

3.    Any designated point of contact; or

4.    The structure of any entity that such Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any

subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C. Corporate Defendants must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D. Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on:  _____"  and supplying the date, signatory's full name, title (if applicable), and signature.

E. Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The subject line must begin:  FTC v. Jason Cardiff, et al., X190001.

# XXI.  RECORDKEEPING

**IT IS FURTHER ORDERED** that Corporate Defendants must create certain records for 20 years after entry of the Order, and retain each such record for 5 years.  Specifically, Corporate Defendants, for any business that each such Defendant, individually or collectively with any other Defendant, is a majority owner or controls directly or indirectly, must create and retain the following records:

A. Accounting records showing the revenues from all Goods or Services sold;

-28-

B. Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. Records of all consumer complaints and refund requests concerning the subject matter of this Order, whether received directly or indirectly, such as through a third party, and any response;

D. All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E. A copy of each unique advertisement or other marketing material.

## XXII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Corporate Defendants' compliance with this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission, Corporate Defendants each must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B. For matters concerning this Order, the Commission is authorized to communicate directly with Corporate Defendants. Corporate Defendants must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.

-29-

C.   The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D.   Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Corporate Defendants, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## XXIII.   EXPIRATION OF PRELIMINARY INJUNCTION PROVISIONS

A.   Upon entry of this Order, the provisions of the Preliminary Injunction (Dkt. 46) other than the asset freeze and receivership shall expire.

B.   The Court will review the Receiver's September 8, 2021 proposed distribution plan and any objections thereto and issue an order regarding final distribution of funds.  Upon the Court's approval of the Receiver's final report, including confirmation of distribution of funds from the Receivership Estate, the asset freeze and receivership shall terminate.

///
///
///

## XXIV. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this        day of                          , 2021.**


_____

**DOLLY M. GEE**

**UNITED STATES DISTRICT JUDGE**

# EXHIBIT 83

## TO THE DECLARATION OF STEPHEN G. LARSON

[Redacted - Document Conditionally Filed Under Seal]

# EXHIBIT 84

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**Federal Trade Commission**,

    Plaintiff,

    v.

**Jason Cardiff**, et al.,

    Defendants.

No. ED CV 18-2104-DMG (PLAx)

FINAL JUDGMENT INCLUDING PERMANENT INJUNCTION AS TO DEFENDANTS JASON CARDIFF AND EUNJUNG CARDIFF

On October 3, 2018, Plaintiff, the Federal Trade Commission ("FTC" or the "Commission"), filed its Complaint for Permanent Injunction and Other Equitable Relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401-8405, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, and moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining

order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants Jason Cardiff, Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, Danielle Cadiz, a/k/a Danielle Walker, Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advanced Men's Institute Prolongz LLC, Run Away Products, LLC, and Carols Place Limited Partnership.  [Doc. # 1.]

This Court entered a temporary restraining order ("TRO") on October 10, 2018.  [Doc. # 29.]  On October 24, 2018, the Court extended the TRO as to Defendants Jason Cardiff and Eunjung Cardiff ("the Cardiffs").  [Doc. # 48.]  On November 8, 2018, the Court entered a Preliminary Injunction as to Defendants Jason Cardiff and Eunjung Cardiff.  [Doc. # 59.]

On August 6, 2020, the Commission moved for summary judgment as to Defendants Jason Cardiff and Eunjung Cardiff on all counts of the Complaint. [Doc. # 423.]  On October 9, 2020, the Court granted summary judgment against the Cardiffs on all sixteen counts in the Commission's Complaint.  [Doc. # 511.] The Commission filed a proposed Final Judgment on September 3, 2021.  [Doc. # 651.]

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

1.      This Court has jurisdiction over this matter and over the Cardiffs and venue in this district is proper under 15 U.S.C. § 53(b) and 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d).

2.      At all relevant times, the Cardiffs' activities as alleged in the Commission's Complaint were in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

3.      The Complaint charged that Defendants, including Jason Cardiff and Eunjung Cardiff, participated in deceptive and unfair acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, Section 4 of

ROSCA, 15 U.S.C. § 8403, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), Section 1005.10(b) of EFTA's implementing Regulation E, 12 C.F.R. § 1005.10(b), and Section 310.4(b)(1)(v) of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(v), in the marketing of Defendants' oral film strips and the Rengalife multilevel marketing program. The Complaint sought both permanent injunctive relief and equitable monetary relief for the challenged acts or practices.

4.     The Complaint stated a claim upon which relief can be granted against the Cardiffs.

5.     The Cardiffs violated Sections 5(a) and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a) and 52, by making:

a.     False or unsubstantiated efficacy clams and false proof claims for their oral film strips TBX-FREE, Eupepsia Thin, and Prolongz;

b.     False money-back guarantee claims for those oral film strips;

c.     False claims that Eupepsia Thin oral film strips were made in the United States, and that testimonialists appearing in advertising for Eupepsia Thin had used the product to lose weight; and

d.     False claims that consumers would not be enrolled in an autoship program and that their credit or debit card would be charged only for a one-time purchase of oral film strips.

6.     The Cardiffs violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by:

a.     Failing to disclose, or disclose adequately, that consumers who provided their billing information for a product order would be enrolled automatically in a continuity plan for future

autoshipments of oral film strips that would be charged to their credit or debit cards; and

b.     Making false and unsubstantiated claims that people who became Rengalife members were likely to earn substantial income.

7.     The Cardiffs violated Sections 5(a) and 5(n) of the FTC Act, 15 U.S.C. §§ 45(a), 45(n), by causing charges to be submitted for payment to consumers' credit and debit cards without the express informed consent of those consumers.

8.     The Cardiffs violated Section 4 of ROSCA, 15 U.S.C. § 8403, by charging consumers for TBX-FREE oral film strips sold over the Internet through a negative option feature as defined in the TSR, 16 C.F.R. §3102(w) without:  (a) clearly and conspicuously disclosing all material terms of the transaction before obtaining the consumer's billing information; (b) obtaining the consumer's express informed consent before making the charge; and (c) providing a simple mechanism to stop recurring charges.

9.     The Cardiffs violated Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), by debiting consumers' bank accounts without first obtaining written authorizations signed or similarly authorized by those consumers for preauthorized electronic fund transfers from their accounts, or providing those consumers a copy of a written authorization signed or similarly authenticated by them.

10.     The Cardiffs violated the TSR by initiating or causing the initiation of outbound telephone calls that delivered prerecorded messages intended to induce the purchase of oral film strips.

11.     The Cardiffs operated the Corporate Defendants as a common enterprise, and the Corporate Defendants were "all involved in the sale of the Products [with] money, products, and employees flow[ing] freely between them." Summary Judgment Order at 20-21 [Doc. # 511].  The Cardiffs were the

"beneficiaries and masterminds" of the common enterprise, and "had knowledge of the misrepresentations in advertising or were recklessly indifferent to the falsity of the misrepresentations." *Id.*

12.    At all times material to the Complaint, both Jason Cardiff and Eunjung Cardiff formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in Findings 5 to 11, above, and both of them are therefore liable for injunctive relief.

13.    At all times material to the Complaint, both Jason Cardiff and Eunjung Cardiff knew of or were recklessly indifferent to the acts and practices set forth in Findings 5 to 11, above.

14.    The danger of future violations by Jason Cardiff and Eunjung Cardiff justifies the issuance of permanent injunctive relief, including banning them from engaging in certain activities.

15.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue injunctive relief for the Defendants' law violations.  Section 19 of the FTC Act, § 57b, empowers the Court to grant such relief as it finds necessary to redress injury to consumers from the Defendants' violations of ROSCA and the TSR, including rescission or reformation of contracts and refund of money.

16.    This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

17.    Pursuant to Federal Rule of Civil Procedure 65(d), the provisions of this Order are binding upon Jason Cardiff and Eunjung Cardiff, their successors and assigns, and their officers, agents, employees and attorneys, and upon those persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.

18.    Entry of this Order is in the public interest, and there being no just reason for delay, the Clerk is directed to enter judgment in favor of Plaintiff Federal Trade Commission immediately.

**THEREFORE, IT IS ORDERED** as follows:

## DEFINITIONS

For the purpose of this Order, the following definitions shall apply:

A.     "**Acquirer**" or "**Acquiring Bank**" means a business organization, Financial Institution, or an agent of a business organization or Financial Institution that has authority from an organization that operates or licenses a credit card system (e.g., Visa, MasterCard, American Express or Discover) to authorize Merchants to accept, transmit, or process payment by credit card through the credit card system for money, products, or anything else of value.

B.     "**Billing Information**" means any data that enables any person to access a consumer's account, such as a credit card, debit card, checking, savings, share or similar account, utility bill, or mortgage loan account.

C.     "**Business Venture**" means any written or oral business arrangement, however denominated, whether or not covered by 16 C.F.R. Part 437, that consists of the payment of any consideration for the right or means to offer, sell, or distribute Goods or Services.  The definition of Business Venture includes multilevel marketing programs.

D.     "**Charge(s),**" "**Charged,**" **or** "**Charging**" means any attempt to collect money or other consideration from a consumer, including, but not limited to, causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

E.     "**Clear(ly) and conspicuous(ly)**" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.   In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a television

6

advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

F. "**Covered Product**" means any Dietary Supplement, Food, Drug, or Device.

7

G.     **"Credit Card Laundering"** means: (a) presenting or depositing into, or causing or allowing another to present or deposit into, the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; (b) employing, soliciting, or otherwise causing or allowing a Merchant, or an employee, representative, or agent of a Merchant, to present to or deposit into the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; or (c) obtaining access to the credit card system through the use of a business relationship or an affiliation with a Merchant, when such access is not authorized by the Merchant Account agreement or the applicable credit card system.

H.     **"Credit Card Sales Draft"** means any record or evidence of a credit card transaction.

I.     **"Corporate Defendant(s)"** means Redwood Scientific Technologies, Inc. (CA); Redwood Scientific Technologies, Inc. (NV); Redwood Scientific Technologies, Inc. (DE); Identify, LLC; Advanced Men's Institute Prolongz LLC; Run Away Product, LLC; and Carols Place Limited Partnership, individually, collectively, or in any combination.

J.     **"Defendant(s)"** means all of the named Defendants, individually, collectively, or in any combination.

K.     **"Device"** means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them; (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in humans or other animals; or (3) intended to affect the structure or any function of the body of humans or other

animals; and which does not achieve any of its principal intended purposes through chemical action within or on the body of humans or other animals and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes.

L.   "**Dietary Supplement**" means:  (1) any product labeled as a Dietary Supplement or otherwise represented as a Dietary Supplement; or (2) any pill, tablet, capsule, powder, softgel, gelcap, liquid, or other similar form containing one or more ingredients that are a vitamin, mineral, herb or other botanical, amino acid, probiotic, or other dietary substance for use by humans to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of any ingredient described above, that is intended to be ingested, and is not represented to be used as a conventional Food or as a sole item of a meal or the diet.

M.   "**Drug**" means:  (1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of humans or other animals; and (4) articles intended for use as a component of any article specified in (1), (2), or (3); but does not include devices or their components, parts, or accessories.

N.   "**Essentially Equivalent Product**" means a product that contains the identical ingredients, except for inactive ingredients (e.g., binders, colors, fillers, excipients) in the same form and dosage, and with the same route of administration (e.g., orally, sublingually), as the Covered Product; *provided that* the Covered Product may contain additional ingredients if reliable scientific evidence generally accepted by experts in the field indicates that the amount and combination of

additional ingredients is unlikely to impede or inhibit the effectiveness of the ingredients in the Essentially Equivalent Product.

O.     "**Financial Institution**" means any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956 (12 U.S.C. § 1843(k)). An institution that is significantly engaged in financial activities is a Financial Institution.

P.     "**Food**" means:  (1) any article used for food or drink for humans or other animals; (2) chewing gum; and (3) any article used for components of any such article.

Q.     "**Good(s) or Service(s)**" includes merchandise, products, plans, or programs.

R.     "**Investment Opportunity**" means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

S.     "**Made in the United States**" means any representation, express or implied, that a product, or a specified component thereof, is of U.S.-origin, including a representation that such product is "made," "manufactured," "built," or "produced" in the United States or in America, or any other U.S.-origin claim.

T.     "**Merchant**" means (a) any person or entity engaged in the sale or marketing of any goods or services, or soliciting a charitable contribution, or (b) any person or entity who applies for or obtains Payment Processing services.

U.     "**Merchant Account**" means any account with an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables an individual, a business, or other organization to accept payments of any kind.

V.     "**Negative Option Feature**" means, in an offer or agreement to sell or provide any Good or Service, a provision under which the consumer's silence or

10

failure to take affirmative action to reject a Good or Service, or to cancel the agreement, is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

W.    "**Payment Processing**" means providing a person or entity, directly or indirectly, with the means used to charge or debit accounts through the use of any payment method or mechanism, including, but not limited to, remotely created payment orders, remotely created checks, ACH debits, or debit, credit, prepaid, or stored value cards. Whether accomplished through the use of software or otherwise, Payment Processing includes, among other things: (a) reviewing and approving Merchant applications for payment processing services; (b) providing the means to transmit sales transactions data from Merchants to Acquiring Banks or other Financial Institutions; (c) clearing, settling, or distributing proceeds of sales transactions from Acquiring Banks or Financial Institutions to Merchants; or (d) processing chargebacks or returned remotely created payment orders, remotely created checks, or ACH checks.

X.    "**Person**" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

Y.    "**Preauthorized Electronic Fund Transfer**" means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

Z.    "**Receiver**" means Robb Evans & Associates, LLC.


# ORDER

## I.    BAN ON NEGATIVE OPTION SALES

**IT IS ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined

11

from the advertising, marketing, promotion, offering for sale, or sale of any Good or Service with a Negative Option Feature.

## II. BAN ON ROBOCALLS AND RINGLESS VOICEMAILS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from initiating telephone calls delivering prerecorded messages, including ringless voicemails.

## III. BAN ON MULTILEVEL MARKETING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, facilitating, or advising, are permanently restrained and enjoined from engaging or participating in any multilevel marketing program.

## IV. BAN ON THE ADVERTISING, MARKETING, PROMOTION, OFFERING FOR SALE, OR SALE OF DISSOLVABLE ORAL FILM STRIPS TO END-USER CONSUMERS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, whether acting directly or through an intermediary, including by consulting, planning, participating, facilitating, or advising, are permanently restrained and enjoined from the advertising, marketing, promotion, offering for sale, or sale of any dissolvable oral film strip to end-user consumers.

## V. PROHIBITED REPRESENTATIONS: HEALTH-RELATED CLAIMS REQUIRING HUMAN CLINICAL TESTING FOR SUBSTANTIATION

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling,

advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation that such product:

A. Helps users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

B. Causes or assists in causing weight loss, including any specific representation about the amount of weight loss;

C. Suppresses or helps suppress appetite;

D. Causes or assists in causing weight loss without dieting or any change in food or lifestyle;

E. Helps users avoid gaining back any weight they lost;

F. Increases ejaculation control or the duration of sex;

G. Treats or prevents premature ejaculation;

H. Cures, mitigates, or treats any disease; or

I. Is comparable or superior to other treatments for quitting smoking, weight loss, or sexual performance, or in curing, mitigating, or treating any disease,

unless the representation is non-misleading, and, at the time of making such representation, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable scientific evidence substantiating that the representation is true. For purposes of this Section, competent and reliable scientific evidence must consist of human clinical testing of the product, or of an Essentially Equivalent Product, that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true. Such testing must be: (1) randomized, double-blind, and placebo-controlled; and (2) conducted

13

by researchers qualified by training and experience to conduct such testing. In addition, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as described in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission. Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VI.    PROHIBITED REPRESENTATIONS:  OTHER HEALTH-RELATED CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation, other than representations covered under the Section of this Order entitled Prohibited Representations:  Health-Related Claims Requiring Human Clinical Testing For Substantiation, about the health benefits, performance, efficacy, safety, or side effects of the product, unless the representation is non-misleading, and, at the time of making such representation, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted by experts in the relevant disease, condition, or function to which the representation relates, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

14

For purposes of this Section, competent and reliable scientific evidence means tests, analyses, research, or studies (1) that have been conducted and evaluated in an objective manner by experts in the relevant disease, condition, or function to which the representation relates; (2) that are generally accepted by such experts to yield accurate and reliable results; and (3) that are randomized, double-blind, and placebo-controlled human clinical testing of the Covered Product, or of an Essentially Equivalent Product, when such experts would generally require such human clinical testing to substantiate that the representation is true.  In addition, when such tests or studies are human clinical tests or studies, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as set forth in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies must be available for inspection and production to the Commission. Persons covered by this Section have the burden of proving that a product satisfies the definition of Essentially Equivalent Product.

## VII.   PRESERVATION OF RECORDS RELATING TO COMPETENT AND RELIABLE HUMAN CLINICAL TESTS OR STUDIES

**IT IS FURTHER ORDERED** that, with regard to any human clinical test or study ("test") upon which Jason Cardiff or Eunjung Cardiff rely to substantiate any claim covered by this Order, they shall secure and preserve all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of the test, including:

A.     All protocols and protocol amendments, reports, articles, write-ups, or other accounts of the results of the test, and drafts of such documents reviewed by the test sponsor or any other person not employed by the research entity;

B.     All documents referring or relating to recruitment; randomization; instructions, including oral instructions, to participants; and participant compliance;

15

C.    Documents sufficient to identify all test participants, including any participants who did not complete the test, and all communications with any participants relating to the test; all raw data collected from participants enrolled in the test, including any participants who did not complete the test; source documents for such data; any data dictionaries; and any case report forms;

D.    All documents referring or relating to any statistical analysis of any test data, including any pretest analysis, intent-to-treat analysis, or between-group analysis performed on any test data; and

E.    All documents referring or relating to the sponsorship of the test, including all communications and contracts between any sponsor and the test's researchers.

*Provided, however*, the preceding preservation requirement does not apply to a reliably reported test, unless the test was conducted, controlled, or sponsored, in whole or in part by: (1) Jason Cardiff or Eunjung Cardiff; (2) their officers, agents, representatives, or employees; (3) any other person or entity in active concert or participation with Jason Cardiff or Eunjung Cardiff; (4) any person or entity affiliated with or acting on behalf of Jason Cardiff or Eunjung Cardiff; (5) any supplier of any ingredient contained in the product at issue to any of the foregoing or to the product's manufacturer; or (6) the supplier or manufacturer of such product.

For purposes of this Section, "reliably reported test" means a report of the test has been published in a peer-reviewed journal, and such published report provides sufficient information about the test for experts in the relevant field to assess the reliability of the results.

For any test conducted, controlled, or sponsored, in whole or in part, by or on behalf of, Jason Cardiff or Eunjung Cardiff, they must establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of any personal information collected from or about participants.  These procedures must

16

be documented in writing and must contain administrative, technical, and physical safeguards appropriate to the size and complexity of the entity sponsoring the test, the nature and scope of that entity's activities, and the sensitivity of the personal information collected from or about the participants.

## VIII.  PROHIBITED REPRESENTATIONS:  TESTS, STUDIES, OR OTHER RESEARCH

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration:

A.      That the product is clinically proven to:

    1.      Help users quit smoking, including any specific representation about success rates or the ease or speed of quitting;

    2.      Cause or assist in causing weight loss, including any specific representation about the amount of weight loss;

    3.      Suppress or help suppress appetite;

    4.      Cause or assist in causing weight loss without dieting or any change in food or lifestyle;

    5.      Help users avoid gaining back any weight they lost;

    6.      Increase ejaculation control or the duration of sex;

    7.      Treat or prevent premature ejaculation; or

    8.      Be comparable or superior to other treatments for quitting smoking.

B.      That the performance or benefits of the product are scientifically or

17

clinically proven or otherwise established; or

C.     The existence, contents, validity, results, conclusions, or interpretations of any test, study, or other research.

## IX.   FDA-APPROVED CLAIMS

**IT IS FURTHER ORDERED** that nothing in this Order prohibits Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, or all other persons in active concert or participation with any of them from:

A.     For any Drug product, making a representation that is approved for inclusion in labeling for such Drug product under a new drug application or biologics license application approved by the Food and Drug Administration, or, for any nonprescription Drug product authorized by Section 505G of the Food, Drug, and Cosmetics Act, 21 U.S.C. § 355h,  ("FDCA") to be marketed without an approved new drug application, making a representation that is permitted or required to appear in its labeling in accordance with  Section 505G(a)(1)-(3) of the FDCA, 21 U.S.C. § 355h(a)(1)-(3), or a final administrative order under Section 505G(b) of the FDCA, 21 U.S.C. § 355h(b); and

B.     For any product, making a representation that is specifically authorized for use in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990 or permitted under Sections 303-304 of the Food and Drug Administration Modernization Act of 1997.

## X.    PROHIBITED MISREPRESENTATIONS:  ENDORSEMENTS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from making, or assisting others

in making, any misrepresentation, expressly or by implication, (1) about the status of any endorser or person providing a review of the Good or Service, including a misrepresentation that the endorser or reviewer is an independent or ordinary user of the Good or Service, or (2) that any person or organization has endorsed any Good or Service.

## XI. PROHIBITED MISREPRESENTATIONS: U.S. ORIGIN CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, or any other product, are permanently restrained and enjoined from making, or assisting others in making, any representation, expressly or by implication, that it is Made in the United States unless:

A. The final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States; or

B. A Clear and Conspicuous qualification appears immediately adjacent to the representation that accurately conveys the extent to which the product contains foreign parts, ingredients or components, and/or processing; or

C. For a claim that a product is assembled in the United States, the product is last substantially transformed in the United States, the product's principal assembly takes place in the United States, and United States assembly operations are substantial.

## XII. PROHIBITED REPRESENTATIONS: EARNINGS CLAIMS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert

or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, or sale of any Good or Service, including Business Ventures or Investment Opportunities, are permanently restrained and enjoined from:

      A.     Misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, any material fact, including:

          1.     That participants will or are likely to achieve substantial sales or earn substantial income or profit;

          2.     The amount of sales, income, or profit that participants have actually earned;

          3.     The amount of time or effort required to earn an amount of compensation or to advance; or

          4.     The total costs or any material restrictions, limitations, or conditions;

      B.     Making any representation, expressly or by implication, including through the use of any program name, endorsement, lifestyle description, depiction, or illustration, regarding the amount of sales, income, or profit that a participant can expect to earn, including that participants will or are likely to achieve substantial sales or earn substantial income or profit, unless the representation is non-misleading, and, at the time it is made, Jason Cardiff or Eunjung Cardiff possess and rely upon competent and reliable evidence that is sufficient to substantiate that the representation is true.

## XIII.  PROHIBITED MISREPRESENTATIONS:  OTHER MATERIAL FACTS

      **IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert

or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service are permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration, any material fact concerning such Good or Service, including:

    A.    The success rate or rate of customer satisfaction;

    B.    The total costs;

    C.    Any refund policy;

    D.    Any material restrictions, limitations, or conditions, including any conditions that might limit certain consumers' ability to obtain the full benefits of the proffered Good or Service;

    E.    Any material aspect of its performance, efficacy, nature, or central characteristics, including that the benefits of the proffered Good or Service can be obtained quickly or easily;

    F.    Any cost to the consumer to purchase, receive, use, or return the Good or Service;

    G.    That the consumer will not be Charged for any Good or Service;

    H.    That a Good or Service is offered on a "free," "trial," "sample," "bonus," "gift," "no obligation," or "discounted" basis, or words of similar import, denoting or implying the absence of an obligation on the part of the recipient of the offer to affirmatively act in order to avoid Charges, including where a Charge will be assessed pursuant to the offer unless the consumer takes affirmative steps to prevent or stop such a Charge;

    I.    The timing or manner of any Charge or bill;

    J.    That the consumer can obtain a Good or Service for a processing, service, shipping, handling, or administrative fee with no further obligation;

K.     The purpose(s) for which the consumer's Billing Information will be used;

L.     The date by which the consumer will incur any obligation or be Charged unless the consumer takes affirmative steps to prevent or stop such a Charge;

M.     That a transaction has been authorized by the consumer; or

N.     Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the Good or Service.

## XIV.  PROHIBITIONS CONCERNING REFUNDS

**IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Good or Service, are permanently restrained and enjoined from failing to honor a refund, return, or cancellation request that complies with any policy to make refunds or allow returns or cancellations.

## XV.  PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.     Credit Card Laundering;

B.     Making, or assisting others in making, directly or by implication, any false or misleading statement in order to obtain Payment Processing services;

C.     Failing to disclose to an Acquiring Bank or other Financial Institution, service provider, payment processor, independent sales organization, or other entity that enables a person to accept payments of any kind any material

information related to a Merchant Account including, but not limited to, the identity of any owner, manager, director, or officer of the applicant for or holder of a Merchant Account, and any connection between an owner, manager, director, or officer of the applicant for or holder of a Merchant Account and any third person who has been or is placed in a Merchant Account monitoring program, had a Merchant Account terminated by a payment processor or a Financial Institution, or has been fined or otherwise disciplined in connection with a Merchant Account by a payment processor or a Financial Institution; and

       D.    Engaging in any tactics to avoid fraud-and-risk-monitoring programs established by any Financial Institution, Acquiring Bank, or the operators of any payment system, including, but not limited to, tactics such as balancing or distributing sales transactions among multiple Merchant Accounts or merchant billing descriptors; splitting a single sales transaction into multiple smaller transactions; or using a shell company to apply for a Merchant Account.

## XVI.  PROHIBITION AGAINST UNAUTHORIZED CHARGES

      **IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, promotion, offering for sale, or sale of any Good or Service, are permanently restrained and enjoined from Charging, causing to be Charged, assisting others in Charging, or attempting to Charge any consumer, without obtaining the consumer's express informed consent to the Charge and having created and maintained a record of such consent.

## XVII. PROHIBITION AGAINST DEBITING CONSUMERS' BANK ACCOUNTS WITHOUT AUTHORIZATION

      **IT IS FURTHER ORDERED** that Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether

acting directly or indirectly, in connection with the sale of any Good or Service, are permanently restrained and enjoined from:

A.    Failing to timely obtain written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account before initiating any Preauthorized Electronic Fund Transfer; and

B.    Failing to provide to the consumer a copy of a valid written authorization signed or similarly authenticated by the consumer for any Preauthorized Electronic Fund Transfer from a consumer's account.

## XVIII.    CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that:

A.    Jason Cardiff, Eunjung Cardiff, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

1.    Disclosing, using, or benefitting from, or assisting others in disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that Corporate Defendants obtained prior to entry of this Order in connection with the advertising, promotion, offering for sale, or sale of Defendants' oral film strips or Rengalife; and

2.    Failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after entry of this Order.

*Provided, however*, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

B.      Upon termination of the receivership, the Receiver shall not return any customer information to the Defendants.

## XIX.   ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff obtain acknowledgments of receipt of this Order:

A.      Jason Cardiff and Eunjung Cardiff, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For 20 years after entry of this Order, Jason Cardiff and Eunjung Cardiff for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, must deliver a copy of this Order  to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.      From each individual or entity to which Jason Cardiff or Eunjung Cardiff delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XX.   COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff make timely submissions to the Commission:

A.    One year after entry of this Order, Jason Cardiff and Eunjung Cardiff must each submit a compliance report, sworn under penalty of perjury. Each of them must:

1.    Identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences;

2.    Identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest;

3.    Describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership;

4.    Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant;

5.    Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

6.    Describe the activities of each business, including the Goods or Services offered, the means of manufacturing, labeling, advertising, promotion, offering for sale, sale or distribution, and the involvement of any other Defendant (which Jason Cardiff and Eunjung Cardiff must describe if they know or should know due to their own involvement);

7.    Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

8.    Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.    For 20 years after entry of this Order, Jason Cardiff and Eunjung Cardiff must each submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

26

1.      Name, including aliases or fictitious name, or residence address;

2.      Title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity;

3.      Any designated point of contact; or

4.      The structure of any entity that such Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.      Jason Cardiff and Eunjung Cardiff must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.      Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. Jason Cardiff, et al., X190001.

## XXI. RECORDKEEPING

**IT IS FURTHER ORDERED** that Jason Cardiff and Eunjung Cardiff must create certain records for 20 years after entry of the Order, and retain each such record for 5 years. Specifically, Jason Cardiff and Eunjung Cardiff, for any business that such Defendant, individually or collectively with any other Defendants, is a majority owner or controls directly or indirectly, must create and retain the following records:

A. Accounting records showing the revenues from all Goods or Services sold;

B. Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. Records of all consumer complaints and refund requests concerning the subject matter of this Order, whether received directly or indirectly, such as through a third party, and any response;

D. All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E. A copy of each unique advertisement or other marketing material.

## XXII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Jason Cardiff and Eunjung Cardiff's compliance with this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission, Jason Cardiff and Eunjung Cardiff each must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of

Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.      For matters concerning this Order, the Commission is authorized to communicate directly with Jason Cardiff and Eunjung Cardiff.  Jason Cardiff and Eunjung Cardiff must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview.  The person interviewed may have counsel present.

C.      The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D.      Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Jason Cardiff and Eunjung Cardiff, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## XXIII.  EXPIRATION OF PRELIMINARY INJUNCTION PROVISIONS

A.      Upon entry of this Order, the provisions of the Preliminary Injunction [Doc. # 59], including the asset freeze and receivership, shall expire, except to the extent provided in the Court's February 28, 2022 Order regarding discharge of the Receiver [Doc. # 702].  Upon the Receiver's completion of the tasks described in paragraphs 5 through 11 of that Order, and the Court's approval of the Receiver's final report, the Receiver will be discharged for all purposes.

## XXIV.   RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this 1st day of March, 2022.**

**DOLLY M. GEE**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT 85

Michael Gerard Fletcher (State Bar No. 070849)
 mfletcher@frandzel.com
Craig A. Welin (State Bar No. 138418)
 cwelin@frandzel.com
Hal D. Goldflam (State Bar No. 179689)
 hgoldflam@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Receiver ROBB EVANS
AND ASSOCIATES LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| FEDERAL TRADE COMMISSION, | Case No. 5:18-cv-02104-DMG-PLA |
|---|---|
| Plaintiff, | **(1) RECEIVER'S FINAL REPORT AND ACCOUNTING, AND (2) NOTICE OF RECEIVER'S FINAL FEE APPLICATION AND FINAL FEE APPLICATION** |
| v. | |
| JASON CARDIFF, etc., et al., | |
| Defendants. | Date:   October 14, 2022
Time:   9:30 a.m.
Place:  Courtroom 8C, 350 West 1st St.
Judge:  Hon. Dolly M. Gee |

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

TO: THE HONORABLE DOLLY M. GEE, UNITED STATES DISTRICT JUDGE, AND TO ALL PARTIES AND OTHER PARTIES IN INTEREST:

Pursuant to paragraph 10 of the Court's Post State Court Interpleader Complaint Filing Discharge Order, Reserving Remaining Receiver Tasks Still to be Completed, entered on February 28, 2022 [Doc. #703] ("First Discharge Order"), this constitutes the Final Report and Accounting of Receiver Robb Evans & Associates LLC, the duly appointed receiver ("Receiver") over Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advance Men's Institute Prolongz LLC, Run Away Productions, LLC, Carols Place Limited Partnership, VPL Medical Inc., and each of their subsidiaries, affiliates, successors, and assigns, and of assets of Jason Cardiff and Eunjung Cardiff (collectively, the "Receivership Defendants"). The Final Report and Accounting is supported by the attached Summary of Receiver's Post-First Discharge Order Activities and Summary of the Receiver's and its Counsel's Fees and Expenses Incurred for the Period from September 1, 2021 through July 31, 2022 ("Final Reporting Period"), the concurrently filed Declarations of Anita Jen and Michael Gerard Fletcher, and the concurrently filed Appendix of Exhibits, and all of the filings and records in this action. This Final Report and Accounting also serves as the Receiver's final fee application for payment of its and its counsel's fees and costs, as set forth in the attached summary, and the concurrently filed Declarations and Appendix of Exhibits.

PLEASE TAKE NOTICE that on October 14, 2022, at 9:30 a.m., or as soon thereafter as the parties may be heard in Courtroom 8C of the above-entitled court located at 350 West 1st Street, 8th Floor, Los Angeles, California 90012, the Receiver will and hereby does apply to the Court for an order that:

1. The Receiver's Final Report and Accounting is approved;

2. The Receiver has satisfactorily completed all of its remaining

1  duties and obligations specified in the First Discharge Order;

2      3.    The receivership over the Receivership Defendants and the

3  receivership estate are terminated in full without any qualifications or conditions;

4      4.    The discharge and release of the Receiver (as that term is defined

5  in paragraph 3 of the First Discharge Order) as detailed in paragraph 3 of the First

6  Discharge Order is affirmed;

7      5.    The fees and expenses of the Receiver, the Receiver's members,

8  staff, and support staff, and the Receiver's outside counsel, Frandzel Robins Bloom

9  & Csato, L.C. ("FRBC"), incurred during the Final Reporting Period, which fees

10  and costs total $256,387.33, are approved and authorized for payment from the

11  remaining $198,992.48 on deposit with the Court (plus any interest earned on the

12  deposit);

13      6.    The clerk of the Court release the $198,992.48 on deposit with

14  the Court (plus any interest earned on the deposit) to the Receiver, which funds shall

15  be used to pay the Receiver's and FRBC's fees and costs incurred during the Final

16  Reporting Period; the Receiver and FRBC are to determine among themselves how

17  to allocate the total disbursement to the unpaid fees and costs since the $198,992.48

18  plus any interest earned on the deposit is insufficient to pay their total fees and costs

19  incurred during the Final Reporting Period;

20      7.    The Receiver is authorized to immediately destroy the remaining

21  records and computers of the Defendants and/or Receivership Entities in the

22  Receiver's possession, which records contain consumer information;

23      8.    The Receiver's bond is fully and unconditionally discharged,

24  released and exonerated;

25      9.    The First Discharge Order otherwise remains in full force and

26  effect; and

27      10.   Notice of this Final Report and Accounting was properly given.

28      PLEASE TAKE FURTHER NOTICE that a copy of this Final Report and

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1   Accounting, supporting declarations and appendix of exhibits are posted on the

2   Receiver's website at https://www.robbevans.com/find-a-case/redwood-scientific-

3   technologies-inc-et-al/  where they may be reviewed in their entirety.

4   Dated: Sepember 14, 2022      FRANDZEL ROBINS BLOOM & CSATO, L.C.

5                               MICHAEL GERARD FLETCHER

                              CRAIG A. WELIN

6                               HAL D. GOLDFLAM

7

8                 By:    /s/ Michael Gerard Fletcher

9                        MICHAEL GERARD FLETCHER

                       Attorneys for Receiver ROBB EVANS &

10                        ASSOCIATES LLC

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

(1) RECEIVER'S FINAL REPORT AND ACCOUNTING, AND (2) NOTICE OF RECEIVER'S FINAL FEE
APPLICATION AND FINAL FEE APPLICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# I.     <u>SUMMARY RECEIVER'S POST-FIRST DISCHARGE ORDER ACTIVITIES</u>

1.     By its Order Setting Deadline for the Filing of Interpleader Action entered on January 25, 2022 [Doc. # 689], this Court ordered the Receiver to file the Receiver's complaint-in-interpleader in the Superior Court of California by February 4, 2022.

2.     On February 24, 2022, the Receiver filed its complaint-in-interpleader in the Los Angeles County Superior Court in the matter styled as *Robb Evans & Associates LLC etc. vs. Redwood Scientific Technologies, Inc., etc. et al.*, Los Angeles County Superior Court case no. 22STCV04546.

3.     At the time the Receiver filed the complaint-in-interpleader, the Receiver made a deposit of $1,000,000.00 in the interpleader action.

4.     Following this Court's Order on Stipulation Authorizing Sale of 700 W. 25th Street, Upland California; Receivership Discharge Order; and Capping Receivership Fees and Costs, filed on February 28, 2922 [Doc. # 702] ("Order Capping Receivership Fees/Costs"), the clerk of the Court released $218,026.20 of the remaining $417,018.68 balance of the receivership estate that the Receiver had previously deposited with the Court, leaving $198,992.48 on deposit with the Court plus any earned interest. The Receiver thereafter deposited the $218,026.20 in the interpleader action.

5.     On February 28, 2022, the Court issued its Post State Court Interpleader Complaint Filing Discharge Order [Doc. # 703] ("First Discharge Order") specifying in paragraphs 5 through 9 the remaining duties of the Receiver in connection with the interpleader action, including obtaining an order discharging the Receiver from the interpleader action.

6.     On June 30, 2022, the Receiver filed in the interpleader action its motion for an order discharging the Receiver from the interpleader action. See Appendix of Exhibits ("App."), Exh. 1.

7.     On July 28, 2022, the court in the interpleader action, the Honorable Barbara M. Scheper, Superior Court Judge presiding, heard and granted the Receiver's motion for an order discharging the Receiver from the interpleader action.  See App., Exh. 2.  As confirmed in the order discharging the Receiver from the interpleader action, the Receiver deposited $1,218.026.20 with the clerk of the Los Angeles County Superior Court in connection with the interpleader action.  *Id.*

8.     As a result of the deposits the Receiver made with the clerk of his Court and in the interpleader action, the Receiver is not in possession, custody or control of any receivership estate funds.

## II.   SUMMARY OF THE RECEIVER'S AND ITS COUNSEL'S FEES AND EXPENSES INCURRED FOR THE PERIOD FROM SEPTEMBER 1, 2021 THROUGH JULY 31, 2022

1.     By its Order Capping Receivership Fees/Costs at paragraph 7, the final fee and costs award for the Receiver and its outside counsel, Frandzel Robins Bloom & Cstao, L.C. ("FRBC"), shall be based on the actual fees and costs from and after September 1, 2021, but the final award shall be capped at no more than $199,000.00.

2.     Attached to the App. as Exhibit 3 is the Receiver's Administrative Expense Report by Month from Inception (October 10, 2018) to July 31, 2022 ("Final Accounting").  As shown in the Final Accounting and further evidenced by Receiver's and FRBC's billing records attached to the App. as Exhibits 4, 5 and 6, (a) the fees and costs of the Receiver and its staff incurred during the Final Reporting Period totaled $44,597.95 (consisting of $27,511.65 in fees and $17,086.30 in costs), and (b) the fees and costs of FRBC totaled $211,789.38 (consisting of $203,911.00 in fees and $7,878.38 in costs), for a total of $256,387.33, which total exceeds the $199,000.00 fee/costs cap.[1]

---

[1] The Receiver has incurred subsequent to the Final Fee Period an additional

(1) RECEIVER'S FINAL REPORT AND ACCOUNTING, AND (2) NOTICE OF RECEIVER'S FINAL FEE APPLICATION AND FINAL FEE APPLICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

3. In light of the work performed during Final Reporting Period, the fees and costs of the Receiver and FRBC are reasonable and should be approved in the entirety and authorized for payment from the balance of the receivership estate funds on deposit with the Court, although the total fees and costs will not be paid in full in light of the fees/costs cap and the insufficient remaining receivership estate funds on deposit with the Court.

## III.  **CONCLUSION**

Based on the foregoing and the concurrently filed Declarations of Anita Jen and Michael Gerard Fletcher, and the Exhibits attached to the App., the Court should approve the Receiver's Final Report and Accounting, grant the Final Fee Application in full, and enter order providing the relief requested above. The Receiver submits concurrently herewith a proposed order and respectfully requests that it be entered by the Court.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

---

estimated $9,066.10 in fees and costs and will incur additional fees and costs, including an estimated $2,000 to destroy the Individual Defendants' and Receivership Entities' records in the Receiver's possession containing customer information which cannot be returned to them pursuant to Section XVIII.B. of the Final Judgment Including Permanent Injunction as to Defendants Jason Cardiff and Eunjung Cardiff [Doc. # 706]. In addition, FRBC has incurred subsequent to the Final Fee Period an estimated $9,809.90 in fees and costs and will incur additional fees to appear at any hearing on this matter and otherwise in connection with closing this matter. These fees and costs incurred after the Final Reporting Period will necessarily be borne by the Receiver and FRBC, including based on the fact the total of their fees and costs incurred during the Final Fee Period exceed the fees/costs cap.

1   Dated: September 14, 2022        FRANDZEL ROBINS BLOOM & CSATO, L.C.
2                                    MICHAEL GERARD FLETCHER
                                     CRAIG A. WELIN
3                                    HAL D. GOLDFLAM

4

5                                    By:    /s/ Michael Gerard Fletcher
6                                           MICHAEL GERARD FLETCHER
                                            Attorneys for Receiver ROBB EVANS &
7                                           ASSOCIATES LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4705301v2 | 078410-0061                8                Case No. 5:18-cv-02104-DMG-PLA

(1) RECEIVER'S FINAL REPORT AND ACCOUNTING, AND (2) NOTICE OF RECEIVER'S FINAL FEE
APPLICATION AND FINAL FEE APPLICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# PROOF OF SERVICE

## FTC v. Jason Cardiff
## Case No. 5:18-cv-2104

I, the undersigned, declare and certify as follows:

I am over the age of eighteen years, not a party to the within action and employed in the County of Los Angeles, State of California. I am employed in the office of Frandzel Robins Bloom & Csato, L.C., members of the Bar of the above-entitled Court, and I made the service referred to below at their direction. My business address is 1000 Wilshire Boulevard, Nineteenth Floor, Los Angeles, CA 90017-2427.

On **September 14, 2022**, I served true copy(ies) of the **(1) RECEIVER'S FINAL REPORT AND ACCOUNTING, AND (2) NOTICE OF RECEIVER'S FINAL FEE APPLICATION AND FINAL FEE APPLICATION** to the party(ies) on the attached service list.

## SEE ATTACHED SERVICE LIST

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on September 14, 2022, at Los Angeles County, California.

_/s/ David T. Moore_
David T. Moore

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

(1) RECEIVER'S FINAL REPORT AND ACCOUNTING, AND (2) NOTICE OF RECEIVER'S FINAL FEE APPLICATION AND FINAL FEE APPLICATION

**SERVICE LIST**
**FTC v. Jason Cardiff**
**Case No. 5:18-cv-2104**

**Electronic Mail Notice List**

- **Elizabeth J Averill**
  eaverill@ftc.gov
- **Peter Bisno**
  pbisno@bisnolaw.com
- **Steven E Bledsoe**
  sbledsoe@larsonllp.com,hpark@larsonllp.com
- **Michael Anthony Brown**
  tbrown@spertuslaw.com,sluecf@spertuslaw.com,docketing@spertuslaw.com
- **Stephen R Cochell**
  srcochell@gmail.com
- **Jennifer Witherell Crastz**
  jcrastz@hrhlaw.com
- **Christopher David Crowell**
  ccrowell@hrhlaw.com
- **Michael Gerard Fletcher**
  mfletcher@frandzel.com,sking@frandzel.com
- **Jonathan Daniel Gershon**
  jgershon@larsonllp.com,nmorales@larsonllp.com,jonathan-gershon-0760@ecf.pacerpro.com
- **Hal D Goldflam**
  hgoldflam@frandzel.com,dmoore@frandzel.com
- **Allan Howard Grant**
  allan@grants-law.com
- **Dolly Kae Hansen**
  dolly@spertuslaw.com
- **Lindsey M Hay**
  lhay@spertuslaw.com
- **Charlie Henke**
  chenke@henkelawfirm.com
- **Inter/Media Time Buying Corporation**
  ccrowell@hrhlaw.com
- **Michael W. Kinney**
  mkinney@lblglaw.com
- **Stephen Gerard Larson**
  slarson@larsonllp.com,ygutierrez@larsonllp.com,sbledsoe@larsonllp.com,ntatiboit@larsonllp.com,nmorales@larsonllp.com
- **Shira D Modell**
  smodell@ftc.gov
- **George B. Newhouse , Jr**
  george@richardscarrington.com,claire@richardscarrington.com,tvena@kaedianllp.com,dyanna@richardscarrington.com,george.newhouse@gmail.com

(1) RECEIVER'S FINAL REPORT AND ACCOUNTING, AND (2) NOTICE OF RECEIVER'S FINAL FEE
APPLICATION AND FINAL FEE APPLICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

- **Stacy Rene Procter**
  sprocter@ftc.gov
- **James A Prunty**
  jprunty@ftc.gov
- **Edwin Rodriguez**
  erodriguez@ftc.gov
- **Elizabeth Jones Sanger**
  esanger@ftc.gov,csands@ftc.gov
- **James W. Spertus**
  jim@spertuslaw.com,sluecf@spertuslaw.com,docketing@spertuslaw.com
- **Jesse James Thaler**
  jessejthaler@gmail.com
- **Gerrick M Warrington**
  gwarrington@frandzel.com,sking@frandzel.com
- **Craig A Welin**
  cwelin@frandzel.com,bwilson@frandzel.com
- **James D White**
  jdw@jamesdwhitelaw.com
- **Jett Williams**
  jwilliams@henkelawfirm.com

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

4705301v2 | 078410-0061

11

Case No. 5:18-cv-02104-DMG-PLA

(1) RECEIVER'S FINAL REPORT AND ACCOUNTING, AND (2) NOTICE OF RECEIVER'S FINAL FEE APPLICATION AND FINAL FEE APPLICATION

# EXHIBIT 86

1  Michael Gerard Fletcher (State Bar No. 070849)
     mfletcher@frandzel.com
2  Craig A. Welin (State Bar No. 138418)
     cwelin@frandzel.com
3  Hal D. Goldflam (State Bar No. 179689)
     hgoldflam@frandzel.com
4  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   1000 Wilshire Boulevard, Nineteenth Floor
5  Los Angeles, California 90017-2427
   Telephone: (323) 852-1000
6  Facsimile: (323) 651-2577

7  Attorneys for Receiver ROBB EVANS
   AND ASSOCIATES LLC

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                  WESTERN DIVISION

12  FEDERAL TRADE COMMISSION,        | Case No. 5:18-cv-02104-DMG-PLA

13              Plaintiff,           | **DECLARATIONS OF ANITA JEN
                                     | AND MICHAEL GERARD
14         v.                        | FLETCHER IN SUPPORT OF THE
                                     | RECEIVER'S FINAL REPORT
15  JASON CARDIFF, etc., et al.,     | AND ACCOUNTING, AND THE
                                     | RECEIVER'S FINAL FEE
16              Defendants.          | APPLICATION**

17                                   | Date:  October 14, 2022
                                     | Time:  9:30 a.m.
18                                   | Place: Courtroom 8C, 350 West 1st St.
                                     | Judge: Hon. Dolly M. Gee
19

20

21

22

23

24

25

26

27

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# DECLARATION OF ANITA JEN

I, Anita Jen, declare as follows:

1.       I am the Chief Financial Officer of Robb Evans & Associates LLC ("REA"), the Receiver in this matter.  I have personal knowledge of the matters set forth in this declaration and, if I were called upon to testify as to those matters, I could and would competently testify thereto based upon my personal knowledge.

2.       I am one of the individuals with REA that has primary responsibility for the day-to-day supervision and management of the receivership estate in this case since REA first began to act as the Temporary Receiver on October 10, 2018, pursuant the its Ex Parte Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue.  The history of this matter has been extensively and previously reported to this Court by the Receiver in the Receiver's previous filings in this matter, and I do not believe that such history needs to be repeated here.

3.       Attached to the concurrently filed Appendix of Exhibits ("App.") is the Receiver's Administrative Expense Report by Month from Inception (October 10, 2018) to July 31, 2022 ("Final Accounting").  As shown in the Final Accounting and confirmed by the Los Angeles County Superior Court's order discharging the Receiver from the interpleader action (App., Exh. 2), the Receiver deposited $1,218,026.20 with the Superior Court in the interpleader action.  As further stated in the Final Accounting, the remaining balance of the receivership estate funds on deposit with the clerk of the Court in this action is $198,992.48 (plus any interest that has been earned on the deposit).  Accordingly, the Receiver has no receivership estate funds in its possession, and the fund balance is negative $254,848.36 after accounting for all of fees and costs of the Receiver and its counsel, Frandzel Robins Bloom & Csato, L.C. ("FRBC") from September 1, 2021, through July 31, 2022 ("Final Reporting Period").

4. As discussed below and in the Declaration of Michael Gerard Fletcher, and as further evidenced by the invoices attached to the App., the Receiver's and FRBC's fees and costs incurred during the Final Reporting Period for which approval is requested are in the aggregate amount of $256,387.33. Specifically, the Receiver and its staff incurred $27,511.65 in fees and $17,086.30 in costs (totaling $44,597.95), and FRBC incurred $203,911.00 in fees and $7,878.38 in costs (totaling $211,789.38) for a total of $256,387.33 in fees and costs incurred during the Final Reporting Period. This total exceeds the Court's February 28, 2022, order capping the total of the final Receiver's FRBC's fees and costs to be paid with receivership funds at $199,000.00. [Doc. #702].

5. Because there are insufficient funds to pay all of the Receiver and FRBC's fees and costs incurred during the Final Reporting Period, the Receiver and FRBC recognize that they will have to "write-off" a portion of their fees and costs and otherwise will not get paid in full from the receivership estate the fees/costs incurred above the Court-ordered cap; however, to the extent interest has been earned on the $198,992.48 remaining on deposit with the Court, the Receiver and FRBC request that the interest (which likely is a nominal amount, e.g. less than $1,000.00) be released by the Court in addition to the $198,992.48 for payment of the Receiver's and FRBC's fees and costs incurred during the Final Reporting Period. In addition, because there are insufficient remaining receivership funds to pay the entirety of the Receiver's and FRBC's aggregate fees and costs incurred during the Final Reporting Period, the Receiver and FRBC have agreed to determine amongst themselves how to allocate the Court's final fees and costs award among themselves.

6. Notably, while the Receiver's fees and costs for which approval is requested are those incurred during the Final Reporting Period, the Receiver has incurred and will incur subsequent to the Final Reporting Period an additional estimated $5,732.10 in fees (including for preparation of the Final Accounting) and

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

DECLARATIONS OF ANITA JEN AND MICHAEL GERARD FLETCHER IN SUPPORT OF THE RECEIVER'S FINAL REPORT AND ACCOUNTING, AND THE RECEIVER'S FINAL FEE APPLICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

estimates incurring an additional $3,334.00 in costs, including an estimated $2,000.00 to destroy the Receivership Defendants' records containing customer information remaining in the Receiver's possession that have not and cannot be returned to the Receivership Defendants, which I discuss further below.

7.    The Receiver's portion of the overall fees and costs during the Final Reporting Period for which approval to pay is requested, are further detailed in Exhibit 4 to the App.  Specifically, Exhibit 4 is comprised of monthly billing summaries reflecting the services rendered and time spent by REA's members, accountants, staff, and support staff during the Seventh Reporting Period (with the work descriptions redacted where appropriate to preserve information protected from disclosure by the attorney-client privilege or otherwise to protect the Receiver and the receivership estate from inappropriate disclosures).  Exhibit 35 to the App. are invoices reflecting costs incurred by the Receiver.

8.    I am familiar with the methods and procedures used to create, record, and maintain the Receiver's billing records.  The billing records attached hereto as Exhibits 4 are prepared from computerized time records prepared contemporaneously with the services rendered by each professional billing time to this matter.  These computerized records are prepared in the ordinary course of business by the Receiver's professionals who have a business duty to accurately record their time spent and services rendered on the matters on which they perform work.  The time records are transferred into a computerized billing program which generates monthly invoices.  In my experience, the Receiver's methods and procedures for recording and accounting for time and services have proven to be reliable and accurate.

9.    As part of REA's normal billing practices, the firm ensures that work is appropriately staffed and that work is allocated to individuals with the appropriate level of experience so as to maximize billing efficiency.  In this case, as set forth in the itemized billing records, REA used only individuals with appropriate levels of

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1   experience to handle the particular discrete tasks assigned to them.

2      10.    I reviewed the billing statements of REA for the Final Reporting

3   Period.  Based on my review of those billing statements, all of the time was

4   reasonable and necessary, and none of the time was written-off or reduced as being

5   inefficient, unproductive, excessive, and/or redundant.  While the services rendered

6   and time spent by REA's members, accountants, staff, and support staff during the

7   Final Reporting Period are summarized in the Receiver's billing summaries, such

8   services included, without limitation: (a) regularly communicating with the

9   Receiver's counsel on various legal and fact issues related to the Receiver's

10  administration, allocation accountings, and windup of the receivership estate, (b)

11  handling of the federal tax claims; (c) preparing the Receiver's Report as to the

12  Summary Accounting, the Ordered Allocations, and the Receiver's

13  Recommendations, filed on September 20, 2021 [Doc. # 659]; (d) preparing creditor

14  information for the interpleader complaint and communicating with the Receiver's

15  counsel regarding the interpleader action; (e) obtaining and reviewing various bank

16  records; (f) reviewing pleadings and documents filed in this action and otherwise

17  monitoring the ongoing litigation as it pertains to the Receiver continuing to perform

18  its duties; (g) coordinating return of records of the Cardiffs and Corporate

19  Defendants that do not contain customer information; and (h) preparing the Final

20  Accounting.

21     11.    During the Final Reporting Period, FRBC performed certain work for

22  the Receiver.  That work is summarized in the accompanying Declaration of

23  Michael Gerard Fletcher and evidenced by FRBC's invoices to the Receiver, which

24  I have reviewed and approved for payment subject to the Court granting the Final

25  Fee Application.

26     12.    I believe that in light of the work performed during Final Reporting

27  Period, the fees and costs of the Receiver and FRBC are reasonable and should be

28  approved in the entirety and authorized for payment, although I recognize they will

1  not be paid in full in light of the fee cap and the insufficient remaining funds on

2  deposit with the Court.

3        13. After the Court issued its Post State Court Interpleader Complaint

4  Filing Discharge Order [Doc #703] ("First Discharge Order"), Mr. Cardiff, through

5  his counsel Stephen Cochell, requested to pick-up the records of the Receivership

6  Defendants then held at a storage facility rented by the Receiver. On March 16,

7  2022, more than 36 boxes and multiple plastic bins containing documents, and other

8  items, were released to a moving company for Mr. Cardiff. Attached to the App. as

9  Exh. 8 is a true and correct copy of the itemized and signed list of items released

10  from the Receiver to the moving company.

11        14. The Receiver, however, maintains possession of numerous records and

12  computers of the Receivership Defendants that the Receiver has determined contain

13  customer information which cannot be released to the Cardiffs or the Receivership

14  entities pursuant to Section XVIII.B. of the Final Judgment Including Permanent

15  Injunction as to Defendants Jason Cardiff and Eunjung Cardiff [Doc. # 706]. The

16  Receiver therefore requests the Court authorize the Receiver to immediately destroy

17  the records in its possession, which it necessarily will need to do at its own time and

18  cost in light of the fees/costs cap and insufficient receivership estate funds on

19  deposit with the Court. Again, the estimated total cost is approximately $2,000

20  (including shredding of records and destroying hard drives on computers).

21        15. I believe that the Receiver has satisfactory complied with the its

22  remaining duties and obligations under the First Discharge Order. The Receiver

23  therefore requests that the Court (a) rule that the Receiver satisfactorily completed

24  all of its remaining duties and obligations specified in the First Discharge Order, and

25  (b) rule that the receivership over the Receivership Defendants and the receivership

26  estate are terminated in full without any qualifications or conditions, the discharge

27  and release of the Receiver (as that term is defined in paragraph 3 of the First

28  Discharge Order) as detailed in paragraph 3 of the First Discharge Order is affirmed.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

16. The Receiver further requests that the Court fully and unconditionally discharge, release and exonerate the Receiver's Bond.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on September ___ 2022, at Alhambra, California.

ANITA JEN

DECLARATIONS OF ANITA JEN AND MICHAEL GERARD FLETCHER IN SUPPORT OF THE RECEIVER'S FINAL REPORT AND ACCOUNTING, AND THE RECEIVER'S FINAL FEE APPLICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# DECLARATION OF MICHAEL GERARD FLETCHER

I, Michael Gerard Fletcher, declare as follows:

1.      I am an attorney at law duly admitted to practice before this Court, and am a shareholder of Frandzel Robins Bloom & Csato, L.C. ("FRBC"), attorneys for the Receiver in this matter, Robb Evans & Associates LLC ("Receiver").  I am one of the attorneys at FRBC primarily responsible for the representation of the Receiver in this action.  I have personal knowledge of the matters set forth in this declaration and if called upon to testify as to these matters I could and would competently testify thereto.

2.      I am one of the attorneys primarily responsible for the representation of the Receiver in this case in addition to Craig A. Welin, who also is a shareholder of FRBC.   During the period of September 1, 2021, through July 31, 2022 ("Final Reporting Period"), the fees and costs of FRBC totaled $211,789.38. consisting of $203,911.00 in fees and $7,878.38 in costs.

3.      Notably, while FRBC's fees and costs for which approval is requested are limited  those incurred during the Final Reporting Period, FRBC, like the Receiver, has incurred and will incur fees subsequent to the Final Reporting Period. FRBC has incurred an additional estimated $9,809.90 in fees and costs (which includes fees incurred in preparing the Receiver's Final Fee Application, Ms. Jen's declaration and this declaration, and the proposed order, among other work performed in assisting the Receiver in the final windup of the receivership estate). Attorneys' fees also will be incurred in preparing for and attending the hearing on the Final Fee Application assuming the Court does not takes the matter under submission without a hearing.

4.      I attach to the Appendix of Exhibits as Exhibit 6 the billing records for FRBC reflecting the services rendered, time spent and costs incurred by FRBC pertaining to this matter during the Final Reporting Period, with the work descriptions redacted where appropriate to preserve information protected from

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

DECLARATIONS OF ANITA JEN AND MICHAEL GERARD FLETCHER IN SUPPORT OF THE RECEIVER'S
FINAL REPORT AND ACCOUNTING, AND THE RECEIVER'S FINAL FEE APPLICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

disclosure by the attorney-client privilege and/or attorney work product doctrine or otherwise protect the Receiver and the receivership estate from inappropriate disclosures (and FRBC and I otherwise preserve the attorney-client privilege regarding our communications with the Receiver as well as documents and information protected from disclosure under the attorney work product doctrine). These billing summaries are organized by date of the work performed, identifying each attorney and paralegal with summary entries for the tasks performed, and the hours worked by each attorney and paralegal.

5.    I attach to the Appendix of Exhibits as Exhibit 7 a table summarizing the hours worked by each attorney and paralegal during the Final Reporting Period, and their respective hourly billing rates.  This table also shows the percentage of the total fees incurred by each timekeeper.  As the table indicates, the work I performed during the Fourth Reporting period accounts for approximately 58% of all of the fees and the work performed by Hal D. Goldflam, accounts for approximately 25% of all of the fees.

6.    I am familiar with the methods and procedures used to create, record and maintain billing records for FRBC's clients.  The billing records attached hereto as Exhibit 6 are prepared from computerized time records prepared contemporaneously with the services rendered by each attorney and paralegal billing time to this matter.  These computerized records are prepared in the ordinary course of business by the attorneys and paralegals employed by FRBC who have a business duty to accurately record their time spent and services rendered on the matters on which they perform work.  The time records are transferred into a computerized billing program which generates monthly invoices under the supervision of the firm's accounting department.  Based upon my experience with FRBC, I believe the firm's methods and procedures for recording and accounting for time and services for its clients is reliable and accurate.

7.    I reviewed the billing statements of FRBC for the Final Reporting

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Period. Based on my review of those billing statements, all of the time was reasonable and necessary, and none of the time was written-off or reduced as being inefficient, unproductive, excessive, and/or redundant, although FRBC "no charged" a total of 10.3 hours of attorney and paralegal work as a courtesy and these "no charges" are indicated in the billing statements. While the legal services rendered by FRBC during the Final Reporting Period, either at the direction of the Receiver or responsible attorneys with this firm, are contained in the specific work entries in Exhibit 6, such services included, without limitation: (a) regularly communicating with the Receiver on various legal and fact issues related to the Receiver's administration of the receivership estate; (b) continuing work in complying with the Court's prior order for the Receiver to review prior fee applications and billing records to determine how much the Receiver incurred in fees due to the machinations and contempts of Jacque Poujade aiding and abetting the contempts of Jason Cardiff during the course of the Receivership that are the subject of the purge payment made by True Pharmastrip Inc.; (c) working with the Receiver on preparing the Receiver's Report as to the Summary Accounting, the Ordered Allocations, and the Receiver's Recommendations [Doc. #. 659 ("Final Report/Summary Accounting")], and preparing the supporting declarations; (d) preparing the Claim Update to the Receiver's Accounting with Allocations [Doc. # 657]; (e) appearing at the September 17, 2021, status hearing; (f) reviewing the various documents filed by the parties and interested non-parties in response to the Final Report/Summary Accounting, which documents are listed in the Court's Order re Windup of Receivership Estate filed on December 2, 2021 [Doc. # 683]; (g) reviewing the ex parte application interested non-parties BMPD Texas Partners LP, et al. to file response to "Receiver's and Inter/Media's Supplemental Arguments" [Doc. # 675] and related responses; (h) preparing the Receiver's Omnibus Reply Regarding the Final Report with Accompanying Accounting [Doc. #669]; (i) communicating with counsel for the senior lender on the Cardiff's residence re

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

senior lender's intended foreclosure; (j) preparing for and attending the November 3, 2021, hearing on the Receiver's Final Report/Summary Accounting; (k) analyzing the Court's December 2, 2021 Order re Windup of Receivership estate [Doc. # 683] ("Windup Order") re implementing same as it concerns the Receiver; (l) advising the Receiver as to its duties and obligations under the Windup Order; (m) communicating with various receivership estate claimants on various matters; (n) communicating with the Cardiffs' regarding various aspects of and the status of the receivership estate; (o) analyzing "Defendants' Motion to Enforce" [Doc # 696]; (p) attending the February 28, 2022, status conference; (q) negotiating with counsel for the Cardiffs, Inter/Media, Redwood Scientific, Inc., True Pharmastrip, Bobby Bedi, and VPL Medical, Inc. regarding the Stipulation Regarding Sale of 700 W. 25th Street, Upland California, the Receivership Discharge Order, and Capping Receivership Fees and Costs [Doc. ## 699, 702]; (q) drafting and negotiating the proposed Post State Court Interpleader Complaint Filing Discharge Order, Reserving Remaining Receiver Tasks Still to be Completed [Doc. # 703]; (r) reviewing filings re the Order to Show Cause issued to Amy Cardiff's counsel, and providing information that the Receiver has regarding the matter to the Court as requested; (s) working with the Receiver regarding the scope of the documents to return to the Receivership Defendants and coordinating with the Cardiffs' counsel for the return of the documents; (t) preparing the complaint for the interpleader action including coordinating with the Receiver regarding the approximately 60 receivership claimants to name as defendants; (u) attending to service of the interpleader complaint on the multiple defendants; (v) communicating with various defendants in the interpleader action regarding various issues involving the interpleader action, including service of the summons and complaint; (w) communicating with various defendants in the interpleader action regarding their requests to be dismissed because, for example, the value of their claims did not warrant them appearing in the action to pursue their claims (e.g., nominal dollar

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

amounts of claims including claims for amount that were less or not substantially more than the first appearance fee in the Los Angeles County Superior Court); (x) obtaining an order from the court in the interpleader action to make the supplemental deposit resulting in a total of $1,218,018.68 being deposited with the court in the interpleader action; (y) viewing pleadings by various of the defendants in the interpleader action; (z) drafting the Receiver's motion for an order discharging it from the interpleader action; (aa) attending the case management conference in the interpleader action; and (bb) attending the hearing on the Receiver's motion to be discharged from the interpleader action.

8. I believe that in light of the work FRBC performed during the Final Reporting Period, FRBC's fees and costs are reasonable and should be approved in their entirety and authorized for payment, although I recognize they will not be paid in full in light of the fees/costs [Doc. # 702] and the insufficient remaining receivership estate funds on deposit with this Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on September 14, 2022, at Los Angeles County, California.

/s/ Michael Gerard Fletcher
Michael Gerard Fletcher

# PROOF OF SERVICE

## FTC v. Jason Cardiff
## Case No. 5:18-cv-2104

I, the undersigned, declare and certify as follows:

I am over the age of eighteen years, not a party to the within action and employed in the County of Los Angeles, State of California. I am employed in the office of Frandzel Robins Bloom & Csato, L.C., members of the Bar of the above-entitled Court, and I made the service referred to below at their direction. My business address is 1000 Wilshire Boulevard, Nineteenth Floor, Los Angeles, CA 90017-2427.

On **September 14, 2022**, I served true copy(ies) of the **DECLARATIONS OF ANITA JEN AND MICHAEL GERARD FLETCHER IN SUPPORT OF THE RECEIVER'S FINAL REPORT AND ACCOUNTING, AND THE RECEIVER'S FINAL FEE APPLICATION** to the party(ies) on the attached service list.

## SEE ATTACHED SERVICE LIST

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on September 14, 2022, at Los Angeles County, California.

*/s/ David T. Moore*
David T. Moore

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

4705300v3 | 078410-0061

13

Case No. 5:18-cv-02104-DMG-PLA
DECLARATIONS OF ANITA JEN AND MICHAEL GERARD FLETCHER IN SUPPORT OF THE RECEIVER'S
FINAL REPORT AND ACCOUNTING, AND THE RECEIVER'S FINAL FEE APPLICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1

2

**SERVICE LIST**
**FTC v. Jason Cardiff**
**Case No. 5:18-cv-2104**

3 **Electronic Mail Notice List**

4 • **Elizabeth J Averill**
5 eaverill@ftc.gov
• **Peter Bisno**
6 pbisno@bisnolaw.com
• **Steven E Bledsoe**
7 sbledsoe@larsonllp.com,hpark@larsonllp.com
• **Michael Anthony Brown**
8 tbrown@spertuslaw.com,sluecf@spertuslaw.com,docketing@spertuslaw.com
9 • **Stephen R Cochell**
srcochell@gmail.com
10 • **Jennifer Witherell Crastz**
jcrastz@hrhlaw.com
11 • **Christopher David Crowell**
ccrowell@hrhlaw.com
12 • **Michael Gerard Fletcher**
13 mfletcher@frandzel.com,sking@frandzel.com
• **Jonathan Daniel Gershon**
14 jgershon@larsonllp.com,nmorales@larsonllp.com,jonathan-gershon-0760@ecf.pacerpro.com
15 • **Hal D Goldflam**
hgoldflam@frandzel.com,dmoore@frandzel.com
16 • **Allan Howard Grant**
allan@grants-law.com
17 • **Dolly Kae Hansen**
dolly@spertuslaw.com
18 • **Lindsey M Hay**
19 lhay@spertuslaw.com
• **Charlie Henke**
20 chenke@henkelawfirm.com
• **Inter/Media Time Buying Corporation**
21 ccrowell@hrhlaw.com
22 • **Michael W. Kinney**
mkinney@lblglaw.com
23 • **Stephen Gerard Larson**
slarson@larsonllp.com,ygutierrez@larsonllp.com,sbledsoe@larsonllp.com,ntatiboit@larsonllp.co
24 m,nmorales@larsonllp.com
25 • **Shira D Modell**
smodell@ftc.gov
26 • **George B. Newhouse , Jr**
george@richardscarrington.com,claire@richardscarrington.com,tvena@kaedianllp.com,dyanna@r
27 ichardscarrington.com,george.newhouse@gmail.com

28

14

DECLARATIONS OF ANITA JEN AND MICHAEL GERARD FLETCHER IN SUPPORT OF THE RECEIVER'S
FINAL REPORT AND ACCOUNTING, AND THE RECEIVER'S FINAL FEE APPLICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1  • **Stacy Rene Procter**
sprocter@ftc.gov

2  • **James A Prunty**
jprunty@ftc.gov

3  • **Edwin Rodriguez**
erodriguez@ftc.gov

4  • **Elizabeth Jones Sanger**
esanger@ftc.gov,csands@ftc.gov

5  • **James W. Spertus**
jim@spertuslaw.com,sluecf@spertuslaw.com,docketing@spertuslaw.com

6  • **Jesse James Thaler**
jessejthaler@gmail.com

7  • **Gerrick M Warrington**
gwarrington@frandzel.com,sking@frandzel.com

8  • **Craig A Welin**
cwelin@frandzel.com,bwilson@frandzel.com

9  • **James D White**
jdw@jamesdwhitelaw.com

10  • **Jett Williams**
jwilliams@henkelawfirm.com

DECLARATIONS OF ANITA JEN AND MICHAEL GERARD FLETCHER IN SUPPORT OF THE RECEIVER'S FINAL REPORT AND ACCOUNTING, AND THE RECEIVER'S FINAL FEE APPLICATION

# EXHIBIT 87
## TO THE DECLARATION
## OF STEPHEN G. LARSON

[Redacted - Document
Conditionally Filed Under
Seal]

# EXHIBIT 88

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>     v.<br><br>JASON CARDIFF, etc., et al.,<br><br>        Defendants. | Case No. ED CV 18-2104-DMG (PLAx)<br><br>**ORDER APPROVING THE RECEIVER'S FINAL REPORT AND ACCOUNTING, AND THE RECEIVER'S FINAL FEE APPLICATION [715]** |

Pursuant to the Court's Post State Court Interpleader Complaint Filing Discharge Order, Reserving Remaining Receiver Tasks Still to be Completed, entered on February 28, 2022 [Doc. # 703] ("First Discharge Order"), Robb Evans & Associates LLC, the duly appointed and acting receiver ("Receiver") over Redwood Scientific Technologies, Inc. (California), Redwood Scientific Technologies, Inc. (Nevada), Redwood Scientific Technologies, Inc. (Delaware), Identify, LLC, Advance Men's Institute Prolongz LLC, Run Away Productions, LLC, Carols Place Limited Partnership, VPL Medical Inc., and each of their subsidiaries, affiliates, successors, and assigns, and of assets of Jason Cardiff and Eunjung Cardiff (collectively, the "Receivership Defendants"), has submitted to this Court the Receiver's Final Report and Accounting and the Receiver's Final Fee Application. [Doc. # 715.] The Final Fee Application was filed on September 14, 2022. Pursuant to this Court's December 2, 2021 Order re Windup of the Receivership Estate [Doc. # 683], any response from the parties and interested non-parties was due September 21, 2022. No response or opposition has been filed, and the Court thus deems the Application unopposed.

The Court having reviewed and considered the Receiver's Final Report and Accounting, the unopposed Final Fee Application, and all papers and evidence filed and cited in support thereof, and good cause appearing therefor,

IT IS HEREBY ORDERED AS FOLLOWS:

1. The Receiver's Final Report and Accounting is approved;

2. The Receiver has satisfactorily completed all of its remaining duties and obligations specified in the First Discharge Order, and the entirety of the Receiver's activities in connection therewith are approved;

3. The receivership over the Receivership Defendants and the receivership estate are terminated in full without any qualifications or conditions;

4. The discharge and release of the Receiver (as that term is defined in paragraph 3 of the First Discharge Order) as detailed in paragraph 3 of the First

Discharge Order is affirmed;

5. The fees and expenses of the Receiver, the Receiver's members, staff, and support staff, and the Receiver's outside counsel, Frandzel Robins Bloom & Csato, L.C. ("FRBC"), incurred during the Final Reporting Period (September 1, 2021 through July 31, 2022), which fees and costs total $256,387.33, are approved and authorized for payment from the remaining $198,992.48 on deposit with the Court (plus any interest earned on the deposit);

6. The Clerk of the Court is directed to release the $198,992.48 on deposit with the Court (plus any interest earned on the deposit) to the Receiver, which funds shall be used by the Receiver to pay the Receiver's and FRBC's respective fees and costs incurred during the Final Reporting Period, and shall be deemed final and full payment; the Receiver and FRBC are to determine among themselves how to allocate the total disbursement to the unpaid fees and costs since the $198,992.48 plus any interest earned on the deposit is insufficient to pay their total fees and costs incurred during the Final Reporting Period;

7. The Receiver is authorized to immediately destroy the remaining records and computers of the Receivership Defendants, which records contain consumer information;

8. The Receiver's bond is fully and unconditionally discharged, released and exonerated;

9. Except as otherwise provided for herein, the First Discharge Order remains in full force and effect; and

10. Notice of the Receiver's Application was properly given.

DATED: September 30, 2022

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

3

# EXHIBIT 89
## TO THE DECLARATION OF STEPHEN G. LARSON

[Redacted - Document Conditionally Filed Under Seal]

# EXHIBIT 90

1  ELIZABETH JONES SANGER (*pro hac vice*)
   esanger@ftc.gov; (202) 326-2757
2  SHIRA D. MODELL (*pro hac vice*)
   smodell@ftc.gov; (202) 326-3116
3  JAMES A. PRUNTY (*pro hac vice*)
   jprunty@ftc.gov; (202) 326-2438
4  EDWIN RODRIGUEZ (*pro hac vice*)
   erodriguez@ftc.gov; (202) 326-3147
5  Federal Trade Commission
6  600 Pennsylvania Ave., NW
7  Washington, DC 20580
   Fax: (202) 326-3259
8

9

10 STACY PROCTER (Local Counsel) (CA 221078)
   sprocter@ftc.gov; (310) 824-4300
11 Federal Trade Commission
12 10990 Wilshire Blvd., Suite 400
   Los Angeles, CA 90024
13 Fax: (310) 824-4380
14 ATTORNEYS FOR PLAINTIFF

15
16                  UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
17

18 | **Federal Trade Commission**, | ) | No. ED 5:18-CV-02104-DMG-PLAx |
19 |                                | ) |                               |
20 |         Plaintiff,             | ) | PLAINTIFF'S MEMORANDUM IN      |
   |                                | ) | SUPPORT OF ITS MOTION FOR      |
21 |         v.                     | ) | SUMMARY JUDGMENT AGAINST       |
   |                                | ) | DEFENDANTS JASON CARDIFF AND   |
22 | **Jason Cardiff, et al.**,     | ) | EUNJUNG CARDIFF               |
23 |                                | ) |                               |
24 |         Defendants.            | ) | Hearing Date: October 9, 2020 |
   |                                | ) | Time: 2:00 p.m.               |
25

26

27

28

# **<u>TABLE OF CONTENTS</u>**

Table of Authorities……………………………………………………………….. iv

Table of Exhibits…………………………………………………………………viii

I.   INTRODUCTION ..................................................................................1

II.  THE PARTIES.......................................................................................2

    A. Plaintiff Federal Trade Commission.................................................2

    B. The Defendants ................................................................................2

       1.  The Cardiffs ...............................................................................2

       2.  The Corporate Defendants..........................................................2

       3.  The Common Enterprise and Alter-Egos ...................................5

III.  DEFENDANTS' ACTS AND PRACTICES ........................................7

    A. Counts I-VI:  Defendants' Deceptive Health Claims .................................7

       1.  Counts I and II: Defendants' TBX-FREE Claims................................8

       2.  Counts III and IV: Defendants' Eupepsia Thin Claims ......................10

       3.  Counts V and VI: Defendants' Prolongz Claims ..................................12

       4.  Counts I-VI: Defendants' Claims for TBX-FREE, Eupepsia Thin, and Prolongz were Unsubstantiated or False ......................................14

          a.   Counts I-II:  Unsubstantiated and False TBX-FREE Claims ........14

          b.   Counts III-IV: Unsubstantiated and False Eupepsia Thin Claims....................................................................................16

          c.   Counts V-VI: Unsubstantiated and False Prolongz Claims...........17

    B. Counts VII-IX:  Other Material Misrepresentations About TBX-FREE, Eupepsia Thin, and Prolongz.................................................................19

       1.  Count VII:  False Claim that Eupepsia Thin Was Made in the United States.................................................................................19

       2.  Count VIII: False Money Back Guarantee Claims ............................19

       3.  Count IX: Deceptive Testimonials for Eupepsia Thin ......................20

    C. The Cardiffs Widely Disseminated Their Deceptive Claims ...................21

i

D. Counts X-XIV:  Defendants Failed to Disclose and Misrepresented Autoship Plans, Enrolled Consumers Without Their Consent, and Charged Consumers Without Authorization ............................................21

E. Count XV: Defendants Made Abusive Telemarketing Calls ...................25

F. Count XVI: Defendants Made Misleading Earnings Claims for Rengalife, Their Multilevel Marketing Scheme ........................................25

IV. LEGAL ARGUMENT ...................................................................................26

A. The FTC Has Shown That No Genuine Issue of Material Fact Exists In Connection With the Allegations Of the Complaint .................................26

   1. Defendants Violated Sections 5 and 12 of the FTC Act .....................27

     a.  Counts I-VI:  The Deceptive Health Claims...................................29

     b.  Count VII:  False Made in the USA Claims ..................................30

     c.  Count VIII:  False Money Back Guarantee Claims .......................30

     d.  Count IX:  Fake Testimonials .......................................................31

     e.  Counts X-XI:  Deceptive Autoship and Continuity Plan Practices ......................................................................................31

     f.  Count XII: Defendants Unfairly Charged Consumers Without Authorization................................................................................32

   2. Count XIII: Defendants Violated the Restore Online Shoppers' Confidence Act (ROSCA) ..................................................................33

   3. Count XIV: Defendants Violated the Electronic Fund Transfer Act (EFTA) and Regulation E...................................................................34

   4. Count XV: Defendants Violated the Telemarketing Sales Rule (TSR)............................................................................................35

   5. Count XVI: Defendants Made False and Unsubstantiated Earnings Claims for Their Rengalife Multilevel Marketing Program.................35

B. The Cardiffs Each Are Liable for Injunctive and Monetary Relief for Their Law Violations ...............................................................................36

ii

1        1. The Cardiffs Operated the Corporate Defendants as a Common

2           Enterprise, and the Corporate Defendants Were Their Alter-Egos......36

3              a. Common Enterprise ................................................................36

4              b. Alter-Egos ...........................................................................38

5        2. The Cardiffs Are Liable for Injunctive and Monetary Relief .............40

6              a. Defendant Jason Cardiff Is Liable for Injunctive and Monetary

7                 Relief ....................................................................................41

8              b. Defendant Eunjung Cardiff Is Liable for Injunctive and Monetary

9                 Relief ....................................................................................43

10     C. The Proposed Permanent Injunction Provides for Injunctive and

11        Monetary Relief Against the Cardiffs....................................................45

12        1. Injunctive Relief ................................................................................45

13        2. Monetary Relief .................................................................................48

14  V.   CONCLUSION................................................................................................54

1

**TABLE OF AUTHORITIES**

2

**Cases**

3   *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................26

4   *Commodity Futures Trading Comm'n v. Crombie*, 914 F.3d 1208

5       (9th Cir. 2019) ..............................................................................................49

6   *FTC v. 1st Guar. Mortg. Corp.*, No. 09-cv-61840 Seitz/O'Sullivan,

7       2011 U.S. Dist. LEXIS 38152 (S.D. Fla. Mar. 30, 2011) ....................................47

8   *FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)............................40

9   *FTC v. Alliance Document Preparation*, *LLC*, 296 F. Supp. 3d 1197 (C.D. Cal.

10      2017) ..........................................................................................................37

11  *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018), *cert.*

12      *granted*, No. 19-508, 2020 U.S. LEXIS 3556 (U.S. July 9, 2020) ... 45, 47, 50, 52

13  *FTC v. AMG Servs.*, No. 2:12-cv-00536-GMN-VCF, 2016 U.S. Dist. LEXIS

14      135765 (D. Nev. Sept. 30, 2016).................................................................. 47, 52

15  *FTC v. AT&T Mobility LLC*, 883 F.3d 848 (9th Cir. 2018) ...................................45

16  *FTC v. Bay Area Bus. Council, Inc.*, No. 02 C 5762 (N.D. Ill. Apr. 16, 2004) ......48

17  *FTC v. Braswell*, No. CV 03-3700-DT (PJWx), 2005 U.S. Dist. LEXIS 39245

18      (C.D. Cal. Dec. 28, 2005).......................................................................47

19  *FTC v. Cardiff*, No. ED CV 18-2104-DMG (PLAx), 2020 U.S. Dist. LEXIS

20      119800 (C.D. Cal. July 7, 2020).............................................................. 50, 51

21  *FTC v. Check Investors, Inc.*, No. 03-2115 (JWB), 2005 U.S. Dist. LEXIS

22      37199 (D.N.J. July 18, 2005) ..............................................................48

23  *FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) .................. 45, 51, 52

24  *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012)......... 24, 32

25  *FTC v. Consumer Def., LLC*, No. 2:18-cv-00030-JCM-BNW, 2019 U.S. Dist.

26      LEXIS 225283 (D. Nev. Dec. 5, 2019)..............................................................53

27  *FTC v. COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300

28      (D. Wyo. 2016)....................................................................................42

*FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019), *cert. granted*, No. 19-825, 2020 U.S. LEXIS 3557 (U.S. July 9, 2020), *and cert. denied*, No. 19-914, 2020 U.S. LEXIS 3567 (U.S. July 9, 2020) ............................... 34, 50

*FTC v. Cruz*, No. 08-1877 (JP), 2010 U.S. Dist. LEXIS 4568 (D.P.R. Jan. 19, 2010) ........................................................................................................... 48

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006) ........................ 28, 40

*FTC v. Data Med. Capital, Inc.*, No. SACV 99-1266 AHS, 2010 U.S. Dist. LEXIS 3344 (C.D. Cal. Jan. 15, 2010) ........................................................... 38

*FTC v. Dinamica Financiera, LLC*, No. CV 09-03554 MMM (PJWx), 2010 U.S. Dist. LEXIS 88000 (C.D. Cal. Aug. 19, 2010) .................................. 47

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ......................... 28

*FTC v. Elec. Payment Sols. of Am., Inc.*, No. CV-17-02535-PHX-SMM, 2019 U.S. Dist. LEXIS 157978 (D. Az. Aug. 28, 2019) .................................. 46

*FTC v. Elegant Sols., Inc.*, No. SACV 19-1333 JVS (KESx), 2020 U.S. Dist. LEXIS 137774 (C.D. Cal. July 6, 2020) ............................................................ 50

*FTC v. Elegant Sols., Inc.*, No. SACV 19-1333 JVS (KESx), Final Judgment, Dkt. 184 (C.D. Cal. July 17, 2020) ........................................ 47, 48

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ................................... 46

*FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993) ............................................... 29

*FTC v. Five Star Auto Club*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ..................... 48

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) ................................... 40

*FTC v. Gill,* 265 F.3d 944 (9th Cir. 2001) .................................................. 27, 28, 47

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) ......................... 40, 45

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011) ... 31, 32, 34, 37

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ................................ 45, 49

*FTC v. INC21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010) ........................ 47

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) ........................ 33

*FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp.2d 1006
(C.D. Cal. 2012) ...................................................................47

*FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009) ......................... 28, 29

*FTC v. Nat. Sol., Inc.*, No. CV 06-6112-JFW (JTLx), 2007 U.S. Dist. LEXIS
60783 (C.D. Cal. Aug. 7, 2007) ..........................................29

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008),
*aff'd* 356 F. App'x 358 (11th Cir. 2009) ...................................... 28, 29

*FTC v. NCH, Inc.*, No. CV-S-94-138-LDG, 1995 U.S. Dist. LEXIS 21098
(D. Nev. May 25, 1995)..............................................27

*FTC v. Neiswonger*, 494 F. Supp. 2d 1067 (E.D. Mo. 2007) ...................................53

*FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010)...................................................32

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010)........... 36, 37, 40

*FTC v. NPB Adver., Inc.*, 218 F. Supp. 3d 1352 (M.D. Fla. 2016) ........................42

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ....................... 27, 28, 45, 49

*FTC v. Pioneer Enters., Inc.*, No. CV-S-92-615-LDG (RJJ), 1992 Dist. LEXIS
19699 (D. Nev. Nov. 12, 1992)........................................27

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997)....................40

*FTC v. Publ'g Clearing House, Inc.*, No. CV-S-94-623-PMP (LRL), 1995 U.S.
Dist. LEXIS 19659 (D. Nev. May 12, 1995) .........................................47

*FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858
(7th Cir. 2008) ............................................................. 28, 30

*FTC v. RCA Credit Servs., LLC*, No. 8:08-cv-2062-T-27MAP, 2010 U.S. Dist.
LEXIS 143755 (M.D. Fla. Oct. 14, 2010)..............................................48

*FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) .........................27

*FTC v. Somenzi*, No. CV 16-07101 SJO (GJSx), 2017 U.S. Dist. LEXIS 206126
(C.D. Cal., July 24, 2017)...........................................47

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) .......................................... passim

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993 (N.D. Ind. 2000).............31

*FTC v. Universal Premium Servs.*, No. CV 06-0849 SJO (OPx), 2007 U.S. Dist. LEXIS 105203 (C.D. Cal., Feb. 21, 2007) .......................................................47

*FTC v. Vocational Guides, Inc.*, No. 3-01-0170, 2009 U.S. Dist. LEXIS 29509 (M.D. Tenn. Apr. 6, 2009)............................................................... 47, 48

*FTC v. Wellness Support Network, Inc.*, No. 10-cv-04879-JCS, 2014 U.S. Dist. LEXIS 21449 (N.D. Cal. Feb. 19, 2014)................................ 29, 42, 44

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) ........27

*Horphag Research Ltd. v. Garcia*, 475 F.3d 1029 (9th Cir. 2007) ........................27

*In re Cliffdale Assocs.*, 103 F.T.C. 110 (1984) ................................................. 27, 28

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)......................................................28

*Liu v. SEC*, 140 S. Ct. 1936 (2020)......................................................... 50, 52, 53

*McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000)..........................................47

*Minton v. Cavaney*, 364 P.2d 473 (Cal. 1961)........................................................39

*POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015) ...............................29

*Root v. Ry. Co.*, 105 U.S. 189 (1882)......................................................................53

*Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907 (W.D. Mich. 2018) .............35

*SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109 (9th Cir. 2006).........................50

*SEC v. Reynolds*, No. 3:08-CV-0438-B, 2008 U.S. Dist. LEXIS 65669 (N.D. Tex. Aug. 22, 2008)........................................................................52

*Sonora Diamond Corp. v. Superior Court*, 99 Cal. Rptr. 2d 824 (2000) ......... 38, 39

*Thompson Med. Co. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986) ..................................29

*Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589 (2009)......................................38

*TRW, Inc. v. FTC*, 647 F.2d 942 (9th Cir. 1981) .....................................................46

*United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199 (1968) ..........46

**Statutes and Regulations**

12 C.F.R. § 1005 ..........................................................................................................2

12 C.F.R. § 205 .........................................................................................................34

15 U.S.C. § 41 *et seq.*..........................................................................................2, 28

15 U.S.C. § 45 ........................................................................................ 2, 27, 28

15 U.S.C. § 52 ........................................................................................ 2, 27, 28

15 U.S.C. § 53(b) ................................................................................ 46, 48, 51

15 U.S.C. §§ 1693-1693r .......................................................................... 2, 34

15 U.S.C. §§ 8401-8405 ........................................................................... 2, 33

16 C.F.R. § 310 ................................................................................. 2, 33, 35

**Other Authorities**

FTC Enforcement Policy Statement on U.S. Origin Claims, 62 Fed. Reg.

63,756 (Dec. 1, 1997) ............................................................................30

Telemarketing Sales Rule ("TSR"), 73 Fed. Reg. 51164 (Aug. 29, 2008) ............35

# <u>TABLE OF EXHIBITS[1]</u>

### TRO Exhibits

| PX Number | Description | ECF Number |
|-----------|-------------|------------|
| **Declarations of FTC Investigators and Forensic Accountant** | | |
| PX-1 | Declaration of Connor Sands<br>FTC Lead Investigator | Dkts. 7, 10, 13, 22, 23, 24-1 to 24-14, and 25 to 25-4 |
| PX-2 | Declaration of Emil T. George<br>FTC Forensic Accountant | Dkt. 6 |
| PX-3 | Declaration of William Ducklow<br>FTC Investigator | Dkt. 8 |
| PX-4 | Declaration of Biaunca Morris<br>FTC Paralegal Specialist | Dkt. 9 |
| PX-5 | Declaration of Aine Farrell<br>FTC Investigator | Dkt. 11 |
| PX-6 | Declaration of Lynne Colbert<br>Supervisory FTC Investigator | Dkt. 12 |

---

[1] The exhibits submitted in support of Plaintiff's *Ex Parte* Application For (1) Temporary Restraining Order And Order To Show Cause Why A Preliminary Injunction Should Not Issue, and (2) Order Waiving Notice Requirement, Dkt. 3, are identified by their ECF numbers in an exhibit key in Plaintiff's Statement Of Uncontroverted Facts And Conclusions Of Law In Support Of Motion For Summary Judgment Against Jason Cardiff And Eunjung Cardiff ("SUF"). Because the FTC's application for a TRO was filed under seal and later uploaded onto the docket, the TRO exhibits do not appear with the TRO application and appear in multiple places in the docket, which are identified in the exhibit key.

| | **Expert Reports** | | |
|---|---|---|
| PX-7 | Declaration of Dr. Judith Prochaska<br>Expert | Dkts. 207 to 207-2 |
| PX-8 | Declaration of Dr. David Levitsky<br>Expert | Dkts. 208 to 208-2 |
| PX-9 | Declaration of Dr. Hossein Sadeghi-Nejad<br>Expert | Dkts. 209 to 209-8 |
| PX-10 | Declaration of Dr. Stacie Bosley<br>Expert | Dkt. 210 |
| | **Consumer Declarations** | |
| PX-11 | Declaration of Bonnie Fromal<br>Consumer | Dkt. 211 |
| PX-12 | Declaration of Douglas Cooper<br>Consumer | Dkt. 211 |
| PX-13 | Declaration of Betsy Rosen<br>Consumer | Dkt. 211 |
| PX-14 | Declaration of Linda Harrell-Cox<br>Consumer | Dkt. 211 |
| PX-15 | Declaration of David Garrett<br>Consumer | Dkt. 211 |
| PX-16 | Declaration of Connie Bryant<br>Consumer | Dkt. 211 |
| PX-17 | Declaration of Terry Reynolds<br>Consumer | Dkt. 211 |
| PX-18 | Declaration of Stephen DeAngelo<br>Consumer | Dkt. 211 |
| PX-19 | Declaration of Ian M. Kramer<br>Consumer | Dkt. 211 |
| PX-20 | Declaration of Brian Grossman<br>Consumer | Dkt. 211 |
| PX-21 | Declaration of Cynthia Boatright<br>Consumer | Dkt. 211 |
| PX-22 | Declaration of Scott Chesko<br>Consumer | Dkt. 211 |

| PX-23 | Declaration of Lisa Roberts Consumer | Dkt. 211 |
|---|---|---|
| PX-24 | Declaration of Cecilia Brown Consumer | Dkt. 211 |
| PX-25 | Declaration of Evelyn Jones Consumer | Dkt. 211 |
| PX-26 | Declaration of Dustin Fatch Consumer | Dkt. 211 |
| PX-27 | Declaration of Robert Frantz Consumer | Dkt. 211 |
| PX-28 | Declaration of Terri McKinney Consumer | Dkt. 211 |
| PX-29 | Declaration of Dorothy Basford Consumer | Dkt. 211 |
| PX-30 | Declaration of Brenda Herel Consumer | Dkt. 211 |
| **Miscellaneous** | | |
| PX-31 | Unreported Cases Cited in TRO Memorandum (Two Parts) | Dkts. 14 to 15 |

**Summary Judgment Exhibits**

| PX Number | Description |
|---|---|
| **Declarations of Defendants' Former Employees** | |
| PX-32 | Declaration of Danielle Walker |
| PX-33 | Declaration of Tracy Carranza |
| PX-34 | Declaration of Sarah Garcia |
| PX-35 | Declaration of Diana Melendez |
| PX-36 | Declaration of April Rodoracio |
| PX-37 | Declaration of Jean Wu |

xi

| | Declarations of Employees of Media Companies | |
|---|---|---|
| PX-38 | Declaration of Kate Adkinson-Connor Cannella<br>Media DTC, LLC | |
| PX-39 | Declaration of Kevin Szymanski<br>Inter/Media Time Buying Corporation | |
| PX-40 | Declaration of Robert Yallen<br>Inter/Media Time Buying Corporation | |
| PX-41 | Declaration of John Cabrinha<br>River Direct, Inc. | |
| PX-42 | Declaration of Brian Young<br>Broad Beam Media, Inc. | |
| PX-43 | Declaration of Ty Sherrell<br>FX Web Media, LLC | |
| PX-44 | Declaration of Andrew Donato<br>Extreme Reach | |
| | **Declarations of Eupepsia Thin Testimonialists, Rengalife Members, and Others** | |
| PX-45 | Declaration of Daniel W. Hogan<br>Testimonialist in Eupepsia Thin Advertising | |
| PX-46 | Declaration of Todd Preston<br>Testimonialist in Eupepsia Thin Advertising | |
| PX-47 | Declaration of Karen Spero<br>Testimonialist in Eupepsia Thin Advertising | |
| PX-48 | Declaration of Ulysses McDowell<br>Rengalife Member | |
| PX-49 | Declaration of John Ziolkowski<br>Rengalife Member | |
| PX-50 | Declaration of Joseph M. Appel<br>Massachusetts Medical Society | |

| Additional Declarations of FTC Investigator and Attorney | |
|---|---|
| PX-51 | Declaration of Lead Investigator Connor Sands |
| PX-52 | Declaration of Attorney Elizabeth Jones Sanger (submitting excerpts from Defendants Jason Cardiff and Eunjung Cardiff's answers to Requests for Admissions) |

**Other Documents**

| | Description | ECF Number |
|---|---|---|
| N/A | Excerpted Transcript of Proceedings Order to Show Cause Re: Contempt | Dkts. 187-1, 188-1, 190-1, 249 |
| N/A | Declaration of Jason Cardiff | Dkt. 265-2 |
| N/A | Declaration of Eunjung Cardiff | Dkt. 265-3 |
| N/A | Declaration of Brick Kane (Receiver) | Dkt. 277-1 |
| N/A | Declaration of Lead Investigator Connor Sands | Dkt. 277-4 |
| N/A | Declaration of Emil T. George FTC Forensic Accountant | Dkt. 381-3 |

# I.    INTRODUCTION

For close to five years, Defendants Jason Cardiff and Eunjung Cardiff (the "Cardiffs") operated a multi-pronged scam that bilked consumers out of more than $18 million.[2]  They used deceptive health claims to lure consumers into buying their TBX-FREE, Eupepsia Thin, and Prolongz dissolvable oral film strips, and trapped them in autoship continuity programs that placed recurring unauthorized charges on their credit and debit cards.  Defendants stymied consumers' attempts to cancel their enrollment in autoship continuity programs and to get refunds, despite their pledged money-back guarantee.  They also placed illegal robocalls and made false earnings claims for their multilevel marketing scheme.  The Cardiffs carried out their scam through a maze of seven corporate entities that they operated as a common enterprise and used as their alter-egos.[3]

The Federal Trade Commission ("FTC") seeks a permanent injunction that would enjoin the conduct alleged in the Complaint and order the Cardiffs to pay equitable monetary relief.

---

[2] The TRO evidence (PX-1 through PX-30), additional evidence submitted herewith – including declarations PX-32 through PX-52, Defendants' responses to requests for admissions, and excerpts from deposition transcripts – and documents already on the docket, establish that no genuine issue of material fact exists as to any of the counts of the Complaint.  Herewith, the FTC submits Plaintiff's Statement Of Uncontroverted Facts And Conclusions Of Law In Support Of Motion For Summary Judgment Against Jason Cardiff and Eunjung Cardiff ("SUF").

[3] The Corporate Defendants defaulted and the Clerk of the Court entered their defaults in March 2019.  Dkts. 91, 92, and 96.  Concurrent with this motion, the FTC is filing a motion for default judgment against the Corporate Defendants.

## II.    THE PARTIES

### A.    Plaintiff Federal Trade Commission

The FTC is an independent agency of the U.S. Government that enforces the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41 *et seq.*, which prohibits unfair or deceptive acts or practices in or affecting commerce, including false advertisements for food, drugs, devices, services, or cosmetics.  15 U.S.C. §§ 45(a) and 52.  The FTC also enforces the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401-8405, which prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements; the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r, and its implementing Regulation E, 12 C.F.R. Part 1005, which regulate electronic fund transfer systems; and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing.

### B.    The Defendants

#### 1.    The Cardiffs

Defendants Jason Cardiff and Eunjung Cardiff have admitted that they were each "an owner, officer, director and/or member of the business defendants identified as Defendants" in this action.[4]  In addition to this admission, the evidence shows that they had the authority to control and did control the Corporate Defendants, operating them as a common enterprise and as their alter-egos.

#### 2.    The Corporate Defendants

Defendant Eunjung Cardiff was President and manager of Defendant Run Away Products, LLC ("Run Away"), which was formed as a New York limited liability company on March 10, 2009.[5]  Defendant Jason Cardiff was a member

---

[4] SUF 18, 52.
[5] SUF 54-56, 221.

and Vice President.[6]  Defendant Eunjung Cardiff formed Defendant Advanced Men's Institute Prolongz LLC ("AMI") as a California limited liability company on January 30, 2014.[7]  She was a member, owner, and CEO.[8]  Defendant Jason Cardiff was the managing member, owner, and President.[9]  Defendant Run Away was the manager of AMI.[10]

Over time, from 2014 to 2017, Defendant AMI morphed to become Defendant Redwood Scientific Technologies, Inc., a Delaware corporation ("Redwood Delaware"), through the following transformations:  First, in late 2014, Defendant Eunjung Cardiff changed Defendant AMI's name to Redwood Scientific Technologies LLC, and then converted the limited liability company into a corporation, Defendant Redwood Scientific Technologies, Inc., a California corporation ("Redwood California").[11]  Defendant Jason Cardiff was an owner of Defendant Redwood California, and its President, Chief Executive Officer, Chief Financial Officer, and a Director; and Defendant Eunjung Cardiff was an owner, and its Secretary, Chief Operating Officer, Director of Marketing, and a member of the Board of Directors.[12]  Defendant Redwood Scientific Technologies, Inc., a Nevada corporation ("Redwood Nevada"), was formed in December 2014[13] and "acquired" Defendant Redwood California on January 6, 2015.[14]  Defendant Jason Cardiff was Defendant Redwood Nevada's Chief Executive Officer and President;

[6] SUF 34-36.
[7] SUF 57, 209.
[8] SUF 53, 58-59.
[9] SUF 45.
[10] SUF 224.
[11] SUF 61, 210-211.
[12] SUF 19-24, 61-65, 256.
[13] SUF 212.
[14] SUF 215.

3

Defendant Eunjung Cardiff was its Chief Operating Officer, Marketing Director, and Secretary; and both Cardiffs were on the Board of Directors.[15]  In late 2017, Defendant Redwood Delaware was formed through the merger of Defendant Redwood Nevada with a Delaware corporation.[16]  Defendant Jason Cardiff was an owner of Redwood Delaware and its President, Chief Executive Officer, Treasurer, and a Director, and Defendant Eunjung Cardiff was its Chief Operating Officer, Chief Marketing Officer, and a Director.[17]  Although Defendants AMI, Redwood California, Redwood Nevada, and Redwood Delaware evolved one from the other, the Cardiffs did not retire any of the names, but continued to use them in connection with the practices that are the subject of the Complaint.  Defendants' business records often do not distinguish between Redwood California, Redwood Nevada, and Redwood Delaware.

Consistent with this blurring of company identities, in early 2017, Defendant Jason Cardiff became the sole member and manager of Defendant Identify, LLC ("Identify"),[18] a Wyoming limited liability company that registered "TBX-FREE," "Redwood Scientific Technologies," "Runaway Products," and "Advanced Men's Institute Prolongz" as trade names.[19]  Both of the Cardiffs have held themselves out as owners.[20]

Defendant Carols Place Limited Partnership ("CPLP") is an Arizona partnership[21] with two partners, Carols Place Trust and Extension First, LLC, a

---

[15] SUF 25, 66.
[16] SUF 217.
[17] SUF 26-31, 67.
[18] SUF 32-33, 47-48.
[19] SUF 225, 254-255.
[20] SUF 32, 76.
[21] SUF 226.

Wyoming company.[22]  The Cardiffs are the only two settlors and trustees of Carols Place Trust[23] and they own Extension First. [24]  Defendant CPLP holds 99.9 percent of the Cardiffs' common shares in Defendant Redwood Delaware.[25]  Carols Place Trust has held title to the Cardiffs' home since January 31, 2017.[26]

### 3. The Common Enterprise and Alter-Egos

The Cardiffs are the common denominator of all the Corporate Defendants. They own, manage, control, and are officers of the Corporate Defendants, which shared office space and employees.[27]  All of them were engaged in the common venture of advertising and selling TBX-FREE, Eupepsia Thin, and Prolongz.[28] The Cardiffs used the Corporate Defendants interchangeably to pay oral thin film strip suppliers,[29] advertising companies,[30] merchant banks for payment processing,[31] employees,[32] and their own personal expenses.[33]  They transferred more than $3.9 million among them.[34]  The Cardiffs have personally guaranteed

---

[22] SUF 229.
[23] SUF 37, 68, 277.
[24] SUF 40, 71, 77, 231.
[25] SUF 172, 228.
[26] SUF 278.
[27] SUF 18-34, 37-49, 52-78, 235-236, 250-253, 263.
[28] SUF 237-239, 260.  Danielle Walker, the Cardiffs' Director of Operations, has declared that "it was all a single business operation marketing oral film strips." SUF 249.  Danielle Walker is a settling defendant who stipulated to a permanent injunction that the Court approved on May 16, 2019.  Dkt. 114.
[29] SUF 239-242, 247-248, 259-260.
[30] SUF 35-36, 99, 111, 131-134, 178-179, 237, 259, 262, 270-276, 857.
[31] SUF 238, 259.
[32] SUF 251, 263.
[33] SUF 176-177.
[34] SUF 264.

Corporate Defendants' debts, including amounts owed to a media buying company and to merchant account banks.[35]

For example, the Cardiffs used Run Away, AMI, Redwood, and Identify to purchase TBX-FREE, Eupepsia Thin, and Prolongz from manufacturers in China and India.[36] The Cardiffs certified to their Indian manufacturer that Identify, Redwood, Run Away, and AMI were "our group of companies (our sister concern companies)."[37] They also used the Corporate Defendants interchangeably to advertise the strips.[38] In settling a breach of contract action by a media buyer, Inter/Media Time Buying Corporation, against Defendant Run Away for failure to pay for advertising, the Cardiffs signed a settlement agreement that included factual recitals that Defendants Run Away, AMI, Redwood California, and Redwood Nevada "were involved in the marketing and sales of 'Prolongz', a sex product that purports to assist in the slowing or delaying of male ejaculation during sexual intercourse. Eunjung Cardiff aka Eunjung No aka Eunjung Lee and Jason Cardiff are officers and/or directors and/or managers and/or owners of the legal entities described in this recital. All of the entities referred to in this recital are affiliated with Eunjung Cardiff aka Eunjung No aka Eunjung Lee and Jason Cardiff."[39] The Cardiffs also used Defendant Run Away to purchase media time from another media buyer, Havas Edge.[40] For 2015-2018, the Cardiffs switched to using Redwood to enter into subsequent contracts with Cannella Response

---

[35] SUF 123, 171, 265-267.
[36] SUF 239, 259-260.
[37] SUF 240-242.
[38] SUF 35-36, 99, 111, 131-134, 178-179, 237, 259, 262, 270-276, 857.
[39] SUF 273. At the time of the settlement, Redwood Delaware had not yet come into existence. SUF 217, 272.
[40] SUF 35, 131, 275.

Television, LLC and Diversified Mercury Communications, LLC ("Mercury Media") for TV advertising for TBX-FREE, Eupepsia Thin, and Prolongz, and with Just Deliver It and Gawk for robocalls, but such expenses often were paid by Defendants Run Away and AMI.[41]  Similarly, the Cardiffs processed sales to consumers interchangeably using merchant accounts belonging to various Corporate Defendants.[42]

The Cardiffs have held themselves personally liable for Corporate Defendants' debts.[43]  For example, in connection with the Inter/Media breach of contract action described above, the Cardiffs signed a continuing guaranty pledging their personal property to pay for Run Away's financial obligations for Prolongz television advertising.[44]  In addition, Eunjung Cardiff personally guaranteed the debt of Defendants AMI, Redwood, and Identify in other personal guarantees and sworn confessions of judgment.[45]  The Cardiffs maintained credit card accounts jointly in their names and the names of Corporate Defendants,[46] and have used these accounts also to pay for personal expenses.[47]

## III.    DEFENDANTS' ACTS AND PRACTICES

### A.    Counts I-VI:  Defendants' Deceptive Health Claims

The backbone of the Cardiffs' scheme was marketing TBX-FREE, Eupepsia

---

[41] SUF 131-134, 178-179, 237, 276, 857.

[42] SUF 238.

[43] SUF 123, 171, 265-267.

[44] SUF 265-267.  Los Angeles Superior Court Judge Frank Johnson entered a finding of fact that the Cardiffs had entered into this guaranty, and that Defendant Run Away was the legal alter-ego of Redwood California, formerly AMI.  SUF 269-271.

[45] SUF 171.

[46] SUF 261.

[47] SUF 177.

7

Thin, and Prolongz as smoking cessation, weight loss, and male sexual performance products[48] with deceptive health claims.

    1.    <u>Counts I and II:  Defendants' TBX-FREE Claims</u>

The Cardiffs sold TBX-FREE from 2015 to 2018[49] with at least $7.2 million in net sales.[50]  They advertised it through national television campaigns,[51] websites, including tbxfree.com,[52] social media in which Defendant Jason Cardiff personally appeared,[53] print,[54] a ringless voicemail message recorded by Defendant Eunjung Cardiff,[55] and product packaging.[56]  The Cardiffs admit that they advertised TBX-FREE as an effective smoking cessation product, as more effective than either nicotine patches or nicotine gum in enabling cigarette smokers to stop smoking, as effective in enabling many cigarette smokers to quit smoking in seven to ten days, and as having an 88 percent success rate.[57]  They therefore admit making most of the TBX-FREE claims challenged in Counts I and II of the Complaint.

---

[48] The Cardiffs have sworn in declarations that "Redwood was in the business of marketing . . . a stop smoking aid (TBX-FREE), an appetite suppressant (Eupepsia Thin), and a men's sexual performance product (Prolongz)," and that "Redwood marketed its products to consumers primarily by creating and running info-commercials on television stations in selected markets in the U.S. by contracting with outside paid marketing media companies to place the ads on TV stations." SUF 233-234.

[49] SUF 281.

[50] SUF 292.

[51] SUF 293-310.

[52] SUF 317.

[53] SUF 318, 341-358.

[54] SUF 319, 359-361.

[55] SUF 168, 362.

[56] SUF 321.

[57] SUF 364-367, 372.

The challenged claims are clear from the ads.  Television ads state "TBX-FREE MAKES IT EASY TO QUIT SMOKING!"[58] and "TBX-FREE is ready to set you free from nicotine addiction forever and the addiction to tobacco and cigarettes."[59]  The ads disparage nicotine patches and gum, first describing their low efficacy rate, and then claiming that in comparison TBX-FREE works for everyone, with an 88 percent efficacy rate: "Did you know the cure rate for the FDA approved patch and gum is a whopping 2 percent?  That's right.  A 2 percent success rate at best. . . . And what about the other 98 percent?  . . . Well, we have you 100 percent covered"[60] and "With an 88 percent success rate . . .TBX-FREE is the number one choice by smokers."[61]  The TV ads claim TBX-FREE has been clinically tested, proclaiming on screen: "HUNDREDS & HUNDREDS OF CLINICAL STUDIES PERFORMED ON OVER 10,600 SMOKERS!"[62]  They claim that smokers should not need to purchase more than a one month supply:  "If you'll get your treatment started today, in as little as 30 days, you should never want to smoke another cigarette again."[63]

The tbxfree.com website touts TBX-FREE as "The #1 Choice to QUIT SMOKING!,"[64] "More effective than the Patch and Gum,"[65] with an "88% Success Rate."[66]  It describes TBX-FREE as "Clinically Proven In:  Johns Hopkins University, The New England Journal of Medicine, Harvard Health Publications,

---

[58] SUF 322.
[59] SUF 323.
[60] SUF 324.
[61] SUF 325.
[62] SUF 326.
[63] SUF 327.
[64] SUF 329.
[65] SUF 328.
[66] SUF 330.

Harvard Medical School,"[67] and claims that "In clinical studies cited in The New England Journal of Medicine, the active ingredient in TBX-FREE™ has an 88% cure care [sic] compared to the patch and gum combined."[68]

Defendant Jason Cardiff appears in Facebook ads making similar claims: "We have an 88 percent effective rate in long-term cure, in long-term smokers,"[69] and "Our clinical data on TBX-Free has been done by some of the greatest medical and scientific institutions anywhere that we know of, including, [sic] not limited to the New England Journal of Medicine, which ranks our product ten times more effective than nicotine-replacement therapy to stop smoking."[70] He touts how fast TBX-FREE works: "I mean really fast, within a week, within ten days,"[71] and "you should never need more than one month."[72]

### 2. Counts III and IV: Defendants' Eupepsia Thin Claims

The Cardiffs admit that they sold Eupepsia Thin from at least 2017 to 2018[73] with at least $1.95 million in net sales.[74] They advertised Eupepsia Thin through national television campaigns,[75] the Internet, including bethinrx.com,[76] and product packaging.[77] The Cardiffs admit that they advertised Eupepsia Thin as an effective appetite suppressant and weight loss aid.[78]

---

[67] SUF 338.
[68] SUF 334.
[69] SUF 343.
[70] SUF 344.
[71] SUF 348.
[72] SUF 350.
[73] SUF 452.
[74] SUF 454-458.
[75] SUF 459, 460, 482-497.
[76] SUF 459, 479, 498-518.
[77] SUF 480, 519-522.
[78] SUF 524, 526.

The claims challenged in Counts III and IV of the Complaint are clear from the ads.  Defendants' TV ads claim that "Eupepsia is a safe and effective way to help you control your appetite"[79] and encourage consumers to "Shed those unwanted pounds with Eupepsia Thin."[80]  The ads claim that Eupepsia Thin acts fast to suppress appetite, "The ingredients in Eupepsia will begin to activate in your system in less than 20 seconds. . . . In minutes, you will feel your appetite suppress, giving you control over how much you eat." [81]  The ads claim consumers will lose substantial weight without diet or exercise:  "This one-of-a-kind product will help you lose weight -- without stepping one foot in the gym or giving up any of your favorite foods. . . . No counting calories or tracking food and no expensive gym memberships to pay,"[82] and "Are you ready to lose 10, 20, even 100 pounds without following a strict and complicated diet plan?"[83]

Eupepsia Thin websites identify specific amounts of weight that consumers can expect to lose, and how long it will take:  "Lose up to 15 pounds your first month with Eupepsia Thin oral strips without diets or changing your food or lifestyle choices"[84]; and "If you would like to lose 8-20lbs – our one month supply at [$]69.95 will work for you. If you would like to lose 20-50lbs – our three month supply at [$]169.95 will work for you."[85]  The ads claim that Eupepsia Thin is more effective than conventional calorie and meal plans and will keep the weight off without lifestyle changes: "Current calorie reduction and meal plans have less

[79] SUF 483.
[80] SUF 482.
[81] SUF 484, 527.
[82] SUF 485, 528.
[83] SUF 488, 528.
[84] SUF 508, 529.
[85] SUF 506, 530.

than 5% success rate while the new product, Eupepsia Thin has a substantially higher success rate,"[86] and people "have been going crazy over this one product that is helping people shed pounds and keeping it off with no lifestyle changes."[87]

Defendants' advertising also claims that clinical studies conducted on Eupepsia Thin show that it is an effective appetite suppressant and weight loss aid.[88] For example, the Eupepsia Thin box claims, "Clinically proven to help suppress appetite between meals."[89] An ad insert received with an FTC Investigator's purchase of Eupepsia Thin claims that "Eupepsia Thin is the product with proven clinical research to help you keep the weight off for life."[90] Defendants delivered some of these deceptive weight loss claims through fake testimonials.[91]

### 3. Counts V and VI: Defendants' Prolongz Claims

The Cardiffs sold Prolongz from 2013 to 2018,[92] with at least $5.9 million in gross sales.[93] They advertised it on television[94] and the Internet.[95] The Cardiffs admit that Prolongz was advertised as a male sexual performance aid and as substantially increasing ejaculation control and the duration of sex.[96]

---

[86] SUF 504, 531.
[87] SUF 502, 532.
[88] SUF 510, 533, 534.
[89] SUF 521.
[90] SUF 522.
[91] *See infra* p. 20. SUF 165-166, 199, 491, 493-495, 497, 513-514, 761-768.
[92] SUF 99, 100, 102, 606.
[93] SUF 608-611.
[94] SUF 99, 131, 614, 620-623.
[95] SUF 635.
[96] SUF 647.

1    The claims challenged in Counts V and VI are clear from Defendants'

2    advertising.  TV ads claim that Prolongz substantially increases ejaculation control,

3    claiming through testimonials or otherwise:  "AMI has given me longevity . . . that

4    ability to control myself,"[97] "As far as my performance has gone, since I've been

5    with AMI, I can go a long, long time,"[98] and "the product helps you last longer."[99]

6    Consequently, the duration of sex would be "Long Lasting."[100]

7        The prolongz.com website claims that "Prolongz is guaranteed to increase

8    your ejaculatory control levels and overall sexual performance"[101] and "[l]onger

9    lasting sex is achievable.  Prolongz™ will make you firmer and last longer."[102]

10   The website makes treatment and prevention claims, asserting that Prolongz "helps

11   in the prevention of Premature Ejaculation (PE).  It is a first of its kind product

12   which uses Oral (sublingual) dissolvable Strip delivery technology for the

13   treatment of PE."[103]  In addition, prolongz.com claims that Prolongz was clinically

14   tested, for example, "[i]n clinical studies, the ingredients in Prolongz™ by

15   Advanced Men's Institute (AMI) were proven to increase ejaculatory control level

16   of over 97% in men"[104] and "[p]roven to effectively increase the length in Sex for

17   over 97% of Thousands of Men who have tried Prolongz."[105]

---

[97] SUF 636.
[98] SUF 637.
[99] SUF 638.
[100] SUF 639.
[101] SUF 640.
[102] SUF 641.
[103] SUF 643.
[104] SUF 644.
[105] SUF 645.

4. <u>Counts I-VI: Defendants' Claims for TBX-FREE, Eupepsia Thin, and Prolongz were Unsubstantiated or False</u>

The FTC retained experts in the fields of smoking cessation, weight-loss, and male sexual health who each concluded that Defendants' efficacy claims are not substantiated by competent and reliable scientific evidence. Moreover, they did not find any clinical testing of TBX-FREE, Eupepsia Thin, or Prolongz to support Defendants' "clinically proven" claims. The Cardiffs have submitted no expert testimony rebutting the analysis of the FTC's experts.

a. Counts I-II: Unsubstantiated and False TBX-FREE Claims

The FTC's smoking cessation expert, Dr. Judith Prochaska, opines that Defendants do not have substantiation for the challenged TBX-FREE claims.[106] Dr. Prochaska says that to substantiate these claims, experts in the field of nicotine addiction would require randomized, controlled trial evidence from a study of TBX-FREE.[107] Dr. Prochaska opines that such a study should involve nicotine-dependent subjects and compare TBX-FREE to a placebo.[108] Successful results would show statistically significant improvements on standard outcome measures, such as biochemically confirmed continuous abstinence rates.[109]

Dr. Prochaska found no evidence in the scientific literature search she independently conducted that supports the challenged TBX-FREE claims.[110] There are no published results of human clinical trials of TBX-FREE, and thus no studies

---

[106] SUF 433-437.
[107] SUF 392, 414.
[108] SUF 392, 414.
[109] SUF 392, 414.
[110] SUF 419-420, 424, 431.

14

comparing TBX-FREE to a placebo to determine whether it has any efficacy at all for smoking cessation.[111]

Defendants have admitted that they do not possess any unpublished studies of TBX-FREE.[112]  Defendants have conceded that the 88 percent success rate claim is false.[113]  In addition, the Cardiffs have not presented any expert testimony on this point.

Dr. Prochaska reviewed the purported substantiation materials supplied by the Defendants – a collection of journal articles on other products containing the purported active ingredient in TBX-FREE, cytisine.[114]  Dr. Prochaska noted that a few cytisine studies that follow the standards of experts in the field have demonstrated modest efficacy for smoking cessation, but the studies were of a completely different product that is marketed by a third-party.[115]  Dr. Prochaska opines that these studies cannot be extrapolated to support any of the TBX-FREE efficacy claims, let alone the outrageous claim that TBX-FREE has an 88 percent success rate, because the dosages, dosage regimens, and modes of administration are just too different.[116]

Despite having no reliable science to back up their claims, Defendants went further, making establishment claims that clinical studies prove that TBX-FREE is an effective smoking cessation product (Count II).[117]  These representations are false:  Dr. Prochaska's search of the scientific literature revealed no clinical study

---

[111] SUF 419-420, 424, 431.
[112] SUF 375, 438.
[113] SUF 375, 438.
[114] SUF 421.
[115] SUF 418, 419, 425.
[116] SUF 426-431.
[117] *See supra* p. 9-10.

of TBX-FREE at all, let alone studies in or by The New England Journal of Medicine, Harvard Health Publications, or Johns Hopkins University.[118]  In addition, The New England Journal of Medicine has confirmed that it did not publish clinical studies or other materials demonstrating that TBX-FREE is an effective smoking cessation product or that users of the product had an 88 percent success rate.[119]

> b.  Counts III-IV:  Unsubstantiated and False Eupepsia Thin Claims

Dr. David Levitsky, the FTC's weight-loss expert, opines that Defendants' appetite suppression and weight-loss claims are not supported by reliable scientific evidence.[120]  He explains that to substantiate the efficacy claims made for Eupepsia Thin, experts in the weight-loss field would require double-blinded, randomized, placebo-controlled trial evidence from a study of the product itself or from a product using the same ingredients in the same dosages; ideally, the results would be replicated by independent laboratories.[121]  Successful results would show statistically significant improvements on standard outcome measures, including clinical (not self-reported) measurements of weight and body fat.[122]

The Cardiffs admit that at the time the product was advertised Defendants did not possess any published or unpublished human clinical studies on Eupepsia Thin to back up their claims.[123]  In addition, the Cardiffs have not presented any expert testimony claiming that the evidence they possessed – a collection of

---

[118] SUF 424.
[119] SUF 445-446.
[120] SUF 570, 577-585, 588-597.
[121] SUF 555.
[122] SUF 566-567.
[123] SUF 535-538, 599.

journal articles on other ingredients and products – substantiated the Eupepsia Thin appetite suppression or weight loss advertising claims.

Dr. Levitsky reviewed the purported substantiation that Defendants submitted to the FTC and determined that it does not support the efficacy claims.[124] In addition, Dr. Levitsky's own review of the scientific literature regarding the purported main ingredient of Eupepsia Thin – Paullinia Cupana H.B.K. 1X (caffeine) – found no studies that can be extrapolated to the product.[125]

Dr. Levitsky stated that some research suggests that high doses (more than 400 mg) of caffeine are associated with appetite suppression, but that there is no evidence either that Eupepsia Thin (supposedly a diluted homeopathic product) contains that much caffeine or that caffeine consumption causes weight loss.[126]

c.    Counts V-VI: Unsubstantiated and False Prolongz Claims

Dr. Hossein Sadeghi-Nejad, an expert in urology and sexual medicine, opines that Defendants have no reliable science to support the Prolongz ejaculation control and premature ejaculation claims.[127]  Dr. Sadeghi-Nejad says that to substantiate the Prolongz claims of increased ejaculatory control and treatment or prevention of premature ejaculation, experts in his field would require well-designed, randomized, double-blind, properly controlled human clinical testing of Prolongz or a substantially similar product using the same dosage and route of administration.[128]  The clinical trial must test the appropriate study population and

---

[124] SUF 568, 570, 576-584.
[125] SUF 569-570, 572-575.
[126] SUF 573-575.
[127] SUF 704-705.
[128] SUF 664-671.

be properly powered (e.g., sufficient duration and sample size) to yield accurate and reliable results.[129] Dr. Sadeghi-Nejad has found no relevant evidence in the scientific literature that meets these standards.[130] Furthermore, the Cardiffs have not presented any expert testimony on this issue.

Dr. Sadeghi-Nejad reviewed the purported substantiation material Defendants provided to the FTC – a pilot survey and a collection of journal articles on other products – and opines that Defendants' substantiation does not meet the standards of experts in the field.[131] The pilot survey sponsored by Defendants did not have a randomized control group.[132] In addition, the duration was too short (1-week use of test product) and too small (29 study subjects) to yield accurate and reliable results.[133] The scientific literature compiled by Defendants on the purported active ingredients in Prolongz was not comparable either to the dosage or to the route of administration of Prolongz.[134]

Despite this lack of substantiation for their ejaculation control and premature ejaculation claims, Defendants claimed that clinical studies prove that Prolongz increases ejaculatory control and the duration of sex for 97 percent of users. There are no such studies.

---

[129] SUF 670-671, 676.
[130] SUF 683-703.
[131] SUF 683-702.
[132] SUF 686.
[133] SUF 687-689.
[134] SUF 694-702.

**B.** **Counts VII-IX: Other Material Misrepresentations About TBX-FREE, Eupepsia Thin, and Prolongz**

    1.    <u>Count VII: False Claim that Eupepsia Thin Was Made in the United States</u>

Defendants falsely claimed, in a seal that appeared on Eupepsia Thin product packaging[135] and their websites,[136] that Eupepsia Thin was "Made in USA." For example, the controltheweight.com website stated: "RST's newest product, Eupepsia Thin, is made in the USA."[137] In fact, Eupepsia Thin was made in India and China[138] and the Cardiffs admit that they knew that was the case.[139]

    2.    <u>Count VIII: False Money Back Guarantee Claims</u>

Defendants advertised money-back guarantees for TBX-FREE,[140] Eupepsia Thin,[141] and Prolongz.[142] For example, Defendant Jason Cardiff claimed in a TBX-FREE Facebook video "We have a lifetime money-back guarantee. So for any reason if it doesn't work, you don't even need to ship it back."[143] In many instances, however, they unjustifiably denied refunds to consumers,[144] concocting refund policies and conditions that had never been disclosed. In practice, Defendants limited their "lifetime" guarantee to 30 days.[145] Defendants sometimes

---

[135] SUF 712-713.
[136] SUF 714-716.
[137] SUF 716.
[138] SUF 718.
[139] SUF 719-721.
[140] SUF 725-731.
[141] SUF 732-733.
[142] SUF 734-736.
[143] SUF 726.
[144] SUF 743, 747, 753.
[145] SUF 738.

misrepresented that consumers did not have to return the product to obtain a refund when in fact Defendants required consumers to return the product after obtaining a Return Merchandise Authorization (RMA),[146] which consumers often could not get because they could not get through to customer service agents.[147]  In addition, Defendant Jason Cardiff instructed his customer service staff to implement daily dollar caps for refunds in contravention of the product guarantees.[148]

      3.    <u>Count IX:  Deceptive Testimonials for Eupepsia Thin</u>

Eupepsia Thin infomercials and websites contained fake testimonials from individuals claiming that they used the product to lose weight, with testimonialists Dan Hogan claiming to have lost 45 pounds, Karen Spero claiming to have lost 90 pounds, and Todd Preston claiming to have lost 132 pounds.[149]  In fact, these three testimonialists admit in declarations that they did not use Eupepsia Thin to lose weight.[150]  Instead, they responded to a talent agency that was looking for actors who had lost at least 20 pounds and had before-and-after pictures, and were instructed to say that their weight loss was due to Eupepsia Thin.[151]  Defendant Jason Cardiff knew that the testimonialists had not used Eupepsia Thin to lose weight.[152]  Defendant Eunjung Cardiff peddled talent releases for the fake testimonials to a media buying company that had warned her that testimonials had to be legitimate.[153]

---

[146] SUF 737.
[147] SUF 748.
[148] SUF 749-754.
[149] SUF 491, 493-495, 497, 513-514, 761.
[150] SUF 762-763.
[151] SUF 764-768.
[152] SUF 199.
[153] SUF 165-166.

### C. The Cardiffs Widely Disseminated Their Deceptive Claims

The Cardiffs admit that their TBX-FREE, Eupepsia Thin, and Prolongz television advertising was disseminated across the United States.[154]  They purchased TV spots from media buying companies, including Inter/Media Time Buying Corp., Havas Edge, Cannella Response Television, and Mercury Media.[155] Cannella sold the Cardiffs media time for the longest period, 2014 to 2018, and alone arranged for 6,416 airings of TBX-FREE ads, 8,039 airings of Eupepsia Thin ads, and 4,748 airings of Prolongz ads.[156]

The Cardiffs also widely advertised the products on company websites, including redwoodamerica.com, tbxfree.com, trytbxfree.com, trytbxfreenow.com, bethinrx.com, thinliferx.com, controltheweight.com, thinyounow.com, prolongz.com, and amilonger.com.[157]  They also marketed the products through social media, including Facebook, through email, robocalls, and print advertising.[158]

### D. Counts X-XIV:  Defendants Failed to Disclose and Misrepresented Autoship Plans, Enrolled Consumers Without Their Consent, and Charged Consumers Without Authorization

Defendants enrolled consumers who ordered TBX-FREE, Eupepsia Thin, and Prolongz into unauthorized autoship programs, making additional shipments and repeatedly charging consumers' saved cards.[159]  Although Defendants allowed

---

[154] SUF 294-310, 459-477, 612-634.

[155] SUF 36, 131, 475, 620, 622.

[156] SUF 132, 135-136, 310, 474, 634.

[157] SUF 317, 479, 635.

[158] SUF 84-86, 174, 293, 318-320, 459, 478, 612, 856.

[159] SUF 772-776.

one-time "straight" sales for a short time, for most of the time the default was to enroll consumers into autoship.[160]

Defendants failed to disclose autoship enrollment and recurring charges and therefore failed to obtain consumers' prior authorization or consent (Counts X and XIII).[161]  For example, FTC Lead Investigator Connor Sands placed two undercover orders of TBX-FREE, online and by phone; neither Defendants' website nor their telephone sales representative disclosed the automatic enrollment and recurring charges.[162]  Both times, the FTC investigator was automatically enrolled in an autoship plan; many consumers reported similar experiences.[163]

Redwood employees confirm that Defendants routinely placed consumers into autoship plans with no or inadequate disclosures.  Until late 2017, Defendants did not include any disclosure of the autoship plan in the phone scripts for their sales representatives; in fact, Defendant Jason Cardiff actually told his sales representatives *not* to disclose the plan at the time of purchase.[164]  Although Defendants' sales scripts purportedly included autoship disclosures beginning in late 2017, the sales representatives routinely failed to read them or skipped over them, instead reassuring consumers who inquired that autoship would not be added.[165]  Sales representatives knew that many consumers would not complete their orders if they understood that autoship plans were part of the sale.  For those representatives, losing sales meant missed sales quotas, commissions, bonuses, and

---

[160] SUF 775-776, 790-794.
[161] SUF 777-787, 798-799, 808-816.
[162] SUF 810-811, 814-815.
[163] SUF 810-816.
[164] SUF 785-787, 798.
[165] SUF 786, 798-799, 811-812.

possibly losing their jobs.[166] Even when Defendants specifically promised to limit the sale to a single purchase, they often placed consumers on the autoship program (Count XI).[167]

Defendants' failure to obtain consent led to unauthorized charges to consumers' credit cards and bank accounts (Counts XII, XIII, XIV).[168] Defendants did not distinguish between credit card payments and bank account payments, and did not obtain written authorization for recurring bank account charges or provide consumers with a copy of such an authorization as required by law.[169]

Most brazenly, when Defendants needed more money, they took the stored debit and credit card information of consumers who had made only a one-time purchase (i.e., a "straight" sale) and simply processed further unauthorized charges on those cards – sometimes over a year after the consumer's original purchase.[170] Defendant Jason Cardiff directed a group of employees to initiate these charges, telling them they had to successfully charge at least $10,000 per day, and threatening to fire at least one of them if she did not comply.[171] Between January and April 2018, they successfully processed unauthorized charges for at least 1,500 consumers.[172] Stunningly, this campaign of outright theft began over four months after Defendants received the FTC's Civil Investigative Demand ("CID") investigating potential unauthorized charges, and it continued during the FTC's

---

[166] SUF 799-808.
[167] SUF 811-812.
[168] SUF 783, 815-818, 821-823, 826, 829-833, 839-841, 847.
[169] SUF 822, 825.
[170] SUF 839-852.
[171] SUF 839, 843-844, 848-852.
[172] SUF 847.

federal action to enforce that CID.[173]

Defendants did not have effective mechanisms for consumers to stop recurring charges (Count XIII). Consumers who took affirmative steps to cancel were often unsuccessful. They were often unable to reach Defendants when they called,[174] and even when they successfully reached someone to cancel their enrollment in the autoship plan, Defendants often continued sending additional shipments and placing more unauthorized charges on consumers' cards.[175] Jason Cardiff also limited the number of refunds his customer service staff could issue each day.[176]

Not surprisingly, up to 80 percent of consumers' complaints to Defendants related to the disguised autoship program and unauthorized charges.[177] Defendants' merchant accounts also experienced high chargebacks (i.e., forced credits back to customers' credit cards), prompting the closure of several of those merchant accounts.[178] Defendant Jason Cardiff knew that the chargeback ratio was too high.[179] Defendants' chargeback rate was consistently over the 1 percent threshold that credit card companies deem indicative of fraud, including some that exceeded 10 percent.[180]

---

[173] SUF 1-2, 4-6.

[174] SUF 748, 819, 824.

[175] SUF 821.

[176] SUF 749-757.

[177] SUF 200, 756, 817, 850.

[178] SUF 746, 826-833, 835-836, 850.

[179] SUF 834-838.

[180] SUF 829-831. *See also FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1075 (C.D. Cal. 2012) (noting that average chargeback rate in the U.S. is 0.2 percent of transaction rate).

### E.    Count XV:  Defendants Made Abusive Telemarketing Calls

In early 2018, Defendants contracted with two services – Just Deliver It and Gawk – to deliver unlawful prerecorded ringless voicemail messages (RVMs) straight to the voicemail boxes of consumers.[181]  The Just Deliver It contract was for 1 million RVMs and the Gawk contract was for 1.5 million RVMs.[182]  More than 1.5 million messages were delivered to consumers.[183]  The Cardiffs admit that they personally recorded the voicemail messages.[184]

### F.    Count XVI:  Defendants Made Misleading Earnings Claims for Rengalife, Their Multilevel Marketing Scheme

The Cardiffs launched their Rengalife multilevel marketing scheme in late March 2018,[185] promoting it using a website, Internet videos featuring Defendant Jason Cardiff, and email.[186]  This advertising touted Rengalife's "life-changing products" (Defendants' oral film strips), easy-to-understand pay structure, and unlimited earning potential.[187]  Defendants represented that Rengalife Directors are guaranteed a minimum annual salary of $7,200, Vice Presidents $30,000, and Senior Vice Presidents $144,000,[188] with bonuses[189] as members advance through the ranks based on the number of recruits in their "downline" networks.  The primary source of income for any Rengalife member would come from purchases

---

[181] SUF 856-857.
[182] SUF 856-857.
[183] SUF 178-179, 856-857, 859.
[184] SUF 125-126, 167-168.
[185] SUF 863-864.
[186] SUF 127, 201, 203, 865-867, 870, 878.
[187] SUF 883, 889.
[188] SUF 897.
[189] SUF 911-912.

of Redwood products by members of his or her own network.[190]  Although advertising for Rengalife was relatively brief, declarations from consumers who paid substantial amounts of money to become Rengalife members and the declaration of Danielle Walker show that the Rengalife program did, in fact, recruit members.[191]

The Cardiffs admit that they did not have actual earnings data from Rengalife members to substantiate their earnings claims.[192]  Moreover, the testimony of FTC expert Dr. Stacie Bosley shows that the Rengalife earnings claims are in fact false because at any point in time, nearly all Rengalife members would be in a negative financial position, having spent more money on required monthly purchases of Redwood film strips than they could recoup through the scheme.[193]

## IV.  LEGAL ARGUMENT

### A.  The FTC Has Shown That No Genuine Issue of Material Fact Exists In Connection With the Allegations of the Complaint

In determining whether to grant summary judgment, a court must determine whether a genuine issue of material fact exists as to the allegations of the Complaint.  The FTC must initially identify evidence that demonstrates the absence of a genuine issue of material fact.[194]  Then the burden shifts to the

---

[190] SUF 918-919, 921.

[191] SUF 869.

[192] SUF 898-899.

[193] SUF 933-936.

[194] *FTC v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Cardiffs to set forth specific facts showing that there is a genuine issue for trial.[195]

### 1.    Defendants Violated Sections 5 and 12 of the FTC Act

An act or practice is deceptive under Section 5(a) of the FTC Act [196] if "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[197]  An act or practice is unfair, and violates Sections 5(a) and 5(n) of the FTC Act, if it causes, or is likely to cause, substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or competition.[198]

Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in order to induce the purchase of food, drugs, devices, services, or cosmetics.[199]  A false advertisement is one that is "misleading in a

---

[195] *Stefanchik*, 559 F.3d at 927 (quoting *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007)).

[196] 15 U.S.C. § 45(a).

[197] *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (quoting and adopting the standard set forth in *Cliffdale Assocs.*, 103 F.T.C. 110, 164–65 (1984))).  Under Section 5, the FTC is not required to prove that a defendant intended to deceive consumers, nor is a defendant's good faith a defense to liability.  *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. NCH, Inc.*, No. CV-S-94-138-LDG, 1995 U.S. Dist. LEXIS 21098, at *18 (D. Nev. May 31, 1995); *FTC v. Pioneer Enters., Inc.*, No. CV-S-92-615-LDG, 1992 U.S. Dist. LEXIS 19699, at *3 (D. Nev. Nov. 12, 1992).

[198] 15 U.S.C. § 45(n).

[199] TBX-FREE, Eupepsia Thin, and Prolongz are drugs for purposes of Section 12. *Cf. FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1266 & 1272 (S.D. Fla. 1999) (holding that diet pills were a "food" and/or "drug" for purposes of §§ 12 and 15 of the FTC Act).

material respect."[200]  Courts apply the same three-prong test for deception to determine if a party has disseminated a "false advertisement."[201]  Section 12 violations are violations of Section 5(a).[202]

Courts routinely determine the existence of express and implied claims on summary judgment without the need for extrinsic evidence.[203]  Advertising claims are deceptive or misleading if:  (1) the advertiser lacked a reasonable basis to assert the claims as true at the time they were made, and the claims are therefore unsubstantiated, or (2) the claims are false.[204]  A representation is material if it "'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"[205]  Claims that "significantly involve health" are presumed material.[206]  A presumption that consumers relied on Defendants' representations arises once the FTC has proved that the Defendants

---

[200] 15 U.S.C. § 55(a)(1); *Pantron I*, 33 F.3d at 1099.

[201] *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 7-8 (1st Cir. 2010); *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1188-89 (N.D. Ga. 2008).

[202] 15 U.S.C. § 52 (b).

[203] *Stefanchik*, 559 F.3d at 927-28; *Gill*, 265 F.3d at 954-56; *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1077-78 (N.D. Cal. 2009) (holding that courts have uniformly rejected imposing a requirement of extrinsic evidence on the FTC); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1189 ("If the advertisement explicitly states or clearly and conspicuously implies a claim, the court need not look to extrinsic evidence to ascertain whether the advertisement made the claim.") (citations omitted); *FTC v. QT, Inc.,* 448 F. Supp. 2d 908, 957-58 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008).

[204] *Pantron I*, 33 F.3d at 1096; *QT, Inc.*, 448 F. Supp. 2d at 958-59.

[205] *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165).

[206] *Kraft*, 970 F.2d at 322-23 (citations omitted).

made material misrepresentations, that they were widely disseminated, and that consumers purchased Defendants' products.[207]

    a.    Counts I-VI:  The Deceptive Health Claims

The FTC and the federal courts have distinguished between "efficacy claims" and related "establishment claims."  An efficacy claim conveys that a product successfully yields the advertised benefit, (e.g., TBX-FREE is an effective smoking cessation product), whereas an establishment claim conveys that the product's effectiveness or superiority has been scientifically established (e.g., Eupepsia Thin is "clinically proven" to suppress appetite).[208]  Courts rely on experts in a given field to identify what constitutes competent and reliable scientific evidence that would substantiate and provide a reasonable basis for claims about a product's effectiveness.[209]  If an advertiser claims to have a certain

---

[207] *FTC v. Figgie Int'l*, 994 F.2d 595, 605-06 (9th Cir. 1993) (citations omitted).
[208] *Thompson Med. Co. v. FTC*, 791 F.2d 189, 194 (D.C. Cir. 1986); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015).
[209] *See, e.g.*, *id.* at 495 (affirming Commission's finding, based on expert testimony and reports, that experts in the relevant medical fields would require randomized controlled trials to support disease-related benefits claims); *FTC v. Wellness Support Network, Inc.*, No. 10-cv-04879-JCS, 2014 U.S. Dist. LEXIS 21449, at *27 (N.D. Cal. Feb. 19, 2014) (court granted summary judgment relying on FTC expert to determine what constituted competent and reliable scientific evidence for efficacy claims); *FTC v. Nat. Sol., Inc.*, No. CV 06-6112-JFW (JTLx), 2007 U.S. Dist. LEXIS 60783, at *12 (C.D. Cal. Aug. 7, 2007) (court granted summary judgment, rejecting defendants' reasonable basis evidence because it was not competent and reliable evidence of efficacy as established by expert testimony); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1202 (finding that expert testimony established that randomized controlled clinical trials were necessary as competent and reliable scientific evidence substantiating weight-loss and erectile dysfunction claims); *Medlab*, 615 F. Supp. 2d at 1079-81 & 1083 (relying on expert testimony to grant summary judgment in case challenging deceptive weight loss claims).

level of substantiation (e.g., clinical studies in The New England Journal of Medicine, Harvard Health Publications, and Johns Hopkins University prove that TBX-FREE is effective), then it must have that level of substantiation or the claim is false.[210]

The FTC retained eminent experts in the fields of smoking cessation, weight loss, and male sexual health – each areas that "significantly involve health" – to review Defendants' claims and to opine on whether Defendants had a reasonable basis for them. The FTC's experts have concluded that Defendants made unsubstantiated and false claims.[211] This expert testimony is unrebutted as the Cardiffs did not name any experts or provide any expert reports during discovery.

### b. Count VII: False Made in the USA Claims

There is no question that Defendants made "Made in USA" claims in Eupepsia Thin product packaging and websites. These Made in USA claims were false because the Cardiffs admit that Eupepsia Thin was not made in the United States, and the facts show that it was made in India and China.[212]

### c. Count VIII: False Money Back Guarantee Claims

Defendants' TBX-FREE, Eupepsia Thin, and Prolongz advertising offered money-back guarantees. These claims of money-back guarantees were in many instances false because the facts clearly show that Defendants thwarted refunding

---

[210] *QT, Inc.,* 448 F. Supp. 2d at 959 (citation omitted) (holding that an advertiser who makes an establishment claim must possess the level of proof claimed in the ad).

[211] *See supra* p. 14.

[212] *See supra* p. 19. SUF 712-721. FTC Enforcement Policy Statement on U.S. Origin Claims, 62 Fed. Reg. 63,756, 63,767 (Dec. 1, 1997) ("a 'Made in USA' claim, like any other objective advertising claim," violates Section 5 of the FTC Act if it is not truthful and substantiated).

money to consumers in multiple ways.[213]  Consequently, the guarantee claims violate Sections 5(a) and 12 of the FTC Act.[214]

### d.     Count IX:  Fake Testimonials

The evidence establishes that testimonials for Eupepsia Thin were false. Three testimonialists submitted declarations stating that in fact they did not use the product to lose the weight claimed in advertising, and that they were retained by a talent agency as actors.[215]  Defendants' use of these fake testimonials is deceptive and violates Sections 5(a) and 12.[216]

### e.     Counts X-XI:  Deceptive Autoship and Continuity Plan Practices

The declarations of an FTC Investigator, multiple former Redwood employees, and consumers establish that Defendants enrolled consumers in an autoship continuity plan without disclosing recurring charges (Count X).[217] Moreover, in some instances, they expressly assured consumers that they would *not* be enrolled in such an autoship program, but enrolled them anyway (Count XI).[218]  Consumers could not consent to terms they did not receive at all, or to

---

[213] *See supra* p. 19.  SUF 725-757.

[214] *Cf. FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1005-06 & 1012 (N.D. Ind. 2000) (granting summary judgment where defendants falsely represented that program came with money-back guarantee without disclosing material conditions before purchase), *aff'd*, 312 F.3d 259 (7th Cir. 2002).

[215] *See supra* p. 20.  SUF 165-166, 199, 491, 493-495, 497, 513-514, 761-768.

[216] *See, e.g.*, *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1228 (D. Nev. 2011) (granting summary judgment on FTC's deception count where defendants presented no evidence showing that certain testimonials were genuine), *aff'd in part and vacated in part on other grounds*, 763 F.3d 1094 (9th Cir. 2014).

[217] *See supra* p. 22.  SUF 777-787, 798-799, 808-816.

[218] *See supra* p. 22-23.  SUF 811-812.

31

representations that conveyed a false impression.[219]  These practices violated
Sections 5(a) and 12 of the FTC Act.

>            f.      Count XII: Defendants Unfairly Charged Consumers
>                    Without Authorization

The evidence also establishes that Defendants routinely charged consumers'
debit or credit cards without their express informed consent.[220]  Consumers could
not give their authorization for charges without being notified about the autoship
program and the recurring charges in the first place.  Consumers experienced
substantial injury from Defendants' unauthorized charges:  their accounts were
charged for unordered products and even those who successfully obtained either a
refund or chargeback had to spend time and effort to resolve the problem with
Defendants, their credit card companies, and their banks.  Consumers could not
reasonably avoid this injury because they only learned about the shipments and
charges after the fact.  The consumer injury resulting from Defendants' actions has
no countervailing benefits for consumers or competition, much less any that
outweighs that injury.  Courts in this Circuit have consistently held unauthorized
charges to be unfair under Section 5(n) of the FTC Act.[221]

---

[219] *Grant Connect*, 827 F. Supp. 2d at 1224 (granting summary judgment on FTC's
deception count where defendants failed to adequately disclose recurring monthly
membership fee buried in the terms and conditions and in fine print).
[220] *See supra* p. 23.  SUF 783, 815-818, 821-823, 826, 829-841, 847.
[221] *See FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157-58 (9th Cir.) (affirming district
court's findings that defendant's practice of creating and delivering unverified
checks was unfair and consumers could not have reasonably avoided the
unauthorized withdrawals), *amended on other grounds*, 210 U.S. App. LEXIS
12592 (9th Cir. 2010); *Commerce Planet*, 878 F. Supp. 2d at 1078-79 (holding it
was an unfair practice to sign consumers up for a continuity program with
automatic monthly credit card charges when they had not consented to or
bargained for the enrollment and, therefore, the recurring charges were not

## 2. Count XIII: Defendants Violated the Restore Online Shoppers' Confidence Act (ROSCA)

Section 4 of ROSCA, 15 U.S.C. § 8403, prohibits charging consumers for goods or services sold on the Internet through a negative option feature, unless the seller clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, obtains the consumer's express informed consent before making the charge, and provides a simple mechanism to stop recurring charges.[222] Defendants' autoship plans were a negative option feature because they shipped additional film strips unless consumers took the affirmative step of cancelling the autoship program.[223]

An FTC Investigator's online undercover purchase of TBX-FREE and the experience of other consumers show that Defendants did not disclose the negative option feature of their autoship program before consumers provided their billing information for online purchases, and therefore did not obtain their express informed consent to incur additional charges.[224] In addition, in many instances consumers had difficulty cancelling the autoship program, and in some cases continued to be charged even after they cancelled, showing that Defendants failed

---

reasonably avoidable); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202-03 (C.D. Cal. 2000) (finding that defendants had engaged in unfair practices by debiting and charging credit card numbers without the cardholders' authorization).
[222] 15 U.S.C. § 8403.
[223] SUF 772-774. ROSCA's definition of "negative option feature" incorporates by reference the definition from the FTC's Telemarketing Sales Rule (TSR), 16 C.F.R. Part 310. 15 U.S.C. § 8403. Under the TSR, a negative option feature "means, in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).
[224] *See supra* p. 22. SUF 775-781, 813-816, 823.

to provide simple mechanisms to stop additional charges.[225]  These practices violate ROSCA.[226]

3.  Count XIV: Defendants Violated the Electronic Fund Transfer Act (EFTA) and Regulation E

EFTA and Regulation E require that, before a merchant can make recurring electronic fund transfers (i.e., debits) from a consumer's bank account, it must obtain a written authorization signed or similarly authenticated by the consumer.[227] For an authorization to be valid, the terms of the preauthorized transfer must be "clear and readily understandable" and the authorization "should evidence the consumer's identity and assent to the authorization."[228]  Moreover, a copy of the authorization must be provided to the consumer.[229]  A consumer's rights under EFTA cannot be waived.[230]

The evidence shows that Defendants failed to obtain written authorization for recurring electronic fund transfers and failed to give consumers a copy of any such authorization.[231]  These failures violate EFTA and Regulation E.[232]

---

[225] *See supra* p. 24.  SUF 748, 819, 821, 824.

[226] *Cf. FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 769-70 (7th Cir. 2019) (affirming grant of summary judgment on FTC's ROSCA count where defendant did not "clearly and conspicuously" disclose that website involved a negative option transaction and did not obtain consumers' express informed consent).

[227] 15 U.S.C. § 1693e(a); 12 C.F.R. § 205.10(b).

[228] Federal Reserve Board's Official Staff Interpretations of Regulation E, 12 C.F.R. Part 205, supp. I, ¶ 10(b), comments (5) & (6).

[229] 15 U.S.C. § 1693e(a); 12 C.F.R. § 205.10(b).

[230] 15 U.S.C. § 1693*l*.

[231] *See supra* p. 23.  SUF 774, 822, 825.

[232] *Grant Connect*, 827 F. Supp. 2d at 1231-32 (granting summary judgment for the FTC where defendants failed to present evidence that preauthorized transfer terms

### 4. Count XV: Defendants Violated the Telemarketing Sales Rule (TSR)

The evidence establishes that Defendants used two companies – Just Deliver It and GAWK – to send illegal ringless voicemails to more than 1.5 million consumers.[233]  Defendants' use of these prerecorded messages violates the TSR, which prohibits initiating outbound telephone calls with prerecorded messages designed to induce the purchase of goods or services.[234]

### 5. Count XVI: Defendants Made False and Unsubstantiated Earnings Claims for Their Rengalife Multilevel Marketing Program

Rengalife advertising promises that Rengalife members are likely to earn substantial income.[235]  The Cardiffs admit, however, that they did not have actual earnings data from Rengalife members to substantiate the claims.[236]  In addition, FTC expert Dr. Stacie Bosley, a preeminent scholar of multi-level marketing, reviewed Rengalife's promotional materials, including details of the program's structure and compensation plan.[237]  Dr. Bosley concluded that compensation in

---

were clear and readily understandable or that they provided consumers with a copy of the authorization for recurring charges).

[233] *See supra* p. 25.  SUF 124, 178, 179, 856-857, 858-859.

[234] 16 C.F.R. §310.4(b)(1)(v).  *See also* TSR, Supp. Info., 73 Fed. Reg. 51164, 51164 (Aug. 29, 2008) (codified at 16 C.F.R. Part 310) (noting that amendment of TSR provision concerning prerecorded message calls applies to prerecorded messages left on an answering machine or voicemail system); *cf. Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907, 909-12 (W.D. Mich. 2018) (holding that direct-to-voicemail messages qualify as a "call" under the Telephone Consumer Protection Act).

[235] *See supra* p. 25.  SUF 872, 879, 883-884, 887-893, 897.

[236] SUF 898-899.

[237] SUF 900-909.

Rengalife was "based almost exclusively" on the endless recruitment of downline distributors – all of whom had to purchase $200 of Redwood film strips monthly[238] – and not by retail sales of those strips to consumers.[239]  She further concluded that at any point in time, the overwhelming majority of Rengalife members would have spent more money purchasing Redwood film strips than they would have earned in "commissions" from their own downline networks, meaning that they would be in a loss position overall.[240]  Defendants did not retain an expert to contest Dr. Bosely's conclusions.[241]  Thus, there is no genuine issue of material fact over whether their deceptive earnings claims violated Section 5(a) of the FTC Act.[242]

## B.   The Cardiffs Each Are Liable for Injunctive and Monetary Relief for Their Law Violations

### 1.   The Cardiffs Operated the Corporate Defendants as a Common Enterprise, and the Corporate Defendants Were Their Alter-Egos

#### a.   Common Enterprise

The Cardiffs operated the Corporate Defendants as a common enterprise as evidenced by multiple factors routinely considered by courts.[243]  The Cardiffs

---

[238] SUF 917-924, 927, 929.

[239] SUF 928.

[240] SUF 933-934.

[241] SUF 937.

[242] *See Stefanchik*, 559 F.3d at 928-29 (affirming district court's grant of summary judgment where the FTC proffered substantial evidence that defendants' earnings claims were deceptive and misleading to an overwhelming number of consumers, very few of whom made money, and defendants offered no competent contrary evidence in the form of survey results, contrary consumer declarations, sworn affidavits, or testimony).

[243] *See supra* p. 5-6.  *See, e.g.*, *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010) ("[E]ntities constitute a common enterprise when they

owned the Corporate Defendants, and managed and controlled them as officers and board members.[244]  The Corporate Defendants shared common office space, first in Claremont, then in Upland, California.[245]  There was no separation of companies because the Cardiffs used Corporate Defendants in the common venture of purchasing TBX-FREE, Eupepsia Thin, and Prolongz from suppliers, advertising the products, [246] and processing sales to consumers.[247]

Among some examples, in connection with purchasing the film strips, Defendant Jason Cardiff certified that Defendants Identify, Redwood, Run Away, and AMI "are our group of companies (our sister concern companies)."[248]  When the Cardiffs settled their litigation with Inter/Media in connection with Prolongz

---

exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues."); *FTC v. Alliance Document Preparation, LLC,* 296 F. Supp. 3d 1197, 1203-04 (C.D. Cal. 2017) ("Courts are permitted to consider a variety of factors when deciding whether a common enterprise exists.  For instance, courts may consider whether companies are under common ownership and control; whether they pool resources and staff; whether they share telephone numbers, employees, and email systems; and whether they jointly participated in a shared business venture or referred customers to one another.") (citing *Network Servs. Depot*, 617 F.3d at 1142-43).

[244] *See supra* p. 2-7.
[245] SUF 235-236.
[246] SUF 237, 239.
[247] SUF 238.  *Cf. Grant Connect*, 827 F. Supp. 2d at 1216-18 (finding no genuine issue of material fact over the existence of a common enterprise where defendants employed the same individuals under different company names at the same location, blurred the lines of corporate separateness, sought to obtain lower chargeback rates by coordinating their activities to make it appear to payment processors and merchant accounts that their companies were different entities, and made their profits interdependent).
[248] SUF 240.

advertising, they agreed to the factual recital that Defendants Run Away, AMI, Redwood California, and Redwood Nevada were all involved in marketing and selling Prolongz, and that the companies were all affiliated with the Cardiffs.[249] Defendants Run Away, AMI, Redwood California, Redwood Nevada, and Redwood Delaware were engaged, at different times, in marketing TBX-FREE, Eupepsia Thin, and Prolongz, through Inter/Media, Havas Edge, Cannella, and Mercury Media.[250] Defendant Jason Cardiff used Defendant Identify to register "TBX-FREE," "Redwood Scientific Technologies," "Runaway Products," and "Advanced Men's Institute" as Identify's trade names.[251] Defendant Eunjung Cardiff signed personal guarantees for Defendants Run Away, AMI, Redwood, and Identify."[252] Payments to vendors were made interchangeably by Corporate Defendants regardless of the contracting Corporate Defendant.[253]

### b. Alter-Egos

Moreover, Corporate Defendants are the alter-egos of the Cardiffs. "Under the alter ego doctrine, . . . [w]hen the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations controlling the corporation."[254] Courts

---

[249] SUF 273.
[250] SUF 274-276.
[251] SUF 254.
[252] SUF 171.
[253] SUF 111, 173-175, 178-179, 245, 247-248.
[254] *FTC v. Data Med. Capital, Inc.*, No. SACV 99-1266 AHS, 2010 U.S. Dist. LEXIS 3344, at *59-60 (C.D. Cal. Jan. 15, 2010) (internal quotation marks omitted; quoting *Sonora Diamond Corp. v. Superior Court*, 99 Cal. Rptr. 2d 824, 836 (Cal. Dist. Ct. App. 2000) and citing *Troyk v. Farmers Group, Inc.*, 90 Cal. Rptr. 3d 589, 619-20 (Cal. Dist. Ct. App. 2009)).

inquire into whether:  (1) there is a "unity of interest and ownership" such that the separate personalities of the corporation and its owners do not really exist, and (2) there will be an "inequitable result" if the company's acts "are treated as those of a corporation alone."[255]

There is a unity of interest and ownership between Corporate Defendants and the Cardiffs who own and control all of the Corporate Defendants.  The Cardiffs have held themselves personally liable for Corporate Defendants' debts.[256] The Cardiffs personally guaranteed the debt of Defendant Run Away in the Inter/Media continuing guaranty and Defendant Eunjung Cardiff personally guaranteed the debt of Defendants AMI, Redwood California, and Identify in sworn confessions of judgment.[257]  Identify transferred at least $100,800 to CPLP.[258]  The Cardiffs maintain credit card accounts in their names and the names of Corporate Defendants,[259] and have used those accounts to pay for personal expenses.[260]  The Cardiffs have used Corporate Defendants to defraud consumers and treating their acts as those of the entities alone would achieve an inequitable result.

---

[255] *Sonora Diamond*, 99 Cal. Rptr. 2d at 836 (citations omitted).
[256] SUF 171, 265-267.  *Minton v. Cavaney*, 364 P.2d 473, 475 (Cal. 1961) (citations omitted) (holding that equitable owners are personally liable when they treat the assets of the corporation as their own and add or withdraw capital from the corporation at will, when they hold themselves out as personally liable for the corporation's debts, or when they provide inadequate capitalization and actively participate in the conduct of corporate affairs).
[257] SUF 171, 265-267.
[258] Dkt. 6, p. 5-6, ¶ 11.
[259] SUF 261.
[260] SUF 177.

## 2. The Cardiffs Are Liable for Injunctive and Monetary Relief

To obtain injunctive relief against an individual, the FTC must establish that he or she participated directly in the unlawful acts or practices or had the authority to control them.[261]  Here, the Cardiffs both participated in and had complete control of the common enterprise that perpetrated the unfair and deceptive practices.  They were individuals and partners engaged in concerted wrongdoing who should be subject to a permanent injunction.

An individual will also be liable for monetary relief if he or she had knowledge of the acts or practices.[262]  The FTC need not show an individual's subjective intent to defraud.[263]  The FTC may satisfy the knowledge requirement by showing actual knowledge of the misrepresentations, reckless indifference to the truth or falsity of the misrepresentations, or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth.[264]  An individual's "degree of participation in business affairs is probative of knowledge."[265]

---

[261] *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014), citing *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997).  *See also FTC v. Gem Merch. Corp.*, 87 F.3d 466, 467 (11th Cir. 1996).

[262] *Network Servs. Depot*, 617 F.3d at 1138-39.

[263] *Id.*; *Stefanchik*, 559 F.3d at 931; *Cyberspace.com*, 453 F.3d at 1202; *Publ'g Clearing House*, 104 F.3d at 1171.

[264] *Network Servs. Depot*, 617 F.3d at 1139.

[265] *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1235 (9th Cir. 1999); *see also Network Servs. Depot*, 617 F.3d at 1138-40 (distribution of deceptive promotional materials was evidence of knowledge); *Publ'g Clearing House*, 104 F.3d at 1171 (company president's work as telephone solicitor was probative of her knowledge).

a.     Defendant Jason Cardiff Is Liable for Injunctive and
Monetary Relief

Defendant Jason Cardiff participated in or controlled every aspect of the unfair and deceptive practices at issue.  He admits that he was "an owner, officer, director and/or member" of Corporate Defendants.[266]  He directed and participated in creating and approving all product advertising, including product infomercials.[267]  He personally made unsubstantiated efficacy claims and false clinical studies claims in advertising, as well as baseless Rengalife earnings claims.[268]  He starred in Facebook Live videos for TBX-FREE.[269]  He participated in contracting with media buying companies, and making decisions about where TV ads would appear.[270]  In at least one instance, he staked his personal assets as guarantor on a contract for Prolongz TV advertising.[271]  He controlled the autoship programs, knew that sales representatives were not disclosing or misrepresenting the autoship programs, and decided to limit refunds to consumers.[272]  He ordered his staff to process unauthorized charges on the cards of consumers who had made one-time purchases in the past.[273]  Defendant Jason Cardiff also applied for merchant account financing, was notified that a merchant account was terminated due to "crazy high chargebacks," directed his employees to open multiple additional merchant accounts (in other company names), and monitored

---

[266] SUF 18.
[267] SUF 87, 91, 95, 109-110, 114-122, 124-127, 144-145, 148-149.
[268] SUF 86, 125-127, 341-358.
[269] SUF 86; 341-358.
[270] SUF 89, 93, 97, 99-100, 102-107.
[271] SUF 123.
[272] SUF 206, 741, 749, 751, 757, 785-787.
[273] SUF 839-841, 843-848.

chargebacks on existing merchant accounts.[274]  He controlled the telemarketing campaigns that delivered illegal prerecorded messages to more than 1.5 million consumers, and personally recorded at least two of those messages.[275]  He created the Rengalife program, and appears in many videos touting its earnings claims.[276]

In addition, Defendant Jason Cardiff had the requisite knowledge to be held liable for monetary relief.  He never retained a scientific expert to evaluate any product; never tested TBX-FREE or Eupepsia Thin, and admits to relying on articles relating to other products gathered by an online contractor to whom Defendants paid $130.[277]  Courts have consistently found this type of conduct to be recklessly indifferent.[278]  He was informed by merchant banks about FTC laws with which he had to comply,[279] and was specifically warned that Defendants' claims for Eupepsia Thin likely violated the FTC's "gut check" claims guidelines

---

[274] SUF 130, 206, 238, 826, 828-829, 834-837, 851.

[275]  SUF 124-126.

[276] SUF 127.

[277] SUF 185, 194-196, 375, 441, 535-538.

[278] *See Wellness Support Network, Inc.*, 2014 U.S. Dist. LEXIS 21449, at *62-63 (defendant who was not a trained scientist or doctor was recklessly indifferent to the truth or falsity of representations in advertising where he obtained claim substantiation only from Internet research, and was responsible for advertising); *FTC v. COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300, 1314 (D. Wyo. 2016) (Defendant had actual knowledge of material misrepresentations or, at the least, showed reckless indifference to their truth or falsity because, although involved in product development and advertising, he did not consult a medical professional to evaluate substantiation or conduct a clinical trial, but relied in part on his own internet research and high school education); *FTC v. NPB Adver., Inc.*, 218 F. Supp. 3d 1352, 1363 (M.D. Fla. 2016) (defendant's copying of unverified content from other websites and reliance on a Dr. Oz segment and a clinical study he did not understand evinced reckless indifference to the falsity of advertising claims).

[279] SUF 129-130.

for weight loss marketing.[280]  He was aware of the "crazy high" chargeback rates and that chargebacks were due to unauthorized charges and unpaid refunds.[281]  Without any effort at veiling the theft, he directed his employees to push through new unauthorized charges for past one-time customers.[282]  He knew that Eupepsia Thin was made overseas, not in the United States,[283] and that testimonials appearing in Eupepsia Thin advertising were false.[284]  In short, he was the architect and chief builder of this massive fraud.

> ### b. Defendant Eunjung Cardiff Is Liable for Injunctive and Monetary Relief

Defendant Eunjung Cardiff also participated in and controlled the unfair and deceptive practices.  She admits that she was "an owner, officer, director and/or member" of Corporate Defendants.[285]  She was responsible for disseminating TBX-FREE, Eupepsia Thin, and Prolongz TV ads across the country[286] to reach Redwood's target audiences.[287]  She worked with cable networks to clear TV ads for broadcast by addressing their concerns about TV ad content, including product claims.[288]  She participated in the creation of advertising, providing voiceovers for TV advertising,[289] reviewing and approving TBX-FREE print advertising,[290] and

---

[280] SUF 189-190.
[281] SUF 835-836, 839-841, 843-847, 851.
[282] SUF 839.
[283] SUF 719-720.
[284] SUF 120-121, 199.
[285] SUF 52.
[286] SUF 90, 94, 98-100, 103-106, 108, 131-134, 137-140, 144, 155.
[287] SUF 139, 280, 450, 603.
[288] SUF 157-165, 192-193, 197-198.
[289] SUF 169.
[290] SUF 88, 181.

recording an illegal prerecorded robocall promoting TBX-FREE.[291] She paid for advertising, including Facebook ads and robocalls.[292] She also co-founded the Rengalife program, and assisted Defendant Jason Cardiff in promoting it.[293] She consented (as his spouse) to Defendant Jason Cardiff's personal guaranty of at least one media buying contract[294] and personally swore to confessions of judgment guaranteeing the debt of Corporate Defendants.[295]

Defendant Eunjung Cardiff had the requisite knowledge to be held liable for monetary relief.[296] She was aware of product claims, approving print ads, providing a voiceover for Eupepsia Thin TV advertising, and recording TBX-FREE claims herself in a robocall.[297] Although she knew the products had not been tested, she disseminated product claims and faulty substantiation knowing that media buying companies and television stations had questions about claim substantiation.[298] In the face of these substantiation concerns, she ignored warnings (e.g., FTC "gut check" claims and an FTC enforcement action against another company for unsubstantiated weight loss claims)[299] and insisted without any scientific basis that the articles Defendants had gathered on ingredients on

---

[291] SUF 167-168.
[292] SUF 111-112, 131, 142, 173-175, 178-179.
[293] SUF 201-202, 864.
[294] SUF 267, 271.
[295] SUF 171.
[296] *Wellness Support Network*, 2014 U.S. Dist. LEXIS 21449, at *63-65 (daughter's reliance on her father's judgment as to the scientific validity of claims reflected reckless indifference to the truth or falsity of advertising representations when she was a co-owner, played a significant role in running the company, and was extensively involved in product advertising).
[297] SUF 88, 92, 96, 167-169, 181.
[298] SUF 157-165, 192-198.
[299] SUF 165, 192-193.

44

other products were enough.[300]  She approved payments to product manufacturers and consequently knew that Eupepsia Thin was not made in the United States, as advertised.[301]  She provided talent releases for fake Eupepsia Thin testimonials to a media buying company when it warned her that testimonialists should not be actors.[302]  She monitored sales results, including the performance of individual Redwood sales representatives, receiving daily reports and directing the call center manager to deal with employees who were not meeting sales quotas.[303]  She was aware that consumers were complaining in large numbers that they were the victims of unauthorized charges.[304]

## C.    The Proposed Permanent Injunction Provides for Injunctive and Monetary Relief Against the Cardiffs

### 1.    Injunctive Relief

Section 13(b) of the FTC Act specifies in broad terms "[t]hat in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  Ninth Circuit precedent is clear that "[t]his provision gives the federal courts broad authority to fashion appropriate remedies for violations of the Act" and includes the "'authority to grant any ancillary relief necessary to accomplish complete justice.'"[305]  Even "if a violation of the FTC Act has ceased,

---

[300] SUF 198.

[301] SUF 180.

[302] SUF 166.

[303] SUF 803-804, 807, 841.

[304] SUF 173, 200, 826, 841.

[305] *See Stefanchik*, 559 F.3d at 931-32.  *See also FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111-13 (9th Cir. 1982); *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 426 (9th Cir. 2018), citing *FTC v. Commerce Planet*, 815 F.3d 593, 598 (9th Cir. 2016) and *Pantron I*, 33 F.3d at 1102; *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 864 (9th Cir. 2018), *Grant Connect,* 763 F.3d at 1101-02.

an injunction will issue under §53(b) if there is reason to believe that the past conduct is 'likely to recur.'"[306]  A permanent injunction should issue unless it is "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"[307]

The Cardiffs' past behavior shows that a broad injunction is necessary to guard against law violations that are likely to recur.  The breadth and scope of the law violations alone indicate the need for a broad injunction.  In addition, the Cardiffs' conduct during the FTC's investigation and repeated contempts of this Court's Orders show the need for the broadest possible injunction.  The Cardiffs continued their illegal conduct during the FTC's investigation, which they deliberately prolonged by refusing to comply with an FTC CID until threatened with contempt by this Court.[308]  Even then, Jason Cardiff ordered employees to destroy responsive documents.[309]  During the pendency of the investigation, he also moved from fraud to outright theft, ordering employees to process new unauthorized charges on old customers.[310]  Since the entry of the TRO, this Court has formally held the Cardiffs in contempt on four occasions for violating its Orders, and the Receiver has issued six affidavits of noncompliance.[311]

Given the wide range of illegal conduct in which they engaged and their repeated failures to follow court orders, broad conduct bans are appropriate in this

---

[306] *FTC v. Elec. Payment Sols. of Am., Inc.*, No. CV-17-02535-PHX-SMM, 2019 U.S. Dist. LEXIS 157978, at *26-27 (D. Az. Aug. 28, 2019) (citing *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985)).

[307] *TRW, Inc. v. FTC*, 647 F.2d 942, 953 (9th Cir. 1981) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

[308] SUF 6, 7.

[309] SUF 12-14.

[310] SUF 839-841.

[311] SUF 279.

case.  The district courts in this Circuit have entered bans,[312] and the Ninth Circuit has upheld such bans.[313]  Similarly, courts in other circuits have banned defendants from broad categories of conduct, such as telemarketing[314] and multi-level

---

[312] *See, e.g.*, Final Judgment 9, *FTC v. Elegant Sols., Inc.*, No. SACV 19-1333 JVS (KESx), (C.D. Cal. July 17, 2020), Dkt. 184 (ban on the sale of secured and unsecured debt relief products and services and on telemarketing); *FTC v. Somenzi*, No. CV 16-07101 SJO (GJSx), 2017 U.S. Dist. LEXIS 206126, *23 (C.D. Cal., July 24, 2017) (ban on participating or assisting in prize promotions); *FTC v. AMG Servs.*, No.: 2:12-cv-00536-GMN-VCF, 2016 U.S. Dist. LEXIS 135765, *44 (D. Nev., Sept. 30, 2016) (ban on consumer lending); *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp.2d 1006, 1014-15 (C.D. Cal. 2012) (ban on infomercial marketing and telemarketing); *FTC v. Dinamica Financiera, LLC*, No. CV 09-03554 MMM (PJWx), 2010 U.S. Dist. LEXIS 88000, at *59 (C.D. Cal. Aug. 19, 2010) (ban on mortgage loan modification and foreclosure relief services); *FTC v. INC21.com Corp.*, 745 F. Supp. 2d 975, 1010 (N.D. Cal. 2010) (ban on billing customers by placing charges on telephone bills); *FTC v. Universal Premium Servs.*, No. CV 06-0849 SJO (OPx), 2007 U.S. Dist. LEXIS 105203, *18 (C.D. Cal., Feb. 21, 2007) (ban on telemarketing and marketing program memberships); *FTC v. Braswell*, No. CV 03-3700-DT (PJWx), 2005 U.S. Dist. LEXIS 39245, at *9-10 (C.D. Cal. Dec. 28, 2005) (ban on direct response marketing of any food, dietary supplement, or drug, for which a health benefit is claimed); *FTC v. Publ'g Clearing House, Inc.*, No. CV-S-94-623-PMP (LRL), 1995 U.S. Dist. LEXIS 19659, at *10-11 (D. Nev. May 12, 1995) (ban on telephone premium promotions).
[313] *See AMG Capital Mgmt.*, 910 F.3d at 428 (upholding ban on consumer lending); *Gill*, 265 F.3d at 957-58 (upholding ban on the credit repair business).
[314] *See, e.g.*, *McGregor v. Chierico*, 206 F.3d 1378, 1386 n.9 (11th Cir. 2000) (upholding ban on telemarketing and the sale of office supplies via direct mail); *FTC v. 1st Guar. Mortg. Corp.*, No. 09-cv-61840 Seitz/O'Sullivan, 2011 U.S. Dist. LEXIS 38152, at *68-73 (S.D. Fla. Mar. 30, 2011) (ban on telemarketing and selling mortgages, and loan modification and credit repair services);  *FTC v. Vocational Guides, Inc.*, No. 3-01-0170, 2009 U.S. Dist. LEXIS 29509, at *5 (M.D. Tenn. Apr. 6, 2009) (ban on telemarketing).

marketing,[315] and from engaging in other lines of business.[316]  Thus, this Court has the authority to impose bans on the Cardiffs to curtail their deceptive practices. The Cardiffs should be banned from advertising, marketing, or selling dissolvable oral film strips, engaging in negative option sales, from making robocalls, and from engaging in multi-level marketing.  The Cardiffs should also be enjoined from the other deceptive practices charged in the Complaint.

As additional, ancillary relief, the proposed permanent injunction contains provisions relating to the treatment of customer information, order acknowledgment, compliance reporting and monitoring, recordkeeping, and the retention of jurisdiction that are customary in FTC cases.[317]

## 2. Monetary Relief

The authority to grant a permanent injunction pursuant to §13(b) of the FTC Act, 15 U.S.C. § 53(b), includes the "power to order restitution" as monetary

---

[315] *See, e.g.*, *FTC v. Five Star Auto Club*, 97 F. Supp. 2d 502, 536 (S.D.N.Y. 2000) (ban on multi-level marketing).

[316] *See, e.g.*, *FTC v. Cruz*, No. 08-1877 (JP), 2010 U.S. Dist. LEXIS 4568, at *4 (D.P.R. Jan. 19, 2010) (ban on marketing business ventures, and employment or investment opportunities); *FTC v. RCA Credit Servs., LLC*, No. 8:08-cv-2062-T-27MAP, 2010 U.S. Dist. LEXIS 143755, at *4-5 (M.D. Fla. Oct. 14, 2010) (ban on marketing credit repair products or services); *Vocational Guides, Inc.*, 2009 U.S. Dist. LEXIS 29509, at *5-6 (ban on sale of grant procurement goods or services); *FTC v. Check Investors, Inc.*, No. 03-2115 (JWB), 2005 U.S. Dist. LEXIS 37199, at *8 (D.N.J. July 18, 2005) (ban on debt collection activities); *FTC v. Bay Area Bus. Council, Inc.*, No. 02 C 5762, Dkt. 114 (N.D. Ill. Apr. 16, 2004) (ban on telemarketing and sale of credit-related products), *aff'd*, 423 F.3d 627 (7th Cir. 2005).

[317] *See*, *e.g.*, Final Judgment 15-22, *FTC v. Elegant Sols., Inc.*, No. SACV 19-1333 JVS (KESx), (C.D. Cal. July 17, 2020), Dkt. 184.

relief.[318]  In this case, restitution – restoring victims to their position prior to Defendants' deceptive and unfair acts – would be the functional equivalent of ordering rescission, another equitable remedy available to this Court.[319]  In this case, the amount of restitution or rescission, as measured by consumer loss, would be $18,213,899.  The Defendants' own QuickBooks accounting records show that the Cardiffs' film strip business generated $18,213,899 in total income from sales from January 1, 2015 through October 12, 2018.[320]  In fact, this figure likely underestimates consumer loss because the Cardiffs' unfair and deceptive practices date farther back, to 2013, when they began advertising Prolongz.[321]

---

[318] *Pantron I*, 33 F.3d at 1102 (quoting *H.N. Singer*, 668 F.2d at 1113 (Ninth Circuit precedent has consistently held equitable relief in FTC cases typically means restoring the victims to their position had the defendants not deceived them (most circuits refer to this as "restitution")).  *See also Stefanchik*, 559 F.3d at 931-32 (court has broad authority under the FTC Act to grant any ancillary relief, "including the power to order restitution"; "because the FTC Act is designed to protect consumers from economic injuries, courts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits").

[319] "Rescission is an old equitable remedy and the district court has power to issue a preliminary injunction to preserve the status quo in order to protect the possibility of that equitable remedy."  *H.N. Singer*, 668 F.2d at 1113.  *See also Commodity Futures Trading Comm'n v. Crombie*, 914 F.3d 1208, 1216 (9th Cir. 2019) (holding that when the "loss suffered by the victim is greater than the unjust benefit received by the defendant . . . restitution can be coupled with the equitable remedy of rescission, which undoes a faulty transaction." (internal quotations and citations omitted)).

[320] Dkt. 381-3, p. 2-3, 5 (records show $18,213,899 of total income, which represents all sales transactions, less all returns ($407,827), all sales refund and allowances ($757,718), and void/refund revenue transactions ($218,160)).  *See also* Dkt. 53, p. 9.

[321] In response to the FTC CID, Redwood reported approximately $7.2 million in net sales of TBX-FREE for 2015-2018; $1.95 million in net sales of Eupepsia Thin for 2017-2018; $5.9 million in gross sales of Prolongz for 2015-2017; and an

As this Court has recognized, the Supreme Court's recent decision in *Liu v. SEC*[322] does not change Ninth Circuit law on the availability of restitution in FTC cases,[323] or limit equitable monetary relief in FTC cases to the profits-based remedy of disgorgement.[324]  In any event, in this case, the amount of disgorgement, as measured by Defendants' net profits, and the amount of restitution or rescission, are the same because in calculating net profits courts need not deduct expenses that have no "value independent of fueling a fraudulent scheme."[325]  Relevant Ninth Circuit precedent on disgorgement[326] is consistent with this holding in *Liu*.

---

additional $1.57 million in film strip sales to third party sellers, for a total of over $16.6 million.  SUF 292, 458, 600, 611.  This total, however, does not account for TBX-FREE or Eupepsia Thin sales from the end of April 2018 until the Receiver took over the business in October 2018, or for 2013-2014 and 2018 Prolongz sales.
[322] *Liu v. SEC*, 140 S. Ct. 1936 (2020).
[323] *See FTC v. Cardiff*, No. ED CV 18-2104-DMG (PLAx), 2020 U.S. Dist. LEXIS 119800, at *17 n.5 (C.D. Cal. July 7, 2020).  *See also FTC v. Elegant Sols., Inc.*, No. SACV 19-1333 JVS (KESx), 2020 U.S. Dist. LEXIS 137774, at *41-43 (C.D. Cal. July 6, 2020).  The Supreme Court has accepted certiorari and has consolidated two cases which squarely present the question whether Section 13(b) of the FTC Act authorizes district courts to enter an injunction that orders the return of unlawfully obtained funds.  *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018), *cert. granted*, No. 19-508, 2020 U.S. LEXIS 3556 (U.S. July 9, 2020) and *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019), *cert. granted*, No. 19-825, 2020 U.S. LEXIS 3557 (U.S. July 9, 2020), and *cert. denied*, No. 19-914, 2020 U.S. LEXIS 3567 (U.S. July 9, 2020).
[324] The *Liu* opinion repeatedly emphasized that its analysis covered profits-based remedies – disgorgement of ill-gotten gains – as opposed to something else.  *See, e.g.*, *Liu*, 140 S. Ct. at 1956 n.1 (describing the "question before us" as "whether the underlying *profits-based* award conforms to equity practice") (emphasis added).
[325] *Id.* at 1950.
[326] *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1115 (9th Cir. 2006) ("[defendants] existed simply to obtain investors' money under false pretenses,

Defendants' expenses, as discussed below, were either to fuel their fraudulent scheme, or to fund the Cardiffs' lavish lifestyle.

The FTC satisfies its burden under the two-step framework for calculating monetary relief under the Section 13(b) of the FTC Act. As this Court has held:

> Under the first step, the FTC bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains, since the purpose of such an award is "to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction." 1 Dobbs, Law of Remedies § 4.1(1), at 552. *Unjust gains in a case like this one are measured by the defendant's net revenues (typically the amount consumers paid for the product or service minus refunds and chargebacks), not by the defendant's net profits.* . . . Nor are unjust gains measured by the consumers' total losses; that would amount to an award of damages, a remedy available under § 19(b) but precluded under § 13(b). . . . In many cases, however, the defendant's unjust gain "will be equal to the consumer's loss because the consumer buys goods or services directly from the defendant."[327]

The FTC has met its burden of reasonably approximating both consumer loss and Defendants' ill-gotten gains. The burden shifts to the Defendants to show that the

---

money the defendants spent at their sole discretion, unrelated to the investors' expectations of the purposes, risks and rewards of entrusting the defendants with their investment dollars").

[327] *Cardiff*, 2020 U.S. Dist. LEXIS 119800, at *13-14, quoting *Commerce Planet*, 815 F.3d at 603.

FTC's figures are inaccurate,[328] and the record would not support such a showing.

Defendants, moreover, cannot show that any of their expenses had "value independent of fueling a fraudulent scheme";[329] accordingly, it would be inequitable to allow them to deduct such amounts from the calculation of their ill-gotten gains. The vast majority of expenses were for the deceptive advertising that lies at the core of this case, and the worthless products. Redwood's accounting records show they spent $12.89 million on "advertising and promotion," "marketing," and "media expenses."[330] The cost-of-goods-sold for oral film strips, without any proof of efficacy, was $3.2 million.[331] Unlike the lease payments and cancer-treatment equipment described in *Liu* (that "arguably" had independent value and may have been consistent with representations made to investors), Defendants' advertising and product expenses have no arguable independent value.[332] The evidence also shows expenditures for luxury vehicles, cruises,

---

[328] While the Receiver noted that the creditability of Defendants' accounting records is "in doubt" (Dkt. 53, p. 10), any risk of uncertainty falls on the Defendants. *See Commerce Planet*, 815 F.3d at 604 (if the FTC makes the required showing, the burden shifts to the defendant "to show that the FTC's figures overstate the amount of the defendant's unjust gains" and "any risk of uncertainty at this second step falls on the wrongdoer whose illegal conduct created the uncertainty.") (internal quotation omitted); *FTC v. AMG Servs.*, No. 2:12-cv-00536-GMN-VCF, 2016 U.S. Dist. LEXIS 135765, at *37 (D. Nev. Sept. 30, 2016) ("Any fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendant's burden to show inaccuracy.") (internal quotations omitted), *aff'd sub. nom. FTC v. AMG Capital Mgmt.*, *LLC*, 910 F.3d 417 (9th Cir. 2018), *cert. granted*, No. 19-508, 2020 U.S. LEXIS 3556 (U.S. July 9, 2020).
[329] *Liu*, 140 S. Ct. at 1950.
[330] Dkt. 381-3, p. 5-6; *see also* Dkt. 53, p. 9.
[331] *Id.*
[332] *Cf. Liu*, 140 S. Ct. at 1941-42, 1950. *See also SEC v. Reynolds*, No. 3:08-CV-0438-B, 2008 U.S. Dist. LEXIS 65669, at *16-17 (N.D. Tex. Aug. 22, 2008)

resorts, and private air and charter travel totaling at least $373,605,[333] which are just "wrongful gains under another name."[334]  These expenses to fuel a fraudulent scheme and to pay for the Cardiffs' lavish personal expenditures are classic "inequitable deductions."[335]  Indeed, Defendants' business is a textbook case of "the entire profit of a business or undertaking"[336] resulting from wrongdoing. Thus, none of these nor any of their other expenses can offset Defendants' unjust gains.

The proposed permanent injunction continues the asset freeze and the Receivership in aid of execution of the judgment.[337]

---

(marketing expenses allegedly incurred by defendants that appeared to be "central to Defendants' fraudulent actions" could not be offset against trading gains; "It is difficult to see how a mailer 'to create market awareness' does anything other than further the purpose of Defendants' scheme.").

[333] Dkt. 6, p. 10-11.

[334] *Liu*, 140 S. Ct. at 1950 (internal quotation omitted).

[335] *Liu*, 140 S. Ct. at 1945, quoting *Root v. Ry. Co.*, 105 U.S. 189, 203 (1882).

[336] *Id.*

[337] *FTC v. Consumer Def., LLC*, No. 2:18-cv-00030-JCM-BNW, 2019 U.S. Dist. LEXIS 225283, at *32 (D. Nev. Dec. 5, 2019) (court continued receivership in permanent injunction); *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, 1083 (E.D. Mo. 2007) (because evidence showed that defendants would probably liquidate bank accounts holding assets belonging to defrauded consumers and because defendants had a history of fraudulent conduct, the court allowed Receiver to continue his investigation until all assets connected with the litigation could be ascertained for purposes of effectuating complete monetary relief).

# V.   CONCLUSION

The FTC respectfully requests that the Court grant summary judgment and enter the proposed permanent injunction.

Respectfully submitted,

Dated:  August 6, 2020

s/ Elizabeth Jones Sanger
ELIZABETH JONES SANGER
esanger@ftc.gov (202) 326-2757;
JAMES A. PRUNTY
jprunty@ftc.gov; (202) 326-2438
EDWIN RODRIGUEZ
erodriguez@ftc.gov; (202) 326-3147
SHIRA D. MODELL
smodell@ftc.gov; (202) 326-3116
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Fax: (202) 326-3259

STACY PROCTER (Local Counsel)
sprocter@ftc.gov; (310) 824-4300
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Fax: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION