1  Stephen G. Larson (SBN 145225)
   *slarson@larsonllp.com*
2  Hilary Potashner (SBN 167060)
   *hpotashner@larsonllp.com*
3  Jonathan Gershon (SBN 306979)
   *jgershon@larsonllp.com*
4  **LARSON LLP**
   555 South Flower Street, 30th Floor
5  Los Angeles, California 90071
   Telephone: (213) 436-4888
6  Facsimile: (213) 623-2000

7  Attorneys for Defendant
   JASON EDWARD THOMAS CARDIFF

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 5:23-CR-00021-JGB |
|---|---|
| Plaintiff, | **DEFENDANT JASON CARDIFF'S REPLY IN SUPPORT OF MOTION TO DISMISS INDICTMENT WITH PREJUDICE** |
| vs. | |
| JASON EDWARD THOMAS CARDIFF, | [*Filed concurrently with Supplemental Declaration of Stephen G. Larson*] |
| Defendant. | Judge: Hon. Jesus G. Bernal |
| | Date: May 20, 2024<br>Time: 2:00 p.m.<br>Courtroom: 1 |

# [REDACTED VERSION OF DOCUMENT FILED CONDITONALLY UNDER SEAL]

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT ....................................................................................................... 1

    A.    The Government Failed to Preserve Exculpatory Evidence ................... 1

        1.    The Government Does Not Dispute That It Allowed the Destruction of Material Exculpatory Evidence ............................ 2

        2.    The Government Was Aware of the Potentially Exculpatory Value of the Evidence at the Time It Was Destroyed ................. 3

        3.    The Destroyed Exculpatory Evidence Was Not Available Through Reasonably Available Means ......................................... 4

    B.    The Government Committed Fraud on the Court ................................... 7

        1.    The Government Concealed the Receiver's True Purpose ......... 7

        2.    The Fraud on the Court Is Not Negated by the Court's Purported "Oversight" of the Receiver ........................................ 8

        3.    The Government Concedes It Concealed Key Material Facts From Judge Gee ................................................................. 8

    C.    The Joint Civil and Criminal Investigations Were Improper ................. 9

        1.    The Government Utilized the FTC Action to Build a Criminal Case Against Cardiff .................................................... 9

        2.    The Government Deceived Cardiff During the FTC Action ..... 10

    D.    The Pre-Indictment Delay of Prosecution Prejudiced Cardiff ............. 12

III. CONCLUSION ................................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. Youngblood*,
   488 U.S. 51 (1988) ...................................................................................... 1, 3

*Bernstein v. PayReel, Inc.*,
   2023 WL 5505872 (C.D. Cal., July 5, 2023) ...................................................... 9

*Jenkins v. County of Riverside*,
   398 F.3d 1093 (9th Cir. 2005) ............................................................................ 8

*Pulido v. County of Los Angeles*,
   2024 WL 1641974 (C.D. Cal., March 8, 2024) .................................................. 8

*U.S. v. Bagley*,
   473 U.S. 667 (1985) ............................................................................................ 5

*U.S. v. Kordel*,
   397 U.S. 1 (1970) ................................................................................................ 9

*U.S. v. Lovasco*,
   431 U.S. 783 (1977) .......................................................................................... 12

*U.S. v. Mills*,
   641 F.2d 785 (9th Cir. 1981) ............................................................................ 12

*U.S. v. Robertson*,
   895 F.3d 1206 (9th Cir. 2018) ............................................................................ 2

*U.S. v. Salyer*,
   2010 WL 3036444 (E.D. Cal. Aug. 2, 2010) ................................................. 3, 6

*U.S. v. Scrushy*,
   366 F.Supp.2d 1134 (N.D. Ala. 2005) ............................................................... 9

*U.S. v. Stringer*,
   535 F.3d 929 (9th Cir. 2008) .............................................................................. 9

*United States v. Hsia*,
   24 F.Supp.2d 14 (D.D.C. 1998) ......................................................................... 5

**Other Authorities**

Fourth Amendment ................................................................................................... 11

Fifth Amendment .......................................................................................... 10, 11, 12

## I.  INTRODUCTION

The Government's[1] Opposition confirms that the Indictment against Jason Cardiff must be dismissed. Unable to rebut the numerous instances of misconduct and violations of Cardiff's constitutional rights outlined in his Motion to Dismiss, the Government instead relies on baseless *ad hominem* attacks against Cardiff, unsubstantiated and irrelevant allegations, and conclusory assertions. In essence, the Government requests the Court ignore the mountain of evidence presented in Cardiff's Motion and simply trust that the Government acted in good faith.

Notwithstanding the Government's efforts to obfuscate its misconduct, it remains clear that it improperly worked in concert with the Federal Trade Commission ("FTC") and the court-appointed Receiver to build a criminal case against Cardiff. The criminal and civil investigations were intertwined from the start, and despite receiving vast quantities of evidence in 2018, the Government delayed seeking an Indictment until after the conclusion of the FTC Action. During this unnecessary delay, the Government, FTC, and Receiver coordinated the destruction of exculpatory evidence they obtained from Cardiff and Redwood Scientific Technologies, Inc. ("Redwood").

Accordingly, the Court should dismiss the Indictment with prejudice, or in the alternative, suppress all evidence obtained by the Government through its unlawful criminal investigation.

## II.  ARGUMENT

### A.  The Government Failed to Preserve Exculpatory Evidence

As explained in Cardiff's Motion, the destruction of material exculpatory evidence is a Due Process violation regardless of whether the Government acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). However, where the Government fails to preserve only *potentially* exculpatory evidence, it violates a

---

[1] "Government" refers to the United States Postal Inspection Service ("USPIS"), the Department of Justice ("DOJ"), and the United States Attorney's Office ("USAO").

defendant's Due Process rights if it acts in bad faith. *U.S. v. Robertson*, 895 F.3d 1206, 1211 (9th Cir. 2018). The Government does not dispute that Cardiff was ordered, and the Receiver was permitted, to destroy exculpatory evidence. Instead, the Government contends that (1) Cardiff has not established that it was aware of its exculpatory value and (2) the Government *may* have provided *copies* of the material exculpatory evidence to Cardiff. Both contentions are without merit.

### 1. The Government Does Not Dispute That It Allowed the Destruction of Material Exculpatory Evidence

Cardiff affirmed under the penalty of perjury that the following material exculpatory evidence was destroyed:

- Nest Cam video and telephone audio recordings which would have refuted the Government's claim that customers were unwittingly enrolled in the monthly rebilling system and that Cardiff directed the destruction of evidence;
- Employees' daily handwritten logbooks which would have demonstrated that Cardiff gave clear instructions regarding the need for express consent prior to charging any customer's credit card;
- Cardiff's own handwritten notes and the daily customer sales log sheets which would have demonstrated Cardiff's protocols ensuring that Redwood's customers who participated in the monthly rebilling plan did so with their prior authorization; and
- Google Suite audit logs which would have shown that emails and documents were not deleted by Redwood employees.

(ECF 45-1 (Cardiff Decl.), ¶¶ 3-13.)

The Government does not dispute that this evidence once existed. Instead, the Government merely notes that proof of its exculpatory nature is based on Cardiff's "self-serving declaration that the evidence may have contained exculpatory information." (Opp. at 14.) Notably, however, the Government does not offer any contrary *evidence* regarding its exculpatory nature. Moreover, Cardiff did not affirm

that exculpatory evidence *might* have been destroyed, he attested that exculpatory information *was* destroyed and reasonably explained why such information was, in fact, exculpatory. (ECF 45-1, ¶¶ 6, 8, 9.)

Finally, the Government does not dispute that this evidence was destroyed. It does, however, suggest that it was not responsible for the destruction of the Nest Cam video recordings based on the fact that Cardiff only paid for "10-day video history subscriptions." (Opp. at 13 n.1, Ex. 5.) However, the video recordings could be downloaded and saved to the Gooqe Suite account. Thus, the Government offers no evidence contradicting Cardiff's Declaration which states that the Google Suite account contained video recordings from the Nest Cams. (ECF 45-1, ¶¶ 4, 9.) There is no genuine dispute that the Government allowed all the material exculpatory evidence that Cardiff identified to be destroyed.

        2.    <u>The Government Was Aware of the Potentially Exculpatory Value of the Evidence at the Time It Was Destroyed</u>

Because the evidence was actually exculpatory, the Indictment must be dismissed regardless of the Government's bad faith. However, even if the evidence were only potentially exculpatory, the Government acted in bad faith because it was aware of the potentially exculpatory value of the evidence at the time that it was destroyed. *See Youngblood*, 488 U.S. at 56-57 n.*.

The Government erroneously contends that Cardiff did not meet his burden of establishing that the Government had "knowledge of the apparent exculpatory value of the evidence" at the time it was destroyed. (Opp. at 12:12-13.) However, Cardiff provided substantial evidence showing that the Receiver and FTC were in constant communication with the Government and that it had access to this evidence prior to its destruction. (Mot. at 4-22, Ex. 1.) Moreover, the Government knows what evidence, on its face, rebuts the Indictment's allegations. *U.S. v. Salyer*, 2010 WL 3036444, at *5 (E.D. Cal. Aug. 2, 2010) (noting that, in the *Brady/Giglio* context, the prosecution is well-equipped to determine whether evidence is favorable to the

defense because such evidence is that which tends to exculpate guilt of the *offense charged by the government*). Given the nature of the Indictment's allegations, it is obvious on its face that the destroyed evidence, which documented Redwood's nonfraudulent business practices and included recordings of communications between Redwood employees and with customers, were potentially exculpatory.

Accordingly, Cardiff has more than met his burden of demonstrating that the Government was aware of the potentially exculpatory value of the evidence prior to its destruction. Notably, the Government, has not provided *any* evidence suggesting that it lacked this awareness. The Court should construe this failure to provide even a single declaration attesting to a lack of knowledge of the potentially exculpatory value of the evidence at the time of its destruction as a concession of its bad faith.

### 3. The Destroyed Exculpatory Evidence Was Not Available Through Reasonably Available Means

Unable to rebut that it allowed the destruction of exculpatory evidence, the Government instead makes the unsubstantiated claim that it believes it produced *copies* of most of the exculpatory evidence, and thus the exculpatory evidence was obtainable through other reasonably available means.

First, the Government claims that it "**believes** it . . . receive[d] all of the material the Receiver was able to collect from the Google [Suite] account." (Opp. at 12-13, emphasis added.) The Government does not provide any supporting evidence for this claim—there is no declaration from the Receiver stating that the entire Google Suite account was provided to the Government (nor could there be, since he is deceased), or even a declaration attesting to the Government's purported belief in this fact. Thus, the Government has not rebutted Cardiff's evidence that the Receiver only provided a portion of the contents of Redwood's Google Suite account. (*See* ECF 45-1, ¶¶ 4, 9.)

Second, the Government argues that "with respect to the paper documents and other physical items taken by the Receive[r] during the immediate access, [Cardiff]

was given several opportunities to collect items from the Receiver prior to their destruction." (Opp. at 13:6-9.) However, Cardiff was prohibited by Court Order from collecting documents that contained customer information, and thus, Cardiff could not have recovered the exculpatory evidence that is at issue. (Mot. at Ex. 86.)

Finally, the Government argues that it produced "over 17.8 million pages of documents" and "10 terabytes of forensic images of electronic devices." (Opp. at 13.) The large quantity of the Government's production does not mean that the production includes copies of the destroyed exculpatory evidence, and the Government has not provided any evidence indicating that it was actually produced. Instead, the Government makes the unsupported assertion that "Defendant is in possession of **most** or all of the documents he claims are potentially exculpatory[,]" which if given any credence whatsoever, is an implicit concession that **some** of the evidence was not produced. (Opp. at 14:19-21) (emphasis added).

Instead of providing evidence that it received and produced copies of the destroyed exculpatory evidence, the Government instead argues that Cardiff "has not demonstrated that the evidence he references in his motion has not already been produced." (Opp. at 14:6-13.) However, it is the Government's obligation, not Cardiff's obligation, "to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *U.S. v. Bagley*, 473 U.S. 667, 675 (1985); *see also United States v. Hsia*, 24 F.Supp.2d 14, 30 (D.D.C. 1998) ("[I]t is the government's responsibility in the first instance to determine whether information in its possession is *Brady* material.").

Notably, Cardiff made multiple requests for the Government to advise whether copies of the destroyed evidence were produced and, if so, to provide the location of this evidence. (Mot. at 30 n.10.) The Government refused to confirm whether the evidence was produced and instead directed Cardiff to search through two bates-stamp ranges totaling approximately 13.5 million pages of documents. (ECF 45-2, ¶¶ 92-93.) Cardiff's counsel conducted their own searches of the

discovery and did not locate the destroyed exculpatory evidence. (*Id.* at ¶ 92.) Thus, the Government's refusal to confirm whether the destroyed exculpatory evidence was copied and produced should be construed as a concession that it was not.[2]

Finally, even if the Government could establish that the exculpatory evidence was both copied and produced to Cardiff in those approximately 13.5 million pages of documents, the evidence still would not be "reasonably available" to Cardiff because it was buried in a proverbial haystack. The Government's disclosures must comply with both the "letter *and* spirit of *Brady/Giglio*." *Salyer*, 2019 WL 3036444, at *6 (emphasis in original). As such the Government cannot meet its *Brady* obligations by simply turning over a mountain of evidence and directing Cardiff to dig through it for exculpatory evidence. *See id.* ("'[T]he government cannot meet its *Brady* obligations by providing [the defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack.'") (citing *Hsia*, 24 F.Supp.2d at 29-30). Indeed, "a duty to disclose may be unfulfilled by disclosing too much; at some point 'disclosure,' in order to be meaningful, requires 'identification' as well." *Id.* (cleaned up).

In sum, the Government facilitated the destruction of evidence, received a copy of some of it before it was destroyed, combined this copy with millions of other documents, regurgitated it back to Cardiff in a document dump, and now makes the unsubstantiated claim that it *believes* that *most* of the material exculpatory evidence identified by Cardiff was contained somewhere in the production, but that it cannot confirm which specific documents or where. This is a clear Due Process violation which requires the Indictment to be dismissed.

---

[2] The Government claims that "a simple search for the word 'notes' within the filename of the documents provided to Defendant shows at least 15 different documents of handwritten notes." (Opp. at 14:13-18.) Counsel for Cardiff attempted the filename search method and received 1,949 hits, not fifteen. While some of these files were handwritten notes, they were not the missing material exculpatory notes.

### B. The Government Committed Fraud on the Court

#### 1. The Government Concealed the Receiver's True Purpose

As explained in the Motion, the Government committed fraud on the Court when it worked with the FTC to procure a Receiver for the express purpose of "protecting assets," without informing the Court that it intended to use the Receiver to allow the USPIS to conduct an extensive search of Redwood premises and to otherwise collect and provide evidence to the Government outside the normal procedures for subpoenas and warrants. (Mot. at 33:12-17.) In response, the Government claims that the Receiver was "authorized to access and control the assets and records of the Receivership Entities" and was thus authorized to "allow[] or consent[] to a search of the Receivership Premises and/or copying or seizure of the Receivership records." (Opp. at 15:20-16:5, 17:16-21.) Moreover, the Government claims the Receiver acted "[i]n accordance with [his] responsibilities and duties" when it "provided law enforcement with material [he] determined may be evidence of criminal activity after conducting interviews with Defendant's employees." (Opp. at 18:8-11.) The Government is wrong.

The Receiver was not permitted to carry out a criminal investigation at the behest of the Government, it was only authorized to cooperate with *reasonable requests* from law enforcement. (Mot. at Ex. 13, p. 25, § XVI(T).) The Government's Opposition repeatedly, and one must assume intentionally, omits the word "reasonable" when referencing the Order, and with obvious reason—it cannot credibly argue that requests to conduct extensive warrantless searches and for the Receiver to waive attorney-client and work-product privileges are "reasonable."[3] Indeed, given that the FTC and Government planned the search *before* it even

---

[3] In addition to the October 22, 2018 ▮▮▮▮▮▮▮, the Government claims that 6 USPIS agents visited Redwood on October 12, 2018 "to keep the peace and maintain security." (Opp. at 7:12-17; ECF No. 62 (Errata).) This explanation lacks credibility, particularly given the simultaneous presence of local law enforcement.

sought a TRO, it can be inferred that they omitted this information from the Court because they knew if they requested permission, the Court would not have allowed it. In sum, the Receiver's work as a *de facto* investigating agent was not reasonable and was deliberately hidden from the Court.

### 2. The Fraud on the Court Is Not Negated by the Court's Purported "Oversight" of the Receiver

The Government claims that its co-opting of the Receiver and urging him to violate his fiduciary duties to Cardiff to further the Government's criminal investigation could not constitute fraud on the Court because the Court had "extensive oversight of the Receivership and monitoring of the Receiver's actions." (Opp. at 17:13-15.) However, the Court's "extensive oversight" was merely a facade given that the Government kept the Court in the dark about the Receiver's efforts as its investigating agent. By deliberately misleading the Court regarding the Receiver's conduct, the Government knowingly deprived the Court of the opportunity to meaningfully review the Receiver's activities.

### 3. The Government Concedes It Concealed Key Material Facts From Judge Gee

The Government does not dispute that it committed fraud on Court when it allowed the FTC to seek a protective order without informing the Court that substantial amounts of nonpublic information had *already* been released to the Government. (Mot. at 34:1-11.) Nor does the Government dispute that it perpetrated fraud on the Court when it allowed the Court to approve requests for destruction of documents containing customer information without informing the Court of their potential evidentiary value in the future criminal prosecution that was in the works. (*Id.* at 34:12-35:3.) By failing to address these arguments, the Government tacitly concedes their merit. *See e.g.*, *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 (9th Cir. 2005) (finding that plaintiff abandoned her claims by not raising them in opposition to the defendant's motion); *Pulido v. County of Los Angeles*, 2024 WL

1641974, at *9 (C.D. Cal., March 8, 2024) (same); *Bernstein v. PayReel, Inc.*, 2023 WL 5505872 at *4 n. 3 (C.D. Cal., July 5, 2023) ("Failure to address a movant's argument for dismissal can constitute a tacit concession of the issue.").

### C. The Joint Civil and Criminal Investigations Were Improper

Parallel civil and criminal investigations are permitted without violating the due process clause if the Government does not act in bad faith. *U.S. v. Stringer*, 535 F.3d 929, 936 (9th Cir. 2008). Although the Government attempts to frame the investigations as parallel, they were not. The Government and FTC clearly collaborated on each other's investigations, as shown by their 710 communications and weekly meetings. *See* Mot. at Ex. 1; *U.S. v. Scrushy*, 366 F.Supp.2d 1134, 1141 (N.D. Ala. 2005) (a civil investigation that is "inescapably intertwined with the criminal investigation… negate[s] the existence of parallel investigations.") Since the investigations were joint, not parallel, the Government was required to inform Cardiff of the criminal investigation, which it did not do. *See id.* at 1139-40.

However, even if the investigations were parallel (which they were not), the Indictment should still be dismissed because the Government acted in bad faith. Bad faith exists where the Government uses civil litigation to obtain an unfair advantage over a criminal defendant and may be found where the government (1) conducts a covert criminal investigation under the guise of a civil action; (2) engages in deceit or affirmative misrepresentations regarding the true purpose of the investigation; (3) the defendant is without counsel; or (4) engages in conduct which demonstrate "special circumstances" that might suggest the unconstitutionality or impropriety of a criminal prosecution. *See U.S. v. Kordel*, 397 U.S. 1, 12-13 (1970).

### 1. The Government Utilized the FTC Action to Build a Criminal Case Against Cardiff

The Government first argues that the FTC did not bring its investigation "solely to obtain evidence for this criminal prosecution" because the "FTC investigation predates the criminal investigation." (Opp. at 6:3-7.) This is

demonstrably false. The CID that the Government relies upon was issued to Redwood, not Cardiff. The FTC Action, filed on October 10, 2018, was the only civil action against Cardiff personally, and it is undisputed that the Government began its criminal investigation months earlier. (Mot. at 4:10-16, Ex. 2.)

Next the Government argues that because "the FTC fully litigated its civil action and obtained a judgment against Defendant" there was no bad faith. (Opp. at 6:15-27.) The fact that the FTC fully litigated the FTC Action does not mean that it was not brought to aid in the development of the criminal case. It is undisputed that the FTC and Government planned for the appointment of the Receiver and the warrantless search of Redwood's office *before* the FTC Action was filed. (Mot. at Exs. 4, 7-10.) Indeed, the Receiver was a receiver who the Government knew from past experience would assist the Government in its criminal investigation. (*Id.* at 7:10 n. 4.) Thus, the evidence shows that the Government ran a covert criminal investigation under the guise of the FTC Action.

### 2. The Government Deceived Cardiff During the FTC Action

The Indictment must also be dismissed because the Government deceived Cardiff into believing that the investigation was exclusively civil in nature. (Mot. at 27:18-28:8.) In response, the Government argues that "non-disclosure of an investigation is not an affirmative misrepresentation, so long as a potential defendant is on notice that a criminal investigation may occur[.]" (Opp. at 8:2-5.) This is because the bad faith analysis focuses on whether the Government used a civil action to obtain an unfair advantage against an unwitting defendant. Here, however, there were *affirmative misrepresentations* which deceived Cardiff and gave the Government an unfair advantage.

Here, it was not until March 28, 2019, that Cardiff was first advised to invoke his Fifth Amendment rights in the FTC Action. By that time, Cardiff had already been severely prejudiced by the Government's misrepresentations and concealments. As explained in the Motion, the Government worked to conceal the

criminal investigation *while* allowing the FTC and Receiver to make affirmative misrepresentations regarding the role of the Receiver in their court filings. If Cardiff had been aware of the existence of the criminal investigation and the Receiver's assistance in it, he would have objected.

Moreover, even if Cardiff had earlier notice of a potential criminal investigation,[4] the Government still acted in bad faith because it concealed the *repercussions* of the FTC Action on the criminal investigation. While notice of a potential criminal investigation may have been sufficient to trigger Cardiff's assertion of his Fifth Amendment rights, it could not have protected him from the Receiver due to the Government's active concealment of the Receiver's role in its investigation.[5] Indeed, the Government sought to conceal the Receiver's cooperation as late ▮▮▮▮▮▮▮▮▮▮. (Supp. Larson Decl., Ex. A (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).) This bad faith concealment deprived Cardiff of his opportunity to raise an objection in court to the Receiver's conduct.

Additionally, bad faith can be shown from the fact that Cardiff's attorney did not appear in the FTC Action until March 1, 2019, and thus Cardiff was unrepresented when the Government sought and obtained the appointment of the biased Receiver. (FTC Action, ECF 87.) Finally, the Government secretly using the biased Receivership to conduct warrantless searches in circumvention of Cardiff's Fourth Amendment rights constitutes a "special circumstance" warranting dismissal.

---

[4] The Government argues that the CID gave Cardiff notice of a potential investigation (Opp. at 8:11-14), but this was directed at Redwood, not Cardiff. The Government also claims the Order appointing the Receiver put Cardiff on notice. (*Id.* at 8:17-20.) However, no reasonable person would construe a boilerplate provision that the Receiver could cooperate with "*reasonable* law enforcement requests" as indicating the existence of a potential criminal investigation.

[5] Similarly, the comments made by the Court during the contempt hearing and by Cardiff during his arrest do not touch upon the Government's failure to alert Cardiff to the Receiver's cooperation in the criminal investigation.

### D. The Pre-Indictment Delay of Prosecution Prejudiced Cardiff

The Government does not dispute that a pre-indictment delay may lead to the denial of a defendant's rights to due process of law. *U.S. v. Lovasco*, 431 U.S. 783, 790 (1977). Instead, the Government erroneously argues that Cardiff was not prejudiced by any pre-Indictment delay. However, as explained in the Motion and in Section II.B, *supra*, it is undisputed that material exculpatory evidence was destroyed by the Receiver in or around April 2021 and September 2022, and by Cardiff in or around March 2022, and the Government has not established that it produced a copy of this evidence to Cardiff. Moreover, Brick Kane and Robb Evans passed away in the Fall of 2021 and cannot testify regarding their knowledge or conduct. Thus, by waiting until January 2023 to obtain the Indictment, the Government severely prejudiced Cardiff. *See U.S. v. Mills*, 641 F.2d 785, 788 (9th Cir. 1981) (noting the prejudice when witnesses or evidence have become unavailable during pre-Indictment delay).

The Government also does not dispute that that it was aware of allegations contained in the Indictment as early as September 2018 and was actively building its case at that time. Instead, the Government relies solely on the unsupported, conclusory claim that it needed additional time to investigate. (Opp. at 24:2-8.) The Government does not provide a declaration explaining how it further developed its case between August 2020 and January 2023. Nor does it even provide the date whereby it believed it received sufficient evidence to bring the Indictment. Instead, it essentially requests that the Court just assume that it needed more time without any basis in fact or evidence. Accordingly, the Court should dismiss the Indictment based on the Government's prejudicial pre-Indictment delay.

### III. CONCLUSION

Therefore, Cardiff requests dismissal with prejudice of the Indictment. In the alternative, Cardiff requests suppression of all evidence obtained by the Government through its bad faith violation of Cardiff's Fifth Amendment rights.

Dated: May 6, 2024

LARSON LLP

By: /s/ Stephen G. Larson

Stephen G. Larson
Hilary Potashner
Jonathan Gershon

Attorneys for Defendant
JASON EDWARD THOMAS CARDIFF