AMANDA N. LISKAMM
Director, Consumer Protection Branch
SHEILA B. BERMAN
MANU J. SEBASTIAN
Trial Attorney
U.S. Department of Justice
Consumer Protection Branch
    450 Fifth Street, NW, Suite 6400S
    Washington, D.C.  20001
    Telephone: (202) 307-0061
    Facsimile: (202) 514-8742
    Email:  Sheila.B.Berman@usdoj.gov

E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
VALERIE L. MAKAREWICZ (Cal. Bar No. 229637)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0756
    Facsimile: (213) 894-6269
    E-mail:    Valerie.Makarewicz@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 5:23-CR-00021-JGB |
| Plaintiff, | **GOVERNMENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO MOTION TO DISMISS COUNT TWO OF THE INDICTMENT** |
| v. | |
| JASON EDWARD THOMAS CARDIFF, | Date:       October 21, 2024 |
| Defendant. | Time:       2:00 p.m. |
| | Courtroom:  1 |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Valerie L. Makarewicz

and Department of Justice Trial Attorneys Sheila B. Berman and Manu J. Sebastian, hereby respectfully files its Opposition to Defendant's Motion to Dismiss Count Two of the Indictment.

Dated September 23, 2024				Respectfully submitted,

						AMANDA LISKAMM
						Director
						Consumer Protection Branch

						E. MARTIN ESTRADA
						United States Attorney


						____/s/_____
						SHEILA B. BERMAN
						MANU J. SEBASTIAN
						Trial Attorneys
						VALERIE L. MAKAREWICZ
						Assistant United States Attorney


						Attorneys for Plaintiff
						United States of America

**TABLE OF CONTENTS**

I.   INTRODUCTION...................................................1

II.  SUMMARY OF FACTS...............................................2

III. LEGAL STANDARDS AND ARGUMENT...................................4

    A.   Standard for Dismissing Count Two of the Indictment.......4

    B.   Defendant's Motion to Dismiss Count 2 should be denied as use of the means of identification is at the crux of the predicate offense................................5

    C.   Security measures did not prevent Defendant from fraudulently using and transferring full credit card and debit card account numbers............................8

    D.   Aggravated Identity Theft is Not Limited to Situations Involving Impersonation..................................10

    E.   Defendant's Fraudulent New Orders on Behalf of Former Customers Were Not Garden-Variety Overbilling............13

IV.  CONCLUSION....................................................15

**TABLE OF AUTHORITIES**

Page(s)

Cases

Dubin v. United States,
   599 U.S. 110 (2023) ........................................... passim

Flores-Figueroa v. United States,
   556 U.S. 646 (2009) ............................................... 13

Hamling v. United States,
   418 U.S. 87 (1974) ................................................. 4

United States v. Boren,
   278 F.3d 911 (9th Cir. 2002) ....................................... 5

United States v. Carll,
   105 U.S. 611 (1882) ................................................ 4

United States v. Felch,
   No. 21-CR-0570, 2024 WL 406554 (D.N.M. Jan. 22, 2024) ............ 12

United States v. Gladden,
   78 F.4th 1232 (11th Cir. 2023) ................................... 12

United States v. Harris,
   983 F.3d 1125 (9th Cir. 2020) .................................... 10

United States v. Iannelli,
   700 F.Supp.3d 1 (D. Mass. 2023) .................................. 13

United States v. Lyle,
   742 F.3d 434 (9th Cir. 2014) ...................................... 5

United States v. Michael,
   882 F.3d 624 (6th Cir. 2018) ..................................... 11

United States v. Ovsepian,
   No. 21-55515, 2024 WL 4020019 (9th Cir. 2024) ..................... 8

United States v. Pernillo-Fuentes,
   252 F.3d 1030 (9th Cir. 2001) ..................................... 4

United States v. Shortt Accountancy Corp.,
   785 F.2d 1448 (9th Cir. 1986) ..................................... 5

Statutes

18 U.S.C. § 2............................................................... 1

18 U.S.C. § 1028A(a)(1).......................................... passim

18 U.S.C. § 1029(a)(5)...................................... 1, 2, 6, 7

18 U.S.C. § 1347............................................................ 5

18 U.S.C. § 1512(b)(2)(B)........................................... 1

Rules

Federal Rule of Criminal Procedure 12(b)(3)(B)(v)................... 4

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

On January 31, 2023, a federal grand jury returned the Indictment against Defendant, charging him with access device fraud in violation of 18 U.S.C. § 1029(a)(5) and 18 U.S.C. § 2 (Count One); aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) and 18 U.S.C. § 2 (Count Two); and two counts of witness tampering in violation of 18 U.S.C. § 1512(b)(2)(B) (Counts Three and Four). Indictment, Dkt.1.

Defendant has moved the Court to dismiss Count 2 of the Indictment, aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), in the wake of the Supreme Court's ruling in Dubin v. United States, 599 U.S. 110 (2023). In Dubin, in light of a Circuit split, the Supreme Court considered what constituted "use" of a means of identification "in relation to" the predicate offense under 18 U.S.C. § 1028A(a)(1): a broad reading of the terms that would include use of a means of identification that "facilitates or furthers the predicate offense in some way" or a more targeted reading that requires "a genuine nexus to the predicate offense." Dubin, 599 U.S. at 116-117.

The Court held that 18 U.S.C. § 1028A(a)(1) "is violated when the defendant's misuse of another person's means of identification is at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature of a billing method." Id. at 114.

The facts of this case fall squarely within the Supreme Court's ruling in Dubin, as the fraudulent use of victims' credit card and debit card account numbers is an element of both crimes.

Specifically, as it relates to Count Two, during approximately January 2018 through May 2018, Defendant ordered his employees to participate in a scheme that defrauded former customers out of money by misusing their credit and debit card account numbers and placing them on periodic continuity plans without their authorization or consent, thus charging those customers for products that they did not order. Indictment, Dkt.1.

As relates to Count 1, the underlying offense of access device fraud in violation of 18 U.S.C. § 1029(a)(5), Defendant is charged with fraudulently using the same credit card and debit card account numbers of those customers, which are access devices. Defendant's fraudulent use of the credit card and debit card account numbers was not ancillary to the predicate offense, but was part and parcel of the charged criminal act.

## II. SUMMARY OF FACTS

Defendant has accepted as true, for purposes of this motion, the FTC's Statement of Uncontroverted Facts and Conclusions of Law, filed in FTC v. Cardiff, et al., Case No. 5:18-CV-02104 (C.D. Cal. 2018) as Dkt. No. 423-3, relevant portions of which are summarized below. Defense Motion to Dismiss Count Two of the Indictment, Dkt. 106, n.2 (hereinafter "Def. Mot."). Beginning in January of 2018, Defendant directed the staff at his company, Redwood, to create brand new "continuity" (subscription) orders for customers who had previously made "straight sale" (one-time) purchases, so their debit and credit cards on file could be charged again and going forward on a recurring basis. Defense Motion to Dismiss Count Two of the Indictment, Exhibit A., Dkt. 106-1, p.6. (hereinafter "Def. Mot. Ex. A") No one at Redwood contacted the affected consumers to get approval for the new

2

charges; Redwood staff processed hundreds of unauthorized transactions each day. Id. at 7-8. Over time, the staff attempted to place new continuity orders using customer information associated with older and older straight sale orders, and ultimately attempted to convert all 2017 straight sale orders into new continuity orders. Id. at 9. Redwood processed unauthorized charges for more than 1,500 consumers through Defendant's straight-to-continuity initiative. Id. Defendant set a revenue goal for staff of $10,000 a day from the straight-to-continuity initiative. Id. In some cases, former customers' credit/ debit cards had expired since placing their original order. Id. at 8. Defendant directed his employees to try changing the expiration dates to new dates to facilitate the processing of new unauthorized charges. Id.

Redwood used a business called Limelight, later known as "Sticky.io" as its Customer Relationship Management provider (hereinafter "The CRM"). Id. at 14. The CRM integrated third-party providers into Redwood's system including the payment processors that sent information from Redwood's website to banks for processing. Id. Defendant and his employees were able to access information in the CRM system, including billing names and addresses, shipping names and addresses, and partial credit card numbers. Id. at 17, 21. The CRM platform gave Defendant, and the employees he directed, the ability to use a customer credit card "on file" to place a new order with the click of a button. Id. at 15.

The mechanism used to create the fraudulent charges was to submit a "new order card on file" transaction. Id. at 19. On January 22, 2018, Redwood employee Julie Green emailed Defendant and two other employees step-by-step instructions on how Redwood could

3

process "new order card on file" transactions. Id. at 65, 72. There were two slightly different sets of instructions sent out a few hours apart; both directed the employee creating the new charge to work from a spreadsheet containing prior single-sale orders, open the old order of a single-sale customer, and "choose place a new order." Id. CRM employee Joanny Spina confirmed that both sets of instructions were ways to process new orders for a prior purchaser using the card on file. Id. at 18-19. She identified one set of instructions as what she would recommend using if a client had a straight sale customer who requested to be put on continuity, but noted that that was not common. Id. at 19. In reviewing a spreadsheet of former customers who were placed on continuity, Spina indicated it was a time-consuming process, saying it would take a lot of people to create new card on file transactions for everyone on the list. Id. Notably, the CRM did not require the logging of customer consent for new order card on file transactions in 2018, although that changed in 2020 when the NMI PaySafe payment processor began enforcing the requirement to document customer consent for a new charge. Id. at 19.

### III. LEGAL STANDARDS AND ARGUMENT

#### A. Standard for Dismissing Count Two of the Indictment

Under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a defendant may move to dismiss a count in an indictment on the grounds that the count "fail[s] to state an offense." Every count must "set forth all the elements necessary to constitute the offence intended to be punished." Hamling v. United States, 418 U.S. 87, 117 (1974) (quoting United States v. Carll, 105 U.S. 611, 612 (1882)). Where a count fails to recite an essential element of the offense, that count is facially defective and must be dismissed. See United States v.

Pernillo-Fuentes, 252 F.3d 1030, 1032 (9th Cir. 2001).

For purposes of ruling on a motion to dismiss a count in an indictment, courts are "bound by the four corners of the indictment." United States v. Lyle, 742 F.3d 434, 436 (9th Cir. 2014) (quoting United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002)). Courts accept the allegations in the indictment as true and "analyz[e] whether a cognizable offense has been charged." Boren, 278 F.3d at 914.

A motion to dismiss a count in an indictment can be determined before trial if it presents legal, rather than factual, issues. United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986).

### B. Defendant's Motion to Dismiss Count 2 should be denied as use of the means of identification is at the crux of the predicate offense.

The aggravated identity theft charge in this case is proper under the Supreme Court's recent decision in Dubin. At issue in Dubin was whether the petitioner, who defrauded Medicaid in violation of 18 U.S.C. § 1347, also committed aggravated identity theft under § 1028A(a)(1). The Court's analysis focused on what constitutes "use" of a means of identification "in relation to" the predicate offense. Dubin, 599 U.S. at 116-117.

In Dubin, the Government advocated for a broad reading of the terms, to include any use of a means of identification that "facilitates or furthers the predicate offense in some way." Id. at 117. Petitioner advocated for a more targeted reading, where "the means of identification is at the crux of what makes the predicate offense criminal, rather than merely an ancillary feature of a payment method." Id. The Court found the government's proposed

5

interpretation to be too broad a reading, as it would "apply automatically any time a name or other means of identification was part of a billing method used in commission of a long line of predicate offenses." Id. (cleaned up). The Court found the more targeted reading was correct, holding that "1028A(a)(1) is violated when the defendant's misuse of another person's means of identification is at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature of a billing method." Id. at 114.

In Dubin, the Government charged aggravated identity theft for use of a patient's Medicaid number on a claim submitted to Medicaid for testing performed by a licensed psychologist, when the person who actually performed the testing was a less-qualified licensed psychological associate. Id. The qualification of the practitioner dictated the amount of the fee paid, and the misrepresentation of the practitioner as a licensed psychologist inflated the amount. Id. The Court found "the crux of the healthcare fraud was a misrepresentation about the qualifications of the petitioner's employee." Id. at 132.

The patient received the services in question and his means of identification was not in and of itself used in a manner that was fraudulent or deceptive. As the fraudulent act was misrepresenting the qualification of the *provider*, misuse of the *patient*'s means of identification on a billing form was determined to be ancillary to the crime.

Aggravated identity theft, 18 U.S.C. § 1028A(a)(1), prohibits the knowing "transfer, possess[ion], or us[e], without lawful authority, a means of identification of another person," during and in relation to, among other offenses, access device fraud (18 U.S.C.

6

1  § 1029(a)(5)). 18 U.S.C. § 1028A(a)(1) & (c)(4).

2      In this case, the predicate offense to the government's charge
3  of aggravated identity theft is access device fraud in violation of
4  18 U.S.C. § 1029(a)(5), which prohibits, "knowingly and with intent
5  to defraud effect(ing) transactions with 1 or more access devices
6  issued to another person to receive payment . . . during any 1-year
7  period . . . equal to or greater than $1,000." Defendant is charged
8  with fraudulently using former Redwood customers' access devices,
9  specifically their credit and debit card account numbers and
10 expiration dates, to effect financial transactions and obtain money.
11 Indictment, Dkt. 1.
12     The aggravated identity theft count charges Defendant with the
13 transfer, possession, and use, without lawful authority, of names and
14 credit and debit card account numbers during and in relation to the
15 commission of the access device fraud. Indictment, Dkt 1.
16     The credit and debit card account numbers referenced in both the
17 identity theft and access device counts are one and the same.
18 Defendant's use of the victims' names and credit card and debit card
19 account numbers is the first element of the predicate crime. The
20 relevant jury instruction is "First, "with [an access device] [access
21 devices] issued to [another person] [other persons] the defendant
22 knowingly effected transactions." *Ninth Circuit Model Criminal Jury*
23 *Instruction* 15.14 (2022 ed). Thus, for Count 2, Defendant's use of
24 the credit card and debit card account numbers of former customers
25 was not ancillary to the underlying charged criminal act, it was part
26 and parcel of the unlawful use of an access device offense.
27     While the Supreme Court acknowledges in *Dubin* that the "crux"
28 test may result in some difficult "close cases," 599 U.S. at n.10,

7

this is not one of them. A Venn diagram depicting the access devices Defendant fraudulently used to effect transactions in violation of §1029(a)(5) and the means of identification Defendant misused in violation of 1028A(a)(1) would depict two heavily overlapping circles, both of which contain the former customers' credit and debit card account numbers. "Identity theft is committed when a defendant uses the means of identification itself to defraud or deceive." Id. at 123. That is exactly what happened in this case.

The Ovsepian case Defendant cites in support of his Motion to Dismiss, presented facts that were "unusually narrow" and is not instructive here. United States v. Ovsepian, No. 21-55515, 2024 WL 4020019 at *9-10 (9th Cir. 2024). There was no analysis or consideration of the use or transfer of any means of identification as the government made the strategic choice to focus on possession of a single patient file onsite. The aggravated identity theft conviction was overturned because possession of that file, which at best "may have lent [the defendant] an air of legitimacy . . .to survive an audit," was not at the crux of the conspiracy to commit healthcare fraud. Id. at *10.

> **C. Security measures did not prevent Defendant from fraudulently using and transferring full credit card and debit card account numbers**

"Identity theft covers both when someone *steals* personal information about and belonging to another ... and *uses* the information to deceive others," and "fraudulent *appropriation* and *use*." Dubin, 599 U.S. at 126 (emphasis in original) (cleaned up). "Identity theft thus intermingles aspects of theft and fraud, misappropriation and deceitful use." Id. at 126-127. "Section 1028A(a)(1)'s three verbs capture this complexity." Id. at 127. While

8

"transfer" and "possess" conjure up two steps of theft, "uses" supplies the deceitful use aspect. Id.

Defendant went to great lengths describing how the CRM system encrypts and protects credit card and debit card numbers so that they are not fully transparent to either Redwood or CRM personnel. Def. Mot. 4-6. There is no dispute that only partial credit card and debit card numbers were visible to Redwood staff and CRM staff, and the full numbers were "securely tokenized and securitized" in the CRM computer system. Id.

While the ability to see the full credit card or debit card number might arguably be relevant to a charge based solely on possession of an account number as a means of identification, that is not the allegation here. Defendant offers no case law or statutory provision in support of the position that direct possession of each digit of a credit or debit card account number is necessary in order to misuse the full number or transfer it to another entity for payment without authorization.

Defendant also asserts that as a result of the security measures there was no "unauthorized access or misuse" of customers' cards simply because the full credit card and debit card numbers account were "never accessible to anyone within Redwood." Id. at 6. That statement is simply not true; the credit and debit card numbers of over 1,500 former customers were misused to make unauthorized purchases.

Defendant has acknowledged the actual use of the credit card and debit card account numbers as part of his straight-to-continuity initiative. "While *using those customers' names and credit and debit card numbers was necessary to charge them for the subscriptions*, that

9

causal relationship is not sufficient under Dubin." Id. at 11-12 (emphasis added). The card owners did not place orders for new subscription plans. Defendant ordered his staff to place the new orders, and they did so without getting the cardholders' authorization. Defendant was able to bypass the protections meant to secure the credit card and debit card account numbers from fraudulent use by placing "new order card on file" transactions using the full card numbers on file. In 2018, there was no requirement by the payment processor to record customer consent in order to process these transactions. Enforcement of the customer consent requirements in 2020 suggests recognition by the payment processors that they needed to close the loophole that allowed sellers like Defendant to commit fraud by creating "new order card on file" transactions without customer consent. Unfortunately, it came too late to help protect the fraud victims in this case.

In creating "new order card on file" transactions, Defendant was able to use the full card account number, which was transferred from Redwood's computer ordering system, through the payment processor to the financial institutions that charged the unwitting former customers' for the "purchase" of new products. The fact that the charges went through is evidence that the full account numbers were used as means of identification without lawful authority.

### D. Aggravated Identity Theft is Not Limited to Situations Involving Impersonation

"Use" of a means of identification in an aggravated identity theft case is not limited to cases of "impersonation" where the defendant assumes an individual's identity or attempts to pass themself off as another. United States v. Harris, 983 F.3d 1125 (9th

Cir. 2020); see also United States v. Michael, 882 F.3d 624 (6th Cir. 2018) (reversed the trial court's dismissal of an aggravated identity theft count that was granted on the grounds it did not involve impersonation.)

Based on construction of the statutory language in 18 U.S.C. § 1028A(a)(1), the grammatical object of "use" is a "means of identification" and therefore "use" in this context means, "[t]o convert to one's service" or "to employ" the means of identification." Webster's New International Dictionary 2806 (2d ed. 1942). See United States v. Michael, 882 F.3d 624, 626 (6th Cir. 2018). "Use" can also be defined as "[t]o put (an instrument, implement, etc.) to practical use; *esp.* to make use of (a device designed for the purpose) in accomplishing a task"). Id. at 626; Black's Law Dictionary 1776 (10th ed. 2014). There is nothing within the statutory language that "suggests 'uses' refers only to assuming an identity or passing oneself off as a particular person." Id. at 627.

Defendant appears to take the position that Count 2 should be dismissed on the theory that there was no effort by Defendant to pass himself off as another person or misrepresent his identity. Def. Mot. at 10-11, 13. The argument relies on a somewhat difficult to follow "who" framing of the question and the assertion that, "There *must* be deception going to 'who' is involved in the transaction rather than just 'how' or 'when' services were provided." Def. Mot. at 10. (emphasis added).

In Dubin, the Supreme Court identifies the "who" framing, as a heuristic, or rule of thumb, that can be helpful in determining if the means of identification is used deceptively and therefore at the

11

1  locus or crux of the predicate criminal activity, but also noted
2  "that like any rule of thumb it will have its limits." Dubin, 599
3  U.S. at 132. The "who" construction does not replace the "crux"
4  analysis to determine if a means of identification is used in
5  relation to the underlying offense.
6      "[F]or fraud or deceit crimes like the one in this case, the
7  means of identification specifically must be used in a manner that is
8  fraudulent or deceptive. Such fraud or deceit going to identity can
9  often be succinctly summarized as going to 'who' is involved."
10 Dubin, 599 U.S. at 131-132.
11     Although Dubin "redirects the statute's focus to offenses built
12 around what the defendant does with the means of identification in
13 particular, § 1028A still proscribes uses of a means of
14 identification involving fraud and deceit about identity." United
15 States v. Felch, No. 21-CR-0570, 2024 WL 406554, at *2 (D.N.M. Jan.
16 22, 2024) *citing* United States v. Gladden, 78 F.4th 1232, 1244 (11th
17 Cir. 2023) (cleaned up). This includes fraud and deceit as to "who"
18 authorized payment of funds.
19     In Felch, the defendant used, a means of identification,
20 specifically her employer's signature on a check, representing that
21 the authorized signatory on the account had approved payment of funds
22 when he had not. Id. "Ms. Felch's fraudulent use of her employer's
23 signature can be succinctly summarized as going to who was involved
24 in the authorization of the check." Id. at *2. "[U]se of her
25 employer's identity to falsely represent to the bank that the check
26 she wrote . . . was authorized by her employer remains firmly at the
27 crux of the predicate bank fraud charge." Id. at 4.
28     A bookkeeper's use of a signature stamp she was generally

12

authorized to use on an unauthorized check she wrote to herself was a misrepresentation of "who" authorized the withdrawal of funds. United States v. Iannelli, 700 F.Supp.3d 1, 3 (D. Mass. 2023). "Such misrepresentation is at the crux of the alleged bank fraud because by whom the signature on a check is authorized determines who is liable for the face amount of the check." Id.

Here, Defendant's fraudulent transactions involved deception as to 'who' was involved in approving the transaction and not simply 'how' or 'when' services were rendered. Defendant had his staff submit self-dealing "purchases," without the card owners' knowledge or authorization. On the face of the each of the fraudulent transactions, it appeared that the victim cardholder had authorized payment for a product sold by Defendant's company. In fact, the victims had not purchased a product or authorized a payment and did not have knowledge that their cards were being charged. Defendant's employees had simply accessed credit and debit card numbers stored in a database from earlier transactions and used those means of identification to fraudulently obtain cash directly from the cardholder's bank account (debit card) or credit card company. This is a classic form of identity theft "involving fraud or deceit about identity: a defendant [who] has used another person's identification information to get access to that person's bank account." Dubin, 599 U.S. at 126 (citing Flores-Figueroa v. United States, 556 U.S. 646 at 656 (2009)).

### E. Defendant's Fraudulent New Orders on Behalf of Former Customers Were Not Garden-Variety Overbilling

In Dubin, the Supreme Court did not hold that use of means of identification for billing, even garden-variety billing, could not

13

1  support a violation of § 1028A(a)(1) if it is at the crux of the
2  predicate offense. Rather, the Court rejected a broad reading of the
3  relevant statutory language in part because, "the Government's
4  reading would, in practice, place garden-variety overbilling *at the*
5  *core* of §1028A(a)(1)." Dubin, 599 U.S. at 122 (emphasis added).
6      Defendant asks this Court to dismiss Count 2 of the Indictment
7  as the "alleged conduct was the type of 'garden variety' overbilling
8  that the Supreme Court held was not penalized by the statute." Def.
9  Mot. at 1.
10     Defendant's actions were not "garden-variety" overbilling.
11 Defendant placed wholly fraudulently orders and processed them for
12 payment. To overbill is "to submit a bill of charges to someone for
13 an amount in excess of what is due: to bill for an excessive amount."
14 *Overbill*, Merriam-Webster.com Dictionary, Merriam-Webster,
15 https://www.merriam-webster.com/dictionary/overbill (last visited
16 September 13, 2024). The examples of garden-variety overbilling
17 referenced in Dubin, a lawyer charging a client for 3 hours when only
18 2.9 hours of work was performed or a waiter serving flank steak and
19 charging for filet mignon, are excess charges on an otherwise
20 legitimate bill. Dubin, 599 U.S. at 113. In those scenarios, the
21 client hired the lawyer to do legal work and the diner ordered and
22 received a steak.
23     Here, the former customers did not place new orders, did not
24 request new products, and did not agree to pay for new products. They
25 were not charged more than what was due, as nothing was rightly due
26 and no legitimate bill existed. The actions of Defendant were not any
27 variety of overbilling—they were outright identity theft designed to
28 take money from the victims without their knowledge or authorization.

14

**IV. CONCLUSION**

For the reasons set forth herein, the government respectfully requests the Court deny Defendant's Motion to Dismiss Count Two.

Dated September 23, 2024                    Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

AMANDA LISKAMM
Director, Consumer Protection Branch


____/s/_____
SHEILA B. BERMAN
MANU J. SEBASTIAN
Trial Attorney
VALERIE L. MAKAREWICZ
Assistant United States Attorney


Attorneys for Plaintiff
UNITED STATES OF AMERICA

15