1           UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3           EASTERN DIVISION-RIVERSIDE

4               - - -

5    HONORABLE JESUS G. BERNAL, DISTRICT JUDGE PRESIDING

6               - - -

7  UNITED STATES OF AMERICA,       )
                            )
8               Plaintiff,  )
                            )
9        vs.          )  No. EDCR 23-21-JGB
                            )
10  JASON EDWARD THOMAS CARDIFF,   )
                            )
11              Defendant.  )
  _____)

12

13      REPORTER'S TRANSCRIPT OF MOTION PROCEEDINGS

14           Riverside, California

15           Monday, June 3, 2024

16              2:32 p.m.

17

18

19

20

21

22       PHYLLIS A. PRESTON, CSR, FCRR
        Federal Official Court Reporter
23      United States District Court
         3470 Twelfth Street
24     Riverside, California 92501
          stenojag@aol.com
25

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:

 4                         OFFICE OF THE UNITED STATES ATTORNEY
                           BY:  VALERIE MAKAREWICZ
 5                         Assistant United States Attorney
                           312 North Spring Street, Suite 1100
 6                         Los Angeles, California 90012

 7

 8                         US DEPARTMENT OF JUSTICE
                           Consumer Protection Branch
                           BY:  MANU SEBASTIAN
 9                         450 5th Street NW, Suite 6400
                           Washington, DC 20001
10

11

12   For the Defendant:

13                         LARSON LLP
                           BY:  STEPHEN LARSON
                               HILARY POTASHNER
14                             JONATHAN GERSHON
                           555 South Flower Street, 30th Floor
15                         Los Angeles, California 90071

16

17                         THE COCHELL LAW FIRM PC
                           BY:  STEPHEN COCHELL
                           5850 San Felipe, Suite 500
18                         Houston, Texas 77057

19

20

21

22

23

24

25
```

1          MONDAY, JUNE 3, 2024; RIVERSIDE, CALIFORNIA

2                          -o0o-

3          THE CLERK:  Calling Item 4 on the calendar, Case No.

4    EDCR 23-21-JGB, United States of America v. Jason Edward Thomas

5    Cardiff.                                                              02:32

6          Counsel, please make your appearances.

7          MS. MAKAREWICZ:  Good afternoon, Your Honor.

8    Assistant United States Valerie Makarewicz on behalf of the

9    Government.

10          MR. SEBASTIAN:  Good afternoon, Your Honor.  Manu          02:32

11    Sebastian from the Consumer Protection Branch at DOJ.

12          THE COURT:  Good afternoon.

13          MS. POTASHNER:  Good afternoon, Your Honor.  Hilary

14    Potashner on behalf of Mr. Cardiff.

15          MR. LARSON:  Good afternoon, Your Honor.  Stephen          02:32

16    Larson also on behalf of Mr. Cardiff.  Your Honor, we also have

17    Stephen Cochell, who is Mr. Cardiff's civil attorney in the FTC

18    case; Jonathan Gershon from our office; and my daughter, Mary

19    Larson, who is interning with us this summer.

20          THE COURT:  Good afternoon to you all.                      02:33

21          The matter is on calendar on a motion made by the

22    defendant for dismissal of the Indictment on several grounds,

23    specifically the following grounds.  So it's alleged in the

24    motion that Mr. Cardiff's due process and Fourth Amendment

25    rights were violated when the Government undertook a joint        02:33

civil and criminal investigation in bad faith and through

primarily the receiver that was appointed in the civil case

engaged in some conduct that would violate Mr. Cardiff's Fourth

Amendment and due process rights.  So there's a second ground

for failing to preserve potentially exculpatory evidence.

Also, there's an allegation that there was fraud on the Court

committed in the civil action and that there was pre-Indictment

delay to the extent that it would prejudice the defendant in

the criminal action.

So let's focus first, if we can, on the second ground

that I mentioned, which is failing to preserve potentially

exculpatory evidence.

So Ms. Potashner?

MS. POTASHNER:  Thank you, Your Honor.

THE COURT:  So is it your position, then, that the

evidence we're talking about is potentially exculpatory, not

actually exculpatory?  As you know, there's a difference in the

law as to how those two things are treated.  So are you

alleging that the evidence is definitely exculpatory so that

bad faith is not an issue or are you saying that there were

potentially exculpatory evidence that was destroyed which would

require a finding of bad faith in order for the Indictment to

be dismissed?

MS. POTASHNER:  Your Honor, I believe that the Court

has before it actually exculpatory evidence.  I do think that

1   we could meet the standard of bad faith, but I don't think that

2   Your Honor needs to go to that standard because I believe that

3   it's actually exculpatory information.  The reason I say that

4   is there is evidence before Your Honor which is in the form of

5   a declaration under oath from Mr. Cardiff explaining exactly      02:35

6   what evidence was destroyed that he does not have access to

7   anymore and exactly why that evidence would be exculpatory.

8          Conversely, the Government has proffered no evidence

9   to rebut that.  There is no contrary declaration submitted by

10  the Government, no information undermining that assertion that   02:35

11  was made under oath.  So I believe that it's actual exculpatory

12  evidence.  I do note that the Government calls itself serving,

13  but that is not evidence.  That's an adjective and that's, you

14  know -- that adjective has little meaning in this context.

15         Mr. Cardiff is in the best position to explain what      02:36

16  evidence was there and what evidence is no longer there and why

17  it would be exculpatory.  Absent any contrary evidence

18  proffered by the Government, by declaration or otherwise,

19  there -- it's just -- it's not a fact in dispute.

20         THE COURT:  Okay.  So the evidence that we're talking     02:36

21  about is -- at least a subset of that is the documents that

22  were presumably destroyed at the receiver's direction, which

23  were involved in the Google Suite or the computer imaging of

24  the computers that were seized or copied from the premises of

25  Redwood, correct?                                                02:36

1        MS. POTASHNER:  That's partially the list.  That is

2   correct but not in total.

3        THE COURT:  Right.  So it's a subset of at least that

4   information, correct?

5        MS. POTASHNER:  Yes, Your Honor.                       02:37

6        THE COURT:  And so -- and the Government provides

7   evidence that -- you know, substantially large amounts of

8   documents were produced as a result of that imaging of that

9   computer that was either seized or copied at the Redwood

10  premises.  Why wouldn't you be able to point me to a specific   02:37

11  document that was produced by the Government that would be the

12  sort of document that's exculpatory in nature that you feel

13  there would be more of that was destroyed?

14       MS. POTASHNER:  Well, Your Honor, I understand the

15  Court's question, but if I could back up a little bit to talk    02:37

16  about the evidence we're talking about because then I think I

17  could answer that question more clearly.

18       The information that I think was electronically

19  stored at some point and then destroyed was literally video

20  images of customer phone calls, video and audio images of        02:38

21  customer phone calls and audio image -- audio recordings of

22  those same calls.  So those -- those are now gone.  There would

23  be no -- no calls that I could point to in the Government's

24  documentation that would substitute for those or demonstrate

25  why those -- those audio and video recordings would be           02:38

1    exculpatory.  They just -- they don't exist.

2         THE COURT:  So those recordings of customer calls are

3    not part of what the Government produced in the civil action or

4    in this action.  Is that what you're saying?

5         MS. POTASHNER:  Correct.  They're not -- they're in                02:38

6    whole cloth not there or that we could not find them.  The

7    Government did offer a range of 13.5 million pages in order for

8    us to search for them.  We did our due diligence.  We searched

9    and searched and searched.  They are not there.  Unless the

10   Government can point to a recording that somehow we've missed,          02:39

11   they don't exist, and so they are now gone.

12        The second set of documents which are not there are

13   documents that were physical notebooks, that were handwritten

14   notebooks, notebooks that contained the records and information

15   that were -- that was written down by employees and also by            02:39

16   Mr. Cardiff himself.

17        THE COURT:  So are you talking about the staff

18   meeting handwritten logbooks or the customer sales log sheets

19   or the handwritten notes?

20        MS. POTASHNER:  All three, Your Honor.                            02:39

21        THE COURT:  Okay.

22        MS. POTASHNER:  And so those documents wouldn't have

23   been electronically maintained in any computer system, so,

24   therefore, a copy of them wouldn't have made their way to the

25   Government.  They were in the possession of the receiver.  The         02:39

1  receiver took possession of Redwood and in taking possession of

2  Redwood took possession of all the documents.  There is

3  absolutely no evidence that we could point to that would be

4  like those -- those documents.  And that's why we can't --

5          THE COURT:  Do you have an idea what volume of                02:40

6  documents we're talking about in those three categories?

7          MS. POTASHNER:  If I may, Your Honor, speak to

8  Mr. Cardiff?

9          THE COURT:  You may.

10          (Counsel and Defendant Cardiff confer.)                       02:40

11          MS. POTASHNER:  Your Honor, there would be about 150

12  to 200 notebooks.

13          THE COURT:  Okay.  Were any of these actually

14  authored by Mr. Cardiff?

15          MS. POTASHNER:  Yes, Your Honor.                              02:41

16          THE COURT:  Okay.  So let's have the Government

17  respond to those arguments at this time.  Mr. Sebastian?

18          MR. SEBASTIAN:  Yes, Your Honor.  So in terms of the

19  material that you just named, including the video recordings,

20  handwritten notebooks, our understanding is that when the FTC      02:41

21  and the receiver went in with the immediate access, there was

22  material that was scanned, including handwritten notebooks.

23  That material that the FTC collected was turned over to us, and

24  we, in turn, turned it over to the defense.

25          In terms of video recordings and of the phone calls,       02:41

1    our understanding -- so the defense included this letter from

2    Google showing that Google Suite's data was deleted and that

3    this letter is a confirmation of that deletion, but we believe

4    that's a misstatement because the statement states that the

5    Government destroyed the data, and then Google confirmed that          02:42

6    that data was destroyed.  But, in fact, the letter reports that

7    Google did not have material associated with three domains.  33

8    other domains were located --

9           THE COURT:  Go back a few words and tell me that

10   again.                                                                 02:42

11          MR. SEBASTIAN:  Sure.  So the subpoena returned from

12   Google confirms that 33 accounts were still in the Google

13   account back when the return came in, and then three domains

14   were not included.  And only those three domains were missing.

15   So Google doesn't confirm that it was destroyed, just that the        02:42

16   material wasn't there.

17          Now, internal Redwood emails from March 2018 indicate

18   that certain domains, like Redwood Sci, were never even

19   included in the Google Suites account, and the defendant is

20   familiar with that.  These are his own documents, and these are      02:42

21   his IT staff discussing that material when that material was

22   supposed to be turned over to the FTC.  Not only that, the

23   defendant is saying under oath that he had recorded phone calls

24   of what his employees were saying to consumers, but he was

25   compelled by the district court to turn over all of that            02:43

```
 1    material, and that material was not produced.  So it was

 2    responsive to the CID, and it was --

 3             THE COURT:  That was before the receiver was

 4    appointed, I presume?

 5             MR. SEBASTIAN:  That's correct.  And so if this              02:43

 6    material existed, it should have been turned over back in 2018.

 7             THE COURT:  How does that affect the analysis here,

 8    though?  Is it relevant to whether or not the Government had

 9    it?

10             MR. SEBASTIAN:  Well, there's a question as to its          02:43

11    actual existence.  So if it existed in 2017, it should have

12    been turned over in response to the CID.  And it wasn't turned

13    over at that time as defense to the civil allegations.

14             THE COURT:  So you're using that fact to argue that

15    those documents do not, in fact, exist because if they did,        02:43

16    they would have been turned over?

17             MR. SEBASTIAN:  So the Government can't for sure say

18    whether or not something existed or not.  What we can say is

19    whether or not it was turned over.  And we don't see that

20    material within the items that were turned over.  And the          02:43

21    evidence that's shown in terms of --

22             THE COURT:  So when the receiver took over and went

23    through Redwood, they found a lot of documents that had not

24    been turned over, correct?

25             MR. SEBASTIAN:  They did.  They found material that        02:44
```

1    wasn't turned over.  They found material --

2         THE COURT:  That was part of the civil -- the

3    district court problem with Mr. Cardiff, the fact that he was

4    not complying with the request to turn over documents to the

5    FTC?                                                          02:44

6         MR. SEBASTIAN:  That's correct.  That's part of our

7    charge conduct, Your Honor, because there's evidence that he

8    was destroying material that was related to the CID and the

9    order that was compelling him to produce this material.

10        THE COURT:  So as to the category of documents which    02:44

11   you believe were in your production, I think we talked about

12   the logbooks; is that correct?

13        MR. SEBASTIAN:  So everything that was turned over to

14   us by the FTC and the receiver has been produced to the

15   defendant.                                                    02:44

16        THE COURT:  Right.  I understand that.  But what

17   categories in the categories that we just talked about do you

18   believe are included in that production?

19        MR. SEBASTIAN:  So in our response, we pointed out

20   that there were notes that were collected, notes that were    02:45

21   scanned, books that were scanned.

22        THE COURT:  Right.

23        MR. SEBASTIAN:  Those were turned over.

24        THE COURT:  And did you review those notes for

25   potentially exculpatory value --                             02:45

1          MR. SEBASTIAN:  So --

2          THE COURT:  -- with regard to this motion?

3          MR. SEBASTIAN:  -- the Government did review some of

4    this material and has turned over all of that material.

5          THE COURT:  I'm not saying whether you turned it over          02:45

6    or not.  I take it for granted that you did turn it over.  I'm

7    saying do any of that material in your view contain exculpatory

8    evidence?

9          MR. SEBASTIAN:  So the material that I personally

10   viewed I do not believe had exculpatory evidence within it.          02:45

11         THE COURT:  And those include the notes that we've

12   been talking about, the handwritten notes, correct?

13         MR. SEBASTIAN:  That's correct.

14         THE COURT:  So your argument is basically saying that

15   those documents may yet exist at Google and might be obtainable     02:45

16   by the defendant, at least some of them, except for three

17   categories?

18         MR. SEBASTIAN:  Some material can.  There's three

19   domains that Google say are not there.  But I don't know

20   what -- this response came in 2021.                                 02:45

21         THE COURT:  Right.

22         MR. SEBASTIAN:  So I don't know if it's still there.

23         THE COURT:  Right.

24         MR. SEBASTIAN:  And the Government was under no

25   obligation to issue search warrants to seize all of that data.     02:46

1          THE COURT:  Okay.  Do you have any other responses

2    that you haven't told me about?

3          MR. SEBASTIAN:  So in terms here with the exculpatory

4    evidence, the Government -- or the defendant has failed to meet

5    his burden.  He fails to show the Government's knowledge that          02:46

6    any of this material was exculpatory, and he ignores the fact

7    that not only did the Government collect and preserve the

8    material that it received, but it turned all that over.

9          THE COURT:  Well, let's stop there, though.  He has a

10   declaration in which he says "these documents existed" and          02:46

11   "they were exculpatory" and "they were taken by the

12   Government."  If that is true, any knowledge of such documents

13   would be imputed to the Government because the Government took

14   them.

15         MR. SEBASTIAN:  And if the material was there, the          02:46

16   Government turned it over if the Government took it.

17         THE COURT:  So you're saying everything the

18   Government took --

19         MR. SEBASTIAN:  We turned over everything.

20         THE COURT:  So there was nothing that the receiver          02:46

21   obtained post-receivership which was not turned over and was

22   destroyed?

23         MR. SEBASTIAN:  There is a difference there.

24         THE COURT:  Okay.

25         MR. SEBASTIAN:  So the receiver is not the          02:47

 1    Government.  The receiver is --

 2          THE COURT:  I understand that.

 3          MR. SEBASTIAN:  -- a Court-appointed agent.  We --

 4    the Government, the DOJ postal, received information from the

 5    receiver and turned that over.  Now, I can clarify that point

 6    in that the material turned over to the DOJ occurred in 2018

 7    through 2020.  Right?  The order to destroy that data was

 8    anything remaining within the receiver's custody.  But our

 9    understanding is everything that the FTC and the receiver

10    collected was turned over to us when we issued our request.

11          THE COURT:  So that phrase, "anything remaining in

12    the receiver's custody," you take that to mean that those would

13    be materials that were already turned over to you?

14          MR. SEBASTIAN:  So a second set of data, right?  So

15    if there's two sets of data --

16          THE COURT:  Who received data?

17          MR. SEBASTIAN:  -- the receiver collected one set and

18    the Court ordered the receiver to destroy its set.  But DOJ was

19    not ordered to destroy that data.  So whatever DOJ collected

20    was turned over.  Now, I can't --

21          THE COURT:  What do you make of the argument that

22    since there was at least the possibility of a criminal

23    prosecution coming, that the Government should have intervened,

24    somehow objected to the destruction of the evidence by the

25    receiver?

02:47

02:47

02:47

02:48

02:48

1        MR. SEBASTIAN:  So the defendant was on notice that a

2   criminal -- that information could be turned over to the

3   Government.  It was on the defendant to either plead the Fifth

4   and not turn over that documentation at that time --

5        THE COURT:  No, but I'm talking about when -- when    02:48

6   the receiver was apparently ordered to destroy the remaining

7   evidence, why didn't the Government say *okay, wait, hold on a*

8   *minute.  There might be exculpatory evidence there* or *why don't*

9   *you just not order the receiver to destroy evidence and turn*

10  *everything to us?*                                        02:48

11       MR. SEBASTIAN:  So I think there's difficulty in

12  saying that, Your Honor, because that's -- first, you're

13  saying -- let me actually ask you this question.  So are you

14  asking why we didn't ask the receiver not to destroy or why we

15  didn't inform the Court?                                   02:49

16       THE COURT:  Ask the Court to order the receiver not

17  to destroy it.

18       MR. SEBASTIAN:  So we received copies of information,

19  and so our understanding is that material relevant to the

20  investigation was turned over and we were going to produce that  02:49

21  material in the criminal investigation.  The civil was its own

22  investigation, and the material that we collected was separate.

23  So whatever occurred in that civil case, that was its own case,

24  whereas we had our criminal investigation, which was completely

25  separate, collected copies of material, retained those     02:49

```
 1    copies --
 2          THE COURT:  By the time the receiver destroyed the
 3    allegedly exculpatory evidence, there was an active criminal
 4    investigation?
 5          MR. SEBASTIAN:  Yes.
 6          THE COURT:  Okay.  So why didn't the Government again
 7    ask the Court not to order the receiver to destroy potentially
 8    exculpatory evidence?  Was the criminal division aware that
 9    there was such an order?
10          MR. SEBASTIAN:  Could you give me one second, Your
11    Honor?
12          THE COURT:  Yes.
13                (Government counsel confer.)
14          MR. SEBASTIAN:  Your Honor, the Government's -- the
15    DOJ's criminal investigation was separate from the civil
16    investigation, and so our understanding is the criminal
17    investigation collected the material relevant to its charged
18    conduct, collected all of the material relevant to it.  That
19    material was turned over.  The material that the receiver was
20    ordered to be destroyed was material relevant to the civil
21    investigation.  Completely separate, two different parties.
22    None of it was --
23          THE COURT:  There was a large overlap between the
24    civil investigation and the -- with the criminal investigation,
25    that it's still the alleged defrauding of potential customers,
```

02:49

02:49

02:50

02:50

02:51

1  correct?

2          MR. SEBASTIAN:  Well, it's two different things.  So

3  the civil investigation was looking to the defendant's false

4  advertising and claims made to consumers.  The criminal

5  investigation is analyzing a small portion of it.  It's a                    02:51

6  four-month -- the charged conduct is four months of credit card

7  fraud where consumers were being charged without their consent,

8  and the defendant was going through old orders and just putting

9  through credit card charges.  And then the next part of the

10 criminal investigation is based on the document destruction and  02:51

11 witness tampering associated with the CID.  They're two

12 separate and distinct investigations, and they were looking at

13 two different things.

14          THE COURT:  Well, I mean, I think there's some

15 overlap in relevance between -- as to some documents may be      02:51

16 relevant to both investigations.  It seems that that's

17 potentially the case.

18          But in any event, we still haven't -- so your answer

19 to the question of why didn't the Government ask the Court to

20 not direct the receiver to destroy documents was because there   02:52

21 were two separate investigations, and the civil investigation

22 did not feel that that was appropriate because it was

23 concluded, the civil investigation was concluded, and did -- to

24 the extent that it was a separate criminal investigation, did

25 the people conducting the criminal investigation, were they      02:52

```
 1    aware that there was an order to destroy the documents by the

 2    receiver?

 3            MR. SEBASTIAN:  So the criminal team was aware of the

 4    order.  That order was forwarded to it by the FTC.

 5            THE COURT:  Okay.                                        02:52

 6            MR. SEBASTIAN:  But that was a completely different

 7    case, and the civil components acted separately from the

 8    criminal components.

 9            THE COURT:  I understand.  So let's go on to the next

10    issue, which is --                                              02:52

11            Do you want to respond to that?

12            MS. POTASHNER:  Your Honor, may I just point out one

13    thing?  Because I think it will get to the meat of the matter

14    in terms of --

15            THE COURT:  Yes.                                        02:53

16            MS. POTASHNER:  -- what Your Honor was asking.  If

17    the Court were to look at Exhibit 87, that's actually an email.

18            THE COURT:  An email between who?

19            MS. POTASHNER:  This looks better on TV than in real

20    life.  So if I could describe what it is for Your Honor.  That  02:53

21    email is an email that is dated September 14th, 2022, from the

22    FTC to DOJ, and it's advising -- it is advising DOJ that the

23    receiver is requesting permission to destroy the evidence.  And

24    it's specifically flagging in that email the destruction of

25    evidence subparagraph.  And so the FTC is expressly saying to   02:53
```

1    DOJ, "we just want to flag this for you that this is

2    happening."  I would take issue with it being completely

3    separate, and I'm sure Your Honor is going to want to go into

4    that a little bit later.  But just in terms of what the DOJ

5    knew, the DOJ knew of that request before it was ordered.  It      02:54

6    wasn't a completely separate situation where the DOJ learned

7    about it after the fact.  And so I just want to make sure that

8    the record is quite clear that the FTC gave DOJ advanced notice

9    of that request by the receiver before it was ever ordered by

10   the Court.                                                         02:54

11        THE COURT:  Understood.  And what's your response to

12   the argument by the Government here, that whatever was

13   remaining with the receiver was just a duplicate of material

14   that was already produced, and, therefore, there was nothing

15   new -- well, whatever was destroyed was already produced in the   02:54

16   hands of the defendant?

17        MS. POTASHNER:  Your Honor, I keep -- in my brain I

18   keep -- I keep hearing the phrase *you know, we're the*

19   *Government, just trust us*, and the Government is just saying

20   that *it's our understanding, it's our belief, it's our* -- but   02:54

21   there is no evidence to that fact, that the entire receiver's

22   file was copied and given to the Government.  There's just no

23   evidence of that.  There's no declaration in real time saying

24   it.  There's just -- there's no information that the Government

25   has put before Your Honor in anticipation of this motion to       02:55

1   actually prove that fact.  And we --

2          THE COURT:  So let's go to that point.

3          Mr. Sebastian, it would have been easy for you to

4   contact the receiver and get a declaration in saying *well,*

5   *whatever I destroyed had already been produced.  It was just a*

6   *copy of the material that was already existing in the hands of*

7   *the Government.*  I didn't see any such declaration in your

8   opposition.

9          MR. SEBASTIAN:  Your Honor, I don't think the

10  Government had an obligation to go seek out as much evidence as

11  it could to find something exculpatory.  Right?

12         THE COURT:  Not even after -- well, I mean, I guess

13  you couldn't do it after the reply and the declaration by the

14  defendant that there was actually exculpatory evidence in the

15  description of that.

16         MR. SEBASTIAN:  So the receivership currently is

17  defunct and so -- but there is possibility to speak with

18  someone at the receivership entity itself.  But just to clarify

19  before, Your Honor, I didn't say that we never received notice

20  of the destruction.

21         THE COURT:  I --

22         MR. SEBASTIAN:  We were notified.  We received the

23  email.

24         THE COURT:  Yeah, I understand that.

25         MR. SEBASTIAN:  We didn't feel that we had a duty to

02:55

02:55

02:56

02:56

02:56

1    go and try to preserve all of the evidence.  In fact, there was

2    so much material sitting there, where would we even store that?

3    The Government doesn't have the obligation to go there and take

4    boxes of material and store it anywhere.  The reason for the

5    destruction was because Mr. Cardiff didn't pick up the material        02:56

6    and the receivership was wasting money storing that.

7            THE COURT:  He was not allowed to have it, so it had

8    to be destroyed.

9            MR. SEBASTIAN:  So he wasn't allowed to have consumer

10   data, right?  It's not all data.  It's just consumer data that        02:56

11   he wasn't permitted to have.  So he went and collected 37 boxes

12   of other material, right?

13           So -- and another couple of notes, when we're talking

14   about the Nest Cam footage, for example, there's 14,000

15   still-frame images of Nest Cam footage, but there was no video        02:57

16   within that material.  There was one 25-minute video taken

17   December 2016 of a -- of one room where they were packaging

18   material, but there were no other videos.  So the fact that

19   that one video from 2016 existed and that there were 14,000

20   screenshots of images that came from the cameras but no actual        02:57

21   video goes back to our point where the Nest Camera footage,

22   there was only a ten-day subscription that was paid for.  So

23   that material wouldn't have been sitting on the Google account

24   in October of 2018 when these calls and the charge conduct

25   occurred January through May of 2018.  And the defense is            02:57

1    arguing that this material could have been downloaded and saved

2    to the Google account.  But we believe that that's contrary to

3    the facts because if the 14,000 picture images are there, then

4    the video should have been there if they existed.

5            THE COURT:  Okay.  Understood.  All right.  Let's now    02:58

6    go to the second point, which is the overlap and presumably

7    joint criminal and civil investigations which the defendant

8    argues violated his Fourth Amendment and due process rights.

9            So as the parties are well aware, this required --

10   requires, in essence, a finding of bad faith.  The fact that    02:58

11   there were concurrent civil and criminal investigations that's

12   done by itself highlight any bad faith or any impropriety on

13   behalf of the Government.  Also, the Government makes the

14   argument that, in fact, there was -- the civil investigation

15   was not a pretext to obtain incriminating evidence.  Since the   02:58

16   civil investigation was protracted, the Government actually

17   obtained summary judgment on 16 of the claims, so it cannot be

18   really a pretext.  And they cite some case law that says that

19   when there is sort of a pursuit of the civil investigation and

20   civil action to judgment, it's very rare to find bad faith      02:59

21   since there was an independent reason to continue with that

22   action apart from obtaining any evidence which would

23   potentially be relevant to the criminal matter.

24           So how do you address that, Ms. Potashner?

25           MS. POTASHNER:  Your Honor, I don't think that the      02:59

1    conclusion that there was a -- there was a finding in favor of

2    the Government in the civil case obviates this entire issue.  I

3    think that when you look at *Kordel*, *Kordel* lists a number of

4    different ways and examples that the Court should look to to

5    determine whether there's bad faith.  We agree that there can          03:00

6    be simultaneous investigations on the civil and criminal side;

7    however, this is not just merely a simultaneous investigation.

8    When you look at the *Kordel* case, it really distills down to --

9    and I have the different examples that it gives.  One example

10   is conducting a covert criminal investigation under the guise          03:00

11   of a civil action.  That's one of the examples that there would

12   be bad faith.  Another is engaging in deceit or affirmative

13   misrepresentation regarding the true purpose of the

14   investigation.  And here I believe we have that, even if we set

15   aside the first -- the first *Kordel* factor based on the fact          03:00

16   that there was ultimately a finding in favor of the Government

17   on the civil side.  But we do have affirmative

18   misrepresentations here.

19          We also have that Mr. Cardiff was not represented at

20   the start of the civil case.  That is another factor that              03:00

21   *Kordel* tells us to look at.  And most importantly, I think, is

22   the catchall factor, which is whether or not the Government

23   engaged in conduct that qualifies as special circumstances that

24   might suggest the unconstitutionality or impropriety of the

25   criminal prosecution.  I think that's exactly what we have here          03:01

1  because I think when the Court reviews *Kordel*, what the Court

2  will find is that *Kordel* is looking at whether or not the

3  Government has gained an unfair advantage by the jockeying of,

4  you know, the criminal and the civil investigation unbeknownst

5  to the defendant.  And that's the question here.  Did the

6  Government in this particular case obtain an unfair advantage?

7  The answer is yes, it did.  The answer is, you know, first, the

8  Government says *well, you know, the CID case came first, the*

9  *criminal* -- and so that came first before the criminal

10  investigation, but when you scratch the surface, that's not

11  actually true.  The CID case was not against Mr. Cardiff.  It

12  was against Redwood.  And so really the criminal investigation

13  started.

14         And what we know from the specific facts here is that

15  the USPIS agent went to Redwood, Mr. Cardiff's place of

16  business, and tried to obtain access to it.  And that happened

17  in the summer of 2018.  She tried multiple times.  She then

18  started -- and I can go back, and I think it's probably worth

19  doing -- the coordination that occurred well before the civil

20  case was ever filed.  And so we have USPIS and the FTC

21  conducting a joint investigation before there's ever even a

22  civil case.

23         The civil case is then filed in October of 2018, and

24  Mr. Cardiff has no counsel.  The Government selects within days

25  of that filing a receiver that has worked closely with the

03:01

03:01

03:02

03:02

03:02

1    Government, FTC, and DOJ in promoting criminal investigations.

2    That's -- that's the person that was selected by the Government

3    and put forward to the Court and the Court accepted because the

4    Court really didn't have the full information of what was going

5    on behind the scenes.  When the receiver was suggested to the          03:03

6    Court and approved by the Court, the Court wasn't told *oh,*

7    *there's also a criminal investigation happening here.  Oh,*

8    *there's already been coordination between the USPIS agent and*

9    *the FTC.*  None of that information was surfaced for the Court.

10   So the Court, of course, presumably took it at face value.              03:03

11   This is a receiver.  It's an appropriate receiver who's going

12   to be doing appropriate work.

13            Then, the Government started immediately with this

14   receiver that was known to the Government and orchestrated a

15   warrantless search within days of the receiver being appointed.        03:03

16   This is outside the scope of what the receiver was appointed as

17   a Court-appointed receiver to do.  This was something that was

18   behind the scenes secretly done by the Government.

19            THE COURT:  Didn't the civil Court allow the receiver

20   to take sort of immediate access or have immediate access to           03:04

21   the business and its premises?

22            MS. POTASHNER:  Of course, Your Honor.  And the Court

23   went further to say --

24            THE COURT:  So how was it outside what the receiver

25   was supposed to do?                                                    03:04

1          MS. POTASHNER:  Because the -- because, Your Honor,

2     the receiver was permitted to take actions in order to protect

3     the business and to -- and to make sure that the assets weren't

4     dissipated.  That was the goal of the receiver and that's why

5     the receiver was appointed.  The receiver was also granted          03:04

6     permission to work with -- to --

7          THE COURT:  Accommodate or consider any reasonable

8     request by law enforcement agents.

9          MS. POTASHNER:  And I think that the key word there

10    is "reasonable," Your Honor.  Reasonable to what end?              03:04

11    Reasonable to the end of the stated purpose of the receiver.

12    That's not what happened here.  What happened here -- although

13    the Government tries to recast it as USPIS was there just to

14    keep the peace while the receiver took possession of the

15    business, common sense dictates that's not true.  There was        03:05

16    local law enforcement there for keeping the peace.  USPIS was

17    there because they had already planned for USPIS to have a

18    complete warrantless search.  And those were conversations that

19    predated the filing of the civil case, conversations that

20    predated the request for the receiver, and conversations that      03:05

21    were effected and resulted in an extensive warrantless search

22    of the premise outside of the knowledge of the Court, outside

23    the knowledge of Mr. Cardiff, who was unrepresented at that

24    time.  That's the second -- that's the second example of the

25    unfair advantage.                                                  03:05

1          This is not an ordinary, simultaneous, or parallel

2    prosecution on the civil side and criminal side.  This is

3    highly orchestrated.  And the Government's attempt to recast it

4    just cannot be accepted by this Court.  When you look at the

5    number, and we stopped counting at 710, but 710 communications          03:06

6    between the civil and criminal side with the Government.  710.

7    If you put that in a two-year period, that would be literally a

8    daily communication.  And all we had was the written

9    communication.  We didn't have the telephone calls; we didn't

10   have the Zooms; we didn't have the Teams; we didn't have          03:06

11   anything that wasn't provided to us in discovery.

12          So it's fair to say that that is probably a limited

13   subset of the amount of coordination happening.  And we see the

14   coordination right at the beginning.  That's an unfair

15   advantage.  The Government was using the civil case in order to          03:06

16   circumvent the Fourth Amendment and in order to disregard

17   Mr. Cardiff's constitutional rights in order to get in there.

18   That was not the role of the receiver; that was not why the

19   receiver was appointed by the Court; and that certainly was not

20   the stated reason or one of the stated reasons that the          03:07

21   Government was seeking a receiver in the first place.  This was

22   all kind of a covert operation behind the scenes.  That is an

23   unfair advantage.

24          THE COURT:  Let me hear from the Government.

25          MR. SEBASTIAN:  Sir, Your Honor, I think the Ninth          03:07

1    Circuit in the *Stringer* case is really on point here.  As the

2    Government has stated before, August 2017 a CID was issued.

3    The defendant keeps going on about a civil action that occurred

4    in 2018, but there is no need for a civil action to actually

5    have started.  It has to be that a civil investigation predated     03:07

6    the criminal investigation and a civil investigation predated,

7    if we go off of this 2018 date, over a year before.  So the

8    FTC, because of consumer complaints, is looking at the

9    defendant, sends him a CID, and requests information.

10           This -- under *Stringer*, the fact that the FTC     03:07

11   investigation predates the criminal investigation negates the

12   likelihood of any bad faith.  And under Unruh, no bad faith

13   exists if the civil investigation culminates in a civil

14   lawsuit.  Not only did this culminate in a civil lawsuit, the

15   FTC won a summary judgment on 16 different counts.  So this     03:08

16   was -- the receiver is now put into place because of

17   misconduct.  And this entire argument that the -- there's an

18   unfair advantage because of secrecy is ridiculous because a

19   grand jury investigation is secret.  *Stringer* clearly says that

20   whether an investigation is overt or covert depends on the     03:08

21   Government's discretion.  And most investigations are covert

22   because defendants, like this defendant, will destroy documents

23   when the Government is looking into them, just like what

24   occurred here.

25           So these arguments -- the argument that he's not     03:08

1    represented at the start of the civil case: incorrect.  Tracy

2    Green represents Cardiff and Redwood for the August 2017 CID.

3    Her web page clearly states that she represents defendants for

4    white-collar defense.

5            This entire argument regarding USPIS being involved,    03:09

6    there was six postal agents, two local law enforcement.  They

7    came in to assist the receiver in taking over a location.  It's

8    two different locations on two separate sides of a parking lot

9    with two different buildings.  So two law enforcement is not

10   enough one-on-one to go to a company with 25 employees and the   03:09

11   defendant.  So they split up law enforcement to go in and

12   ensure access.

13           When we talk about a warrantless search, that's also

14   ridiculous because the receiver in October writes an entire

15   report.  When the receiver walks into the location, he finds an   03:09

16   entire storage room full of mailing -- mailing papers.  These

17   papers indicate that the defendant is sending letters from a

18   master prophet to the elderly.  And the receiver then reports

19   that there's $1.5 million in donations collected.  And so for

20   the receiver to see this material and then allow postal to come   03:10

21   in and take pictures is not ridiculous.  It's something within

22   the receiver's purview because the receiver is put into place

23   because the defendant is committing misconduct.  And when he

24   walks into the location, sees the misconduct, he allows postal

25   to then come back at a different time and collect the material   03:10

```
 1   that's relevant.

 2          THE COURT:  What do you make of the voluminous or

 3   repeated communications between the civil CID people and the

 4   criminal investigation people --

 5          MR. SEBASTIAN:  Sure.                                      03:10

 6          THE COURT:  -- over a period of time?

 7          MR. SEBASTIAN:  So there's 710 communications that

 8   the Government was not obligated to disclose that we

 9   voluntarily turned over.  In all of these communications, there

10   is not one instance of misconduct or showing the intertwining   03:10

11   under Scrushy.  The defendant uses Scrushy as their main case.

12   In Scrushy the SEC not only set the dates and times and

13   locations of depositions, they were also heavily involved.

14   Here the FTC conducted their own, and the Government

15   interviewed over 35 witnesses completely separate from the FTC.  03:11

16   The FTC was not at any of the interviews and was not involved.

17   And DOJ was not involved in any of the FTC interviews.

18   Completely separate.

19          Communications between the two agencies are actually

20   typical.  And under Stringer, it says that the agencies can go   03:11

21   back and forth and communicate.  That organization or

22   communication is not something that shows bad faith.  Bad faith

23   is an affirmative misrepresentation which involves trickery.

24   And during the defendant's deposition, his attorney clearly

25   asked the FTC attorney whether or not they were talking to       03:11
```

1    prosecutorial authority.  And the FTC attorney states, "From

2    time to time we share information with Government agencies, and

3    those communications with Government agencies may be civil or

4    criminal and are confidential, and we cannot disclose them."

5            THE COURT:  All right, then.  Very well.                    03:11

6            I'll have you get the last word, Ms. Potashner.

7            MS. POTASHNER:  Thank you, Your Honor.  The one thing

8    that I wanted to point out is that the Government just

9    indicated that the receiver in his due diligence went in after

10   the receivership was -- was approved by the Court and went in   03:12

11   and saw materials that caused him concern and brought in the

12   U.S. Postal.  That is just not correct.  There is an indication

13   now, just to remind the Court --

14           THE COURT:  The U.S. Postal Service people were there

15   before the receiver saw that material.                          03:12

16           MS. POTASHNER:  That is true.  And there's also an

17   indication on September 26th where the FTC is emailing U.S.

18   Postal assessing her availability, the postal agent's

19   availability regarding access and entering Redwood.  So it is

20   not correct that the -- that the receiver was surprised by what 03:12

21   he saw and then it made sense to bring in U.S. Postal after

22   that.  That is just -- that is -- that is a reversal of the

23   order that things happened here.  The -- there was a plan by

24   FTC and U.S. Postal to get in and search that property, and the

25   receiver was a vehicle for that search that was used by the     03:13

1    Government, plain and simple based on the evidence and the

2    communications.

3          And I appreciate that the Government, you know, says

4    that the Government didn't have to provide this information to

5    us.  I appreciate the Government providing that information,                03:13

6    but it doesn't undermine the truth of the matter, which is that

7    the civil case was used as a vehicle to do this criminal

8    investigation.

9          And I do think it is important that the CID case that

10   the Government is relying on was not a case against                          03:13

11   Mr. Cardiff.  It wasn't.  It was a case against Redwood.  I

12   understand it's related, but it was not a case against

13   Mr. Cardiff.  And Mr. Cardiff was not represented at the front

14   end of the civil case.  That's on the docket.  The Court can

15   take judicial notice of when a -- when the lawyer came into                 03:13

16   that case.

17         THE COURT:  Thank you.

18         Thank you, counsel.  The matter stands submitted.  I

19   expect to issue a ruling by the end of the week.

20               (Proceedings concluded.)                                        03:14

21                       -o0o-

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4          I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME

5     COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

6     THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

7     PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

8     FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

9     STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

10    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

11    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

12    THE UNITED STATES.

13

14

15              DATED THIS 2ND DAY OF OCTOBER, 2024

16

17

18          /s/ PHYLLIS A. PRESTON

19    _____

20    PHYLLIS A. PRESTON, CSR No. 8701, FCRR

21     FEDERAL OFFICIAL COURT REPORTER

22

23

24

25