Stephen R. Cochell
Cochell Law Firm P.C.
5850 San Felipe Ste 500
Houston Texas 77057
(346)800-3500
srcochell@gmail.com
Admitted Pro Hac Vice

Allan Grant (SBN#213658)
Grant's Law Firm
17351 Greentree Drive
Riverside, California 92503-6762
Telephone (888)937-7555
Facsimile (866)858-6637

Attorneys for Defendant
Jason Edward Thomas Cardiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 5:23-CR-00021-JGB |
| Plaintiff, | |
| vs. | |
| JASON EDWARD THOMAS CARDIFF, | |
| Defendant. | |

**DECLARATION OF STEPHEN R. COCHELL IN SUPPORT OF JASON CARDIFF'S MOTION TO DISMISS COUNTS 3 AND 4 OF THE INDICTMENT**

I, Stephen R. Cochell, declare as follows:

I am a partner and owner of Cochell Law Firm, P.C., attorneys of record for Defendant Jason Edward Thomas Cardiff. I have personal knowledge of

1

the facts set forth herein. If called as a witness, I could and would competently testify to the matters stated herein. I make this declaration in support of Defendant Jason Cardiff's Motion to Dismiss Counts 3 and 4 of the Indictment. I have reviewed the following documents in the CID Case, the Civil Case and Mr. Cardiff's Declaration that are relevant to this motion and state as follows:.

1. A true and correct copy of a Civil Investigative Demand ("CID") was served by the FTC on Redwood and was downloaded from Pacer from Case No. 2:17-cv-07921 and is attached as **Exhibit 1** and was downloaded from Pacer from Case No. 2:17-cv-07921**.**

**2.** A true and correct copy of a Show Cause Order issued by the Hon. Judge S. James Otero dated January 16, 2018 is attached as **Exhibit 2.** The document was downloaded from Pacer from Case No. 2:17-cv-07921.

3. A true and correct copy of an Order dated April 23, 2018, is attached as **Exhibit 3** and continues the Show Cause Hearing to May 29, 2018 The document was downloaded from Pacer from Case No. 2:17-cv-07921.

4. A true and correct copy of Minutes dated May 29, 2018 is attached as **Exhibit 4**, wherein Defendant's counsel advised the Court that a third party discovery company would copy and produce the database. CID. The document was downloaded from Pacer from Case No. 2:17-cv-07921.

5. A true and correct copy of an Order dated June 12, 2018 is attached as **Exhibit 5,** wherein the Court entered an Order to update the Relativity database. The document was downloaded from Pacer

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

from Case No. 2:17-cv-07921.

6.  A true and correct copy of two status reports filed by the FTC are attached as **Exhibit 6** dated July 13, 2018 and **Exhibit 7** dated August 2, 2018.  The documents were downloaded from Pacer from Case No. 2:17-cv-07921.

7.  A true and correct copy of an Order dated September 10, 2018 is attached as **Exhibit 8** and sets a status conference for September 11, 2018 due to counsel's absence. The document was downloaded from Pacer from Case No. 2:17-cv-07921.

8.  A true and correct copy of an Order dated September 17, 2018 is attached as **Exhibit 9** and states that due to Ms. Green's absence, the Court re-set the Status Conference for October 22, 2018.

9.  A true and correct copy of a Joint Status Report dated October 12, 2018 is attached as **Exhibit 10.** The document was downloaded from Pacer from Case No. 2:17-cv-07921.

10. A true and correct copy of a Stipulation to Dismiss the CID case dated October 18, 2018 is attached as **Exhibit 11**. The document was downloaded from Pacer from Case No. 2:17-cv-07921.

11. A true and correct copy of an Order dismissing the Petition For An Order Enforcing Civil Investigative Matter without prejudice is attached as **Exhibit 12**. The document was downloaded from Pacer from Case No. 2:17-cv-07921.

12. A true and correct copy of the Receiver's Initial Report to the Court dated October 12, 2018, is attached as **Exhibit 13**.    The document was downloaded from Pacer from Case No. 2:17-cv-07921.

13. The Government, by Manu Sebastian, DOJ sent a letter dated April 18, 2024 describing the Government's production of documents included a group of documents entitled "GOV_MOI" which contained government memoranda of interviews and other "Agent Materials." These include "MTF" (Memorandum to File) and "MTA" (Memorandum of Activity). A true and correct copy of this document is attached hereto as **Exhibit 14** and includes "Comprehensive Production Index as of April 18, 2024": GOV_MOI 1-1076: GOV_MOI 1077-1553; and  GOV_MOI 1554-1801. I have reviewed these materials and was unable to locate any documents that suggest that Defendant Jason Cardiff anticipated or foresaw filing of an "official proceeding" i.e. FTC lawsuit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 2d day of December, 2024, at Houston, Texas.

/s/ Stephen R. Cochell
Stephen R. Cochell

# EXHIBIT 1

# Petition Exhibit 2:

## Civil Investigative Demand to
## Redwood Scientific Technologies, Inc.
## (August 3, 2017)



UNITED STATES OF AMERICA
Federal Trade Commission
Washington, D.C. 20580

August 8, 2017

Via Federal Express
Redwood Scientific Technologies, Inc.
250 W. 1st Street, Suite 310
Claremont, CA 91711
Attn: Jason Cardiff, President and Chief Executive Officer

FTC Matter No. 172-3117

Dear Mr. Cardiff:

The Federal Trade Commission (FTC) has issued the attached Civil Investigative Demand asking for information as part of a non-public investigation. Our purpose is to determine:

Whether Redwood Scientific Technologies, Inc. has violated Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45 and 52, by, among other things:

1. Making false or unsubstantiated representations concerning TBX-FREE's effectiveness as a smoking cessation product;

2. Making false or unsubstantiated representations concerning Eupepsia Thin's effectiveness as an appetite suppressant and weight loss aid;

3. Representing that certain medical institutions and publications have endorsed TBX-FREE as an effective smoking cessation product; and

4. Falsely representing that TBX-FREE is sold with a money back guarantee.

Whether Redwood Scientific Technologies, Inc. has violated the Restore Online Shoppers' Confidence Act, 15 U.S.C. § 8401 *et seq.*, by, among other things, enrolling consumers in autoship plans without their express informed consent.

Whether Commission action to obtain monetary relief would be in the public interest.

Please read the attached documents carefully. Here are a few important points we would like to highlight:

1. **Contact FTC counsel, Shira Modell, 202-326-3116, smodell@ftc.gov as soon as possible to schedule an initial meeting to be held within 14 days.** You can meet in person or by phone to discuss any questions you have, including whether there are changes to how you comply with the Civil Investigative Demand that would reduce

August 8, 2017
Page 2

your cost or burden while still giving the FTC the information it needs.  Please read the attached documents for more information about that meeting.

2.  **You must immediately stop any routine procedures for electronic or paper document destruction, and you must preserve all paper or electronic documents** that are in any way relevant to this investigation, even if you believe the documents are protected from discovery by privilege or some other reason.

3.  **We will use your response for purposes of this investigation.**  We will not disclose it under the Freedom of Information Act, 5 U.S.C. § 552.  We may disclose the information in response to a valid request from Congress or other civil and criminal federal, state, local, or foreign law enforcement agencies for their official law enforcement purposes.  The FTC or other agencies may use and disclose your response in any federal, state, or foreign civil or criminal proceeding, or if required to do so by law.

4.  **Your response is due on September 6, 2017.**  The attached documents contain important information about how you should provide your response.

Please contact FTC counsel immediately to set up an initial meeting.  We appreciate your cooperation.

Very truly yours,

Donald Clark
Secretary of the Commission



United States of America
Federal Trade Commission

## CIVIL INVESTIGATIVE DEMAND

**1. TO**

Redwood Scientific Technologies, Inc.
250 W. 1st Street, Suite 310
Claremont, CA 91711
Attn: Jason Cardiff, President and Chief Executive Officer

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

**2. ACTION REQUIRED**

☐ You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| | |
| | DATE AND TIME OF HEARING OR DEPOSITION |
| | |

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

☒ You are required to produce the tangible things described on the attached schedule. Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

**SEP 0 6 2017**

**3. SUBJECT OF INVESTIGATION**

See attached Schedule and attached Resolution

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Lynne Colbert/Connor Sands<br>Federal Trade Commission<br>600 Pennsylvania Ave, NW, Mail Drop CC-10528<br>Washington, DC 20580 | Shira Modell<br>Federal Trade Commission<br>600 Pennsylvania Ave, NW, Mail Drop CC-10528<br>Washington, DC 20580<br>(202) 326-3116 |

| DATE ISSUED | COMMISSIONER'S SIGNATURE |
|---|---|
| August 3, 2017 | Terrell McSwain |

### INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

### YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCRulesofPractice. Paper copies are available upon request.

FTC Form **144** (rev 12/15)

## Form of Certificate of Compliance*

I/We do certify that all of the documents, information and tangible things required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document or tangible thing responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to its submission and the reasons for the objections have been stated.

Signature _____

Title _____

Sworn to before me this day

_____     _____

_____
Notary Public

_____

*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible.  In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

FTC Form **144-Back** (rev. 12/15)

## FEDERAL TRADE COMMISSION ("FTC")
## CIVIL INVESTIGATIVE DEMAND ("CID") SCHEDULE
### FTC File No. 172-3117

**Meet and Confer:** You must contact **FTC counsel,** Shira Modell (202-326-3116); smodell@ftc.gov, as soon as possible to schedule a meeting (telephonic or in person) to be held within fourteen (14) days after you receive this CID. At the meeting, you must discuss with FTC counsel any questions you have regarding this CID or any possible CID modifications that could reduce your cost, burden, or response time yet still provide the FTC with the information it needs to pursue its investigation. The meeting also will address how to assert any claims of protected status (e.g., privilege, work-product, etc.) and the production of electronically stored information. You must make available at the meeting personnel knowledgeable about your information or records management systems, your systems for electronically stored information, custodians likely to have information responsive to this CID, and any other issues relevant to compliance with this CID.

**Document Retention**: You must retain all documentary materials used in preparing responses to this CID. The FTC may require the submission of additional documents later during this investigation. **Accordingly, you must suspend any routine procedures for document destruction and take other measures to prevent the destruction of documents** that are in any way relevant to this investigation, even if you believe those documents are protected from discovery. *See* 15 U.S.C. § 50; *see also* 18 U.S.C. §§ 1505, 1519.

**Sharing of Information:** The FTC will use information you provide in response to the CID for purposes of this investigation. We will not disclose such information under the Freedom of Information Act, 5 U.S.C. § 552. We also will not disclose such information, except as allowed under the FTC Act (15 U.S.C. § 57b-2), the Commission's Rules of Practice (16 C.F.R. §§ 4.10 & 4.11), or if required by a legal obligation. Under the FTC Act, we may provide your information in response to a request from Congress or a proper request from another law enforcement agency. However, we will not publically disclose such information without giving you prior notice.

**Manner of Production**: You may produce documentary material or tangible things by making them available for inspection and copying at your principal place of business. Alternatively, you may send all responsive documents and tangible things to **Lynne Colbert, Federal Trade Commission, 600 Pennsylvania Avenue, N.W. Mail Drop CC-10528, Washington, D.C. 20580**. If you are sending the materials, use a courier service such as Federal Express or UPS because heightened security measures delay postal delivery to the FTC. You must inform FTC counsel by email or telephone of how you intend to produce materials responsive to this CID at least five days before the return date.

**Certification of Compliance**: You or any person with knowledge of the facts and circumstances relating to the responses to this CID must certify that such responses are complete by completing the "Form of Certificate of Compliance" set forth on the back of the CID form or by signing a declaration under penalty of perjury pursuant to 28 U.S.C. § 1746.

**Certification of Records of Regularly Conducted Activity**: Attached is a Certification of Records of Regularly Conducted Activity. Please execute and return this Certification with your response. Completing this certification may reduce the need to subpoena you to testify at future proceedings to establish the admissibility of documents produced in response to this CID.

**Definitions and Instructions**: Please review carefully the Definitions and Instructions that appear after the Specifications and provide important information regarding compliance with this CID.

## SUBJECT OF INVESTIGATION

Whether the "Company," as defined herein, has violated Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45 and 52, by, among other things:

1. Making false or unsubstantiated representations concerning TBX-FREE's effectiveness as a smoking cessation product;

2. Making false or unsubstantiated representations concerning Eupepsia Thin's effectiveness as an appetite suppressant and weight loss aid;

3. Representing that certain medical institutions and publications have endorsed TBX-FREE as an effective smoking cessation product; and

4. Falsely representing that TBX-FREE is sold with a money back guarantee.

Whether the "Company," as defined herein, has violated the Restore Online Shoppers' Confidence Act, 15 U.S.C. § 8401 et seq., by, among other things, enrolling consumers in autoship plans without their express informed consent.

Whether Commission action to obtain monetary relief would be in the public interest.

See also attached resolution.

## SPECIFICATIONS

**Applicable Time Period:** Unless otherwise directed, the applicable time period for the requests set forth below is from January 1, 2015 until the date of full and complete compliance with this CID.

**SPECIFICATIONS FOR WRITTEN INTERROGATORY RESPONSES**

1. Provide the following information for Redwood Scientific Technologies, Inc. ("Redwood"):

   a. Its full legal name and all other names under which it has done business;

   b. The mailing address, street address, and telephone number of its headquarters;

   c. The state(s) in which it is organized and date(s) of incorporation or licensing;

-2-

  d. The identity of all managers, officers, directors, principals, and owners;

  e. The identity of all persons holding five percent or more interest in Redwood and for each, state the percentage of its holdings; and

  f. The names, addresses, officers, directors, owners, and state(s) of incorporation or other organization of all of its parents, subsidiaries, affiliate companies, joint ventures, partnerships, operations under assumed names, and divisions.

2. Provide the following information separately for TBX-FREE and for Eupepsia Thin:

  a. The per unit sales price to consumers or the suggested retail price;

  b. Your annual gross sales revenue for 2015, 2016, and 2017 to date;

  c. The number and dollar value of refund requests or chargebacks for 2015, 2016, and 2017 to date;

  d. The number and dollar value of refunds paid to consumers for 2015, 2016, and 2017 to date;

  e. The total dollar amount spent by you on advertising, marketing, or other promotion of the product; and

  f. The percentage of your direct sales (i.e., not including sales through third parties) derived from one-time orders versus autoship orders.

If you maintain financial data on a fiscal year basis that differs from the calendar year, provide the requested data according to those fiscal years and specify the dates of each fiscal year.

3. Provide the following information for Blossom, Prolongz, Comfort Time, ProvaxaltoNIN, and Sumnusent:

  a. Your annual gross sales revenue for 2015, 2016, and 2017 to date; and

  b. The percentage of your direct sales (i.e., not including sales through third parties) derived from one-time orders versus autoship orders.

If you maintain financial data on a fiscal year basis that differs from the calendar year, provide the requested data according to those fiscal years and specify the dates of each fiscal year.

4. List the full name and URL for each website or social media page or account operated by you or on your behalf referring to or relating to TBX-FREE and Eupepsia Thin, and, for each such website or page, identify the owner or operator and describe in detail its relationship to you.

5. Identify each advertising platform and network you have used to place advertising online for TBX-FREE, and provide your account number or name for each.

<center>-3-</center>

6.      Provide any keywords, terms, phrases, or other criteria that you (or any person or entity acting for or on your behalf) have used to effect the placement or delivery of any advertisement or sponsored link for TBX-FREE in connection with any online advertising network or advertising delivery or contextual marketing software or system, including any advertisement or sponsored link in search results generated by Google or any other Internet search engine (e.g., through the Google AdWords program).

7.      Identify the person(s) responsible for creating, designing, developing, reviewing, testing, evaluating, or approving any advertisement or promotional material submitted in response to Document Request 2, including, but not limited to, any website or page listed in response to Written Interrogatory 4, and describe in detail the functions each person performed.

8.      Identify all persons responsible for developing, reviewing, or evaluating substantiation, scientific or otherwise, for the claims set forth in Document Request 5 for TBX-FREE, and describe in detail the functions each person performed.

9.      Identify all persons upon whose advice, opinion, or expertise Redwood, or any person acting for or on behalf of Redwood, relied to substantiate the claims set forth in Document Request 5 for TBX-FREE, and state any compensation, remuneration, or thing of value provided to each person.

10.     Regardless of time period, describe in detail any human clinical studies testing the efficacy of TBX-FREE for smoking cessation, including the role of Redwood in each study.

11.     Identify all persons responsible for developing, reviewing, or evaluating substantiation, scientific or otherwise, for the claims set forth in Document Request 7 for Eupepsia Thin, and describe in detail the functions each person performed.

12.     Identify all persons upon whose advice, opinion, or expertise Redwood, or any person acting for or on behalf of Redwood, relied to substantiate the claims set forth in Document Request 7 for Eupepsia Thin, and state any compensation, remuneration, or thing of value provided to each person.

13.     Regardless of time period, describe in detail any human clinical studies testing the efficacy of Eupepsia Thin for appetite suppression or weight loss, including the role of Redwood in each study.

14.     Identify each consumer appearing in any advertisement or promotional material submitted in response to Document Request 2, and provide the following information for each:

        a.      Whether the person works for Redwood or is related to someone who works for Redwood; and

        b.      Any compensation provided to that person in exchange for their endorsement.

15.     Identify each consumer appearing in the program length commercial for Eupepsia Thin found at https://www.youtube.com/watch?v=ACYlj3eTpJU, and provide the following information for each:

-4-

    a.    Whether the person works for Redwood or is related to someone who works for Redwood; and

    b.    Any compensation provided to that person in exchange for their endorsement.

16.    Identify and describe in detail the role of each of the following individuals in connection with your operations, including, but not limited to, product development, modification, and testing; quality control; instructions to consumers for product use; product reviews, testimonials, and endorsements; review of and response to consumer complaints; developing, reviewing, or approving advertising content, including, but not limited to, websites or other internet content; and developing, reviewing, or evaluating advertising substantiation:

    a.    Jason Cardiff;

    b.    Eunjung Cardiff;

    c.    Jacques Poujade; and

    d.    Mohammad Salah Zaki.

17.    Describe in detail Redwood's relationship, if any, with Dalian Jixin Electronic Information Co., Ltd., including, but not limited to, any involvement by Dalian Jixin in the clinical testing, manufacturing, registration, labeling, advertising, or sale of TBX-FREE or Eupepsia Thin.

18.    Identify all payment processors used in connection with sales of TBX-FREE and the chargeback rates for each one.

19.    For any investigation or proceeding relating to TBX-FREE initiated by any federal, state, provincial, international, or local government entity, industry or trade organization, self-regulatory entity, or advocacy group:

    a.    State the forum and name of the investigation or proceeding, and identify all parties;

    b.    State the dates on which the investigation or proceeding was initiated and on which you first became aware of it;

    c.    Describe with specificity the nature of the investigation or proceeding and state any statutes, regulations, industry guidelines, or other rules the other parties allege may be violated; and

    d.    Describe with specificity the disposition or current status of the matter.

20.    Describe in detail Redwood's refund policy for TBX-FREE.

21.    Describe in detail Redwood's record retention policies, including the manner and duration of preservation of email and advertising materials.

22.    Identify all persons who participated in preparing responses to this CID.

**SPECIFICATIONS FOR PRODUCTION OF DOCUMENTS AND TANGIBLE THINGS**

Demand is made for the following:

1.    Two complete packages (including the product, package and package labeling, and package inserts) of each version of TBX-FREE and Eupepsia Thin manufactured, advertised, promoted, marketed, offered for sale, sold, or distributed by Redwood.

2.    A copy of each different advertisement for TBX-FREE and Eupepsia Thin, whether disseminated to consumers, distributors or potential distributors, retailers, or any other person.

3.    All marketing strategy documents showing the, themes, messages, or inferences that you intended or believed to be conveyed in advertising for TBX-FREE or Eupepsia Thin.

4.    All consumer research, copy tests, focus group reports, marketing surveys and reports, recall tests, audience reaction tests, communication tests conducted on proposed, draft, or final advertising for TBX-FREE or Eupepsia Thin, and all documents presented to test audiences.

5.    Without regard to time period, and whether or not Redwood believes these claims were made in advertising or promotional materials, all documents, including, but not limited to, studies, tests, experiments, demonstrations, and written or oral statements or opinions, substantiating the following claims about TBX-FREE:

  a.    That TBX-FREE is an effective smoking cessation product;

  b.    That TBX-FREE enables most smokers to stop smoking in just one month;

  c.    That TBX-FREE is more effective than nicotine patches in enabling smokers to stop smoking;

  d.    That TBX-FREE is more effective than nicotine gum in enabling smokers to stop smoking;

  e.    That TBX-FREE has an "88% success rate";

  f.    That TBX-FREE has an 88 percent success rate among people who have smoked longer than 5 years;

  g.    That 10,600 people have used TBX-FREE, and 88 percent of them stopped smoking as a direct result of their use of the product;

  h.    That the U.S. Food and Drug Administration has determined that TBX-FREE is an effective smoking cessation product;

FTC Petition, Exhibit 2
**- 24 -**

i.   That clinical testing of TBX-FREE conducted at Johns Hopkins University has proven that TBX-FREE is an effective smoking cessation product;

j.   That Johns Hopkins University has endorsed TBX-FREE as an effective smoking cessation product;

k.   That the New England Journal of Medicine has endorsed TBX-FREE as an effective smoking cessation product;

l.   That the New England Journal of Medicine has said that TBX-FREE is 10 times more effective for smoking cessation than nicotine replacement therapy; and

m.   That Harvard Medical School's Harvard Health Publications has endorsed TBX-FREE as an effective smoking cessation product.

6.   All documents not produced in response to any other Document Request that refer to or relate to both: (1) TBX-FREE; and (2) the New England Journal of Medicine, Johns Hopkins University, or Harvard Medical School's Harvard Health Publications.

7.   Without regard to time period, and whether or not Redwood believes these claims were made in advertising or promotional materials, all documents, including, but not limited to, studies, tests, experiments, demonstrations, and written or oral statements or opinions, substantiating the following claims about Eupepsia Thin:

a.   That Eupepsia Thin is an effective appetite suppressant;

b.   That Eupepsia Thin enables users to weight;

c.   That Eupepsia Thin enables users to lose more than 100 pounds;

d.   That clinical studies prove Eupepsia Thin is an effective appetite suppressant;

e.   That "In clinical studies, participants who took Eupepsia Thin were 328% more successful at losing weight and keeping it off, with up to 78% of the weight lost being body fat"; and

f.   That Eupepsia Thin enables users to lose substantial amounts of weight without giving up their favorite foods or increasing their exercise.

8.   Without regard to time period, provide the following for each unpublished human clinical study responsive to Written Interrogatory 10 (regarding TBX-FREE) or to Written Interrogatory 13 (regarding Eupepsia Thin):

a.   Documents showing the product(s) tested;

b.   Documents showing the sponsor of the study;

c.   Documents showing the date(s) the study was conducted;

-7-

FTC Petition, Exhibit 2
- 25 -

    d.    Documents showing the protocol of the study (e.g., the manner in which subjects were selected to participate, an exact description and number of the subjects who participated, copies of all instructions provided to the subjects, whether any incentives were provided for participation);

    e.    Documents showing the identity and qualifications of the individuals who conducted the study, and for each such person, the nature and amount of the total compensation or remuneration received;

    f.    Copies of each of the test instruments (e.g., questionnaires) used in the study;

    g.    All draft or final versions, including any amendments, of protocols, statistical analysis plans, clinical agreements, reports, manuscripts, presentations, abstracts, or meeting notes or minutes;

    h.    All raw data collected from participants enrolled in the study, including any participants who did not complete the study; source documents for such data; any data dictionaries; and any case report forms;

    i.    All draft, interim, or final data summaries, whether in chart, table, or any other form, including baseline and outcome measurements for all subjects enrolled in the study; and

    j.    All other documents not explicitly referenced herein that were used by the researchers to obtain, convey, or analyze data or conclusions, or otherwise provide guidance regarding the execution of the study.

If any material contains sensitive health information, as defined in Instruction I-11, please follow those instructions before producing such information.

9.    For each consumer endorser identified in response to Written Interrogatory 14 or 15, provide the following:

    a.    All scripts, talking points, or other materials given to the endorser; and

    b.    All documents referring to or relating to communications between Redwood and the endorser, including, but not limited to, any agreements, contracts, or compensation (including reimbursement for travel and related expenses).

10.    All communications between you or any other person and the Food and Drug Administration concerning TBX-FREE or Eupepsia Thin.

11.    All complaints, answers, judgments, and settlement agreements in any state or federal court litigation referring to or relating to TBX-FREE, in which you or any affiliated person or entity is a named party.

-8-

FTC Petition, Exhibit 2
- 26 -

12.     All emails, memos, market research, studies, reports, analyses, or surveys referring to or relating to the sale of TBX-FREE as part of a continuity plan, negative option, or free-to-pay conversion.

13.     All documents prepared for any communications with consumers about TBX-FREE or Eupepsia Thin, including, but not limited to, telemarketing scripts, outlines, guides, suggested responses to questions, policies, manuals, or procedures for handling consumer questions and orders and consumer complaints and inquiries, including communications referring to or relating to any continuity program, negative option, free-to-pay conversion, or refund or cancelation policies.

14.     All 2017 documents and communications referring to or relating to consumers' complaints that they or a family member:

      a.     Never ordered TBX-FREE;

      b.     Canceled their order or attempted unsuccessfully to do so;

      c.     Were billed for TBX-FREE that was never ordered, was never received, or was returned;

      d.     Were billed for subsequent shipments of TBX-FREE before receiving their free trial;

      e.     Were billed for TBX-FREE that was sent or received after the account was canceled;

      f.     Never authorized or made more than a single purchase of the TBX-FREE; or

      g.     Did not understand that they would be receiving automatic additional shipments.

If any material contains sensitive health information, as defined in Instruction I-11, please follow those instructions before producing such information.

15.     All 2017 documents and communications referring to or relating to consumers' complaints about problems obtaining a refund for their purchase of TBX-FREE, including, but not limited to, complaints that they or a family member:

      a.     Had not successfully quit smoking after using TBX-FREE;

      b.     Had attempted to obtain a refund pursuant to a 30-day money back guarantee offered by Redwood;

      c.     Had been denied a refund because they had opened their package of TBX-FREE; or

      d.     Had been unable to reach a customer service representative.

FTC Petition, Exhibit 2
- 27 -

If any material contains sensitive health information, as defined in Instruction I-11, please follow those instructions before producing such information.

16.    All 2017 documents referring to or relating to communications with payment processors regarding consumer chargebacks against you in connection with the sale of TBX-FREE.

## DEFINITIONS

The following definitions apply to this CID:

D-1.    "**Company**," "**You**," or "**Your**" means Redwood Scientific Technologies, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, members, employees, agents, consultants, and other persons working for or on behalf of the foregoing.

D-2.    "**Document**" means the complete original, all drafts, and any non-identical copy, whether different from the original because of notations on the copy, different metadata, or otherwise, of any item covered by 15 U.S.C. § 57b-1(a)(5), 16 C.F.R. § 2.7(a)(2), and Federal Rule of Civil Procedure 34(a)(1)(A).

D-3.    "**Identify**" or "**the identity of**" requires identification of (a) natural persons by name, title, present business affiliation, present business address, telephone number, and email address or, if a present business affiliation or present business address is not known, the last known business and home addresses; and (b) businesses or other organizations by name, address, and the identities of your contact persons at the business or organization.

D-4.    "**Advertisement**" or "**Advertising**" or "**Ad**" means any written or verbal statement, illustration, or depiction that promotes the sale of a good or service or is designed to increase consumer interest in a brand, good, or service. Advertising media includes, but is not limited to: packaging and labeling; promotional materials; print; television; radio; and Internet, social media, and other digital content.

D-5.    "**Endorsement**" shall mean any advertising message (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser. The party whose opinions, beliefs, findings, or experience the message appears to reflect will be called the "endorser" and may be an individual, group, or institution.

## INSTRUCTIONS

I-1.    **Petitions to Limit or Quash**: You must file any petition to limit or quash this CID with the Secretary of the FTC no later than twenty (20) days after service of the CID, or, if the return date is less than twenty (20) days after service, prior to the return date. Such petition must set forth all assertions of protected status or other factual and legal objections to the CID and comply with the requirements set forth in 16 C.F.R. § 2.10(a)(1) – (2). **The FTC will not consider petitions to quash or limit if you have not previously met and conferred with FTC staff**

-10-

**and, absent extraordinary circumstances, will consider only issues raised during the meet and confer process.** 16 C.F.R. § 2.7(k); *see also* § 2.11(b). **If you file a petition to limit or quash, you must still timely respond to all requests that you do not seek to modify or set aside in your petition.** 15 U.S.C. § 57b-1(f); 16 C.F.R. § 2.10(b).

I-2. **Withholding Requested Material / Privilege Claims**: If you withhold from production any material responsive to this CID based on a claim of privilege, work product protection, statutory exemption, or any similar claim, you must assert the claim no later than the return date of this CID, and you must submit a detailed log, in a searchable electronic format, of the items withheld that identifies the basis for withholding the material and meets all the requirements set forth in 16 C.F.R. § 2.11(a) – (c). The information in the log must be of sufficient detail to enable FTC staff to assess the validity of the claim for each document, including attachments, without disclosing the protected information. If only some portion of any responsive material is privileged, you must submit all non-privileged portions of the material. Otherwise, produce all responsive information and material without redaction. 16 C.F.R. § 2.11(c). The failure to provide information sufficient to support a claim of protected status may result in denial of the claim. 16 C.F.R. § 2.11(a)(1).

I-3. **Modification of Specifications**: The Bureau Director, a Deputy Bureau Director, Associate Director, Regional Director, or Assistant Regional Director must agree in writing to any modifications of this CID. 16 C.F.R. § 2.7(l).

I-4. **Scope of Search**: This CID covers documents and information in your possession or under your actual or constructive custody or control, including documents and information in the possession, custody, or control of your attorneys, accountants, directors, officers, employees, service providers, and other agents and consultants, whether or not such documents or information were received from or disseminated to any person or entity.

I-5. **Identification of Responsive Documents**: For specifications requesting production of documents, you must identify in writing the documents that are responsive to the specification. Documents that may be responsive to more than one specification of this CID need not be produced more than once. If any documents responsive to this CID have been previously supplied to the FTC, you may identify the documents previously provided and the date of submission.

I-6. **Maintain Document Order**: You must produce documents in the order in which they appear in your files or as electronically stored. If documents are removed from their original folders, binders, covers, containers, or electronic source, you must specify the folder, binder, cover, container, or electronic media or file paths from which such documents came.

I-7. **Numbering of Documents**: You must number all documents in your submission with a unique identifier such as a bates number or a document ID.

I-8. **Production of Copies**: Unless otherwise stated, you may submit copies in lieu of original documents if they are true, correct, and complete copies of the originals and you preserve and retain the originals in their same state as of the time you received this CID.

FTC Petition, Exhibit 2
- 29 -

Submission of copies constitutes a waiver of any claim as to the authenticity of the copies should the FTC introduce such copies as evidence in any legal proceeding.

I-9.    **Production in Color**:  You must produce copies of advertisements in color, and you must produce copies of other materials in color if necessary to interpret them or render them intelligible.

I-10.    **Electronically Stored Information**:  See the attached FTC Bureau of Consumer Protection Production Requirements ("Production Requirements"), which detail all requirements for the production of electronically stored information to the FTC.  You must discuss issues relating to the production of electronically stored information with FTC staff **prior to** production.

I-11.    **Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI")**:  If any materials responsive to this CID contain Sensitive PII or SHI, please contact FTC counsel before producing those materials to discuss whether there are steps you can take to minimize the amount of Sensitive PII or SHI you produce, and how to securely transmit such information to the FTC.

Sensitive PII includes an individual's Social Security number; an individual's biometric data (such as fingerprints or retina scans, but not photographs); and an individual's name, address, or phone number in combination with one or more of the following:  date of birth, Social Security number, driver's license or state identification number (or foreign country equivalent), passport number, financial account number, credit card number, or debit card number.  SHI includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

I-12.    **Interrogatory Responses**:  For specifications requesting answers to written interrogatories, answer each interrogatory and each interrogatory subpart separately and fully, in writing, and under oath.

I-13.    **Submission of Documents in Lieu of Interrogatory Answers**:  You may answer any written interrogatory by submitting previously existing documents that contain the information requested in the interrogatory so long as you clearly indicate in each written interrogatory response which documents contain the responsive information.  For any interrogatory that asks you to identify documents, you may, at your option, produce the documents responsive to the interrogatory so long as you clearly indicate the specific interrogatory to which such documents are responsive.

FTC Petition, Exhibit 2
- 30 -

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION

COMMISSIONERS:     Jon Leibowitz, Chairman
                   Pamela Jones Harbour
                   William E. Kovacic
                   J. Thomas Rosch

**RESOLUTION DIRECTING USE OF COMPULSORY PROCESS IN A NONPUBLIC
INVESTIGATION OF UNNAMED PERSONS ENGAGED DIRECTLY OR
INDIRECTLY IN THE ADVERTISING OR MARKETING OF DIETARY
SUPPLEMENTS, FOODS, DRUGS, DEVICES, OR ANY OTHER PRODUCT OR
SERVICE INTENDED TO PROVIDE A HEALTH BENEFIT OR TO AFFECT THE
STRUCTURE OR FUNCTION OF THE BODY**

File No.   0023191

Nature and Scope of Investigation:

To investigate whether unnamed persons, partnerships, or corporations, or others
engaged directly or indirectly in the advertising or marketing of dietary supplements, foods,
drugs, devices, or any other product or service intended to provide a health benefit or to affect
the structure or function of the body have misrepresented or are misrepresenting the safety or
efficacy of such products or services, and therefore have engaged or are engaging in unfair or
deceptive acts or practices or in the making of false advertisements, in or affecting commerce, in
violation of Sections 5 and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45 and 52.
The investigation is also to determine whether Commission action to obtain redress for injury to
consumers or others would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory
processes available to it be used in connection with this investigation for a period not to exceed
ten (10) years from the date of issuance of this resolution. The expiration of this ten (10) year
period shall not limit or terminate the investigation or the legal effect of any compulsory process
issued during the ten (10) year period. The Federal Trade Commission specifically authorizes
the filing or continuation of actions to enforce any such compulsory process after expiration of
the ten year period.

Authority to conduct investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50,
and 57b-1, as amended; FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 et seq. and
supplements thereto.

By direction of the Commission.     *Donald S. Clark*
                                    Donald S. Clark
                                    Secretary

Issued: August 13, 2009

**CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY**
**Pursuant to 28 U.S.C. § 1746**

1.  I, _____, **have** personal knowledge of the facts set forth below and am competent to testify as follows:

2.  I have authority to certify the authenticity of the records produced by Redwood Scientific Technologies, Inc. (the "Company") and attached hereto.

3.  The documents produced and attached hereto by the Company are originals or true copies of records of regularly conducted activity that:

    a)  Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

    b)  Were kept in the course of the regularly conducted activity of the Company; and

    c)  Were made by the regularly conducted activity as a regular practice of the Company.

I certify under penalty of perjury that the foregoing is true and correct.


Date: _____        _____
                                     Signature

# EXHIBIT 2

**FILED**
CLERK, U.S. DISTRICT COURT

January 16 ,2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____VPC_____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | ) )  Case No. 2:17-cv-07921-SJO-PLA |
| Petitioner, | ) ) |
| v. | )  ORDER TO SHOW CAUSE |
| REDWOOD SCIENTIFIC TECHNOLOGIES, INC., | ) ) ) |
| Respondent. | ) ) |

Petitioner, the Federal Trade Commission (FTC or Commission), under the authority conferred by Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1 and Fed. R. Civ. P. 81(a)(5), has invoked the aid of this Court for an order requiring Respondent Redwood Scientific Technologies, Inc. to comply with a civil investigative demand (CID), issued to the company on August 3, 2017, in aid of an FTC law enforcement investigation.

The Court has considered the Federal Trade Commission's Petition for an Order Enforcing Civil Investigative Demand and the papers filed in support thereof; and, appearing to the Court that Petitioner has shown good cause for the entry of such order, it is by this Court hereby

ORDERED that Respondent Redwood Scientific Technologies, Inc. appear at 8:30 a.m. on the 29th day of January, 2018, in Courtroom No. 10C of the United States Courthouse for the Central District of California, Western Division located at 350 West 1st Street, Los Angeles, California, and show cause, if any there be, why this Court should not grant said Petition and enter an Order enforcing the CID

issued to Respondent.  Such an Order would direct Respondent to produce, within ten (10) days of the date of the Order, all responsive documents and information. Unless the Court determines otherwise, notwithstanding the filing or pendency of any procedural or other motions, all issues raised by the Petition and supporting papers, and any opposition to the Petition, will be considered at the hearing on the Petition, and the allegations of said Petition shall be deemed admitted unless controverted by a specific factual showing; and

IT IS FURTHER ORDERED that, if Respondent believes it to be necessary for the Court to hear live testimony, it must file an affidavit reflecting such testimony (or if a proposed witness is not available to provide such an affidavit, a specific description of the witness's proposed testimony) and explain why Respondent believes that live testimony is required; and

IT IS FURTHER ORDERED that, if Respondent intends to file pleadings, affidavits, exhibits, motions or other papers in opposition to said Petition or to the entry of the Order requested therein, such papers must be filed with the Court and received by Petitioner's counsel on the 19th day of January, 2018.  Such submission shall include, in the case of any affidavits or exhibits not previously submitted, or objections not previously made to the Federal Trade Commission, an explanation as to why such objections were not made or such papers or information not submitted to the Commission.  Any reply by Petitioner shall be filed with the Court and received by Respondent on the 23rd day of January, 2018; and

IT IS FURTHER ORDERED that, pursuant to Fed. R. Civ. P. 81(a)(5) and 26(a)(1)(B)(v), this is a summary proceeding and no party shall be entitled to discovery without further order of the Court upon a specific showing of need; and that the dates for a hearing and the filing of papers established by this Order shall not be altered without prior order of the Court upon good cause shown; and

IT IS FURTHER ORDERED that, pursuant to Fed. R. Civ. P. 81(a)(5) and its advisory committee note (1946), a copy of this Order and copies of said Petition

and exhibits filed therewith, shall be served forthwith by Petitioner upon Respondents or his counsel, using as expeditious means as practicable.

IT IS SO ORDERED:

DATED: January 16, 2018

_____

UNITED STATES DISTRICT JUDGE

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-07921 SJO (PLAx) | Date | April 23, 2018 |
|---|---|---|---|
| Title | Federal Trade Commission v. Redwood Scientific Technologies | | |

| Present: The Honorable | JAMES OTERO, Judge presiding |
|---|---|

| Victor Cruz | Carol Zurborg | |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Buke W. Kappler | Tracy Green |

**Proceedings:** PETITION FOR AN ORDER ENFORCING CIVIL INVESTIGATIVE

Hearing held.

Court and counsel confer.

The Court continues the Order to Show Cause hearing to Tuesday, May 29, 2019 @ 8:30 a.m. The parties shall file a joint status report by May 22, 2018.

Government counsel may appear by video conference, but shall contact the clerk one week prior to make arrangements.

|  | : | 0/11 |
|---|---|---|
| Initials of Preparer | | vpc |

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 17-07921 SJO (PLAx) | Date | May 29, 2018 |
|---|---|---|---|
| Title | Federal Trade Commission v. Redwood Scientific Technologies | | |

| Present: The Honorable | JAMES OTERO, Judge presiding |
|---|---|

| Victor Cruz | Carol Zurborg | |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Buke W. Kappler | Tracy Green |

**Proceedings:**     ORDER TO SHOW CAUSE HEARING

Hearing held.

Court and counsel confer.

Matter placed on second call.

Matter recalled.

Defendant's counsel advises the Court that the third party discovery company can copy and produce the database within eight days.

The Court Orders defendant to produce a copy of the database by June 13, 2018. However, if there's full compliance and the parties agree that the matter should be taken off calendar, then the Court should be notified no later than 48 hours prior to the date set for hearing, otherwise the parties and counsel would be ordered to attend.

The Court continues the Order to Show Cause hearing to Thursday, June 14, 2018 @ 9:00 a.m.

Government counsel shall prepare and lodge a proposed order consistent with the Court's orders.

|   |   | : | 0/18 |
|---|---|---|---|
| | Initials of Preparer | | vpc |

# EXHIBIT 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | ) ) ) |
| Petitioner, | ) ) ) ) |
| v. | ) ) ) |
| REDWOOD SCIENTIFIC TECHNOLOGIES, INC., | ) ) ) |
| Respondent. | ) ) ) |

Case No. 2:17-cv-07921-SJO-PLA

ORDER

Order to Show Cause Issued:
March 20, 2018;
Current Hearing Date:
June 14, 2018, 9:00 a.m.

Upon consideration of the parties' respective positions at the continued show cause hearing on May 29, 2018, it is hereby

ORDERED that Respondent Redwood Scientific Technologies, Inc. (Redwood) shall update the Relativity database developed by its vendor Lighthouse (*see* ECF #26-8 at 46) to include all sources of information that are potentially responsive to Petitioner Federal Trade Commission's Civil Investigative Demand (CID);

IT IS FURTHER ORDERED THAT Redwood shall prepare a copy of this updated Relativity database and shall produce this copy of the updated database to the Federal Trade Commission by Federal Express for delivery no later than Tuesday, June 12, 2018;

IT IS FURTHER ORDERED THAT, in addition to the copy of the Relativity database, Respondent Redwood shall also produce to the Federal Trade Commission by Federal Express for delivery no later than Tuesday, June 12, 2018 the following information under a sworn certificate from a responsible individual

with knowledge at Lighthouse: (1) a list of all sources of information in the updated Relativity database, identified by custodian name, email address (if applicable), and type of data source; and (2) a statement from Lighthouse that the copy of the updated database is identical and correct to the original, *provided however* that Redwood may exclude from the copy to be produced to the FTC any attorney work product (such as tags, notes, or saved searches) currently contained in the Relativity database;

IT IS FURTHER ORDERED THAT this hearing is continued to Thursday, June 14, 2018, at 9:00 a.m. in Courtroom 10C of the United States Courthouse for the Central District of California, Western Division, at 350 West 1st Street, Los Angeles, California, at which time counsel for the Federal Trade Commission may appear by video or telephone conference[1], *provided however* that, should Redwood fully comply with this Order sufficiently in advance of the June 12 production date, the parties may request that the hearing be removed from the Court's calendar by submitting a joint request to the Court no later than 48 hours before the hearing date and time; and

[The remainder of this page intentionally left blank.]

////
////
////
////
////
////
////
////

---

[1] Counsel for the Federal Trade Commission are directed to contact the clerk one week in advance of the hearing to make arrangements.

IT IS FURTHER ORDERED THAT a failure by Redwood either to update its Relativity database, or to produce a copy of the updated Relativity database to the Federal Trade Commission by Federal Express for delivery by June 12, 2018, will be grounds for this Court to impose such sanctions as its discretion warrants to coerce Redwood into compliance with the Order dated January 25, 2018 [ECF #17], including but not limited to daily sanctions of no less than $5,000 per day for such period as the Court deems appropriate, or other such sanctions.

IT IS SO ORDERED.

Dated:  June 12, 2018

_____

THE HON. S. JAMES OTERO
UNITED STATES DISTRICT JUDGE

# EXHIBIT 6

BURKE W. KAPPLER
D.C. Bar No. 471936; bkappler@ftc.gov
(Admitted *pro hac vice*)
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Tel: 202-326-2043; Fax: 202-326-2477

STACY PROCTER
(Local Counsel)
CA Bar No. 221078; sprocter@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Tel: 310-824-4343; Fax: 310-824-4380

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, ) <br><br> Petitioner, ) <br><br> v. ) <br><br> REDWOOD SCIENTIFIC TECHNOLOGIES, INC., ) <br><br> Respondent. ) | Case No. 2:17-cv-07921-SJO-PLA <br><br> FEDERAL TRADE COMMISSION'S JULY 13, 2018, STATUS REPORT ON CIVIL CONTEMPT PROCEEDING <br><br> Current Hearing Date: August 3, 2018 |

Pursuant to the Court's Order of June 13, 2018 [ECF #35], Petitioner, the Federal Trade Commission, submits this status report making an initial assessment of a database containing documents and information produced by Respondent, Redwood Scientific Technologies, Inc. As described in greater detail below,

despite this production, Redwood's compliance is still lagging in three areas: (1) Redwood's failure to adequately claim attorney-client privilege and provide a privilege log; (2) Redwood's failure to update its production to the date of compliance; and (3) Redwood's failure to supplement interrogatory responses. The FTC therefore reserves its right to seek coercive sanctions and, if the Court so directs, will prepare an updated status report and submit it to the Court in advance of the hearing that has been calendared for August 3, 2018.

### Developments Following the May 29 Show Cause Hearing

On May 29, 2018, the Court held a continued show cause hearing on the FTC's application for civil contempt. At that hearing, the Court directed Redwood to update a Relativity database developed by its vendor Lighthouse to include all sources of information that are potentially responsive to the FTC's CID and then to produce a copy of this database to the FTC by June 12, 2018. The Court then continued the hearing to June 14, 2018 and orally directed the FTC to submit a proposed order. See ECF #29. The Court entered the FTC's proposed order on June 12, 2018. ECF ##27, 29.

The following day, June 13, Redwood filed a motion seeking additional time to produce the information as directed by the Court and to continue the hearing set for June 14, 2018. ECF #33. The FTC immediately opposed this motion, ECF #34, and the Court denied the motion. The Court then directed the FTC to file a status report on July 13, 2018. ECF #35.

On June 14, 2018, Redwood made its first production to the FTC. This production consisted entirely of native electronic files and totaled approximately 306 GB. This production could not be used by the FTC, however, because as native files (or "raw data"), the documents were in a format that required them to be processed and uploaded into a document review system. See Status Report Ex. 1 at 7, 8-9. As the FTC later learned, the production contained all of the information Redwood had collected and processed in order to create its Relativity database in

April and early May 2018, including duplicate files and nonresponsive system files. The FTC would have been required to redo this processing and uploading in order to search and review this production, an effort requiring significant time and expense.[1]

Once it became apparent that Redwood had failed to provide the database in the expected format required by the Court's Order of June 12, 2018, the FTC scheduled a call with Redwood's counsel and Redwood's vendor, Lighthouse, on June 18, 2018 to discuss the production. As a result of that call, Redwood agreed to provide the FTC an exact copy of its database by June 26, 2018 and, in fact, completed that production in a timely manner.

### FTC's Initial Assessment of Redwood's Database

The FTC has been diligently reviewing the database—which contains approximately 1.6 million documents—since Redwood produced it on June 26.[2] It is not yet possible to state whether Redwood has fully responded to each of the CID specifications but there appear to be gaps in the production. Specifically, FTC reviewers have noted communications that refer to material that appears to be missing, such as a five-minute television ad for TBX-FREE, but further examination will be required to determine whether responsive documents that should have been produced have in fact been omitted.

Given the ongoing review process, the FTC does not at this time seek coercive sanctions. The Commission, however, reserves its right to seek such sanctions if further review confirms that Redwood has failed to comply fully with the CID and the Court's Orders.

---

[1] Redwood described some of the steps necessary to prepare the Relativity database in its letter dated May 22, 2018. *See* ECF #26-8 at 46.

[2] As the correspondence shows, the FTC experienced some initial technical difficulties in accessing the database but was able to review the data after consulting with Redwood's vendor. Status Report Ex. 2 at 14-16.

## **Additional Issues in Redwood's Compliance**

The FTC further wishes to bring to the Court's attention the following issues affecting Redwood's full and complete compliance that may require the Commission to seek additional relief from the Court:

Inadequate privilege claims. Redwood informed the FTC that the database contains documents that may reflect privileged attorney-client communications. Status Report Ex. 1 at 10. The FTC asked Redwood to provide a list of search terms or attorney names to screen for such material, but Redwood did not do so. *Id.* at 8; Status Report Ex. 2 at 13. The FTC also asked Redwood to identify specific privileged documents and prepare a privilege log, but Redwood never responded to this request and to date has not provided a privilege log. Status Report Ex. 2 at 13. Redwood's only assertion of privilege was to "tag" a set of 13,755 documents as "potentially privileged." While the FTC has refrained from reviewing these documents, the Redwood "tags" are not proper assertions of privilege. The FTC has asked Redwood to address these deficiencies. *Id.* In the meantime, FTC reviewers are also undertaking to screen out additional materials not identified by Redwood that bear indicia of privilege, but doing so is impeding review.

Failure to update production. The most recent documents in the Redwood-produced database appear to be dated May 1, 2018.[3] The CID, however, obligated Redwood to produce documents up to the date of compliance – *i.e.*, June 26, 2018. This requirement is also embodied in the Court's Order of June 12, 2018. ECF #29

---

[3]  On June 14, 2018, Redwood produced a flash drive in addition to the 306 GB hard drive containing raw data. This separate production contained a download of emails from a single Redwood customer support email address through June 12, 2018, and an updated version of a spreadsheet tracking communications with consumers through June 12. These appear to be the only two sources Redwood updated past May 1, 2018.

at 1. The FTC continues to review the database and seek information from Redwood to determine if Redwood has complied with the CID instructions or this Court's Order. *See*, *e.g.*, Status Report Ex. 2 at 12. Redwood has not responded to the FTC's request for more information.

Failure to supplement document productions and interrogatory responses. By email dated June 15, 2018, Redwood committed to supplement and complete the company's responses to date, including providing updated Excel spreadsheets on the company's sales and refunds and supplemental responses to numerous interrogatories. Status Report Ex. 1 at 7. The FTC has not yet received this supplemental production. Status Report Ex. 2 at 13-14.

The FTC has repeatedly raised all of these issues to Redwood, most recently on June 27 and June 28, but has not received any substantive response. *See* Status Report Exs. 1, 2.

## Conclusion

The FTC's assessment of Redwood's database is ongoing. The FTC does not at this time ask the Court to impose coercive sanctions, but respectfully offers to file an updated status report on August 2, 2018.

Respectfully submitted,

Date: July 13, 2018

ALDEN F. ABBOTT
General Counsel

JOEL MARCUS
Deputy General Counsel for Litigation

LESLIE RICE MELMAN
Assistant General Counsel for Litigation

*/s/ Burke W. Kappler*
BURKE W. KAPPLER
Attorney

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
Tel.: (202) 326-2043
Fax: (202) 326-2477
Email: bkappler@ftc.gov

**Certificate of Service**

    I hereby certify that on July 13, 2018, I served the foregoing July 13, 2018 Status Report on Civil Contempt Proceeding by filing this document with the Central District of California's CM/ECF system, which provided a notice of electronic filing to all counsel of record.

                           */s/ Burke W. Kappler*
                           BURKE W. KAPPLER

# EXHIBIT 7

BURKE W. KAPPLER
D.C. Bar No. 471936; bkappler@ftc.gov
(Admitted *pro hac vice*)
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Tel: 202-326-2043; Fax: 202-326-2477

STACY PROCTER
(Local Counsel)
CA Bar No. 221078; sprocter@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Tel: 310-824-4343; Fax: 310-824-4380

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Petitioner, <br><br> v. <br><br> REDWOOD SCIENTIFIC TECHNOLOGIES, INC., <br><br> Respondent. | Case No. 2:17-cv-07921-SJO-PLA <br><br> FEDERAL TRADE COMMISSION'S AUGUST 2, 2018, STATUS REPORT ON CIVIL CONTEMPT PROCEEDING |

　　　　Pursuant to the Court's Order of July 31, 2018 [ECF #38], Petitioner, the Federal Trade Commission, submits this status report providing additional information regarding Respondent Redwood Scientific Technologies, Inc.'s compliance with the FTC's Civil Investigative Demand and the Court's Orders.

In sum, Redwood has not responded to the FTC on any of the issues discussed in the July 13 status report [ECF #37] and, in fact, has not communicated with the FTC at all. As a result, the issues identified in that prior status report remain outstanding and unresolved. The FTC continues to reserve its right to seek coercive sanctions should Redwood fail to comply with the CID and the Court's Orders and further requests that the Court set a hearing date to address Redwood's deficiencies.

## **Current Status**

1.    <u>Missing advertisements</u>. FTC staff has been reviewing the database produced by Redwood on June 26. Despite conducting a diligent search the FTC has not located multiple types of advertisements for TBX-FREE and Eupepsia Thin that it has reason to believe exist. These include, for example, long-form television infomercials. FTC staff have found multiple emails referring to 11 such infomercials that Redwood apparently did not produce to the FTC. In addition, database documents refer to a 5-minute short-form commercial for TBX-FREE that also does not appear to have been produced. (To date, Redwood has produced only a 3½ - minute short-form commercial for TBX-FREE and a 25-minute long-form infomercial for Eupepsia Thin.) Database documents also refer to "EpepPrint," which suggests that print advertising exists for Eupepsia Thin. The FTC is also aware that Redwood advertised its products over the radio and on the internet through product-specific websites, yet it has not located such advertising in the database.

2.    <u>Inadequate privilege claim</u>. Redwood has not responded to the FTC's requests for more information to support its privilege claim and has not provided a privilege log. Although Redwood did tag 13,755 documents as "potentially privileged," neither Redwood nor its vendor Lighthouse have answered the FTC's requests for more information explaining how they developed this tag. FTC staff has refrained from reviewing these tagged documents for the time being, but this

tag appears imprecise and underinclusive because FTC staff has also reviewed documents that bear indicia of privilege without such tags. Redwood's failure to sufficiently support its privilege claim has thus hindered the FTC's review of the database.

3. <u>Failure to update database</u>. Based on its review, FTC staff can confirm that the most recent documents in the database date from May 1, 2018, even though Redwood produced this information on June 26. It thus appears that Redwood has not updated the database as required by the Court's Order of June 12, 2018 [ECF #29 at 1].

4. <u>Failure to supplement document productions and interrogatory responses</u>. As described in the July 13, 2018 status report, Redwood offered to supplement and complete several prior responses. This including updating spreadsheets with sales and refunds information and updating responses to interrogatories. Redwood has not produced this information to date.

## **Conclusion**

Although Redwood has produced a sizeable amount of information, a number of deficiencies remain. The FTC reserves the right to seek sanctions should Redwood fail to correct these deficiencies. The FTC further requests that the Court set a hearing on or before August 17 or after August 28 to determine whether Redwood has sufficiently addressed these deficiencies, including whether it has provided information necessary to maintain its privilege claim.

Respectfully submitted,

Date: August 2, 2018        ALDEN F. ABBOTT
                                      General Counsel

                                      JOEL MARCUS
                                      Deputy General Counsel for Litigation

                                      LESLIE RICE MELMAN
                                      Assistant General Counsel for Litigation

                                      */s/ Burke W. Kappler*
                                      BURKE W. KAPPLER
                                      Attorney

                                      FEDERAL TRADE COMMISSION
                                      600 Pennsylvania Ave., N.W.
                                      Washington, DC 20580
                                      Tel.: (202) 326-2043
                                      Fax: (202) 326-2477
                                      Email: bkappler@ftc.gov

## **Certificate of Service**

I hereby certify that on August 2, 2018, I served the foregoing August 2, 2018 Status Report on Civil Contempt Proceeding by filing this document with the Central District of California's CM/ECF system, which provided a notice of electronic filing to all counsel of record.

*/s/ Burke W. Kappler*
BURKE W. KAPPLER

# EXHIBIT 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-07921 SJO (PLAx) | Date | September 10, 2018 |
|---|---|---|---|
| Title | Federal Trade Commission v. Redwood Scientific Technologies | | |

| Present: The Honorable | JAMES OTERO, Judge presiding | |
|---|---|---|
| Victor Cruz | Carol Zurborg | |
| Deputy Clerk | Court Reporter | Tape No. |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Burke W. Kappler (Telephonic)                    Not Present

**Proceedings:**        STATUS CONFERENCE

Hearing held.

Defendant's counsel is not present.

Court and Plaintiff's counsel confer.

Plaintiff's counsel is seeking for the Court to set a deadline for complete production of documents, and that if defendant doesn't complete production, for the Court to set a hearing requiring defendant to appear and explain why they have not complied.

The Court continues this matter to tomorrow, Tuesday, September 11, 2018 @ 9:00 a.m.  Counsel for defendants is Ordered to personally appear at this hearing.  If defendant's counsel fails to appear at tomorrow's proceeding the Court will consider imposing sanctions and setting the        matter for an order to show cause hearing re contempt of Court.  Plaintiff may appear telephonically.

|  | : | 0/04 |
|---|---|---|
| Initials of Preparer | | vpc |

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-07921 SJO (PLAx) | Date | September 10, 2018 |
|---|---|---|---|
| Title | Federal Trade Commission v. Redwood Scientific Technologies | | |

| Present: The Honorable | JAMES OTERO, Judge presiding |
|---|---|

| Victor Cruz | Carol Zurborg | |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Burke W. Kappler (Telephonic) | Not Present |

**Proceedings:**     STATUS CONFERENCE

Hearing held.

Defendant's counsel is not present.

Court and Plaintiff's counsel confer.

Plaintiff's counsel is seeking for the Court to set a deadline for complete production of documents, and that if defendant doesn't complete production, for the Court to set a hearing requiring defendant to appear and explain why they have not complied.

The Court continues this matter to tomorrow, Tuesday, September 11, 2018 @ 9:00 a.m.  Counsel for defendants is Ordered to personally appear at this hearing.  If defendant's counsel fails to appear at tomorrow's proceeding the Court will consider imposing sanctions and setting the       matter for an order to show cause hearing re contempt of Court.  Plaintiff may appear telephonically.

|  | : | 0/04 |
|---|---|---|
| Initials of Preparer | | vpc |

# EXHIBIT 10

BURKE W. KAPPLER
D.C. Bar No. 471936; bkappler@ftc.gov
(Admitted *pro hac vice*)
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Tel: 202-326-2043; Fax: 202-326-2477

STACY PROCTER
(Local Counsel)
CA Bar No. 221078; sprocter@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Tel: 310-824-4300; Fax: 310-824-4380

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | ) ) ) |
| Petitioner, | ) ) ) |
| v. | ) ) |
| REDWOOD SCIENTIFIC TECHNOLOGIES, INC., | ) ) ) |
| Respondent. | ) ) ) |

Case No. 2:17-cv-07921-SJO-PLA

OCTOBER 12, 2018, JOINT STATUS REPORT ON CIVIL CONTEMPT PROCEEDING

Pursuant to the Court's Order during the hearing on September 17, 2018, [ECF #43], Petitioner Federal Trade Commission and Respondent Redwood Scientific Technologies, Inc. submit this joint status report briefly describing

Respondent Redwood Scientific Technologies, Inc.'s efforts to comply with the FTC's Civil Investigative Demand (CID) and the Court's Orders.

Following the last hearing on September 17, 2018, counsel for the parties met and conferred multiple times by telephone and have also exchanged emails. As a result of those communications, Redwood provided supplemental responses to the CID's document requests and interrogatory responses on September 24, 2018. Redwood has not produced a privilege log to date. The company has clarified that it does not assert privilege over any documents in the database that are not tagged as "potentially privileged," and has provided additional information regarding the criteria it used to create its "potentially privileged" tag. Counsel for Redwood is gathering information and documents regarding whether any additional advertisements for TBX-FREE and Eupepsia Thin can be located, and is also compiling updated information about sales, refunds, and consumer complaints to the date of final and complete production as required by the CID.

Joint Status Report (October 12, 2018)

Respectfully submitted,

*Counsel for Respondent*
*Redwood Scientific Technologies,*
*Inc.*

*/s/ Tracy Green*
Tracy Green, Esq.

GREEN & ASSOCIATES
800 West Sixth Street, Suite 450
Los Angeles, CA 90017
Tel.: 213-233-2260
Fax: (213) 477-2260
Email: tgreen@greenassoc.com

*Counsel for Petitioner*
*Federal Trade Commission*

ALDEN F. ABBOTT
General Counsel

JOEL MARCUS
Deputy General Counsel for Litigation

LESLIE RICE MELMAN
Assistant General Counsel for
Litigation

*/s/ Burke W. Kappler*
BURKE W. KAPPLER
Attorney

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
Tel.: (202) 326-2043
Fax: (202) 326-2477
Email: bkappler@ftc.gov

Date: October 12, 2018

## **Certificate of Service**

I hereby certify that on October 12, 2018, I served the foregoing October 12, 2018, Joint Status Report on Civil Contempt Proceeding by filing this document with the Central District of California's CM/ECF system, which provided a notice of electronic filing to all counsel of record.

*/s/ Burke W. Kappler*
BURKE W. KAPPLER

# EXHIBIT 11

BURKE W. KAPPLER
D.C. Bar No. 471936; bkappler@ftc.gov
(Admitted *pro hac vice*)
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Tel: 202-326-2043; Fax: 202-326-2477

STACY PROCTER
(Local Counsel)
CA Bar No. 221078; sprocter@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Tel: 310-824-4343; Fax: 310-824-4380

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | ) ) ) ) |
| Petitioner, | ) ) |
| v. | ) ) ) |
| REDWOOD SCIENTIFIC TECHNOLOGIES, INC., | ) ) ) ) |
| Respondent. | ) ) |

Case No. 2:17-cv-07921-SJO-PLA

STIPULATION FOR DISMISSAL

Current Hearing Date:
October 22, 2018

Petitioner Federal Trade Commission, by and through its counsel, and Respondent Redwood Scientific Technologies, Inc., by and through its counsel, hereby stipulate as follows:

1.      This proceeding should be dismissed pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure;

2.      This stipulation nullifies the purpose and need for the October 22, 2018, hearing scheduled pursuant to the Court's Order dated September 17, 2018; and

3.      Upon entry of this Stipulation and conforming order, the parties respectfully request that the Court vacate the hearing scheduled for October 22, 2018, and dismiss this proceeding.

4.      A proposed order is provided.

                                    Respectfully submitted,

Dated:  October 18, 2018            FEDERAL TRADE COMMISSION
                                    By:  */s/ Burke W. Kappler*_____
                                    Burke W. Kappler (*pro hac vice*)
                                    Attorney for Petitioner Federal Trade
                                    Commission

     *  Pursuant to L.R. 5-4.3.4(a)(2)(i), counsel for Petitioner and filer of this document attests that counsel for Respondent, whose electronic signature appears below, is a registered CM/ECF filer, concurs in the filing of this stipulation, and has authorized this filing.

Dated:  October 18, 2018            GREEN & ASSOCIATES
                                    By:  */s/ Tracy Green*_____
                                    Tracy Green (CA Bar No. 137869)
                                    Attorney for Respondent Redwood
                                    Scientific Technologies, Inc.

1

2

## Certificate of Service

3      I hereby certify that on October 18, 2018, I served the foregoing Stipulation

4  for Dismissal by filing this document with the Central District of California's

5  CM/ECF system, which provided a notice of electronic filing to all counsel of

6  record.

7

8              */s/ Burke W. Kappler*
               BURKE W. KAPPLER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 12

FILED
CLERK, U.S. DISTRICT COURT

October 19, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY: ___VPC___ DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>           Petitioner,<br><br>        v.<br><br>REDWOOD SCIENTIFIC TECHNOLOGIES, INC.,<br><br>           Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 2:17-cv-07921-SJO-PLA

[PROPOSED] ORDER

Current Hearing Date:
October 22, 2018

Upon consideration of the Stipulation for Dismissal filed by the parties, it is hereby

ORDERED that this matter is DISMISSED without prejudice; and

IT IS FURTHER ORDERED THAT this stipulation nullifies the purpose and need for the October 22, 2018, hearing scheduled pursuant to the Order dated September 17, 2018,; and

IT IS FURTHER ORDERED THAT the hearing scheduled for October 22, 2018 be vacated.

IT IS SO ORDERED.

Dated: October 19, 2018

_S. James Otero_

_____

THE HON. S. JAMES OTERO
UNITED STATES DISTRICT JUDGE

# EXHIBIT 13

Michael Gerard Fletcher (State Bar No. 070849)
  mfletcher@frandzel.com
Craig A. Welin (State Bar No.138418)
  cwelin@frandzel.com
Hal D. Goldflam  (State Bar No.179689)
  hgoldflam@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Receiver ROBB EVANS
AND ASSOCIATES LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>       Plaintiff,<br><br>    v.<br><br>JASON CARDIFF, et al.,<br><br>       Defendants. | Case No. 5:18-cv-02104-SJO-PLA<br><br>**REPORT OF RECEIVER'S ACTIVITIES FOR THE PERIOD FROM OCTOBER 10, 2018 THROUGH OCTOBER 31, 2018**<br><br>[NO HEARING ASSIGNED] |

1    TO: THE HONORABLE S. JAMES OTERO, JUDGE OF THE UNITED

2    STATES DISTRICT COURT.

3    Robb Evans & Associates LLC, Receiver in the above-entitled matter,

4    herewith submits its Report of Activities for the period from October 10, 2018

5    through October 31, 2018.

6

7    DATED: November 1, 2018            FRANDZEL ROBINS BLOOM & CSATO, L.C.
                                         MICHAEL GERARD FLETCHER
8                                        CRAIG A. WELIN
                                         HAL D. GOLDFLAM
9

10

11                                       By:    /s/ Hal D. Goldflam

12                                              HAL D. GOLDFLAM
                                                Attorneys for Receiver ROBB
13                                              EVANS & ASSOCIATES LLC

14

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

REPORT OF RECEIVER'S ACTIVITIES FOR THE PERIOD FROM OCTOBER 10, 2018
THROUGH OCTOBER 31, 2018

**Robb Evans & Associates LLC**
**Receiver of**
**Redwood Scientific Technologies, Inc. et al.**

**REPORT OF RECEIVER'S ACTIVITIES**
**OCTOBER 10, 2018 THROUGH OCTOBER 31, 2018**

This report covers the activities of the Receiver[1] since the inception of the receivership. This is the first report to the Court on the progress of the receivership. It does not constitute an audit of financial condition and is intended only to provide information for use by the Court in assessing the progress of the receivership.

## Overview

This report will describe the steps taken by the Receiver to implement the terms of the Temporary Restraining Order (TRO). This report will also describe the destruction of Receivership Entity records in May 2018 on orders from Jason Cardiff and an additional potential violation of the TRO.

## Custody, Control, and Possession

On October 12, 2018 the Receiver took control of the business premises located at 820 and 870 North Mountain Ave. in Upland, CA. There was one employee present at 820 North Mountain Ave., Suite 100. Offices for Individual Defendants Jason Cardiff and Eunjung Cardiff are at Suite 100.

Jason Cardiff was present at 870 North Mountain Ave., Suite 115. Upon seeing the TRO, he advised the Receiver that the office was that of People United for Christians (PUFC), which was not mentioned in the paperwork he saw.

As set forth below, the operations of Redwood Scientific Technologies, Inc. (Redwood) and the PUFC are intertwined and comingled.

The Receiver interviewed five individuals at 870 North Mountain Ave.

The first individual interviewed by the Receiver stated that he worked as a warehouse worker and sales representative for Redwood. He stated his primary job was to move the Redwood

---

[1] Reference to the Receiver in this report means the Receiver, the Receiver's deputies, and staff.

inventory located in that entity's warehouse across the hall into a small office located in Suite 115 that had been set up with shelves for inventory.  He did not know why he was moving inventory owned by one company into a suite purportedly occupied by PUFC.  In addition to relocating inventory, he stated he made sales calls on companies in the area for the purpose of selling dissolvable film strips to aid in smoking cessation, weight loss, sleep aid, and improved sexual performance for men and women.

The other four individuals that were interviewed by the Receiver all stated they worked for PUFC.  The Receiver learned that PUFC is a "virtual ministry" whose message was delivered by Mr. Cardiff, the Master Prophet.  Mr. Cardiff exclusively determined the ministry's message through solicitation campaigns which he took from a library of previously used campaigns found in one of the offices.

Two of the four individuals were part time and only worked when called in and the other two were permanent, salaried employees.  All four employees worked on solicitation campaigns for PUFC, one preparing art work, others preparing the mailers with the inclusion of religious symbols in the mailings.  The Receiver observed that the employees were cutting small swatches of cheesecloth representing an item of religious significance.  One full-time employee and one part-time employee also did computer input reflecting the amount of money received for a particular campaign.  This input entailed taking information off of the front of empty return envelopes that Defendant Eunjung Cardiff sent to the suite after opening them and removing the money in them.  The envelopes had the sender's name and address in the upper left hand corner.  In the lower left hand corner there was a code for the marketing campaign the envelope was returned on.  Hand written on the right side of the envelope was a number representing the amount of money received in that envelope.

One employee told the Receiver that in August, 2018 there was a meeting with all employees of Redwood and PUFC where it was announced to employees they would begin selling medical marijuana (CBD) dissolvable film strips.  When that company required help in packaging that product, PUFC employees would go to 820 North Mountain and work there.  The four PUFC employees were always paid by PUFC, even when work was done for Redwood, although the individual responsible for keeping track of employee time used an internal code to designate which hours in the pay period were worked at Redwood and which at PUFC.  One PUFC employee listed her supervisor as Julie.  The only Julie the Receiver was able to locate in the records is on the payroll report for Redwood.

Employees of PUFC stated that after the third quarter, 2017, employees did not receive checks with paystubs and that at year end they did not receive 2017 W-2 reports for their use in completing their taxes.  The employee stated that when she pressed Mr. Cardiff, he became very angry and referred her to a Redwood supervisor who told her PUFC had not reported any information to the Internal Revenue Service and therefore, the employees did not need to either.

In addition, the Receiver observed a substantial amount of Redwood paper records located in the 870 Mountain Ave. suites. Some file cabinets contained records for both Redwood and the ministry.

The 870 Mountain Ave. suites are leased to Intel Property LLC, a Wyoming Limited Liability Company. The Guarantor on this lease is Redwood.

Defendant Danielle Cadiz, who is on Redwood's payroll, is listed as Manager on the application for Messengers for Christ World Healing's post office box application (Exhibit 1). This post office box receives mail from solicitations made by PUFC.

The Receivership Entities utilize Google Suites for email and for their documents. The Receiver took steps to change the administrative password for Google Suites and restricted access by anyone not authorized by the Receiver. Representatives of the Federal Trade Commission (FTC) commenced a forensic image of the data contained in Google Suites.

The Receivership Entities utilize QuickBooks for their accounting system. The Receiver accessed and downloaded the QuickBooks data.

The Receiver changed the locks to all of the office suites and took control of the mail.

## Interview with Jason Cardiff

On October 12, 2018 the Receiver met with Mr. Cardiff and explained to him the asset freeze provisions and the duties of the Receiver as detailed in the TRO[2].

Mr. Cardiff told the Receiver that credit card merchant processors for the Receivership Entities had terminated processing several months ago and there were no current merchant processing accounts. He stated that as a result the total sales for last month were about $7,000.

The Receiver directed Mr. Cardiff to Section XVI. paragraph E. of the TRO which requires the Receiver to take custody, control, and possession of various valuable articles. Mr. Cardiff told the Receiver that all of the items listed in the TRO had been liquidated over the past few years. He first said the items had been liquidated over the last two to three years and then later said over the last four to five years. He further stated that everything was sold for cash at pawn shops overseas and most items were sold at pawn shops in London. He also told the Receiver that he had no records reflecting the sale of any of the assets detailed in the TRO. The Receiver then asked Mr. Cardiff about item 25, his wife's (defendant Eunjung Cardiff) 8.5 carat diamond ring which is insured for $532,000. In response, Mr. Cardiff explained that the

---

[2] Tracy Green, Esq., an attorney who is representing Mr. Cardiff in the discovery dispute with the FTC, was on a speaker phone during this interview. Ms. Green reinforced the Receiver's explanation of the TRO, including the asset freeze provisions.

ring was sold in Abu Dhabi and proceeds of the sale were wire transferred to a trust in the Cook Islands. He stated there are currently no funds in the trust because the funds were wire transferred back to the United States to fund business operations. In response to further questions from the Receiver, he stated that neither he nor his wife is a trustee of the Cook Islands trust and he does not know how the trust works or who provides instructions to the trust to transfer funds.

The Receiver obtained a current insurance policy for the jewelry from Roger Stone Insurance agency. The policy period is from February 11, 2018 to February 11, 2019 and the annual premium is $16,868.77. The coverage still includes the 8.5 carat diamond ring discussed above (Exhibit 2, Item#27 on page 2).

The Receiver will investigate this issue further, but has preliminarily concluded that Mr. Cardiff's explanation about the disposition of these valuable assets that remain insured and the operation of the Cook Islands trust strains credibility and truthfulness.

## Interview with Danielle Walker a/k/a Danielle Cadiz

On October 27, 2018 the Receiver interviewed Danielle Walker. Ms. Walker was the former Operations Director of Redwood and provided a great deal of information to the Receiver.

The Receiver asked Ms. Walker if Mr. Cardiff or anyone else issued instructions to destroy computer files after receiving the FTC's Civil Investigative Demand (CID) in August 2017. Ms. Walker told the Receiver that Redwood received an additional CID in May of 2018. According to Ms. Walker, the May 2018 CID contained a list of key words. The CID instructed Redwood to search all computer files for these key words and to produce any responsive documents to the FTC. Ms. Walker told the Receiver that Mr. Cardiff instructed Redwood's employees to search their documents for these key words and to delete any documents with any of the key words. According to Ms. Walker, Mr. Cardiff said "that if the FTC got a hold of anything with key words, especially those that discussed 88%, we would all be in a lot of trouble and we would lose everything."

## Business Activities Prohibited by the Temporary Restraining Order

The TRO directs that any material fact about the defendants' products including TBX-FREE, Eupepsia Thin, or Prolongz may not be misrepresented, expressly or by implication including, but not limited to, claims that:

- TBX-FREE is an effective smoking cessation product is more effective than either nicotine patches or nicotine gum;

- Eupepsia Thin is an effective appetite suppressant and weight loss aid and starts working in less than 20 seconds and suppresses a user's appetite within minutes; and
- Prolongz treats or prevents premature ejaculation.

The Receiver viewed numerous products displayed in several areas of the main office, Suite 100, including samples of TBX-FREE, Eupepsia, and Prolongz. The Receiver also studied a six-panel color foldout Product Catalog displaying and describing these three products. The Catalog and the product cartons have text with the prohibited claims, including… "allows smokers to stop smoking once and for all…has an 88% cure compared to the patch and gum combined; …creating the sensation of feeling full almost instantly, suppressing your appetite…easy weight loss; …homeopathic drug, which helps in the prevention of Premature Ejaculation (PE)."

Scripts posted near the desks of telephone receptionists contained similar wording to use when discussing products with in-bound callers.

## Certain Duties and Authorities of the Receiver

Included in the Court's directions to the Receiver is the Order to "Suspend business operations of the Receivership Entities if in the judgment of the Receiver such operations cannot be continued legally and profitably." The Receiver has considered facts and issues related to each prong of this directive.

The Receiver has concluded business operations of the Receivership Entities cannot be continued lawfully. As described above, the existing products and advertising materials contain text with claims that are prohibited by the TRO.

The Receiver has concluded business operations of the Receivership Entities cannot be continued profitably. Financial information below fully describes the hopelessly insolvent financial condition and operation of the Receivership Entities. In addition to negative cash balances of about $114,000, there are approximately $5.0 million in current liabilities. Mr. Cardiff stated all liabilities are delinquent and several cash advance loans are in litigation or subject to judgment. The audited financial statements for 2015 and 2016 from Redwood's independent auditor show accumulated losses of about $9.9 million as of December 31, 2016. Redwood's financial records, which appear to be incomplete and not fully current, show additional net losses from January 1, 2017 through October 12, 2018 of approximately $1.99 million, indicating accumulated losses could now total about $11.9 million. Documents on site indicate the premises rent is substantially delinquent. The Receiver has determined there could be potential payroll tax liability claims from the Internal Revenue Service because of improperly classifying employees as independent contractors.

## Financial Information

Based on the Receiver's preliminary review and analysis of the account details recorded under Redwood's QuickBooks accounting file, the creditability of Redwoods accounting records are in doubt. Redwood's bank accounts did not appear to be properly and periodically reconciled through the current time period, and many of the accounting records appear to be outdated or transactions appear not to be properly recorded.

Advanced Men's Institute Prolongz LLC (AMI) was organized in January 2014 in California and began selling its products in February 2014. In November 2014, AMI changed its name to Redwood Scientific Technologies LLC. Immediately after the name change, Redwood Scientific Technologies LLC converted from a limited liability company into a California corporation and became Redwood Scientific Technologies Inc. (Redwood California) in January 2015.

Redwood Scientific Technologies Inc. was also incorporated in the state of Nevada on December 17, 2014 (Redwood Nevada). In January 2015, a Share Exchange Agreement was entered into between Redwood California and Jason Cardiff, the shareholder and Chief Executive Officer of Redwood California, in which Mr. Cardiff transferred 100% of Redwood California he owned to Redwood Nevada and Redwood California became a wholly owned subsidiary of Redwood Nevada.

The Receiver obtained the online access to the Receivership Entities' QuickBooks accounting from Mr. Cardiff. The QuickBooks accounting file is in the name of Redwood Scientific Technologies Inc., which appears to be the accounting records for Redwood California and Redwood Nevada (collectively referred as Redwood). The QuickBooks accounting file for Redwood is stored on the QuickBooks online website.

Redwood's QuickBooks accounting file contains multiple bank accounts, which are in the name of affiliated entities and subsidiaries other than Redwood, including but not limited to, Advanced Men's Institute Prolongz LLC (shown as "AMI"), American Nutra Partners LLC (shown as "AM Nutra Partner" or "AM Nutra P LLC"), Expo Supplements, LLC (shown as "Expo Supplements"), Nature's Future LLC (shown as "Nature's Fut LLC") Owl Enterprises, LLC (shown as "OWL"), Top Hill Shop, Ltd (shown as "Top Hill Shop"), Smoke Stop, LLC (shown as "Smoke Shop"), TV Sales LLC, and Intel Property, LLC (shown as "Checking_70"). In addition to the affiliated entities and subsidiaries above, the Receiver also discovered a binder in Mr. Cardiff's office, which contain many corporate documents along with a list of entity names (Exhibit 3), which appear to be affiliated entities of the Receivership Entities. These demonstrate that the Receivership Entities have created a complex web of affiliated entities and subsidiaries in order to open many credit card merchant processing accounts to receive revenue from consumers or to hold the assets for the Receivership Entities.

The financial statements generated from Redwood's QuickBooks accounting file, including profit and loss and balance sheet by year are under Exhibit 4 and 5.

According to Redwood's QuickBooks accounting records, the Receivership Entities generated approximately $19.6 million in gross sales from January 1, 2015 through October 12, 2018, and the refunds and chargebacks were approximately $1.38 million during the same period. The net sales revenue was approximately $18.2 million from January 1, 2015 through October 12, 2018.

The Receivership Entities' books and records show their operations have suffered significant losses since the inception of operations. All of the sales revenue was spent to cover the cost of goods sold and expenses. Cost of goods sold was approximately $3.2 million from its inception to October 12, 2018. The most significant expenses on the books were media expenses (approximately $10.2 million), advertising expenses (approximately $2.8 million) and payroll and wages (approximately $3.2 million, including payroll taxes), which totaled nearly $16 million or 77% of the total expenses. The total net losses from its inception through October 12, 2018 were approximately $6.4 million.

Redwood's balance sheet shows approximately $2.5 million in total assets as of October 12, 2018, which primarily consists of the account receivables ("AR Limelight") of $1.2 million and inter-company receivables ("Intercompany Runway") of $921,104.54. The Receiver reviewed the account details, which reflect that the last transaction for account receivables was dated July 11, 2018 and the last transaction for inter-company receivables was dated January 17, 2018, both of which appear to be outdated and not properly reconciled. Lime Light CRM, Inc. (Lime Light) is the former Customer Relationship Management System (CRM) service provider for the Receivership Entities, and the Receiver served Lime Light with the TRO and obtained the CRM data for the Receivership Entities for further assessment as discussed below.

Redwood's balance sheet shows a negative balance of $113,724.58 in cash and bank account balances as of October 12, 2018. The Receiver served the TRO on all known financial institutions and merchant processors that were used by the Receivership Entities, which is discussed in more detail below.

In addition, Redwood's balance sheet shows approximately $5.1 million in common stock, which include the capital contributions raised from the public and received from outside investors. The Receiver found a 2014 independent auditor's report, which indicates that, in 2015, Redwood Nevada began a public placement offering for a maximum of 2,222,222 units at a purchase price of $2.25 per unit. Each unit consists of one share of Redwood Nevada's common stock, par value of $0.01 per share, and a warrant to purchase the number of shares of common stock as is equal to 50% of the number of shares of common stock underlying the investor's unit at an exercise price of $2.75 per share. The Receiver also discovered a copy of the subscription escrow agreement pertaining to this public placement offering, which is under Exhibit 6.

Redwood's books and records show that all of the capital contributions received from investors were spent. As of October 12, 2018 the books also reflect total liabilities of approximately $5 million.

As noted above, based on the Receiver's preliminary review and analysis of the account details recorded under Redwood's QuickBooks accounting file, the creditability of Redwoods accounting records are in doubt. Redwood's bank accounts did not appear to be properly and periodically reconciled through the current time period, and many of the accounting records appear to be outdated or transactions appear not to be properly recorded. For example, the Receiver discovered in Mr. Cardiff's office a document regarding a recent disbursement authorization dated July 18, 2018 (Exhibit 7) for the funding of $725,000, including $362,250 to Redwood, $2,750 to Legal & Compliance LLC, $35,000 to Auctus Fund Management LLC, and $325,000 to Auctus Fund LLC. According to this authorization, Redwood authorized Auctus Fund LLC to initiate debit and credit entries to Redwood's accounts at Zions Bank. The Receiver reviewed Redwood's QuickBooks accounting records and was unable to locate or reconcile the recording pertaining to these transactions, other than a deposit of $223,250 received on May 5, 2018, which was recorded as short-term loan – Legal and Compliance LLC but still remained as an unpaid liability on Redwood's books as of October 12, 2018. It is unclear to the Receiver whether or not and to which account Redwood has received $362,250 or has made any payments to Auctus Fund Management LLC or Auctus Fund LLC pursuant to this authorization.

In addition, on October 22, 2018 the Receiver obtained audited financial statements for 2015 and 2016 from Redwood's Independent Auditor, EKS&H LLP. The 2016 audited balance sheet shows accumulated losses of about $9.9 million as of December 31, 2016 (Exhibit 8), which is significantly different from $5.6[3] million shown on Redwood's QuickBooks accounting records (Exhibit 5). The audited profit and loss statements show net losses for 2015 and 2016 of about $5.7 million and $4.2 million, respectively (Exhibit 9). However, Redwood's profit and loss statements generated from its QuickBooks accounting file at Exhibit 4 show the net losses for 2015 and 2016 were approximately $3.3 million and $1 million, respectively.

## Customer Relationship Management (CRM)

The Receivership Entities maintained consumer data on CRM hosted by Lime Light. Apparently, Lime Light terminated the relationship with the Receivership Entities in June 2018.

---

[3] This includes $4,589,074.18 in retained earnings as of December 31, 2016 and 2016 net loss of $1,014,432.08 shown in Exhibit 4.

The Receiver served the TRO on Lime Light and obtained the CRM data of the Receivership Entities directly from Lime Light. According to the CRM data, the product sales and sale orders were recorded from February 7, 2014 to June 15, 2018. The Receiver reviewed, compared and analyzed the sales in the CRM data and the sales recorded on the books as shown below.

| Based on Redwood's QuickBooks | 2015 | 2016 | 2017 | 1/1/2018~ 6/15/2018 | TOTAL |
|---|---|---|---|---|---|
| Sales | $ 4,578,794.44 | $ 5,400,000.72 | $ 297,000.81 | $ 25,500.00 | $ 10,301,295.97 |
| Sales Limelight | - | - | 6,892,212.81 | 959,694.47 | 7,851,907.28 |
| Sales Retail | - | 73,626.60 | 1,154,725.15 | 101,199.85 | 1,329,551.60 |
| Total Sales Per Books <A> | $ 4,578,794.44 | $ 5,473,627.32 | $ 8,343,938.77 | $ 1,086,394.32 | $ 19,482,754.85 |

| Per CRM Data | 2015 | 2016 | 2017 | 1/1/2018~ 6/15/2018 | TOTAL |
|---|---|---|---|---|---|
| Approved & Shipped Sales <B> | $ 4,495,822.52 | $ 5,274,316.61 | $ 6,154,233.33 | $ 977,714.71 | $ 16,902,087.17 |
| Variances <A> - <B> | $ 82,971.92 | $ 199,310.71 | $ 2,189,705.44 | $ 108,679.61 | $ 2,580,667.68 |

Other than some timing differences, the most significant variance was likely related to retail sales, which was recorded under "Sales Retail" account.

The Receiver reviewed the sales details on the books, and it shows that Redwood recorded (under "Sales-Limelight" or "Sales" and "Account Receivable" on the books) based on CRM data on a monthly basis. Starting from 2017, they also separately recorded the retail sales (under "Sales Retail" and "AR-limelight" on the books) other than the sales. It is unclear to the Receiver if Redwood did not properly reconcile the retail sales or whether there was an overstatement of these retail sales because the books still show approximately $1.2 million in "AR-Limelight" outstanding and not collected to date (Exhibit 5).

## PUFC

PUFC was registered as a non-profit entity with the State of California on May 21, 2013. Ms. Walker told the Receiver that early in its existence, PUFC would raise money and make donations to one of the outside Board Member's charity, St. Vincent Church. When those donations ceased, the outside Board Member resigned. Ms. Walker was not aware of any other charitable donations made by PUFC because "there was never enough money in the bank." Ms. Walker stated that Mr. Cardiff obtained his solicitation mailing lists from his former father-in-law, Peter Popoff. According to information on the Internet Mr. Popoff is a televangelist who has been accused for at least the past 30 years of making deceptive or

fraudulent claims to heal sickness and promoting products such as "blessed water" and "holy sand" to potential susceptible and vulnerable viewers. The information also reports that Mr. Popoff, referring to himself as a Prophet, promised "fabulous extreme fortune" and "miracles" in exchange for donations to his organization. After a donation, multiple solicitation letters follow, requesting more donations in exchange for miracles.

Ms. Walker stated that Mr. Cardiff produced and completed three mailings each month in sets of about 76,000, 24,000, and 8,000 to consumers listed in a mailing data base. The three sets totaled about 108,000 letters. The second and third mailing sets were smaller and were directed to selected portions of the first mailing group.

The Receiver located multiple copies of a computer-generated mass-produced letter that Mr. Cardiff fashioned as a personal note to the target individuals addressed. The four-page letter came from an unidentified "Master Prophet" and included within the letter the name and address, including address barcode, of an individual the Master Prophet appeared to be on a first name basis. Further attempts to personalize the letter are in the form of faux hand written notations, check marks, underscores, asterisks, circles and encouragement to read on, in green ink. There is also an extensive use of bold type. The letter is overflowing with religious terminology, promises from God, divination of future events and assurances of money to come to the target individuals.

Text contained in letters include the following:

**The powerful events I witnessed in the spirit realm (that) reveal that your upcoming future is altogether ASTOUNDING.**

**Realize one thing: God would never direct me to write you like this if He wasn't ALREADY TAKING MEASURES TO BLESS YOU!**

**I tried to make sure that you had this MIRACULOUS ANOINTED OIL in your hands…Steps one through three involve putting the miraculous anointed oil on painful areas of the body. Step four involves putting the miraculous anointed oil on a cell phone and mailbox to facilitate the notification and receipt of money "a LARGE SUM OF MONEY sooner than you think."**

Following the promises is a strong request, almost a directive, to send a donation of $40 to $250 to "see God move with your prayer needs."

Attached at Exhibit 10 is one of several letters with similar characteristics designed to solicit donations.

The Receiver downloaded a database that purportedly contains consumer information for funds generated by direct mailing campaigns in 2018. The dates in the database begin on June 15, 2018 and end on October 12, 2018. During this time period there were 4,823 donations totaling approximately $163,000 or about an average of $40,750 per month.

The Receiver also found a copy of PUFC's QuickBooks file in the Receivership Entities' Google Suites. The Receiver reviewed PUFC's QuickBooks records (Exhibit 11), which only recorded the transactions from December 2017 to April 2018, and the total income and expenses for the same period were approximately $14,300 and $52,700, respectively. According to Ms. Walker, PUFC's QuickBooks accounting only recorded the transactions for vendor payments, and they did not record all the income received from donations.

Although the Receiver does not have sufficient information about the donation income that PUFC has collected since its inception, the personal financial information submitted by Mr. Cardiff and his wife shows that they received $2,010,000 of income from their employment from 2014 to 2018, including $1,525,000 from PUFC and $485,0000 from Redwood.

## Bank and Credit Card Merchant Processing Accounts

The Receiver has located and frozen numerous accounts in financial institutions and with credit card merchant processors. Currently, $312,942.09 is frozen in accounts with financial institutions and $248,789.07[4] is frozen in accounts with credit card merchant processors. Several financial institutions have not yet confirmed accounts subject to the TRO.

## Violations of the TRO

The Receiver filed its affidavit on non-compliance with the TRO on October 22, 2018. On October 24, 2018 this Court ordered the Cardiffs to return $8,715 to the Receiver by October 25, 2018. To date, the Cardiffs have not returned any funds to the Receiver, nor have they contacted the Receiver about returning funds.

On October 17, 2018 the Receiver was informed that a female picked up the mail at the post office box in La Verne (Exhibit 1).

On October 18, 2018 the Receiver went to the post office and showed employees pictures on Eunjung Cardiff. One employee tentatively identified Ms. Cardiff as the individual who picked up the mail the previous day. That same day, the Receiver picked up 323 envelopes that contained $5,170.72 in cash, checks, and money orders. Since the initial recovery of mail, the

---

[4] This amount may be reduced due to future credit card chargebacks initiated by consumers.

Receiver has taken possession of an additional 1,484 envelopes than contained $20,831.02 in cash, checks and money orders.

The Receiver is continuing its investigation to determine who picked up the mail in violation of the TRO.

Respectfully submitted,

    /s/

Robb Evans & Associates LLC
Receiver

# Exhibit 1

ACE ID: KN3SMQ (FACILITY MANAGER/SUPERVISOR)     BOX-SECTION:  91750 · LA VERNE   10/18/2018

**** RESTRICTED INFORMATION ****     *WebBATS*

Home | Customer | Payments | Reports | Utility | Key/Combo | Locks | Tools | Help | Exit

## Edit 1093 for Boxes/Services

The Edit 1093 for Boxes/Services page allows users to edit customer information.
For additional information, click here.

### Customer Profile

| | |
|---|---|
| Customer Number | -6063 |

Next Payment Due Date   10/31/2018

Will This Box Be Used for    ⦿ Organization/Business Use
⦾ Residential/Personal

Group E Box     NO    Fee To No Fee

Application Date    05/08/2013     Begin Date     05/08/2013

### Applicant Information

| | |
|---|---|
| Name of Organization/Business (if applicable) | MESSENGERS FOR CHRIST WORLD HE |
| Applicant First Name | DANIELLE    MI [ ] |
| Last Name | CADIZ |
| Title (Required if Business) | MANAGER |
| Country | UNITED STATES OF AMERICA |
| Address Line 1 | 250 W 1ST ST |
| Address Line 2 | STE 310 |
| Address Line 3 | |
| City | CLAREMONT |
| State/Province | California |
| ZIP/Postal Code | 91711 - [ ] |
| Telephone | [ ]  Ext. [ ] |
| Email Address | DANIELLE@OFFICEEXECS.COM |
| Box Overflow | [ ] |
| Applicant's Client Name | |

Customer Declined or No Email [ ]   or date [ ]

### Identification Verification

| | |
|---|---|
| Primary Photo ID Type | DRIVER'S LICENSE |
| Identification No | ****2720 |
| Secondary ID Type | HOME INSURANCE POLICY |
| Verification Date | 05/08/2013 |
| Last Verified By | LB |

Report Suspicious Activity

### Service Application

| | |
|---|---|
| PO Box | 370 |
| Caller | |
| Reserve | |
| Key/Combo | |
| Express Mail Reshipment | [ ] |
| Recurring Payment | NONE |

Next Payment Due Date   10/31/2018

Keys Issued    2

Federal Agency [ ]

### Additional Services

To add or cancel a service, please go to Customer > Additional Services > Add/Cancel Additional Services.

SIGNATURE ON FILE ☑           STREET ADDRESSING ☑

WebBATS - Edit 1093 for Boxes/Services - **RESTRICTED INFORMATION**

---

**STREET ADDRESSING**

| Alternate Street Address : | City: | | State: |
|---|---|---|---|
| 3355 N WHITE AVE # 370 | LA VERNE | | CA |

11-Digit Street Address Zip Code:

91750611695

---

### Additional Names

| | Individual | EUNJUNG | CARDIFF |
|---|---|---|---|
| | Individual | MARK | SCHEIB |

---

| Add Individual | | | Add Company |
|---|---|---|---|
| First [ ] | MI [ ] | Last [ ] | Company [ ] |
| First [ ] | MI [ ] | Last [ ] | Company [ ] |
| First [ ] | MI [ ] | Last [ ] | Company [ ] |
| First [ ] | MI [ ] | Last [ ] | Company [ ] |
| First [ ] | MI [ ] | Last [ ] | Company [ ] |

Save

Case 5:23-cr-00021-JGB   Document 133-1   Filed 12/02/24   Page 84 of 146   Page ID
Case 5:18-cv-02104-SJO-PLA   Document 82-1   Filed 11/01/18   Page 19 of 70   Page ID #:3211
#:5437

# Exhibit 2

# Personal Collections Renewal Policy

Prepared For: Jason Cardiff and Eunjung Cardiff

Date: 12/28/2017

Agency Name: Roger Stone Insurance Agency

Agency Phone Number: (949) 757-0270

12/28/2017

**Dear Jason Cardiff and Eunjung Cardiff,**

Thank you for your continued confidence in Nationwide® Private Client and Roger Stone Insurance Agency to service your insurance needs.

We are pleased to present you with your personalized renewal policy. We designed this policy to protect your assets and provide you peace of mind. When you acquire new possessions or your assets change, please advise your insurance agent so we can ensure your exposures are properly protected.

Crestbrook has formally transitioned to Nationwide Private Client. Nationwide, a Fortune 100 company based in Columbus, Ohio, is one of the largest and strongest diversified insurance and financial services organizations in the U.S. and is rated A+ by both A.M. Best and Standard & Poor's.

Delivering on our promise - in the event of a loss, our claims service is available 24/7, 365 days a year (855) 473-6410 or via email PrivateClient@nationwide.com.

If you have any questions about your policy or if you would like to know if you qualify for any additional credits or discounts, please contact your local agent.

We appreciate the opportunity to be your carrier of choice and will work hard to protect what is important to you.

Regards,

Jim Pedersen
President, Nationwide Private Client

**Private Client**

## Your Renewal Policy Declaration
**Personal Collections Policy**
Policy Number
Policy Period 02/11/2018  to  02/11/2019

Jason Cardiff and Eunjung Cardiff
700 W 25th St
Upland, CA 91784-1119

Roger Stone Insurance Agency, CA003125
5015 Birch St
Newport Beach, CA 92660-2162
(949) 757-0270

### General Policy Information
**Issued: 12/28/2017**
These Declarations are a part of the policy named above and identified by the policy number above. They supersede any Declarations issued earlier. Your Personal Collections Policy will provide the insurance described in this policy in return for the premium and compliance with all applicable policy provisions. See policy for details regarding additional coverages and policy coverage options. Coverage is provided where a premium or limit of liability is shown for the coverage(s) below or in the attached schedule.

**Policy Period From  02/11/2018  To  02/11/2019** but only if the required premium for this period has been paid and only for annual renewal periods if premiums are paid as required.  Each period begins and ends at 12:01 A.M. standard time at the Residence Premises.

### How You saved on this Policy with Nationwide Private Client

Protective Device Discount Applies
Modified Scheduled Rating Discount Applies

### Changes Made to Your Policy

Jewelry Item # 1: ONE LADIES 14K YELLOW GOLD AND DIAMOND RING Item Limit changed from 11,813 to 12,097
Jewelry Item # 2: ONE LADIES DIAMOND PENDANT SETTING 14 KT WHI Item Limit changed from 23,730 to 24,300
Jewelry Item # 3: ONE PAIR OF LADIES DIAMOND STUD EARRINGS WIT Item Limit changed from 34,125 to 34,944
Jewelry Item # 4: ONE LADIES DIAMOND FANCY RING CONTAINING 1 R Item Limit changed from 31,763 to 32,526
Jewelry Item # 5: ONE MENS ROADSTER SM WG/WG PAVED BEZEL WITH Item Limit changed from 32,550 to 33,332
Jewelry Item # 6: ONE LADIES HANDMADE PLATINUM DIAMOND BRACELE Item Limit changed from 46,725 to 47,847
Jewelry Item # 7: ONE MENS GTS 18KT WHITE GOLD DAYTONA ROLEX W Item Limit changed from 42,000 to 43,008
Jewelry Item # 8: 5.08CT ROUND DIAMOND I COLOR SI2 CLARITY EGL PLATINUM RING Item Limit

Underwritten by Crestbrook Insurance Company



P 1502 (01-13)
Page 1

**Private Client**

**Your Renewal Policy Declaration**
**Personal Collections Policy**
Policy Number !
Policy Period 02/11/2018  to 02/11/2019

changed from 102,076 to 104,526
Jewelry Item # 9: ONE MENS ROLEX YACHT-MASTER 18K GOLD WATCH Item Limit changed from 14,125 to 14,464
Jewelry Item # 10: ONE LADIES LOVE BRA YELLOW GOLD 4 DIA 17CM Item Limit changed from 9,819 to 10,055
Jewelry Item # 11: ONE LADIES YELLOW GOLD RING, SERIAL #UD0824 Item Limit changed from 2,284 to 2,339
Jewelry Item # 12: ONE LADIES FANCY DIAMOND BRACELET Item Limit changed from 39,375 to 40,320
Jewelry Item # 13: MEN'S ROLEX WATCH 18KT GOLD PEARLMASTER"MAST Item Limit changed from 33,180 to 33,977
Jewelry Item # 14: 1 TIFFANY PEARL BRACELET Item Limit changed from 3,166 to 3,242
Jewelry Item # 15: ONE LADIES EMERALD AND DIAMOND RING CONTAINI Item Limit changed from 24,856 to 25,453
Jewelry Item # 16: IWC PORTOFINO MOON PHASE WATCH Item Limit changed from 8,000 to 8,192
Jewelry Item # 17: PRE-OWNER LADY'S STAINLESS STEEL PATEK PHILI Item Limit changed from 8,145 to 8,341
Jewelry Item # 18: ROLEX MODEL NAME: ROLEX VINTAGE THUND Item Limit changed from 9,000 to 9,216
Jewelry Item # 19: ONE STUART MOORE "ARONADE" PLATINUM DIAMOND Item Limit changed from 12,650 to 12,954
Jewelry Item # 20: PETER PHILIPPE ANNUAL CALENDER WRISTWATCH Item Limit changed from 41,300 to 42,292
Jewelry Item # 21: 18K YG Tiffany Diamond Bracelet - B01764 Item Limit changed from 7,600 to 7,783
FineArts Item # 22: "LIVING ROOM" ARTIST ROMERO BRITTO MEDIUM SI Item Limit changed from 12,600 to 12,903
Jewelry Item # 27: ladies ring round center stone 8.5cts, VS2 with diamonds Item Limit changed from 532,000 to 544,768
Jewelry Item # 28: MenÔÇÕs Patek Philippe gold calendar watch model 5035J Item Limit changed from 28,500 to 29,184


**PROPERTY INSURED**

**1. Scheduled Valuable Articles**

| Personal Property Class | Total Amount Of Insurance | Blanket Per Item Max Limit | Premium |
|---|---|---|---|
| Jewelry | $1,125,160 | | $16,675.36 |
| Fine Arts with 10% Earthquake Deductible | $12,903 | | $13.41 |
| Collectibles with 10% Earthquake Deductible | $40,000 | | $180.00 |

Underwritten by Crestbrook Insurance Company

P 1502 (01-13)
Page 2



Case 5:23-cv-00021-JGB-PLA Document 131-1 Filed 12/03/24 Page 89 of 146 Page ID
Case 5:18-cv-02104-SJO-PLA Document 82-1 Filed 11/01/18 Page 23 of 70 Page ID #:3216
#:5442

**Private Client**

### Your Renewal Policy Declaration
**Personal Collections Policy**
Policy Number
Policy Period 02/11/2018  to  02/11/2019

**2. Blanket Coverage**

**Total Annual Premium:**    **$16,868.77**

**SCHEDULE OF PERSONAL PROPERTY ITEMS INSURED**

"Refer to Schedule of Valuable Articles"

---

**FORMS AND ENDORSEMENTS MADE PART OF POLICY**

G8000 01/13 Privacy statement - Crestbrook
G8021CA 02/14 Summary of Rights
G8018CA 02/14 Important Information for California Policyholders
P9003CA 02/14 California Amendatory Endorsement
G8019CA 02/14 Premium Refund Disclosure - California
P1400 01/13 Personal Collections Policy
P9012 01/13 Schedule of Valuable Articles

---

**Issued By: Nationwide Private Client**
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 8877 North Gainey Center Drive • Scottsdale, Arizona 85258
A stock company wholly owned by Nationwide Mutual Insurance Company

**How to Contact Us:**
24-Hours Claims Reporting       1-855-473-6410

Underwritten by Crestbrook Insurance Company



Crestbrook Insurance Company

P9012 (01-13)

## SCHEDULE OF VALUABLE ARTICLES

| Item Number | Property/Class | Limit of Liability | Description |
|---|---|---|---|
| 1 | Jewelry | $ 12097 | ONE LADIES 14K YELLOW GOLD AND DIAMOND RING |
| 2 | Jewelry | $ 24300 | ONE LADIES DIAMOND PENDANT SETTING 14 KT WHI |
| 3 | Jewelry | $ 34944 | ONE PAIR OF LADIES DIAMOND STUD EARRINGS WIT |
| 4 | Jewelry | $ 32526 | ONE LADIES DIAMOND FANCY RING CONTAINING 1 R |
| 5 | Jewelry | $ 33332 | ONE MENS ROADSTER SM WG/WG PAVED BEZEL WITH |
| 6 | Jewelry | $ 47847 | ONE LADIES HANDMADE PLATINUM DIAMOND BRACELE |
| 7 | Jewelry | $ 43008 | ONE MENS GTS 18KT WHITE GOLD DAYTONA ROLEX W |
| 8 | Jewelry | $ 104526 | 5.08CT ROUND DIAMOND I COLOR SI2 CLARITY EGL PLATINUM RING |
| 9 | Jewelry | $ 14464 | ONE MENS ROLEX YACHT-MASTER 18K GOLD WATCH |
| 10 | Jewelry | $ 10055 | ONE LADIES LOVE BRA YELLOW GOLD 4 DIA 17CM |
| 11 | Jewelry | $ 2339 | ONE LADIES YELLOW GOLD RING, SERIAL #UD0824 |
| 12 | Jewelry | $ 40320 | ONE LADIES FANCY DIAMOND BRACELET |
| 13 | Jewelry | $ 33977 | MEN'S ROLEX WATCH 18KT GOLD PEARLMASTER"MAST |

P9012 (01-13)

1

Crestbrook Insurance Company                                    P9012 (01-13)

# SCHEDULE OF VALUABLE ARTICLES

| Item Number | Property/Class | Limit of Liability | Description |
|---|---|---|---|
| 14 | Jewelry | $ 3242 | 1 TIFFANY PEARL BRACELET |
| 15 | Jewelry | $ 25453 | ONE LADIES EMERALD AND DIAMOND RING CONTAINI |
| 16 | Jewelry | $ 8192 | IWC PORTOFINO MOON PHASE WATCH |
| 17 | Jewelry | $ 8341 | PRE-OWNER LADY'S STAINLESS STEEL PATEK PHILI |
| 18 | Jewelry | $ 9216 | ROLEX MODEL NAME: ROLEX VINTAGE THUND |
| 19 | Jewelry | $ 12954 | ONE STUART MOORE "ARONADE" PLATINUM DIAMOND |
| 20 | Jewelry | $ 42292 | PETER PHILIPPE ANNUAL CALENDER WRISTWATCH |
| 21 | Jewelry | $ 7783 | 18K YG Tiffany Diamond Bracelet - B01764 |
| 22 | Fine Arts | $ 12903 | "LIVING ROOM" ARTIST ROMERO BRITTO MEDIUM SI |
| 25 | Collectibles | $ 20000 | Hermes Birkin Bag, size 35, Togo leather in Sienna color |
| 26 | Collectibles | $ 20000 | Hermes Togo Birkin bag size 35 in Curry |
| 27 | Jewelry | $ 544768 | ladies ring round center stone 8.5cts, VS2 with diamonds |
| 28 | Jewelry | $ 29184 | MenÔÇÖs Patek Philippe gold calendar watch model 5035J |

P9012 (01-13)

# Exhibit 3

## TABLE OF CONTENTS

| 1 | Direct Management Service | 13 | MARF DBA Clean Water for Life |
|---|---|---|---|
| | Diversified Gold Group | | Messenger for Christ UK |
| | Eco Glass | | New Era Ministries |
| 4 | Faith Time Inc. | 16 | New Income Now |
| | Fast Forward Media | | Real Deal Products |
| | First Choice Media Inc. | | Riley Aviation |
| 7 | FCM Direct Sales, Inc. | 19 | Run Away Media |
| | (a)First Choice Media DTH Inc.<br>(b) G2 Broadcasting | | Run Away Products DBA Lash 28 |
| | JCardiff Corp. | | Tyrant Management Group |
| 10 | Kelly Media Group, Inc. | 22 | Vertex Watch Inc. |
| | Kelly Product Group PTY | | Vertex Watch Ltd. UK |
| | Medical Aid Research Fund | | Ukams Aka First Choice Media Direct Sales |

# Exhibit 4

Case 5:23-cv-00021-JGB-PLA Document 131-1 Filed 12/03/24 Page 95 of 146 Page ID
Case 5:18-cv-02104-SJO-PLA Document 32 Filed 11/02/18 Page 29 of 70 Page ID #:3222
#:5448

Page 1 of 3

**Redwood Scientific Technologies Inc.**
**Profit & Loss**
All Transactions
Downloaded from its QuickBooks Accounting File

| | 2015 | 2016 | 2017 | 1/1/2018~ 10/12/2018 | TOTAL |
|---|---|---|---|---|---|
| **Income** | | | | | |
| Sales | 4,578,794.44 | 5,400,000.72 | 297,000.81 | 32,297.48 | 10,308,093.45 |
| Sales Limelight | 0.00 | 0.00 | 6,892,212.81 | 965,507.06 | 7,857,719.87 |
| Sales Retail | 0.00 | 73,626.60 | 1,154,725.15 | 101,933.54 | 1,330,285.29 |
| Sales - Shipping and Handling | 0.00 | 0.00 | 58,406.91 | 8,106.74 | 66,513.65 |
| 47930 - Sales - Amazon | 0.00 | 0.00 | 0.00 | 33,377.38 | 33,377.38 |
| Misc Income | 336.21 | 0.00 | 0.00 | 1,075.75 | 1,411.96 |
| Uncategorized Income | 0.00 | 0.00 | 0.00 | 203.84 | 203.84 |
| Sales Refund & Allowances | 0.00 | (20,896.32) | (691,767.85) | (45,054.26) | (757,718.43) |
| Sales - Returns | (240,352.77) | (167,474.32) | 0.00 | 0.00 | (407,827.09) |
| Void/Refund Revenue | 0.00 | (28,343.00) | 0.00 | (189,817.47) | (218,160.47) |
| **Total Income** | 4,338,777.88 | 5,256,913.68 | 7,710,577.83 | 907,630.06 | 18,213,899.45 |
| | | | | | |
| **Cost of Goods Sold** | | | | | |
| Cost of Goods Sold | 350,004.52 | 628,952.09 | 521,617.11 | 87,708.88 | 1,588,282.60 |
| Merchant Account Fees & Exp | 296,099.93 | 469,324.15 | 157,388.94 | 129,606.55 | 1,052,419.57 |
| Freight and Shipping Costs | 219,441.26 | 163,182.18 | 45,958.92 | 3,253.56 | 431,835.92 |
| Printing & Reproduction | 38,967.11 | 17,674.87 | 26,905.37 | 507.53 | 84,054.88 |
| US Customs & Border Protection | 0.00 | 22,370.00 | 500.00 | 0.00 | 22,870.00 |
| Product Samples Expense | 1,034.29 | 0.00 | 0.00 | 0.00 | 1,034.29 |
| **Total COGS** | 905,547.11 | 1,301,503.29 | 752,370.34 | 221,076.52 | 3,180,497.26 |
| | | | | | |
| **Gross Profit** | 3,433,230.77 | 3,955,410.39 | 6,958,207.49 | 686,553.54 | 15,033,402.19 |
| | | | | | |
| **Expense** | | | | | |
| Media Exp | 4,184,253.55 | 1,427,083.08 | 2,944,391.16 | 1,641,061.87 | 10,196,789.66 |
| Payroll Wages and Salaries | 632,783.93 | 831,085.63 | 1,012,333.87 | 339,325.54 | 2,815,528.97 |
| Advertising and Promotion | 579,254.68 | 1,045,893.95 | 899,192.92 | 19,996.53 | 2,544,338.08 |
| Professional Fees | 139,115.63 | 148,274.28 | 208,160.85 | 127,469.79 | 623,020.55 |
| Rent Expense | 150,158.09 | 102,835.71 | 116,180.14 | 82,341.43 | 451,515.37 |

**Redwood Scientific Technologies Inc.**
**Profit & Loss**
All Transactions
Downloaded from its QuickBooks Accounting File

| | 2015 | 2016 | 2017 | 1/1/2018~ 10/12/2018 | TOTAL |
|---|---|---|---|---|---|
| Payroll Taxes | 132,641.91 | 61,834.87 | 194,694.25 | 34,126.45 | 423,297.48 |
| Legal Fees | 115,491.00 | 135,632.01 | 119,548.06 | 10,000.00 | 380,671.07 |
| Computer and Software Expense | 107,027.99 | 77,942.48 | 141,818.13 | 39,656.32 | 366,444.92 |
| Fulfillment Expense | 283,388.68 | 49,807.65 | 4,427.20 | 1,960.59 | 339,584.12 |
| Outside Services | 99,567.12 | 81,835.68 | 101,960.93 | 891.56 | 284,255.29 |
| Automobile Expense | 53,851.92 | 62,531.25 | 90,530.85 | 61,892.98 | 268,807.00 |
| Telephone Expense | 85,290.47 | 69,468.60 | 77,758.40 | 16,035.75 | 248,553.22 |
| Travel Expense | 122,964.11 | 65,207.80 | 55,052.13 | 2,919.22 | 246,143.26 |
| Postage and Delivery | 31.98 | 2,578.74 | 170,667.91 | 10,677.25 | 183,955.88 |
| Employee Benefits | 46,158.02 | 27,323.48 | 51,504.74 | 29,859.56 | 154,845.80 |
| Insurance Expense | 48,803.64 | 77,890.74 | 16,227.71 | 7,566.26 | 150,488.35 |
| Marketing | 0.00 | 916.61 | 121,934.67 | 27,395.25 | 150,246.53 |
| Shipping | 39.22 | 6,629.67 | 86,191.93 | 39,500.43 | 132,361.25 |
| Office Expense | 0.00 | 9,236.44 | 60,791.29 | 24,004.57 | 94,032.30 |
| Shipping Supplies | 9,357.88 | 24,468.47 | 46,763.61 | 4,797.48 | 85,387.44 |
| Repairs and Maintenance | 215.00 | 36,996.91 | 32,842.17 | 3,581.00 | 73,635.08 |
| Bank Service Charges | 10,276.11 | 7,645.04 | 37,630.92 | 8,921.74 | 64,473.81 |
| Office Supplies | 20,627.03 | 27,972.55 | 10,504.56 | 5,040.70 | 64,144.84 |
| Miscellaneous | 0.00 | 42,555.62 | 20,458.85 | 0.00 | 63,014.47 |
| Interest Expense | 0.00 | 14,293.56 | 41,819.23 | 0.00 | 56,112.79 |
| Dues and Subscriptions | 16,215.57 | 13,675.88 | 15,742.76 | 736.72 | 46,370.93 |
| Meals and Entertainment | 21,506.27 | 11,509.30 | 8,230.07 | 655.29 | 41,900.93 |
| Commission Expense | 4,841.35 | (34.08) | 0.00 | 28,591.34 | 33,398.61 |
| Printing and Reproduction | 3,207.02 | 5,189.39 | 9,317.73 | 4,379.65 | 22,093.79 |
| Utilities | 4,000.68 | 6,715.36 | 8,322.92 | 2,780.91 | 21,819.87 |
| Web Services | 0.00 | 8,458.82 | 12,841.16 | 0.00 | 21,299.98 |
| Business License & Permits | 8,967.78 | 4,161.85 | 7,609.95 | 349.59 | 21,089.17 |
| Consulting | 0.00 | 0.00 | 5,602.00 | 4,060.00 | 9,662.00 |
| Training | 8,808.00 | 0.00 | 0.00 | 0.00 | 8,808.00 |
| Product Liability | 741.44 | 1,976.37 | 3,273.95 | 580.95 | 6,572.71 |

**Redwood Scientific Technologies Inc.**
**Profit & Loss**
All Transactions
Downloaded from its QuickBooks Accounting File

| | 2015 | 2016 | 2017 | 1/1/2018~ 10/12/2018 | TOTAL |
|---|---|---|---|---|---|
| Reimbursable | 2,178.04 | 59.61 | 3,502.46 | 152.73 | 5,892.84 |
| Service Fees | 0.00 | 0.00 | 3,660.74 | 1,500.00 | 5,160.74 |
| Franchise Tax | 3,642.31 | 0.00 | 0.00 | 0.00 | 3,642.31 |
| FINANCE CHARGE | 0.00 | 0.00 | 2,500.00 | 0.00 | 2,500.00 |
| Donation | 1,512.00 | 165.00 | 337.52 | 0.00 | 2,014.52 |
| Human Resource - Hiring | 0.00 | 0.00 | 573.85 | 995.00 | 1,568.85 |
| Federal Income Tax | 0.00 | 0.00 | 0.00 | 1,082.12 | 1,082.12 |
| **Total Expense** | 6,896,918.42 | 4,489,818.32 | 6,744,901.59 | 2,584,886.57 | 20,716,524.90 |
| | | | | | |
| **Other Income/Expense** | | | | | |
| **Other Expense** | | | | | |
| Loss on Settlement of Lawsuit | 0.00 | 432,789.21 | 0.00 | 0.00 | 432,789.21 |
| Ask My Accountant | 0.00 | 0.00 | (25,000.00) | 337,211.74 | 312,211.74 |
| Bad Debt | 47,786.00 | 10,289.46 | 0.00 | 0.00 | 58,075.46 |
| Prov(Benefit)for Taxes Deferred | 0.00 | 36,836.98 | 0.00 | 0.00 | 36,836.98 |
| Discounts Allowed | 0.00 | 108.50 | 0.00 | 0.00 | 108.50 |
| Income Tax Expense - Federal | (131,255.00) | 0.00 | 700.00 | 0.00 | (130,555.00) |
| Income Tax Expense - State | (34,172.00) | 0.00 | 0.00 | 0.00 | (34,172.00) |
| **Total Other Expense** | (117,641.00) | 480,024.15 | (24,300.00) | 337,211.74 | 675,294.89 |
| | | | | | |
| **Net Other Income** | 117,641.00 | (480,024.15) | 24,300.00 | (337,211.74) | (675,294.89) |
| | | | | | |
| **Net Income** | (3,346,046.65) | (1,014,432.08) | 237,605.90 | (2,235,544.77) | (6,358,417.60) |

# Exhibit 5

**Redwood Scientific Technologies Inc.**

## Balance Sheet
**All Transactions**
**Downloaded from its QuickBooks Accounting File**

|  | Dec 31, 14 | Dec 31, 15 | Dec 31, 16 | Dec 31, 17 | Oct 12, 18 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| **Checking/Savings** | | | | | |
| AMI Citibank 2531 | 1,990.49 | 24,755.10 | 10,665.65 | 929.18 | 241.48 |
| AMI HSBC-4731-6 | 24.74 | 0.00 | 0.00 | 0.00 | 0.00 |
| BOFA  AM Nutra Partner - 5185 | 269.34 | 0.00 | 0.00 | 0.00 | (3,098.50) |
| Checking - 43P | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Checking_47 | 0.00 | 0.00 | 0.00 | 105,000.59 | 140,831.64 |
| Checking_54 | 0.00 | 0.00 | 0.00 | (21,735.89) | (115,801.28) |
| Checking_62 | 0.00 | 0.00 | 0.00 | 8,518.68 | (248.08) |
| Checking_70 | 0.00 | 0.00 | 0.00 | 118.80 | (101,249.70) |
| Checking_94 | 0.00 | 0.00 | 0.00 | 19,523.62 | (2,975.38) |
| Citibank- 0178 | 0.00 | 0.00 | 1,285.86 | 0.00 | 0.00 |
| Citibank- 7471 | 0.00 | 0.00 | 1,539.59 | 805.27 | 805.27 |
| Citibank  AM Nutra P LLC - 4409 | 29.41 | 40,104.27 | 4,675.59 | 0.00 | 0.00 |
| Citibank Cking RSTI-7294 | 0.00 | (20,249.72) | 0.00 | 0.00 | 0.00 |
| Citibank Expo Supplements-4227 | (221.68) | 0.00 | 0.00 | 0.00 | 0.00 |
| Citibank Expo Supplements-8977 | (20.00) | 0.00 | 0.00 | 0.00 | 0.00 |
| Citibank Healthy Way Expr-2059 | 0.00 | 1,391.00 | 1,016.00 | 0.00 | 0.00 |
| Citibank Nature's Fut  LLC-1770 | 2.55 | 27,120.85 | 2,847.64 | 0.00 | 0.00 |
| Citibank OWL -1996 | 3.75 | 0.00 | 0.00 | 0.00 | 0.00 |
| Citibank RST - Smoke Shop 4048 | 0.00 | 0.00 | 606.33 | 0.00 | 0.00 |
| Citibank RSTI-3081  -Closed | 0.00 | 390,209.40 | 6,602.68 | 0.00 | 0.00 |
| Citibank RSTI-5409 | 0.00 | 130,113.22 | 37,813.95 | 0.00 | 0.00 |
| Citibank Top Hill Shop Ltd-2778 | 0.00 | 1,894.39 | 96,826.10 | (20.00) | (20.00) |
| National Bank of CaI  AMI-6346 | 939.51 | 2,013.66 | 0.00 | 0.00 | 0.00 |
| National Bank of Cal NF-6478 | 0.00 | 1,756.80 | 0.00 | 0.00 | 0.00 |
| TV Sales LLC | 0.00 | 0.00 | 0.00 | 0.00 | (32,210.03) |
| **Total Checking/Savings** | 3,018.11 | 599,108.97 | 163,879.39 | 113,140.25 | (113,724.58) |
| **Accounts Receivable** | | | | | |
| **Accounts Receivable** | | | | | |
| Provision for doubtful accounts | 0.00 | (9,886.00) | (20,175.46) | 0.00 | 0.00 |
| Accounts Receivable - Other | 0.00 | 29,150.32 | 96,686.25 | 54,735.42 | 54,734.62 |
| **Total Accounts Receivable** | 0.00 | 19,264.32 | 76,510.79 | 54,735.42 | 54,734.62 |
| AR Limelight | 0.00 | 392,618.29 | 849,091.48 | 1,366,475.86 | 1,199,705.49 |
| **Total Accounts Receivable** | 0.00 | 411,882.61 | 925,602.27 | 1,421,211.28 | 1,254,440.11 |
| **Other Current Assets** | | | | | |
| Due to/from People United for C | 0.00 | 0.00 | 0.00 | 0.00 | (11,183.96) |
| Intercompany Runaway | 0.00 | 426,897.37 | 620,463.83 | 920,615.36 | 921,104.54 |
| Inventory  Asset | 30,960.15 | 67,081.36 | 2,564.48 | 41,690.77 | 41,690.77 |
| Inventory Asset | 0.00 | 0.00 | 0.00 | 1,733.40 | 761.40 |
| Prepaid Expense - Other | 16,857.54 | 1,500.00 | 0.00 | 0.00 | 0.00 |
| Prepaid Rent | 0.00 | 5,762.84 | 21,330.93 | 31,937.18 | 31,937.18 |
| Prior Company Receivables (dele | 42,627.60 | 0.00 | 0.00 | 0.00 | 0.00 |
| Retention Receivable | 357,086.20 | 438,765.92 | 366,057.00 | 330,983.65 | 293,077.89 |

Redwood Scientific Technologies Inc.

## Balance Sheet
### All Transactions
Downloaded from its QuickBooks Accounting File

| | Dec 31, 14 | Dec 31, 15 | Dec 31, 16 | Dec 31, 17 | Oct 12, 18 |
|---|---|---|---|---|---|
| Uncategorized Asset | 0.00 | 0.00 | 0.00 | 0.00 | 18,095.95 |
| Undeposited Funds | 0.00 | 0.00 | 7,706.24 | 7,706.24 | 7,706.24 |
| Total Other Current Assets | 447,531.49 | 940,007.49 | 1,018,122.48 | 1,334,666.60 | 1,303,190.01 |
| | | | | | |
| Total Current Assets | 450,549.60 | 1,950,999.07 | 2,107,604.14 | 2,869,018.13 | 2,443,905.54 |
| | | | | | |
| Fixed Assets | | | | | |
| Furniture and Equipment | 0.00 | 0.00 | 0.00 | 13,781.65 | 13,781.65 |
| Total Fixed Assets | 0.00 | 0.00 | 0.00 | 13,781.65 | 13,781.65 |
| | | | | | |
| TOTAL ASSETS | 450,549.60 | 1,950,999.07 | 2,107,604.14 | 2,882,799.78 | 2,457,687.19 |
| | | | | | |
| LIABILITIES & EQUITY | | | | | |
| Liabilities | | | | | |
| Current Liabilities | | | | | |
| Accounts Payable | | | | | |
| Accounts Payable | 0.00 | 179,833.97 | 737,036.96 | 787,345.76 | 786,597.13 |
| Accrued Liability | 17,895.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Accounts Payable | 17,895.00 | 179,833.97 | 737,036.96 | 787,345.76 | 786,597.13 |
| | | | | | |
| Credit Cards | | | | | |
| Credit Cards | | | | | |
| American Express | 31,289.00 | 21,974.14 | 0.00 | 4,343.90 | (322,245.32) |
| AMEX 0-52006 (0-53004) | 0.00 | 0.00 | 23,509.47 | 41,228.92 | 77,196.85 |
| AMEX 0-88009 | 0.00 | 0.00 | 24.99 | 264.99 | 579.96 |
| AMEX 4-06008 | 0.00 | 0.00 | 238.75 | 247.01 | 148.01 |
| AMEX 4-36004 | 0.00 | 0.00 | 3,242.65 | 6,237.71 | 80,510.74 |
| AMEX 6-35003 | 0.00 | 0.00 | 2,053.79 | (970.02) | (970.02) |
| Amex 9-67002 (9-68000) | 0.00 | 0.00 | (8,755.60) | 113,428.80 | 147,359.42 |
| Credit Cards - Other | 0.00 | 0.00 | 0.00 | (85,927.37) | 1,314,072.63 |
| Total Credit Cards | 31,289.00 | 21,974.14 | 20,314.05 | 78,853.94 | 1,296,652.27 |
| | | | | | |
| Total Credit Cards | 31,289.00 | 21,974.14 | 20,314.05 | 78,853.94 | 1,296,652.27 |
| | | | | | |
| Other Current Liabilities | | | | | |
| 23003 - S-T Loan - Vernon Capi | 0.00 | 0.00 | 0.00 | 135,919.20 | 22,555.47 |
| 23004 - S-T Loan - Argus Capita | 0.00 | 0.00 | 0.00 | 0.00 | (138,139.99) |
| 23006 - S-T Loan - APP GROUP IN | 0.00 | 0.00 | 0.00 | 0.00 | 110,225.79 |
| 23007 - S-T Loan - ACE Funding | 0.00 | 0.00 | 0.00 | 0.00 | 44,225.00 |
| 23008 - S-T Loan from ORG CAPIT | 0.00 | 0.00 | 0.00 | 0.00 | 2,491.45 |
| 23009 - S-T Loan - LEGAL AND CO | 0.00 | 0.00 | 0.00 | 0.00 | 223,250.00 |
| Accrued Advertising | 0.00 | 1,234,421.58 | 617,210.79 | 617,210.79 | 617,210.79 |
| Accrued Expenses | 0.00 | 156,959.50 | 156,959.50 | 156,959.50 | 156,959.50 |
| Due to Shareholder | 0.00 | 189,235.06 | 237,828.02 | 279,458.21 | 279,323.21 |
| Due to Shareholder - Carlos Pla | 0.00 | 0.00 | 0.00 | (2,200.00) | 341,300.00 |
| Income Tax Payable | 165,427.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Loan from Highcrest | | | | | (10,250.00) |

**Redwood Scientific Technologies Inc.**
## Balance Sheet
**All Transactions**
Downloaded from its QuickBooks Accounting File

| | Dec 31, 14 | Dec 31, 15 | Dec 31, 16 | Dec 31, 17 | Oct 12, 18 |
|---|---|---|---|---|---|
| Los Angeles County - Long Beach | 0.00 | 0.00 | 0.00 | 0.00 | 365.10 |
| N/P-Redwood Scientific NV Corp | 12,500.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Note Payable (Advertising) | 0.00 | 0.00 | 1,016,174.79 | 845,680.02 | 845,680.02 |
| Payroll Liabilities | 0.00 | 130,000.00 | 227,500.00 | 227,500.00 | 227,500.00 |
| Sales Tax Payable | 0.00 | 0.00 | 4,118.72 | 7,531.09 | 631.09 |
| San Bernardino County - S B  Ci | 0.00 | 0.00 | 36.92 | 0.00 | 0.00 |
| Santa Clara County - Big Basin | 0.00 | 0.00 | 0.00 | 0.00 | (0.10) |
| Short Term Loan from Knight Cap | 0.00 | 0.00 | 0.00 | 99,332.10 | 35,286.76 |
| Total Other Current Liabilities | 177,927.00 | 1,710,616.14 | 2,259,828.74 | 2,367,390.91 | 2,758,614.09 |
| | | | | | |
| Total Current Liabilities | 227,111.00 | 1,912,424.25 | 3,017,179.75 | 3,233,590.61 | 4,841,863.49 |
| | | | | | |
| Long Term Liabilities | | | | | |
| N/P-Eunjung | 1,048.00 | 1,048.00 | 1,048.00 | 1,048.00 | 1,048.00 |
| Warrant Liability | 0.00 | 224,968.00 | 224,968.00 | 222,718.00 | 222,347.30 |
| Total Long Term Liabilities | 1,048.00 | 226,016.00 | 226,016.00 | 223,766.00 | 223,395.30 |
| | | | | | |
| Total Liabilities | 228,159.00 | 2,138,440.25 | 3,243,195.75 | 3,457,356.61 | 5,065,258.79 |
| | | | | | |
| Equity | | | | | |
| Additional paid-in Capital | 50,000.00 | (227,792.78) | (227,792.78) | 71,577.22 | 274,107.22 |
| Additional Paid-in Capital BCF | 0.00 | (363,698.00) | (363,698.00) | (363,698.00) | (363,698.00) |
| Common Stock $0.01 par value | 0.00 | 5,034,507.78 | 5,131,707.78 | 5,153,337.78 | 5,153,337.78 |
| Member Contribution | 207,073.00 | 207,073.00 | 207,073.00 | 207,073.00 | 207,073.00 |
| Opening Balance Equity | 0.00 | 0.00 | (30,918.35) | (28,489.47) | (28,489.47) |
| Owners/Members Draw | (248,457.00) | (248,457.00) | (248,457.00) | (248,457.00) | (248,457.00) |
| Retained Earnings | 213,774.60 | (1,243,027.53) | (4,589,074.18) | (5,603,506.26) | (5,365,900.36) |
| Net Income | 0.00 | (3,346,046.65) | (1,014,432.08) | 237,605.90 | (2,235,544.77) |
| Total Equity | 222,390.60 | (187,441.18) | (1,135,591.61) | (574,556.83) | (2,607,571.60) |
| | | | | | |
| **TOTAL LIABILITIES & EQUITY** | **450,549.60** | **1,950,999.07** | **2,107,604.14** | **2,882,799.78** | **2,457,687.19** |

# Exhibit 6

# SUBSCRIPTION ESCROW AGREEMENT

This Subscription Escrow Agreement (this "Agreement") is entered into and effective as of June 8th, by and among **Redwood Scientific Technologies, Inc.**, a Nevada corporation (the "Company") and **SUNTRUST BANK**, a Georgia banking corporation (the "Escrow Agent") and **Newport Coast Securities, Inc.**, a New York corporation (the "Banker"),

## WITNESSETH:

**WHEREAS, the** Company proposes to offer for sale (the "Offering") a maximum of (2,222,222) units of securities, (the "Units"),at a subscription price of $2.25 per Unit ("Unit Price") with each unit consisting of 1 share of Common Stock at $.0.01 par value per share (the "Common Stock") and a warrant ("Warrants") to purchase the number of shares of Common Stock equal to 50% of the number of Common Stock underlying the Investors Unit ("Warrant Shares") at an exercise price of $2.75 per share ("Exercise Price"), payable in cash pursuant to subscription agreements ("Subscription Agreements") for an aggregate maximum offering price of $5,000,000[1] (the "Maximum Offering"); and

**WHEREAS,** the Shares are proposed to be offered for sale to investors (the "Subscribers") by participating broker-dealers pursuant to an exemption from registration under the Securities Act of 1933, as amended, and pursuant to exemptions from registration under certain state securities laws;

**WHEREAS,** the Offering shall terminate by the earlier to occur of (a) receipt of the Maximum Offering (subject to increase to cover over-allotments, if any) or (b) September 30, 2015 (the "Initial Termination Date"), unless otherwise extended for thirty (30) days by the mutual agreement of the Company and the Banker;

**WHEREAS,** the Company may hold multiple closings between the date of this Agreement and the Closing Date (as hereinafter defined) to raise the Maximum Offering (each a "Closing" and collectively, the "Closings");

**NOW THEREFORE,** in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Company and the Escrow Agent agree as follows:

1.      <u>Deposits in Escrow.</u>

      (a)    The Subscribers shall deposit or cause to be deposited with the Escrow Agent, to be held in escrow under the terms of this Agreement, all proceeds received from the sale of the Shares to the Subscribers (the "Subscription Proceeds"). The Escrow Agent shall have no responsibility for Subscription Proceeds until such proceeds are actually received, clear through normal banking channels and constitute collected funds. The Escrow Agent shall have no duty to collect or seek to compel payment of any Subscription Proceeds, except to place such proceeds or instruments representing such proceeds for deposit and payment through customary banking channels. Checks for Subscription Proceeds furnished by Subscribers shall be made payable to: **SunTrust Bank, as Escrow Agent for Redwood Scientific Technologies, Inc.**

      (b)    The Company or the Banker shall deliver to the Escrow Agent, in a form acceptable to the Escrow Agent, schedules disclosing the name and address of each of the Subscribers, the number of Shares subscribed for by each Subscriber, the Federal tax identification number of each of the Subscribers, the amount of Subscription Proceeds received from each Subscriber, and such other information as will enable the Escrow Agent to attribute to a particular Subscriber all Subscription Proceeds received by the Escrow Agent.

---

[1] The Company may accept additional subscriptions for up to 222,22 Units ($500,000) for over-allotments.

{HTW00021393: 3}
SunTrust Bank Escrow Services Subscription Escrow 1.2015

1

2.   Rejection of Subscription Agreement.

(a)   Any Subscription Agreement may be rejected by the Company in whole or in part. The Company shall promptly notify the Escrow Agent in writing in the event of any such rejection. Upon the receipt of a written notice of rejection from the Company pertaining to any Subscription Agreement, the Escrow Agent shall return to the Subscriber whose name appears on the rejected Subscription Agreement the Subscription Agreement (if then in the Escrow Agent's possession) and the Subscription Proceeds tendered by such Subscriber, without payment of interest; provided such Subscriber's Subscription Proceeds constitute collected funds held by the Escrow Agent.

(b)   In the event the Escrow Agent receives written notice from the Company that a Subscription Agreement has been withdrawn by a Subscriber, the Escrow Agent shall return to such Subscriber whose name appears on the withdrawn Subscription Agreement the Subscription Agreement (if then in the Escrow Agent's possession) and the Subscription Proceeds tendered by such Subscriber, without payment of interest; provided such Subscriber's Subscription Proceeds constitute collected funds held by the Escrow Agent.

3.   Disbursements.

(a)   If prior to 3:00 P.M. Eastern time on the Initial Termination Date, the Escrow Agent receives written notice, in the form of Exhibit C attached hereto and made a part hereof ("Extension Notice"), and signed by the Company and the Banker stating that the Initial Termination Date has been extended for up to another 30 days (such 30th day being referred to as the "Extension Date"), then the Initial Termination Date shall be extended to the date set forth in the Extension Notice. The term "Final Closing Date" means the latest possible date included in the last Extension Notice received by the Escrow Agent, or the Initial Termination Date if an Extension Notice is not received.

(b)
(c)   At any such time on or before the Final Closing Date, the Escrow Agent has received written notice signed by the Company and the Banker that a Closing shall take place, the Escrow Agent shall disburse all Subscription Proceeds then held by the Escrow Agent and any earnings thereon to the account of the Company, unless otherwise directed as per written directions signed by the Company and the Banker to the Escrow Agent.

(d)   Following the earlier of: (i) receipt and disbursement of the Maximum Offering, (ii) written notice from the Company and the Banker that the Offering has terminated, or (iii) the Final Closing Date, this Agreement (except as otherwise provided herein) shall terminate.

(c)   If, the Escrow Agent has not received an Extension Notice by the Initial Termination Date, then the Escrow Agent shall release all funds received to the Company. Upon disbursement of all of the Subscription Proceeds and earnings thereon held by the Escrow Agent as provided in this Section 3(b), this Agreement (except as otherwise provided herein) shall terminate.

(d)   The Company shall provide a copy of this Agreement to each Subscriber.

4.   Investment of Subscription Proceeds; Compensation of Escrow Agent.

(a)   All funds received by the Escrow Agent shall be held only in non-interest bearing bank accounts at Suntrust Bank.

(b)   On or before the execution and delivery of this Agreement, the Company shall provide to the Escrow Agent a completed Form W-9 or Form W-8, whichever is appropriate. Notwithstanding anything to the contrary herein provided, except for the delivery of Form 1099's, the Escrow Agent shall have no duty to prepare or file any Federal or state tax report or return with respect to any funds held pursuant to this Agreement or any income earned thereon. The Company shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Subscription Proceeds or any earnings or interest thereon unless such tax, late payment, interest, penalty or other cost or expense was finally adjudicated by a court of competent jurisdiction to have been directly caused by the gross negligence of wilful misconduct of the Escrow Agent. The indemnification provided in this section is in addition to the indemnification provided in other sections of this Agreement and shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement

(c)     The Company agrees to pay to the Escrow Agent compensation, and to reimburse the Escrow Agent for costs and expenses, all in accordance with the provisions of Exhibit B hereto, which is incorporated herein by reference and made a part hereof. The fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Agreement; provided, however, that in the event that the conditions for the disbursement of funds are not fulfilled, or the Escrow Agent renders any service not contemplated in this Agreement, or there is any assignment of interest in the subject matter of this Agreement or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Agreement or the subject matter hereof, then the Company shall compensate the Escrow Agent for such extraordinary services and reimburse the Escrow Agent for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event. To the extent permitted by applicable law, the Escrow Agent shall have, and is hereby granted, a prior lien upon and first priority security interest in the Subscription Proceeds held hereunder (and the earnings and interest accrued thereon) with respect to its unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights, superior to the interests of any other persons or entities and without judicial action to foreclose such lien and security interest, and the Escrow Agent shall have and is hereby granted the right to set off and deduct any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from the Subscription Proceeds held hereunder (and the earnings and interest accrued thereon). The provisions of this section shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

5.     Duties of Escrow Agent; Indemnification.

(a)     This Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent hereto, which duties shall be deemed purely ministerial in nature, and no implied duties or obligations shall be read into this Agreement against the Escrow Agent. The Escrow Agent shall in no event be deemed to be a fiduciary to the Company, the Subscribers, or any other person or entity under this Agreement.  The permissive rights of the Escrow Agent to do things enumerated in this Agreement shall not be construed as duties. In performing its duties under this Agreement, or upon the claimed failure to perform its duties, the Escrow Agent shall not be liable for any damages, losses or expenses other than damages, losses or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the Escrow Agent's willful misconduct or gross negligence. In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The Escrow Agent shall have no liability with respect to the the Company to perform in accordance with this Agreement. The Escrow Agent shall have no liability with respect to the transfer or distribution of any funds affected by the Escrow Agent pursuant to wiring or transfer instructions provided to the Escrow Agent in accordance with the provisions of this Agreement. The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with this Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.

(b)     No provision of this Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Agreement.

(c)     This Agreement constitutes the entire agreement between the Escrow Agent, the Company and the Banker in connection with the subject matter of this Agreement, and no other agreement entered into by the Company related to the subject matter of this Agreement, including, without limitation, the Subscription Agreements, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be deposited with the Escrow Agent or the Escrow Agent may have knowledge thereof.

(d)     The Escrow Agent shall in no way be responsible for nor shall it be its duty to notify the Company or any other person or entity interested in this Agreement of any payment required or maturity occurring under this Agreement or under the terms of any instrument deposited herewith unless such notice is explicitly provided for in this Agreement.

(e)     The Escrow Agent shall be protected in acting upon any written instruction, notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which the Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, items directing investment or non-investment of funds, items requesting or authorizing release, disbursement or retainage of the subject matter of  this Agreement and Items amending the terms of this Agreement. The Escrow Agent shall be under no duty or obligation to inquire into or investigate the validity, accuracy or content of any such notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document. The Escrow Agent shall have no duty or obligation to make any formulaic calculations of any kind hereunder.

(f)     The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. The Escrow Agent shall be entitled to seek the advice of legal counsel with respect to any matter arising under this Agreement and the Escrow Agent shall have no liability and shall be fully protected with respect to any action taken or omitted pursuant to the advice of such legal counsel. The Company shall be liable for, and shall promptly pay, upon demand by the Escrow Agent, the reasonable and documented fees and expenses of any such legal counsel.

(g)     The Company represents and warrants to the Escrow Agent that there is no security interest in the Subscription Proceeds or the earnings thereon or any part of the Subscription Proceeds or such earnings; no financing statement under the Uniform Commercial Code of any jurisdiction is on file in any jurisdiction claiming a security interest in or describing, whether specifically or generally, the Subscription Proceeds or the earnings thereon or any part of the Subscription Proceeds or such earnings; and the Escrow Agent shall have no responsibility at any time to ascertain whether or not any security interest exists in the Subscription Proceeds or the earnings thereon or any part of the Subscription Proceeds or such earnings or to file any financing statement under the Uniform Commercial Code of any jurisdiction with respect to the Subscription Proceeds, the earnings thereon or any part thereof.

(h)     In the event of any disagreement resulting in adverse claims or demands being made in connection with the matters covered by this Agreement, or in the event that the Escrow Agent, in good faith, is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to the Company, any Subscriber or any other person or entity for its failure or refusal to act, and the Escrow Agent shall be entitled to continue to refrain from acting until (i) the rights of the Company, the Subscribers and all other interested persons and entities shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjudged and all doubt resolved by agreement among the Company and all other interested persons and entities, and the Escrow Agent shall have been notified thereof in writing signed by the Company and all such persons and entities. Notwithstanding the preceding, the Escrow Agent may in its discretion obey the order, judgment, decree or levy of any court, whether with or without jurisdiction, or of an agency of the United States or any political subdivision thereof, or of any agency of any State of the United States or of any political subdivision of any thereof, and the Escrow Agent is hereby authorized in its sole discretion to comply with and obey any such orders, judgments, decrees or levies. The rights of the Escrow Agent under this sub-paragraph are cumulative of all other rights which it may have by law or otherwise.

In the event of any disagreement or doubt, as described above, the Escrow Agent shall have the right, in addition to the rights described above and at the election of the Escrow Agent, to tender into the registry or custody of any court having jurisdiction, all funds and property held under this Agreement, and the Escrow Agent shall have the right to take such other legal action as may be appropriate or necessary, in the sole discretion of the Escrow Agent. Upon such tender, the Escrow Agent shall be discharged from all further duties under this Agreement; provided, however, that any such action of the Escrow Agent shall not deprive the Escrow Agent of its compensation and right to reimbursement of expenses hereunder arising prior to such action and discharge of the Escrow Agent of its duties hereunder.

(i)     The Escrow Agent may resign at any time from its obligations under this Agreement by providing written notice to the Company. Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been furnished. In such event, the Company shall promptly appoint a successor escrow agent. In the event no successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Agreement; provided, however, that any such action of the Escrow Agent shall not deprive the Escrow Agent of its compensation and right to reimbursement of expenses hereunder arising prior to such action and discharge of the Escrow Agent of its duties hereunder. The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder.

(j)     Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business of the Escrow Agent may be transferred, shall be the Escrow Agent under this Agreement without further act.

(k)     The Company agrees to indemnify, defend and hold harmless the Escrow Agent and each of the Escrow Agent's officers, directors, agents and employees (the "Indemnified Parties") from and against any and all losses, liabilities, claims, damages, expenses and costs (including, without limitation, attorneys' fees and expenses) of every nature whatsoever (collectively, "Losses") which any such Indemnified Party may incur and which arise directly or

indirectly from this Agreement or which arise directly or indirectly by virtue of the Escrow Agent's undertaking to serve as Escrow Agent hereunder; provided, however, that no Indemnified Party shall be entitled to indemnity with respect to Losses that have been finally adjudicated by a court of competent jurisdiction to have been directly caused by such Indemnified Party's gross negligence or willful misconduct. The provisions of this section shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

(l)     The Company acknowledges that the Escrow Agent is serving as escrow agent for the limited purposes set forth herein and represents, covenants and warrants to the Escrow Agent that no statement or representation, whether oral or in writing, has been or will be made to any Subscriber to the effect that the Escrow Agent has investigated the desirability or advisability of investment in the Shares or approved, endorsed or passed upon the merits of such investment or is otherwise involved in any manner with the transactions contemplated hereby, other than as escrow agent under this Agreement. It is further agreed that the Company shall not use or permit the use of the name "SunTrust," "SunTrust Bank," "SunTrust Banks, Inc." or any variation thereof in any sales presentation, placement or offering memorandum or literature pertaining directly or indirectly to the Offering except strictly in the context of the duties of the Escrow Agent as escrow agent under this Agreement. Any breach or violation of the paragraph shall be grounds for immediate termination of this Agreement by the Escrow Agent.

(m)     The Escrow Agent shall have no duty or responsibility for determining whether the Shares or the offer and sale thereof conform to the requirements of applicable Federal or state securities laws, including but not limited to the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended. The Company represents and warrants to the Escrow Agent that the Shares and the Offering will comply in all respects with applicable Federal and state securities laws and further represents and warrants that the Company has obtained and acted upon the advice of legal counsel with respect to such compliance with applicable Federal and state securities laws. The Company acknowledges that the Escrow Agent has not participated in the preparation or review of any sales or offering material relating to the Offering or the Shares. In addition to any other indemnities provided for in this Agreement, the Company agrees to indemnify and hold harmless the Indemnified Parties from and against any and all Losses incurred by any of the Indemnified Parties which directly or indirectly arise from any violation or alleged violation of any Federal or state securities laws; provided, however, that no Indemnified Party shall have the right to be indemnified hereunder with respect to any Losses that have been finally adjudicated by a court of competent jurisdiction to have been directly caused by such Indemnified Party's gross negligence or willful misconduct. The Company hereby agrees that the indemnifications and protections afforded the Escrow Agent and the other Indemnified Parties in this section shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

(n)     The Escrow Agent and any director, officer or employee of the Escrow Agent may become pecuniarily interested in any transaction in which the Company may be interested and may contract and lend money to the Company and otherwise act as fully and freely as though it were not escrow agent under this Agreement. Nothing herein shall preclude the Escrow Agent from acting in any other capacity for the Company.

6.     Notices.

Any notice, request for consent, report, or any other communication required or permitted in this Agreement shall be in writing and shall be deemed to have been given when delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by electronic mail to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by United States mail, postage prepaid, or by certified mail, return receipt requested and postage prepaid, in each case to the appropriate address set forth below or at such other address as any party hereto may have furnished to the other parties hereto in writing:

If to Escrow Agent:

**SunTrust Bank**
**Attn: Escrow Services**

Phone #: 804-782-
Fax #: 804-225-7141
Email:     @suntrust.com

If to Company:

Redwood     Scientific     Technologies, Inc.
250     W.     First     Street.     Suite     310
Claremont, CA 91711

E-mail:_____

Tax identification #:_____

With a copy to (which shall not constitute notice):

Hunter Taubman Fischer LLC
1450 Broadway, 26th Floor
New York, NY 10018

If to the Banker:

_____

_____

_____

_____

E-mail:_____

Any party hereto may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party hereto. Notwithstanding anything to the contrary herein provided, the Escrow Agent shall not be deemed to have received any notice, request, report or other communication hereunder prior to the Escrow Agent's actual receipt thereof.

7.     Successors and Assigns; Amendment.

The rights created by this Agreement shall inure to the benefit of and the obligations created hereby shall be binding upon the successors and assigns of the Escrow Agent and the Company; provided, however, that except as provided in Section 5(j) neither this Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of the other party hereto. This Agreement may not be amended without the written consent of all parties in writing.

8.     Construction.

This Agreement shall be construed and enforced according to the laws of the State of Georgia.

9.     Severability.

If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid, illegal or unenforceable, then the remainder of this Agreement and the application thereof will nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated by this Agreement are not affected in any manner materially adverse to any party hereto. Upon such determination that any provision is invalid, illegal or unenforceable, the parties hereto agree to replace such provision with a valid, legal and enforceable provision that will achieve, to the maximum extent legally permissible, the economic, business and other purposes of such provision.

10.     Term.

This Agreement shall terminate and the Escrow Agent shall be discharged of all responsibilities hereunder at such time as the Escrow Agent shall have disbursed all Subscription Proceeds and any earnings thereon in accordance with the provisions of this Agreement; provided, however, that the provisions of Sections 4(b), 4(c), 5(k) and 5(m) hereof shall survive any termination of this Agreement and any resignation or removal of the Escrow Agent.

11.     Counterparts.

This Agreement may be executed in separate facsimile or other electronic counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

12.   Authorized Signatures.   Contemporaneously with the execution and delivery of this Agreement and, if necessary, from time to time thereafter, the Company shall execute and deliver to the Escrow Agent a Certificate of Incumbency substantially in the form of Exhibit A hereto (a "Certificate of Incumbency") for the purpose of establishing the identity and authority of persons entitled to issue notices, instructions or directions to the Escrow Agent on behalf of the Company.   Until such time as the Escrow Agent shall receive an amended Certificate of Incumbency replacing any Certificate of Incumbency theretofore delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on the most recent Certificate of Incumbency furnished to the Escrow Agent.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

**SunTrust Bank, as Escrow Agent**

By:_____

Title:_____

**Company:  REDWOOD SCIENTIFIC TECHNOLOGIES, INC.**

By: _Jason Cardiff_____

Title:CEO_____

**Banker: NEWPORT COAST SECURITIES, INC.**

By:_____

Title:_____

**EXHIBIT A**

**Certificate of Incumbency**
**(List of Authorized Representatives)**

Client Name:  _____

As an Authorized Officer of the above referenced entity, I hereby certify that each person listed below is an authorized signor for such entity, and that the title and signature appearing beside each name is true and correct.

| **Name** | **Title** | **Signature** | **Contact Number** |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

DATE: _____

By: _____
Name: _____
Title: _____

**EXHIBIT B**

**Schedule of Fees & Expenses**

**TO BE PROVIDED BY SUNTRUST**

**Exhibit C**
**Extension Notice**


Date: _____


**SunTrust Bank**
[ ]
Attention: [ ]


Dear Mr./Ms. [_____]:

       In accordance with the terms of paragraph 3(a) of a Subscription Escrow Agreement dated June [ ], 2015 by and among **Redwood Scientific Technologies, Inc.**, a Nevada corporation (the "Company") and **SUNTRUST BANK,** a Georgia banking corporation (the "Escrow Agent") and **Newport Coast Securities, Inc.**, a New York corporation (the "Banker"), the Company and the Banker hereby notify the Escrow Agent that the Closing Date has been extended from September 30, 2015 to [ ].


Very truly yours,

**Redwood Scientific Technologies, Inc.**


By:_____
Name: Jason Cardiff
Title: CEO


**Newport Coast Securities, Inc.**


By:_____
Name: [ ]
Title: CEO

Case 8:19-cv-01004-SJO-PLA   Document 52-1   Filed 11/01/18   Page 400 of 76   Page ID #:5466

# Exhibit 7

## DISBURSEMENT AUTHORIZATION

TO:      AUCTUS FUND, LLC ("Auctus")

FROM:    REDWOOD SCIENTIFIC TECHNOLOGIES, INC. (the "Company")

DATE:     July 18, 2018

RE:       Disbursement of Funds

In connection with the funding of an aggregate of $725,000.00 pursuant to that certain Securities Purchase Agreement dated as of July 18, 2018 (the "Agreement"), you are hereby directed to disburse such funds currently held in or being sent to escrow in the Attorney Trust Account of Legal & Compliance, LLC as directed by Auctus as follows:

1.    $362,250.00 to the Company in accordance with the wire transfer instructions attached as <u>Schedule A</u> hereto;

2.    $2,750.00 to Legal & Compliance, LLC in accordance with the wire transfer instructions attached as <u>Schedule B</u> hereto, for Auctus' legal fees;

3.    $35,000.00 to Auctus Fund Management, LLC in accordance with the wire transfer instructions attached as <u>Schedule C</u> hereto; and

4.    $325,000.00 to Auctus Fund, LLC, for the Company's benefit (to be applied to the repayment of the convertible promissory note in the original principal amount of $250,000.00 issued by the Company to Auctus on May 8, 2018), in accordance with the wire transfer instructions attached as <u>Schedule D</u> hereto.

[signature page follows]

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer as of the date first above written.

**REDWOOD SCIENTIFIC TECHNOLOGIES, INC.**

By: _____

Name: Jason Cardiff

Title: Chief Executive Officer

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed as of day and year first above written.


**THE COMPANY:**

**REDWOOD SCIENTIFIC TECHNOLOGIES, INC.**


By: _____

    Name: JASON CARDIFF

    Title: CHIEF EXECUTIVE OFFICER


**INVESTOR:**

**AUCTUS FUND, LLC**



By: _____

    Name: LOU POSNER

    Title: MANAGING DIRECTOR

Upon receipt of such funds, you may release from escrow the Note, the Purchase Agreement and the Instructions to Transfer Agent (each as defined in the Agreement).

REDWOOD SCIENTIFIC TECHNOLOGIES, INC.

By: _____

Name: Jason Cardiff

Title: Chief Executive Officer

IN WITNESS WHEREOF, this Security Agreement has been executed as of the date first set written above.

**REDWOOD SCIENTIFIC TECHNOLOGIES, INC.**

By: _____ chief Execute 8/18

Name: Jason Cardiff

Title: Chief Executive Officer


**AUCTUS FUND, LLC**

By: _____

Name: Lou Posner

Title: Managing Member

**PRIVILEGED AND CONFIDENTIAL**

The information and any accompanying documents is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this communication is not the intended recipient or the employee or agent responsible to deliver the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying or use of this communication is strictly prohibited. If you receive this communication in error, please notify me immediately by email and delete it from your computer system, destroy the original communication and its attachments without reading them or saving them to disk or otherwise. Thank you.

2

**PRIVILEGED AND CONFIDENTIAL**

The information and any accompanying documents is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this communication is not the intended recipient or the employee or agent responsible to deliver the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying or use of this communication is strictly prohibited. If you receive this communication in error, please notify me immediately by email and delete it from your computer system, destroy the original communication and its attachments without reading them or saving them to disk or otherwise. Thank you.

2

EXHIBIT A
(see attached)

## AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS

Redwood Scientific Technologies, Inc., a Delaware corporation (the "Company") issued that certain senior secured convertible promissory note to Auctus Fund, LLC (the "Holder") on July 18, 2018, in the principal amount of $725,000.00 (the "Note"). The Company hereby irrevocably authorizes the Holder to initiate debit and credit entries to its checking account indicated below (the "Account") and the depository named below (the "Depository"), to debit or credit the same to such Account, for the amounts specified in the Note until the Note is satisfied in its entirety. The Company hereby represents and certifies that the Account is used for commercial and/or business purposes only.

Depository Name: <u>Redwood Scientific Technologies, Inc.</u>

Name of Bank: <u>Zion Bank</u>

Routing/ABA Number: <u>0054</u>

Account Number: <u>4694</u>

A copy of a voided check for the Account is attached hereto as Exhibit "A". This authority is to remain in full force and effect until the Holder confirms in a signed writing that the Note has been satisfied in full, and in a manner as to afford the Depository a reasonable opportunity to act on it.

Redwood Scientific Technologies, Inc.

By: _____
Name: Jason Cardiff
Title: <u>Chief Executive Officer</u>

## AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS

Redwood Scientific Technologies, Inc., a Delaware corporation (the "Company") issued that certain senior secured convertible promissory note to Auctus Fund, LLC (the "Holder") on July 18, 2018, in the principal amount of $725,000.00 (the "Note"). The Company hereby irrevocably authorizes the Holder to initiate debit and credit entries to its checking account indicated below (the "Account") and the depository named below (the "Depository"), to debit or credit the same to such Account, for the amounts specified in the Note until the Note is satisfied in its entirety. The Company hereby represents and certifies that the Account is used for commercial and/or business purposes only.

Depository Name: <u>Redwood Scientific Technologies, Inc.</u>

Name of Bank: _____ Zion    Bank _____

Routing/ABA Number: _____ 2054 _____

Account Number: _____ 4462 _____

A copy of a voided check for the Account is attached hereto as Exhibit "A". This authority is to remain in full force and effect until the Holder confirms in a signed writing that the Note has been satisfied in full, and in a manner as to afford the Depository a reasonable opportunity to act on it.

Redwood Scientific Technologies, Inc.

By: _____
Name: Jason Cardiff
Title: Chief Executive Officer

## AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS

Redwood Scientific Technologies, Inc., a Delaware corporation (the "Company") issued that certain senior secured convertible promissory note to Auctus Fund, LLC (the "Holder") on July 18, 2018, in the principal amount of $725,000.00 (the "Note"). The Company hereby irrevocably authorizes the Holder to initiate debit and credit entries to its checking account indicated below (the "Account") and the depository named below (the "Depository"), to debit or credit the same to such Account, for the amounts specified in the Note until the Note is satisfied in its entirety. The Company hereby represents and certifies that the Account is used for commercial and/or business purposes only.

Depository Name: <u>Redwood Scientific Technologies, Inc.</u>

Name of Bank: <u>Zion Bank</u>

Routing/ABA Number: <u>0054</u>

Account Number: <u>4454</u>

A copy of a voided check for the Account is attached hereto as Exhibit "A". This authority is to remain in full force and effect until the Holder confirms in a signed writing that the Note has been satisfied in full, and in a manner as to afford the Depository a reasonable opportunity to act on it.

Redwood Scientific Technologies, Inc.

By: _____
Name: <u>Jason Cardiff</u>
Title: <u>Chief Executive Officer</u>

## AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS

Redwood Scientific Technologies, Inc., a Delaware corporation (the "Company") issued that certain senior secured convertible promissory note to Auctus Fund, LLC (the "Holder") on July 18, 2018, in the principal amount of $725,000.00 (the "Note"). The Company hereby irrevocably authorizes the Holder to initiate debit and credit entries to its checking account indicated below (the "Account") and the depository named below (the "Depository"), to debit or credit the same to such Account, for the amounts specified in the Note until the Note is satisfied in its entirety. The Company hereby represents and certifies that the Account is used for commercial and/or business purposes only.

Depository Name: <u>Redwood Scientific Technologies, Inc.</u>

Name of Bank: <u>Zion Bank</u>

Routing/ABA Number: <u>0054</u>

Account Number: <u>1470</u>

A copy of a voided check for the Account is attached hereto as Exhibit "A". This authority is to remain in full force and effect until the Holder confirms in a signed writing that the Note has been satisfied in full, and in a manner as to afford the Depository a reasonable opportunity to act on it.

Redwood Scientific Technologies, Inc.

By: _____
Name: <u>Jason Cardiff</u>
Title: <u>Chief Executive Officer</u>

## AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS

Redwood Scientific Technologies, Inc., a Delaware corporation (the "Company") issued that certain senior secured convertible promissory note to Auctus Fund, LLC (the "Holder") on July 18, 2018, in the principal amount of $725,000.00 (the "Note"). The Company hereby irrevocably authorizes the Holder to initiate debit and credit entries to its checking account indicated below (the "Account") and the depository named below (the "Depository"), to debit or credit the same to such Account, for the amounts specified in the Note until the Note is satisfied in its entirety. The Company hereby represents and certifies that the Account is used for commercial and/or business purposes only.

Depository Name: <u>Redwood Scientific Technologies, Inc.</u>

Name of Bank: <u>Zinn    Bank</u>

Routing/ABA Number: <u>00054</u>

Account Number: <u>.4447</u>

A copy of a voided check for the Account is attached hereto as Exhibit "A". This authority is to remain in full force and effect until the Holder confirms in a signed writing that the Note has been satisfied in full, and in a manner as to afford the Depository a reasonable opportunity to act on it.

Redwood Scientific Technologies, Inc.

By: _____
Name: <u>Jason Cardiff</u>
Title: <u>Chief Executive Officer</u>

Date

**First Western Trust**
Attention: Karen Walker
P.O. Box 7424
Jackson, WY 83002

**RE: Employee Access**

To Whom It May Concern:

Please allow internet access and account inquiry access to my account(s) for the following person:

**NAME:**
**ADDRESS:**
**PHONE:**
**SSN:**
**EMAIL ADDRESS:**

I understand that this gives authority to this person to see online and make account inquires on the following account:

**ACCOUNT NAME:** **Put any and all Accounts for Business**
**Account Number** or list by individual account numbers

Sincerely,

Name of Owner

## Schedule C

| | |
|---|---|
| Account Name: | Auctus Fund Management, LLC |
| Account Address: | 545 Boylston Street, 2nd Floor, Boston, MA 02116 |
| ABA Routing Number: | 0120 |
| Account Number: | |
| Bank Name: | Citizens Bank |
| Bank Address: | 1 Exchange Place<br>53 State Street<br>Boston, MA 02109 |

**<u>Schedule D</u>**

| | |
|---|---|
| Account Name: | Auctus Fund, LLC |
| Account Address: | 545 Boylston Street, 2nd Floor, Boston, MA 02116 |
| ABA Routing Number: | 2186 |
| Account Number: | |
| Bank Name: | People's United Bank |
| Bank Address: | 850 Main Street, Bridgeport, CT 06604 |

IN WITNESS WHEREOF, the undersigned has executed this Officer's Certificate as of the date first written above.

Jason Cardiff
Chief Executive Officer

Case 8:18-cv-02104-SJO-FLA   Document 52-1   Filed 11/01/18   Page 65 of 76   Page ID #:5484

# Exhibit 8

# REDWOOD SCIENTIFIC TECHNOLOGIES, INC.

## Consolidated Balance Sheets

|  | December 31, | |
| --- | ---: | ---: |
|  | 2016 | 2015 |
| **Assets** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 161,708 | $ 583,566 |
| Accounts receivable, net | 73,421 | 19,264 |
| Inventory | 65,506 | 113,463 |
| Prepaids and other current assets | 55,385 | 7,263 |
| Total current assets | 356,020 | 723,556 |
| | | |
| **Non-current assets** | | |
| Retention receivable | 366,057 | 438,767 |
| Total non-current assets | 366,057 | 438,767 |
| | | |
| Total assets | $ 722,077 | $ 1,162,323 |
| **Liabilities and Stockholders' Deficit** | | |
| **Current liabilities** | | |
| Accounts payable | $ 829,983 | $ 201,808 |
| Accrued liabilities | 916,453 | 469,941 |
| Advances from related party | 238,876 | 202,783 |
| Series A convertible notes ($1,500,000 face value, net of $0 and $124,856 debt discount, respectively) | 1,500,000 | 1,375,144 |
| Note payable, current portion | 451,174 | - |
| Total current liabilities | 3,936,486 | 2,249,676 |
| | | |
| **Non-current liabilities** | | |
| Other long-term liabilities | - | 1,075,000 |
| Note payable, less current portion | 590,001 | 1,316,953 |
| Derivative warrant liability | 1,132,705 | - |
| Total non-current liabilities | 1,722,706 | 2,391,953 |
| Total liabilities | 5,659,192 | 4,641,629 |
| | | |
| Commitments and contingencies | | |
| | | |
| **Stockholders' deficit** | | |
| Preferred stock, $0.01 par value; 10,000,000 shares authorized; no shares issued or outstanding | - | - |
| Common stock, $0.01 par value; 50,000,000 shares authorized; 8,225,142 (2016) and 5,916,556 (2015) shares issued; 7,475,142 (2016) and 5,916,556 (2015) shares outstanding | 74,530 | 59,166 |
| Additional paid-in capital | 4,905,682 | 2,192,965 |
| Accumulated deficit | (9,917,327) | (5,731,437) |
| Total stockholders' deficit | (4,937,115) | (3,479,306) |
| | | |
| Total liabilities and stockholders' deficit | $ 722,077 | $ 1,162,323 |

See notes to consolidated financial statements.

- 3 -

# Exhibit 9

# REDWOOD SCIENTIFIC TECHNOLOGIES, INC.

## Consolidated Statements of Operations

|  | For the Years Ended December 31, | |
|---|---|---|
|  | 2016 | 2015 |
| Sales, net | $ 4,555,725 | $ 3,586,968 |
| Cost of sales | 1,104,210 | 1,152,691 |
| Gross profit | 3,451,515 | 2,434,277 |
| Operating expenses |  |  |
| Advertising and media | 2,545,048 | 3,346,304 |
| Payroll, benefits, and related | 3,568,068 | 835,675 |
| General and administrative | 1,105,162 | 1,255,493 |
| Rents and occupancy | 179,020 | 239,449 |
| Total operating expenses | 7,397,298 | 5,676,921 |
| Loss from operations | (3,945,783) | (3,242,644) |
| Other (expense) income |  |  |
| Interest expense | (424,355) | (1,514,942) |
| Unrealized loss (gain) on derivative warrants | 184,248 | (29,598) |
| Loss on settlement of lawsuit | - | (1,075,000) |
| Other income | - | 165,427 |
| Total other expense | (240,107) | (2,454,113) |
| Loss before income taxes | (4,185,890) | (5,696,757) |
| Income tax expense |  |  |
| Federal taxes | - | - |
| State taxes | - | - |
| Total income tax expense | - | - |
| Net loss | $ (4,185,890) | $ (5,696,757) |

See notes to consolidated financial statements.

- 4 -

Case 8:18-cv-02104-SJO-FLA   Document 52-1   Filed 11/01/18   Page 69 of 76   Page ID #:5488

# Exhibit 10

*Master Prophet said...*

**Peter, for a reason that I'll explain to you in just a moment, I had an irresistible urge to ask God to give me a glimpse into your future - and what I saw was GLORIOUS! I tried to make sure that you had this MIRACULOUS ANOINTED OIL in your hands as soon as I got your call. It was very important to me that you have what the Spirit showed me during this time of Miracle manifestation in your life.**

****AUTO**ALL FOR AADC 112
Peter

Rockaway Beach, NY  11693-1736

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

Dear Peter,



I was so happy when you made contact with me and I want you to know I take this very seriously I am here for you and I want to lead you and guide you into a place that makes your dreams come true. I also need you to know whatever you share with me is private I am your personal Master Prophet and I have pledged to the Lord to keep you private and safe at all costs. From time to time as the Lord leads, I will communicate with you. And when I do all I ask is that you take time to respond. As far as I am concerned this is a personal ministry and it is all about you and GOD.

Peter, I want to agree with you and we need to take special steps. I take it very seriously and I see God moving on this even now.

Yes, it's true, for a very special reason that I'll explain in this letter, I suddenly had an irresistible urge to take a peek into your future.

You know, Peter, I've only very rarely felt this urge or leading to look into the future to help someone **but when I do it's for an important** reason.

The last time this happened to me was when I sensed that an **extremely happy** event would take place in the life of one of the people whom God had led to me. This person is a precious woman who lives in Lafayette, LA. She has given me permission to use her name in my correspondence with you.

Debra asked me to help her at a particularly difficult time in her life. She was struggling with health and family problems as well as satanic bondages. And she also had an urgent need for money. Unfortunately, she could get no help from anyone. **Even her own pastor refused to deal with her any further!** It seemed in the natural that there were no indications of any favorable changes in her situation.

One morning, I had an almost **irresistible urge to pray for Debra** as I was thinking about her situation and her family. Without hesitation, I began to pray and almost immediately I began **to sense a strange and powerful anointing coming upon me.** My eyes were closed and when I opened my eyes I was in a vision. What I saw left me with no doubt: Yes, Debra would soon receive a significant amount of money. (I saw the number 2, followed by several zeros in the vision) **I saw several other things about her life and several steps of faith that she needed to take in order to release this miracle.**

I wrote Debra right away to let her know what the Lord had shown me and what steps of faith she needed to take to release this miracle (just like I'm writing to you today). I told her exactly when to sow a special seed and the amount she should sow **to get the miracle harvest she needed.**

I didn't hear from her for a while. A few weeks ago, I got a letter from her son. She told me that **after his mother acted in obedience and used the faith tools that I sent her she unexpectedly received the delightful amount of $18,000.00!** Debra has, by now, seen a tremendous change in her situation; her financial difficulties have been eased by this unexpected blessing. You can read the inspiring letter her daughter sent me along with the rest of her story, reproduced at the end of my letter to you.

If I've taken this much time to tell you Debra's story, it's simply because yesterday morning after I got your request for the Miracle Oil, **I had an irresistible URGE TO PRAY FOR YOU, Peter, exactly as I did for Debra!**

In fact, I honestly believe you could very well have the same experience as Debra, that is to say, **you could be getting your hands on a LARGE SUM OF MONEY sooner than you think.** In your case as well as Debra's I believe this sum will come from an unexpected source… a source that only God knows about. I can even tell you that the number 10, followed by several zeros is what I saw in the VISION of the LORD.

Yes, it's true, and just as for Debra, I had a sudden desire to pray and wait upon the Lord concerning her situation. I am now receiving the same spiritual prompting and am feeling the same powerful anointing pulsating through

*KEEP READING*

me. As I opened my eyes what I saw was a spiritual vision. **The powerful events I witnessed in the spirit realm reveled that your upcoming future is altogether ASTOUNDING!** Listen, and then you be the judge.

First of all, I can tell you that **if you'll take the FAITH STEPS that I'm about to reveal to you** and I will tell you exactly what to do, your life and your loved one's life will take some of the most incredible turns. Your Faith will break the chain that hinders your financial deliverance. **You'll see your season change and your life will be transformed in a manner that will utterly amaze you!**

**The first thing that I saw in the vision while praying for you was this:**

I saw a new day dawning for you! The sun was just beginning to break over the horizon in front of you. I heard the voice of the Lord proclaim: **"the night is over; the darkness is dissipating, and a new day is dawning for my Child."**

**Here is the interpretation that the Lord gave me concerning the rising of the sun.** It foretells that the person for whom it's destined (YOU) will very shortly have an unexpected, considerable and significant amount of money. The rising sun signifies triumph over your circumstances and situation as well as a new spirit of initiative. The rising sun also signifies a very lively spirit and very strong spiritual perception. **When the anointing of the Holy Spirit comes upon you, you will demonstrate brilliant intelligence.** Do you remember how the doctors of the law were astonished when they heard 12-year-old Jesus speak?

I can tell you, as I told Debra, **exactly** what Faith Steps to take to see the release of this money and when, **and exactly how to take them.**

**In order for me to be completely precise, I will also need your participation that will be indispensable for you to attain this sum.**

But this amount of **money will not be the only amount you get because I saw a second blessing coming to you several weeks after you received the first amount.** In fact, you were still rejoicing about the first amount when this second blessing came in. The second blessing will be a little less than the first blessing…but the way it comes to you will be very interesting. Partner English, you'll know beyond a shadow of a doubt that it's miracle money, that is comes from God and that it was released as a direct result of your faith and obedience unto the Lord. I'll tell you more about this a little later…

**THE SECOND VISION THAT GOD GAVE ME for you…**

**I saw fiery chariots driven by Angels just like the ones that carried Elijah into heaven drawn by magnificent, powerful horses.** The Lord began to give me the interpretation of this **VISION.** This vision signifies angelic protection, and God given triumph in your circumstances and difficult situations. BUT angelic hosts ready to do battle also signify that some battles lie ahead. **It is vitally important that we know the EXACT significance of this VISION so that you can be ready for whatever Satan throws at you.** Yes, it's possible to completely avoid Satan's traps if act now and follow divine guidance and direction.

**THE THIRD VISION THAT GOD LET ME SEE,** while thinking carefully about your situation…

This was a very strange vision of a man walking in semi-darkness with lamps attached to his shoes so that he could see where he was going. In Biblical times this was the way people who walked at night could see the perils, roadblocks and obstacles that lay ahead.

**This vision-the LORD let me know-has two different interpretations.** First, there is someone who is close to you and you are not certain about this person's feelings and intentions. Second, you are about to have an extremely favorable, rewarding and unforeseen encounter.

✴ It is of utmost importance to you, that you know exactly where you stand with the first individual and know exactly what the encounter with this second individual signifies.

Beloved, if this is the case, I believe that you are right on the edge of seeing a **SOLUTION** that will bring this person who occupies your thoughts back to you **more loving and attentive** to you and the things of God than ever before. My first impression seems to be that you are having some problems with a person who you hold very dear. Do you feel that they are not as free and open with you as they once were? Is this person less interested in you?

✴ **Concerning the second individual:** You will have some unforeseen encounters that could drastically alter or completely change your life. You have, within the circle of people you deal with, someone very close who is looking to you

—OVER—

for guidance and inspiration. Do you know who this is or might be?

— 3 —

**THIS IS WHAT YOU MUST DO, RIGHT AWAY!**

You must very carefully follow the faith steps that I have outlined for you using the Miracle Anointing Oil. **Without your participation I will not be able to give you INDISPENSABLE explanations** regarding these visions and these events that will strongly influence your life. Your action now will release the power to experience victory over your circumstances.

Just as for Debra, the **VISION** indicated to me with certainty that you should receive, over the course of the next few months, an important amount of money (as I've told you I saw the number 10 followed by many zeros). **By taking this step of faith, you'll actually be setting yourself up for the supernatural blessing.**

When we united our faith in agreement, Debra succeeded in getting enough to solve her immediate problems, when she had nothing that predisposed her to riches…So wouldn't the same hold true for you?

**The second VISION, remember, tells about a "problem" that might soon appear in your life.**

It's **imperative** that we know the exact nature of this problem, so we can either completely avoid it or plan a strategy to overcome it. This is the reason why it's necessary that you act on your faith TODAY **(don't wait one more day!)** so I can tell you with greater accuracy what danger seems to threaten you, and how you can ensure that it never appears.

**The third vision** concerned your relationships and matters of the heart… specifically I believe it dealt with certain people in your family and circle of acquaintances.

Does the person who occupies your thoughts seem distant or disinterested in you? Do they seem less affectionate? Do you feel someone is trying to move further away from you? **If this is the case, you must absolutely know more!** It's the reason for which you need to follow through with this relationship that you've begun with this prophet.

As you can see, **it's truly necessary for your well-being and your future that you ACT NOW!** There are some steps of faith that only you can take; I can't take them for you… you, and no one else.

Follow these instructions… Fill a basin with warm water**. NOW EMPTY THE MIRACLE ANOINTED OIL into the basin.** As you "move the anointed oil water" around in the basin, pray this prayer, **"OH GOD, IN THE NAME OF JESUS…COMPLETE EVERY GOOD WORK YOU HAVE STARTED IN MY LIFE…AND LET MY OBEDIENCE TODAY COME UP BEFORE YOU AS A MEMORIAL OF MY FAITH AND OBEDIENCE! AMEN."** *FOLLOW EXACT DIRECTIONS!*

By exactly following the directions the Lord gave me for you, I was shown in the spirit several things that will start to happen. In the next 16 days you will begin to experience harmonious relationships because of an inner feeling of calm and balance. Your plans will work out well, and your goals will be more easily achieved than at other times in your entire life. **Other people will not stand in your way, and you can expect favors or at least less resistance from others and even those seen as enemies will move in your favor.** People that were enemies in the past will not know what happened and will want to help you… **Great financial advancement is favored because of increased confidence and ease; you see things are all going to fall into place in your favor.**

Now this can only happen if God moves and we are united together I need you to follow the steps below:

✓ My child, **FIRST:** take a clean washcloth and wash your eyes with this anointed oil water. Keep your eyes closed as you do this! The Holy Ghost desires to sharpen your focus and increase your perception to see things you have formerly overlooked **AND ALSO TO SEE NEW OPPORTUNITIES THAT YOU WOULD NOT HAVE SEEN! GLORY!**

✓**SECOND:** Wash your feet with this water that you placed the Miracle oil. **GOD IS ENDEAVORING TO WALK YOU INTO A TOMORROW UNLIKE ANY YESTERDAY YOU HAVE EVER KNOWN! What I see is ABSOLUTELY INCREDIBLE!** In fact, I "sense" you have been going through some very difficult times. Am I right? Some of the personal problems you have been dealing with seem at times almost INSURMOUNTABLE! I "discern" you not only need a serious touch in your body, but also your mind is

*GO ON TO PAGE 4*

Case 5:23-cv-00021-JGB  Document 134-1  Filed 12/02/24  Page 139 of 146  Page
ID #:5492
Case 5:18-cv-02104-SJO-PLA  Document 52-1  Filed 11/01/19  Page 139 of 76  Page ID #:3266

overwhelmed by worry and fatigue. Beloved, get ready for some radical changes…**YOUR FAITH IS NOW ON THE "CUTTING EDGE"! GLORY!**

I feel your faith touching the heart of God, right now! **STEP THREE:** Anywhere in your body where there is sickness or pain, gently wash this area with this water that you placed the oil in, saying **"IN THE NAME OF JESUS, BE MADE WHOLE!"** Remember, God used Anointed oil in the Bible to bring more miracles to more people than any other method. If I didn't feel a definite witness of the Holy Ghost between us now, and knew beyond a shadow of a doubt you were a believer, **YOU WOULD NOT BE HOLDING THIS LETTER IN YOUR HAND!**

Lynette, while this "faith cycle" is high between us **WE MUST CONCENTRATE ON YOUR MONEY MATTERS AND ESPECIALLY ON RELEASING THESE TWO SUMS OF MONEY THAT GOD SHOWED ME!** Realize one thing: God would never direct me to write you like this if He wasn't **ALREADY TAKING MEASURES TO BLESS YOU!**

**STEP FOUR:** Wipe off your phone with this cloth. You are going to get news after you do this that will be worth thousands of dollars to you. Throw a few drops of this Anointed oil on your mailbox because **money is COMING after you do this in faith! GLORY!** I am seeing a breakthrough amount of money it should be more than $3,950.50 and it is important that when this happens you act as one of God's silent Angels. I am also seeing God move with your prayer needs but only as long as we have agreement together.

You must now walk toward God in your giving. I feel in the spirit a seed that will move God is $60.00. If you in no way can give $60.00, give at least $40.00. I am also seeing for you a challenge amount of $250.00 don't let the Devil take your blessings. We both know you cannot lose by giving; only the devil will tell you to stop. God wants you to prosper and satan wants to hold you back and keep you down. That is why I am here to intervene on your behalf and push you through to the promises that belong to you. In this month and at this time you must **SOW A TURN AROUND SEED OF YOUR FIRST FRUITS.** Maybe there are some tithes you have been saving.

After you finish these steps of faith **your answer will let me know that YOU HAVE OBEYED GOD** and I will then be able to give you more specific insights and directions from God. These revelations from God will give you the certainty you're missing and that you need to avoid danger and grab hold of the two blessings God is sending your way. *DO NOT WAIT!*

This is so important, I need you to write your name on the Anointed Oil Packet and send back the empty Anointed Oil Packet to me along with your prayer requests. Once I have this I will be able to hold it in prayer and agreement and place it on my special prayer altar for 24 hours on your behalf. Once that is done and the spirits and spoken to me I will send you the anointed turn around kit.

I'm waiting with impatience for news from you that you completed the faith steps of obedience that I gave you. **Now fill out the prayer page and get it back to me right away!** Don't let this sit in your home longer than 24 hours.

With Love and Prayers,

*Look for your Anointed Oil inside the enclosed return envelope*
*I can't wait to get it back!*

People United For Christians ● PO Box 370 ● La Verne CA 91750-0370

**Please make vow offerings payable to People United For Christians. Thank you!**



# Exhibit 11

**People United for Christians**

## Profit & Loss

All Transactions
Downloaded from its QuickBooks Accounting File

|  | Dec 31, 17 | Apr 17, 18 | TOTAL |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| Income | | | |
| Direct Public Support | | | |
| Gifts in Kind - Goods | 5,980.13 | 0.00 | 5,980.13 |
| Direct Public Support - Other | 0.00 | 8,307.62 | 8,307.62 |
| Total Direct Public Support | 5,980.13 | 8,307.62 | 14,287.75 |
| **Total Income** | 5,980.13 | 8,307.62 | 14,287.75 |
| | | | |
| Expense | | | |
| Contract Services | | | |
| Outside Contract Services | 2,144.77 | 8,052.57 | 10,197.34 |
| Contract Services - Other | 508.13 | 5,909.90 | 6,418.03 |
| Total Contract Services | 2,652.90 | 13,962.47 | 16,615.37 |
| | | | |
| Operations | | | |
| Printing and Copying | 0.00 | 5,558.40 | 5,558.40 |
| Supplies | 0.00 | 683.98 | 683.98 |
| Total Operations | 0.00 | 6,242.38 | 6,242.38 |
| | | | |
| Payroll Expenses | 1,498.42 | 8,227.48 | 9,725.90 |
| Postage | 1,490.00 | 18,632.33 | 20,122.33 |
| | | | |
| **Total Expense** | 5,641.32 | 47,064.66 | 52,705.98 |
| | | | |
| **Net Ordinary Income** | 338.81 | (38,757.04) | (38,418.23) |
| | | | |
| **Net Income** | **338.81** | **(38,757.04)** | **(38,418.23)** |

## People United for Christians
## Balance Sheet
### All Transactions
Downloaded from its QuickBooks Accounting File

| | Dec 31, 17 | Apr 17, 18 |
|---|---|---|
| **ASSETS** | | |
| Current Assets | | |
| Checking/Savings | | |
| PUFC- Citizens | 338.81 | (37,722.07) |
| Total Checking/Savings | 338.81 | (37,722.07) |
| Total Current Assets | 338.81 | (37,722.07) |
| | | |
| **TOTAL ASSETS** | **338.81** | **(37,722.07)** |
| | | |
| **LIABILITIES & EQUITY** | | |
| Liabilities | | |
| Current Liabilities | | |
| Accounts Payable | | |
| Accounts Payable | 0.00 | 696.16 |
| Total Accounts Payable | 0.00 | 696.16 |
| Total Current Liabilities | 0.00 | 696.16 |
| Total Liabilities | 0.00 | 696.16 |
| | | |
| Equity | | |
| Retained Earnings | 0.00 | 338.81 |
| Net Income | 338.81 | (38,757.04) |
| Total Equity | 338.81 | (38,418.23) |
| | | |
| **TOTAL LIABILITIES & EQUITY** | **338.81** | **(37,722.07)** |

# EXHIBIT 14

# EXHIBIT 20

**CARDIFF MOTION
TO SUPPRESS**



**U.S. Department of Justice**
*Consumer Protection Branch*

| **Manu J. Sebastian** | **Overnight Delivery Address** | **Mailing Address** |
|---|---|---|
| Phone:    202-514-0515 | 450 5th St NW, Suite 6400 | P.O. Box 386 |
| Fax:    202-514-8742 | Washington, DC 20001 | Washington, DC 20044 |

April 18, 2024

<u>VIA EMAIL</u>

Jonathan D. Gershon
Larson LLP
555 South Flower Street
30th Floor
Los Angeles, CA 90071
jgershon@larsonllp.com

      Re:   *United States v. Jason Edward Thomas Cardiff,*
              <u>5:23-cr-00021-BERNAL (C.D. Cal)</u>

Dear Counsel:

      Enclosed please find the government's tenth discovery production in the above-captioned matter. The enclosed production is provided on a hard drive. The password to access the drive was emailed to you separately.

      The tenth production contains United States Postal Inspection Service (USPIS) Agent-Generated Materials, including additional memoranda of interviews (MOIs), Memoranda to File (MTFs), and Memoranda of Activity (MOA) generated during the investigation of this matter, as well as captures of websites associated with the Defendant. For your convenience, the documents in this production are produced both in load-ready format, as searchable PDFs, and in some cases, in native format. Pursuant to the protective order entered by the Court on December 28, 2023 (Dkt. # 37), the government is identifying all of these documents as CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER.

      The documents in this production have a bate stamp range of GOV007_00000001 through GOV007_00134913.

      To the extent that the enclosed materials and any future discovery provided to you exceeds the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law, such materials are provided voluntarily and solely as a matter of discretion.  By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.

*United States v. Cardiff*
Page **2** of **2**

       Importantly, to date, the government has not received any discovery from you. With this letter the government renews its requests for all reciprocal discovery to which it is entitled under Rule 16(b) and 26.2 of the Federal Rules of Criminal Procedure. The government again also requests pursuant to Rules 12.1, 12.2, and 12.3 all notice of intention of your clients to rely on an entrapment defense, a defense involving mental condition or duress, an alibi defense, or a public-authority defense.

       Respectfully,

Manu J. Sebastian
Trial Attorney