1   ELIZABETH JONES SANGER (*pro hac vice*)
    esanger@ftc.gov; (202) 326-2757
2   JAMES A. PRUNTY (*pro hac vice*)
    jprunty@ftc.gov; (202) 326-2438
3   EDWIN RODRIGUEZ (*pro hac vice*)
    erodriguez@ftc.gov; (202) 326-3147
4   SHIRA D. MODELL (*pro hac vice*)
    smodell@ftc.gov; (202) 326-3116
5   Federal Trade Commission
6   600 Pennsylvania Ave., NW
7   Washington, DC 20580
8   Fax: (202) 326-3259
9
10  STACY PROCTER (Local Counsel) (CA 221078)
    sprocter@ftc.gov; (310) 824-4300
11  Federal Trade Commission
12  10990 Wilshire Blvd., Suite 400
    Los Angeles, CA 90024
13  Fax: (310) 824-4380
14  ATTORNEYS FOR PLAINTIFF

15

16 **UNITED STATES DISTRICT COURT**
   **CENTRAL DISTRICT OF CALIFORNIA**

17

18 | No. ED 18-CV-02104 DMG (PLAx)

19 **Federal Trade Commission**, | **DECLARATION OF DANIELLE**
                                  | **WALKER (aka Danielle Cadiz)**
20                     Plaintiff,

21                          v.

22 **Jason Cardiff, et al.**,

23                    Defendants.

24

25

26

27

28

PX-32

I, Danielle Walker, declare as follows:

1. I am over the age of eighteen years, and I reside in Lake Elsinore, CA. My name is Danielle Walker, but my maiden name was Danielle Cadiz.

2. I was a Defendant in the above-titled matter. I stipulated to a final judgment that was entered by the Court on May 16, 2019. The stipulated final judgment contains a clause requiring my ongoing cooperation with the Federal Trade Commission's ("FTC") and Receiver's investigations in this case. I am submitting this declaration pursuant to that cooperation clause.

3. I have personal knowledge of the following facts and, if called as a witness, I could and would testify competently thereto.

4. I have reviewed all of the attachments to this declaration and can attest to their authenticity. Many of the attachments are emails that I either sent or received, either as the direct recipient or as someone copied on the email. Other attachments are documents I have direct knowledge of from my work as Director of Operations at Redwood Scientific.

5. I worked for Jason Cardiff for the whole period from 2010 to 2018. Eunjung Cardiff joined the business operation in 2011. After I left in July 2018, I continued to consult for them until I received notice of this lawsuit in October 2018. During the time I worked for the Cardiffs, they were engaged in various business ventures, including selling vaping products under the name Cigirex. From 2013 through 2018, they sold oral thin film strip products, including Prolongz beginning in 2013, TBX-FREE beginning in 2015, and Eupepsia Thin beginning in 2017.

6. I was Jason Cardiff's executive administrative assistant from 2010 until early 2012 at Kelly Media, a company owned and operated by Jason Cardiff. From 2010-2012, I was paid by Kelly Media. From 2012-2014, I was the office manager at Run Away Products, which was managed by Eunjung Cardiff. See, e.g., Attachments 1-2.

7.      In 2014, I was also the Business Manager of Run Away Products.  At that time, Run Away Products usually paid for goods and services using bank accounts in the name of Advanced Men's Institute Prolongz, LLC (AMI).  For example, when Run Away Products contracted to buy media time for television advertising for Prolongz oral thin film strips from Inter/Media Time Buying Corporation in 2014, it was Advanced Men's Institute that paid invoices, which received final approval from Eunjung Cardiff.  Over the time I worked for the Cardiffs (through about July 2018), Jason and Eunjung Cardiff also used bank accounts belonging to Redwood, Identify, People United For Christians, and TV Sales to meet operational costs.

8.      The log-ins for AMI, Run Away Products, and Redwood bank accounts were under the exclusive control of Eunjung Cardiff.  In many cases, I established online access to these accounts, but beginning in late 2012, Eunjung Cardiff assumed complete control of those accounts and used all of the sign-ins and passwords I had created, including the account sign-ins for Redwood and its related entities.  I did have my own log-in for an account at HSBC, but I did not have the authority to make payments or withdraw money from that account.  Eunjung Cardiff also held the key tokens for certain bank accounts, which were needed in order to access the accounts online.

9.      Also in 2014, AMI became Redwood Scientific Technologies, LLC, and then the limited liability company was converted into a California corporation, Redwood Scientific Technologies, Inc.  Redwood was ultimately incorporated in three different states (California, Nevada, and Delaware), but it was all a single business operation marketing oral film strips.  We incorporated in Nevada, and later Delaware, to ease the process of becoming a publicly traded company.  See, e.g., Attachments 3-18.

10.      Although AMI had changed its name and had converted from an LLC to a corporation, the Cardiffs continued to use the AMI name, for example, to

PX-32

purchase oral film strips from Chinese and Indian manufacturers. Redwood's film strips had been registered as unapproved homeopathic drugs with the FDA under AMI's name, so it was important to continue using the name to import the products from China and India.

11. I worked for Redwood from the time of the name change in late 2014 until October 2018. Around January 2017, the Cardiffs decided to start using the name Identify, LLC, but the business of selling oral film strips remained the same. See, e.g., Attachments 19-24.

12. In early 2017, the Cardiffs made me the Director of Operations for Redwood. In that capacity I had the opportunity to observe all facets of Redwood operations and I supervised all staff except for Eunjung Cardiff and Jason Cardiff.

13. Jason and Eunjung Cardiff had ultimate authority for making all Redwood business decisions, including hiring and firing staff, signing contracts, approving expenses, creating and approving advertising, placing advertising on television networks and social media, opening and managing bank and merchant accounts, setting and enforcing policies, permitting staff to make customer refunds, setting up the auto-ship program for customer sales, and employee training. During the time I was at Redwood, from 2014-2018, Jason Cardiff was at the office every day unless he was traveling. Eunjung Cardiff was at the office several times each week, although she sometimes worked from home. Regardless of the corporate name being used, I and all other employees followed the Cardiffs' orders.

14. I was the Director of Operations when the FTC issued a Civil Investigative Demand ("CID") to Redwood dated August 3, 2017. Jason Cardiff directed me to collect information and documents responsive to the CID and to work with Redwood's attorney to draft and sign responses to the CID's interrogatories. Gus Navarro (Redwood's IT Manager) and Jason Cardiff also certified some portions of Redwood's CID response.

15.     As the Director of Operations and a records custodian for Redwood, I had authority to certify interrogatory answers and the authenticity of the business records produced to the FTC by Redwood in response to the CID.  These responsive documents were produced to the FTC between March 22, 2018 and June 14, 2018 under my supervision and at Jason Cardiff's direction. The response to the FTC included Redwood business records copied by Redwood's e-discovery contractor, Light House, which kept me updated on their progress processing the documents.  At my direction, Light House subsequently provided these e-discovery documents directly to the FTC in a Relativity load format.  After the documents were produced, Light House sent Redwood a thorough report containing breakdowns of the type and number of files produced to the FTC.  Documents pertaining to the CID and Redwood's responses, including the CID itself, Redwood's CID interrogatory responses, and Light House's report are attached as Attachments 25-30.

16.     The documents Redwood produced to the FTC between March 22, 2018 and June 14, 2018 are true copies of records of regularly conducted activity of the business that:

      a. Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

      b. Were kept in the course of the regularly conducted activity of Redwood; and

      c. Were made as part of Redwood's regularly conducted business activity and as a regular practice of Redwood.

17.     The business records provided to the FTC include documents obtained by Redwood from the Better Business Bureau, as well as Redwood's correspondence with the Better Business Bureau.  These documents were

1    integrated into Redwood's company records and regularly kept and relied upon by

2    the company in the conduct of its daily business.

3          18.    The business records provided to the FTC in response to the CID also

4    contain summaries of Redwood business records I prepared at the direction of

5    Jason and Eunjung Cardiff.  These records reflect sales and refund figures for sales

6    of Prolongz, TBX-FREE, Eupepsia Thin, and other film strip products. The raw

7    data for these computations were part of Redwood's business records.

8          19.    In approximately May 2018, Jason Cardiff instructed me and Gus

9    Navarro, Redwood's IT Manager, to destroy documents on all Redwood

10    employees' computers that were responsive to the FTC's CID, including

11    documents related to Redwood's paid advertising of oral film strips on Facebook.

12    I also specifically remember that he told us to delete anything referencing an 88%

13    success rate; any documents that showed that he and Eunjung Cardiff approved

14    marketing and advertising distribution; and any evidence showing that they had

15    created the files (e.g., Facebook ads, content for paid advertisements).  He told me

16    not to worry about deleting files from his and Eunjung Cardiff's computers, and I

17    understood that he was taking care of the files on those computers.

18          20.    During the time I worked for the Cardiffs, Redwood sold Prolongz,

19    TBX-FREE, Eupepsia Thin, and other thin film strip products.  Prolongz was sold

20    as a male sexual performance enhancer that was meant to deal with premature

21    ejaculation, TBX-FREE was marketed as a smoking cessation product, and

22    Eupepsia Thin was advertised as an appetite suppressant and weight-loss product.

23    Redwood also sold Prolongz-X, which it was my understanding was a stronger

24    version of Prolongz, and Product-X, which was sold as a male sexual performance

25    enhancer, but was marketed for erectile disfunction, not premature ejaculation like

26    Prolongz.  Other products were sold for improving sleep (Sumnusent), enhancing

27    mood and reducing anxiety (Provaxaltonin), and women's sexual enhancement

28    (Blossom).  Redwood also sold Comfort Time (aspirin) and Cloverstrips (CBD).

21.     Advertising for Prolongz, TBX-FREE, and Eupepsia Thin was through both long-form and short-form television commercials, websites, social media, including Facebook, Instagram, and YouTube, and print.  TBX-FREE and Product X were also marketed through robocalls.  Redwood sold these products primarily through direct to consumer sales, but also through third-party retailers.

22.     Jason Cardiff appeared in videos on social media that advertised TBX-FREE, Eupepsia Thin, and the Rengalife multilevel marketing program, and he recorded voice messages for ringless voicemails that went to consumers' cell phones.  Eunjung Cardiff recorded voiceovers for Eupepsia Thin television advertising and recorded a ringless voicemail message for TBX-FREE.  I discuss these later in my declaration.

23.     In my position as Director of Operations, I observed Jason Cardiff collaborate with other Redwood employees and third-party contractors, such as Ty Sherrell at FX Web Media, to create advertising for television and the Internet, including Facebook.  Jason Cardiff would type up content for Facebook ads and give it to Jean Wu, a Redwood employee, who would fix any grammatical issues and return to him for final approval.  He also delegated some of the back-and-forth with third-party contractors to Ms. Wu and other Redwood employees, but at the end, he always had the last word and always approved the final versions of the ads.

24.     The FTC provided me with two video files bates-stamped CAN-CARDIFF0000033 and CAN-CARDIFF0000046.  I reviewed the videos and can identify them as Redwood Eupepsia Thin commercials.  I can also identify the voice of Eunjung Cardiff providing the voiceover for the commercials beginning at the 00:57 time-stamp mark in CAN-CARDIFF0000033 and for the whole of CAN-CARDIFF0000046.

25.     Jason and Eunjung Cardiff were responsible for purchasing media time for television commercials advertising Prolongz, TBX-FREE, and Eupepsia Thin.  They purchased media time for these commercials through at least four

media companies:  Inter/Media Time Buying Corp., Havas Edge, Cannella Response Television, LLC, and Diversified Mercury Communications, LLC ("Mercury Media").  The most important media buying company was Cannella because it bought media time for Redwood for the longest time, from 2014-2018.

26.     Eunjung and Jason Cardiff hired these companies to identify television networks for the placement of Prolongz, TBX-FREE, and Eupepsia Thin advertising on television stations across the country.  The contracting party with Inter/Media and Havas Edge was Run Away Products and the contracting party with Cannella and Mercury Media was Redwood.  The television advertisements were either long-form ads with a standard duration of twenty-eight minutes and 30 seconds (28:30) or shorter ads with a duration of one, two, or five minutes.

27.     Inter/Media purchased media time for Prolongz television advertising in 2013 and 2014, pursuant to a contract with Run Away Products.  The Cardiffs chose the TV networks and time slots for advertising Prolongz based on their spending budgets.  There was a contractual dispute between Run Away and Inter/Media that resulted in Inter/Media suing Run Away, AMI, and Redwood for breach of contract.  I received Inter/Media invoices and obtained approval from Eunjung Cardiff to pay them from an HSBC account belonging to AMI.  Eunjung Cardiff signed checks on that account to pay for media for Prolongz.

28.     Havas Edge purchased media time for Prolongz television advertising in 2014.  Although I was not yet the Director of Operations at that time, when I took that position I saw that Redwood's records included invoices to Run Away Products documenting media buys for Prolongz.  See Attachments 31-35.

29.     Mercury Media purchased media time for TBX-FREE, Eupepsia Thin, and other Redwood products.  At Eunjung Cardiff's direction, I signed the Client Services Agreement with Mercury Media.  See Attachments 36-38.  Redwood's principal contact at Mercury Media was Alison Brawner.  Jason and Eunjung Cardiff and I communicated by email routinely with her.  Jason Cardiff told me to

1   send Mercury Media information about Redwood's call center and how Mercury
2   Media could get copies of the Eupepsia Thin and TBX-FREE advertising.

3          30.    Although I signed the contract and communicated with Mercury
4   Media, Jason and Eunjung Cardiff made all the decisions about media buying for
5   advertising TBX-FREE and Eupepsia Thin, including approving budgets and
6   choosing media slots for advertising.  See, e.g., Attachments 39-47.

7          31.    When Mercury Media informed us in June 2017 that the Scripps
8   television network had not approved TBX-FREE for airing because TBX-FREE
9   was not FDA approved, Jason Cardiff told me to send Redwood's FDA registration
10   of TBX-FREE and the collection of articles Redwood had gathered about the main
11   ingredient in TBX-FREE to Mercury Media.  I did, along with a letter from
12   Benjamin England, an attorney who Redwood had hired.  See Attachments 40-41.

13          32.    Mercury Media subsequently informed the Cardiffs and me that
14   Scripps had rejected TBX-FREE advertising because it could not "approve any
15   smoking cessation products unless they are FDA approved."  See Attachment 42.

16          33.    Eunjung Cardiff told Mercury Media what listings she wanted to
17   appear on television programming guides for Eupepsia Thin and TBX-FREE.  She
18   told Mercury Media to use "FAST WEIGHT LOSS- Lose up to 10lbs in 1 week!"
19   as the listing for Eupepsia Thin, and "STOP SMOKING NOW- TBX Free is the #1
20   selling stop smoking aid- guaranteed!" as the listing for TBX-FREE.  See
21   Attachment 44.

22          34.    Cannella purchased media time for Prolongz in 2014, 2015, and 2016,
23   for TBX-FREE in 2015, 2016, 2017, and 2018, and for Eupepsia Thin in 2017 and
24   2018.  Cannella was responsible for the bulk of television advertising for these
25   products.

26          35.    As with Mercury Media, Jason and Eunjung Cardiff made all
27   decisions about media buying through Cannella for Prolongz, TBX-FREE, and

28

PX-32

1  Eupepsia Thin, and approved all payments.  Redwood's principal contact at

2  Cannella was Kate Adkinson-Connor.

3        36.    Eunjung Cardiff was the main point of contact for Redwood's media

4  buying for Prolongz, TBX-FREE, and Eupepsia Thin television advertising.  She

5  kept track of sales generated by particular television advertising campaigns and

6  kept in constant contact with media companies.  She also approved payments to

7  media companies.

8        37.    In addition to television advertising, Redwood advertised on a number

9  of websites, which were created at Jason Cardiff's direction and approved by him

10  before going live.  From time to time, he directed changes in those websites.

11  Redwood's websites included:  www.tbxfree.com, www.trytbxfree.com,

12  www.trytbxfreenow.com, and www.stopsmokingnow.com (TBX-FREE);

13  www.bethinrx.com, www.thinliferx.com, www.thinyounow.com, and

14  www.controltheweight.com (Eupepsia Thin); and www.prolongz.com and

15  www.amilonger.com (Prolongz).  Redwood corporate websites included

16  Redwoodscientific.co, redwoodscientific.com, and redwoodamerica.com.

17  Attachments 48-59 are pages from www.tbxfree.com, bethinrx.com,

18  controltheweight.com, prolongz.com, amilonger.com, redwoodamerica.com, and

19  redwoodscientific.co that I recognize from my years working for the Redwood

20  companies and can authenticate as excerpts from those websites.

21        38.    Jason and Eunjung Cardiff also advertised Prolongz, TBX-FREE, and

22  Eupepsia Thin on social media, including Facebook and Instagram.

23        39.    Jason Cardiff wrote content for Facebook ads and directed Redwood

24  staff and outside contractors to create TBX-FREE advertising for placement on

25  Facebook, which he approved.  The FTC provided me with three video files that it

26  informed me were previously submitted to the Court as PX-1, Atts. 9, 12, and 15.  I

27  reviewed the videos and can identify them as Redwood TBX-FREE videos that

28

1  appeared on Facebook.  I recognize Jason Cardiff who appears in all three videos.

2  TBX-FREE ads also appeared on other social media.  See, e.g, Attachment 60.

3     40.     The Facebook ads were paid with an American Express card issued to

4  Eunjung Cardiff in the name of Run Away Products.  She would pay the card with

5  Redwood funds and funds from other Cardiff companies as needed.

6     41.     A group of Redwood employees including myself were responsible

7  for the day-to-day administration of Redwood's Facebook presence.  When

8  Redwood first started placing paid Facebook ads, Jean Wu coordinated with

9  Eunjung Cardiff and third-party contractors to place those ads.  Later, when

10 Redwood posted content under various accounts for its film strip products, I and

11 other Redwood employees, including Angelica Salas, Sarah Garcia, and Ryan

12 Henry would manage Redwood's account.  Jason Cardiff instructed us to keep the

13 posts positive.

14    42.     Redwood did some print advertising for TBX-FREE.  Eunjung Cardiff

15 approved the content of print ads, approved their dissemination, and monitored

16 their performance, receiving reports about customer calls generated by print

17 advertising and the resulting sales amounts.  See, e.g., Attachments 61-66.

18    43.     To my knowledge, Redwood never conducted any scientific testing of

19 TBX-FREE or Eupepsia Thin to support its advertising claims.  The closest to a

20 test of any Redwood products was a survey of men for a male sexual enhancement

21 product.  At Jason Cardiff's direction, I found an online copywriter to help me

22 gather articles about the ingredients in some of the products.

23    44.     Sometimes binders of the collected articles were later sent to merchant

24 banks that wanted to know more about the products Redwood was selling before

25 entering into credit card merchant relationships with Redwood.  We also sent these

26 to media buying companies.

27    45.     To my knowledge, Redwood never hired any scientific experts in

28 male sexual performance, smoking cessation, or weight-loss to evaluate the

1   advertising claims being made for Prolongz, TBX-FREE, or Eupepsia Thin.  I am
2   not aware that either Jason or Eunjung Cardiff, or anyone else at Redwood, had
3   any expertise in any of these areas.

4       46.     To my knowledge, Redwood did not conduct any scientific testing of
5   any of its other film strips before bringing them to market, including Sumnusent,
6   Provaxaltonin, Blossom, Product-X, or Cloverstrips.  The most we ever did was
7   simply gather articles about their ingredients.

8       47.     TBX-FREE, Eupepsia Thin, and Prolongz were made in China and
9   India.  They were never made in the United States.

10      48.     Redwood also purchased product packaging from foreign suppliers.
11  The FTC provided me with a Eupepsia Thin box, which it has informed me was
12  previously submitted to the Court has PX-1, Att. 27.  See Attachment 67.  I
13  recognize it as the product packaging that Redwood purchased from China for
14  Eupepsia Thin.

15      49.     Jason Cardiff and Eunjung Cardiff used many company names to
16  purchase the oral film strip from the Chinese and Indian manufacturers.  As shown
17  in the attached invoices and communications, AMI, Redwood, Run Away
18  Products, and Identify all purchased film strips from Dalian SML Health Product
19  Co., Ltd., in China, and from Aavishkar Oral Strips PVT LTD, in India, including
20  Prolongz, TBX-FREE, and Eupepsia Thin.  See, e.g., Attachments 68-82.

21      50.     I was responsible for ordering the products and communicating with
22  the suppliers.  Jason Cardiff also communicated with the manufacturers.  Eunjung
23  Cardiff personally authorized payments of the invoices (sometimes the invoices for
24  Eupepsia Thin referred to them as "hungerstrips").

25      51.     Because Jason and Eunjung Cardiff used so many different company
26  names to order and pay for the oral strips, Aavishkar, the Indian manufacturer,
27  requested that Redwood provide a signed statement clarifying that the companies
28  whose names appeared on invoices were related.  Jason Cardiff signed a

1     certification, as the President of Identify, LLC, stating that Identify, Redwood, Run

2     Away Products, and Advanced Mens Institute "are our group of companies (our

3     sister concern companies)." After I sent the certification to Aavishkar, Eunjung

4     Cardiff asked me to confirm that I had taken care of this. See Attachmnents 80-82.

5        52.     Eupepsia Thin television commercials and websites included

6     testimonials from people who supposedly used it to lose weight. I believe that the

7     testimonials were fake because Redwood filmed the Eupepsia Thin long-form

8     commercial in February 2017, but did not start selling the product until after that.

9     To the best of my knowledge, Redwood did not send any advance samples of

10     Eupepsia Thin to anyone before filming the commercial.

11        53.     Telephone sales were handled in-house by Redwood employees.

12     Initially, in 2014-2015, there were only a few employees answering sales calls, but

13     as Redwood increased its television advertising purchases in 2016, the call center

14     grew substantially. Redwood had as many as 20-25 employees handling consumer

15     calls during 2017.

16        54.     From my position as the Director of Operations, I supervised all

17     aspects of the business, including the sales and customer service representatives.

18     Jason Cardiff wrote the sales scripts they were supposed to use and personally

19     supervised their training. On a number of occasions Jason Cardiff worked one-on-

20     one with the sales employees in an effort to improve their sales.

21        55.     Redwood customers were typically automatically enrolled in auto-

22     ship plans when they made a purchase, many times without their prior

23     authorization. These auto-ship plans would automatically ship more product

24     unless customers called to cancel. Unless they cancelled orders, they would

25     continue to get charged automatically for additional product shipments. If

26     customers purchased a one-month supply, another shipment would go out to them

27     and their credit/debit card would be charged again exactly one month later.

28

PX-32

56.     The original scripts Jason Cardiff created for the call center did not contain a disclosure of the auto-ship program.  In late 2017, when I learned that some sales representatives were not telling customers about the auto-ship program when they enrolled them, I told Jason Cardiff and a disclosure was added to the script.  Sometimes the sales representatives also did not disclose information about added express shipping and shipping insurance charges, which would also be charged with every subsequent auto-shipment.

57.     Diana Melendez (the call center manager) regularly sent audio recordings of sales representatives' calls to Jason Cardiff, Eunjung Cardiff, Julie Green, and me for monitoring.  Some employees continued to omit the disclosures even after they were added to the script because they needed to meet sales quotas and telling customers about the auto-ship program would cause them to lose sales. I am not aware of a single sales representative being fired for failing to disclose the auto-ship program, but I heard both Jason and Eunjung Cardiff instruct call center managers to fire employees who did not produce enough sales.

58.     In many instances, customers complained that they had been told they would not get automatic shipments, but they were signed-up for automatic shipments anyway.

59.     Disclosure of the auto-ship program was also a problem with website sales.  I personally handled some calls from consumers who had ordered online and complained that the autoship program was not disclosed before they placed online orders.  I also brought this up at our regular management meetings.

60.     Jason and Eunjung Cardiff were also aware of customer complaints about the auto-ship program because we discussed them at our regular management meetings.  The call center managers were responsible for responding to chargebacks and had a standard packet of materials ready to challenge chargebacks as they came in.

61.     When Redwood first started selling TBX-FREE, it advertised a lifetime guarantee for its film strip products.  However, the terms and conditions were that orders could only be returned within 30 days of the initial order.  The lifetime guarantee created a lot of confusion in the call center and with customers.  At some point, we switched to a 30-day guarantee.  When Eupepsia Thin was launched, it was also advertised with a lifetime guarantee.  The guarantee was similarly changed to 30 days after lots of complaints came in about the guarantee.

62.     Customers who purchased 3-month and 6-month supplies were also automatically signed up for auto-ship.  There were lots of complaints from these customers when they were automatically charged again because they were not expecting it and the charges were higher for multiple months of product.

63.     Redwood accepted both debit and credit card payments.  For customers who paid with debit cards, Redwood did not get a written authorization from them to debit their bank accounts for the continuing automatic shipments.

64.     There were short periods in 2017 when Jason Cardiff allowed sales representatives to make "straight sales," meaning one-time sales of Redwood products without auto-ship.  However, he did not like straight sales because they decreased long-term sales revenues.  After a brief experiment with straight sales, he directed that all customers be placed on auto-ship plans.

65.     In approximately January 2018, Jason Cardiff instructed Julie Green (a Redwood supervisor) that customers who had made one-time, straight sale purchases should be placed on auto-ship plans – even those who had purchased as much as a year before.  When Julie Green had to be out of the office for a while, she trained Diana Melendez on the process to take over.  Diana Melendez, Julie Green, and I kept Jason Cardiff up-to-date on our progress in carrying out his instructions.  Jason Cardiff told us to hit a goal of $10,000 in successful charges each day.  We did not hit the goal every day, but did have quite a bit of success re-

PX-32

Walker Declaration
-14-

1  running the cards, especially from orders that were more recent.  The older the
2  original order, the less likely the card could be re-charged.

3      66.    Redwood did not contact these customers to tell them or get their
4  approval for additional charges.  Julie Green and Diana Melendez were in charge
5  of processing these additional charges to the customers' credit and debit cards.
6  Julie Green generated lists of customers and their card information and she and
7  Diana Melendez kept track of the number of customers who were successfully
8  converted from straight sale to auto-ship.  The conversions proved difficult in a
9  number of cases because the cards had expired.  Jason Cardiff told Diana
10  Melendez to try changing expiration dates to see if she could get charges to clear.
11  Attachments 83-114 are email communications among Jason Cardiff, Julie Green,
12  Diana Melendez, and me, relating to converting straight sale customers to
13  continuity customers.

14      67.    Jason Cardiff was very impatient at the progress of these account
15  conversions, so I ended up assisting Diana Melendez because he had threatened to
16  fire her if she could not successfully convert these accounts.  We continued to
17  convert straight sale customers to auto-ship plans, and charge them without their
18  authorization until sometime in April 2018.  Ultimately, Redwood was successful
19  in converting over 1,500 customers from straight sales to an auto-ship plan.

20      68.    We got a lot of customer complaints as a result and Jason Cardiff was
21  still upset that our efforts had not produced more of these conversions to auto-ship
22  programs.

23      69.    After Redwood started converting straight sales to auto-ship, customer
24  complaints and chargebacks increased.  As a result, we started losing merchant
25  accounts or our merchant account applications were denied.  Jason Cardiff only
26  agreed to stop the conversions when it was clear that continuing the project would
27  result in more merchant accounts being lost.

28

PX-32

Walker Declaration
-15-

70.     Redwood received many complaints from customers who tried to cancel their automatic shipments and had a hard time doing it, and from customers who tried to get refunds under Redwood's money-back guarantee, but had a hard time getting a refund.  See, e.g., Attachments 115-116.

71.     Redwood offered a money-back guarantee for Prolongz, TBX-FREE, and Eupepsia Thin.  It was a real selling point for many customers.  However, there were a lot of complaints from customers who were denied refunds.  Redwood's policy was to deny requests for refunds if most of the product had already been opened or if it was not returned within 30 days of ordering.  Even if the consumers had not used most of the package, they were required to call first to obtain a Return Merchandise Authorization ("RMA") number prior to returning the product.  They would also be required to pay their own postage.  Many customers did not receive their orders for up to two weeks after ordering, and had very little time left to try the product and request a refund before the 30 day period expired.  A lot of customers did not understand they had only 30 days from the date they placed their orders to request a refund.  From time to time, Redwood experienced some product shortages that made it difficult to get the products to them right away.  This also resulted in customers not being able to take advantage of the money-back guarantee.

72.     Sometimes Redwood used a free trial offer with Prolongz and TBX-FREE, where customers only paid shipping and handling.  They had 15 days from the day the product shipped to try it out.  Shipping typically took 7-10 days.  After the 15-day trial period, customers would then be charged for a full 30-day supply.  A lot of customers complained that they did not know they would be charged for an auto-ship, or that they thought they had more time to try the product.  We stopped using the free trial offers before we started marketing Eupepsia Thin.

73.     In addition to the return conditions and the delivery problems, another factor that hampered our ability to honor the money-back guarantee was that in

2017 through early 2018, Jason Cardiff imposed a dollar limit on the amount of refunds that customer service could process per day (between $1,000-$1,500 per day, depending on sales numbers). Customer service representatives had to create a waiting list for customer refunds that had already been promised but not yet processed. If a customer was really angry, we would often prioritize his or her refund to try to avoid chargebacks. The refund cap contributed to increased customer complaints and chargebacks. Sometimes we had to deny refunds because the customer did not meet the terms and conditions, which also led to complaints.

74. Sometimes customers complained to us that they had not been able to reach us by phone because the phone number on their product packing or packing slip was no longer working. Redwood often changed phone numbers. In some instances I was able to authorize refunds for those customers, but we were always subject to the daily refund limit.

75. There were periods of time, especially when a lot of ads were running on television, when customer service representatives could not answer all of the customer phone calls coming in. Even when the call center was divided between sales and customer service, the priority was always taking sales calls, so sometimes customer service reps were not available to take their usual calls. Because of this, many customers had difficulty canceling the automatic shipments to avoid additional charges and requesting a refund under the money-back guarantee.

76. Jason and Eunjung Cardiff were aware of all of these problems because they could see the daily sales and refund/chargeback numbers, including in real time. When calls were not answered, it affected Redwood's bottom line; it also resulted in large amounts of Redwood products being returned to us without prior authorization (i.e., without an RMA) and in increased chargebacks.

77. Tracy Carranza and Diana Melendez prepared sales reports, and shared those reports with Jason and Eunjung Cardiff. I was copied on the emails. See, e.g, Attachment 117. Depending on the report, the information would include

1    sales revenue data, including sales numbers for ad campaigns, auto-ship
2    ("continuity") programs, and sales representatives, as well as media spend and
3    chargeback information.

4         78.    Redwood had a Customer Relationship Management system ("CRM")
5    that was hosted by Lime Light, a Redwood contractor.  The CRM data included
6    order information, including customer information, the product sold, the identity of
7    the sales representative who closed the sale, and a notes field containing
8    summaries of customer service calls, including reasons for cancellations or
9    requests for refunds.  Redwood used CRM data to answer FTC CID interrogatories
10   asking for product sales and consumer complaint information.

11        79.    Complaints from customers that they did not know about the autoship
12   program and were charged without their authorization made up more than 70% of
13   all customer service calls and resulted in requests for refunds and in high
14   chargeback rates to credit cards.  In addition, Redwood was denied merchant
15   accounts or had them terminated on numerous occasions because of high
16   chargebacks.  See, e.g., Attachments 118-125.  The merchant account processors
17   that terminated Redwood's accounts included Elavon, Esquire Bank, Chase, Chase
18   Paymentech, and Vantiv.

19        80.    Because Redwood had difficulty keeping merchant card processing
20   accounts open due to high chargeback rates, Jason and Eunjung Cardiff were
21   constantly looking and applying for new ones.  Redwood had a poor credit history
22   with many banks, so Eunjung and Jason Cardiff had to sign personal guarantees to
23   obtain new merchant card processing accounts.  I helped the Cardiffs prepare many
24   of these documents or recognize their signatures on the documents.  See, e.g.,
25   Attachments 126-135.

26        81.    The Cardiffs also encouraged Redwood staff to find family members
27   and friends who could apply for new merchant card accounts in their own names
28   and who would then allow Redwood to use the accounts to process sales.  Several

PX-32

Walker Declaration
-18-

1    employees took advantage of this offer and got payments for opening the accounts

2    and approximately $250 for each month these accounts remained open.

3        82.    For a short time in 2018, Redwood sent ringless voicemails ("RVM")

4    that advertised Product X and TBX-FREE to over 1.5 million consumers.  Jason

5    Cardiff contracted with two companies – Just Deliver It and Gawk, Inc. ("Gawk")

6    to deliver these messages.  Attachments 136-145 are business records related to

7    Redwood's RVM campaigns.

8        83.    Jason Cardiff negotiated the terms of the Gawk contract with its CEO,

9    Scott Kettle, and communicated with Mr. Kettle about how he wanted the RVMs

10   implemented.  He told me to sign the contract, which I did.  I was the primary

11   point of contact with Gawk, and used Gawk's online platform to execute

12   Redwood's RVM campaigns, which sent out messages I uploaded that had been

13   personally recorded by Jason and Eunjung Cardiff.  I also monitored the campaigns

14   using Gawk's "Campaign Wizard," which gave me real-time access to Redwood's

15   RVM campaigns and allowed me to confirm that the messages were delivered to

16   consumers.  I reported back to Jason Cardiff about the RVM campaigns.  See, e.g.,

17   Attachments 136-140.

18       84.    Eunjung Cardiff approved a payment in the amount of $10,375 to Just

19   Deliver It and paid $14,350 to Gawk from her American Express card ending in

20   53004.  See Attachments 141-145.

21       85.    I have listened to three audio files provided to me by the FTC, which

22   the FTC has informed me were previously submitted to the Court as PX-1, Atts.

23   123, 125, and 127.  I recognize the files as recordings that Redwood sent as RVM

24   messages to consumers using the Gawk platform.  I recognize the voice in PX-1,

25   Atts. 123 and 127 as that of Jason Cardiff.  I recognize the voice in PX-1, Att. 125,

26   which is a RVM recording about TBX-FREE, as that of Eunjung Cardiff.

27       86.    Jason Cardiff asked me to work with Jonathan Bextel of Mountain

28   Business Center in Wyoming to register the trade name Rengalife for Intel

Properties LLC (another business entity the Cardiffs used to conduct Redwood business). I did this. See, e.g., Attachments 146-148.

87.      Jason and Eunjung Cardiff launched a multi-level marketing program called Rengalife in March 2018. Rengalife members were required to buy Redwood film strips every month, which they would then try to resell. Rengalife advertising promised that members would make money by recruiting additional members to sell Redwood products.

88.      I discussed Rengalife with the Cardiffs, and communicated by email with them. The FTC provided me with three files that it informed me were previously submitted to the Court as PX-1, Atts. 257-259. See Attachments 149-151. I have reviewed the documents and can identify them as email communications among us relating to Renglife.

89.      Jason Cardiff created and posted multiple videos promoting Rengalife on social media. I have reviewed seven video files that the FTC provided to me and that are identified below, and recognize them as Rengalife promotional videos that appeared on the Internet. I can identify Jason Cardiff who appears in all of the videos, and Eunjung Cardiff who appears briefly in one of them. I can also identify the background of some of the videos as either Redwood's office or the Cardiffs' home.

90.      I recognize three of the video files, which the FTC informed me were previously submitted to the Court as PX-1, Atts. 143, 146, and 149, as videos promoting Rengalife that featured Jason Cardiff.

91.      The FTC also provided me with a file that it informed me was previously submitted to the Court as PX-1, Att. 156. I recognize this file as a video capture of part of the Rengalife website, in which Jason Cardiff also appears.

92.      The FTC identified the four remaining video files as "Rengalife -- Facebook - 03.21.2018," "Rengalife -- Facebook - 03.26.2018," "Rengalife -- Facebook - 03.28.2018," and "Rengalife -- Facebook - 04.25.2018." I recognize

1   all four of these video files as Rengalife videos featuring Jason Cardiff.  I can also
2   identify Eunjung Cardiff, who appears briefly on screen at 9:33, of the Rengalife --
3   Facebook – 03.21.2018" video, which was filmed in the Cardiffs' home.

4    93. Redwood also posted advertising content on YouTube for the purpose
5   of linking the videos to email campaigns.  For example, the Rengalife videos were
6   also available on YouTube so that consumers who received promotional emails
7   about Rengalife could click on a link and watch them.

8    94. Jason and Eunjung Cardiff, with the assistance of Redwood
9   employees, created the contents of the Rengalife website, www.rengalife.com.
10  Eunjung Cardiff came up with the name Rengalife.

11   95. The FTC provided me with four files that it informed me were
12  previously submitted to the Court as PX-1, Atts. 152-55.  See Attachments 152-
13  155.  I have reviewed the documents and can identify them as portions of the
14  rengalife.com website promoting Rengalife.  Jason and Eunjung were heavily
15  involved in the creation of this website.

16   96. The earnings statements on the Rengalife website and Facebook page
17  were not based on actual Rengalife experience because Rengalife was just getting
18  started.  The income promised was just theoretical, assuming Rengalife members
19  were able to develop multiple levels of recruits who bought Redwood film strips
20  every month.  After the website and Facebook page went live, several people
21  signed up for Rengalife and purchased bundles of film strips from Redwood.

22   97. In late June 2018, Jason Cardiff asked me to create several new
23  California LLCs, including Cannabis Oral Thin Film Technology and River
24  Electronics.  I registered those LLCs under names and contact information
25  provided to me by Jason Cardiff, and sent him links to the filed forms on July 12,
26  2018.

27   98. When I left Redwood in July 2018, the company was still selling
28  Prolongz, TBX-FREE, and Eupepsia Thin, as well as other film strips such as

1    Sumnusent and Provoxaltonin. By that time, it was also selling Cloverstrips, an
2    oral strip with CBD.
3          99.    On July 22, 2018, Jason Cardiff asked me to register Cannastrip Labs
4    LLC in Wyoming and Canada. Typically, we registered Wyoming business
5    entities with the assistance of Mountain Business Center. For the Canadian
6    company, I suggested to Jason Cardiff that we ask the attorney team that registered
7    People United For Christians ("PUFC") in Canada, Benchmark Law Corporation.
8          100.   On August 12, 2018, Jason Cardiff asked me to compile files to
9    present to potential investors, including a stock offering for Redwood (Delaware)
10   at $0.10 per share, presentation decks for Redwood and a cannabis oral thin film
11   business venture, cannabis oral thin film business financial projections, a company
12   profile of Redwood, and a link to a Redwood corporate promotional video. Jason
13   Cardiff sent me the cannabis presentation and financial projections over Whatsapp.
14   I saved all the files in a single folder that both Jason Cardiff and I had access to.
15         101.   On August 28, 2018, Jason Cardiff asked me how we opened the
16   PUFC bank account in Canada. He stated that he needed to open a bank account
17   for the cannabis company. I told him I went to Canada to open the PUFC account
18   and that we used the attorney's office as the agent's address. I also told him that
19   most banks require the signer to go in to the bank to set up an account.
20         102.   On August 30, 2018, Jason Cardiff told me he was headed to Canada
21   and asked me to send him all the details on the PUFC bank account.
22
23   I declare under penalty of perjury under the laws of the United States of America
24   that the foregoing is true and correct.
25   Executed on July 17, 2020 in Lake Elsinore, California.
26
27   By _____
28        Danielle Walker

Walker Declaration
-22-

PX-32