1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION-RIVERSIDE

4                      - - -

5      HONORABLE JESUS G. BERNAL, DISTRICT JUDGE PRESIDING

6                      - - -

7    UNITED STATES OF AMERICA,          )
                                        )
8                    Plaintiff,         )
                                        )
9            vs.                        )   No. EDCR 23-21-JGB
                                        )
10   JASON EDWARD THOMAS CARDIFF,       )
                                        )
11                   Defendant.         )
     _____)

12

13

           REPORTER'S TRANSCRIPT OF MOTION PROCEEDINGS

14
                    Riverside, California

15
                    Monday, October 21, 2024

16
                        3:13 p.m.

17

18

19

20

21

22              PHYLLIS A. PRESTON, CSR, FCRR
                Federal Official Court Reporter
23              United States District Court
                    3470 Twelfth Street
24              Riverside, California 92501
                    stenojag@aol.com

25

```
 1   APPEARANCES:

 2


 3   For the Plaintiff:

 4                       OFFICE OF THE UNITED STATES ATTORNEY
                         BY:  VALERIE MAKAREWICZ
 5                       Assistant United States Attorney
                         312 North Spring Street, Suite 1100
 6                       Los Angeles, California 90012

 7

                         US DEPARTMENT OF JUSTICE
 8                       Consumer Protection Branch
                         BY:  MANU SEBASTIAN
 9                       450 5th Street NW, Suite 6400
                         Washington, DC 20001
10

11
                         THE COCHELL LAW FIRM PC
12   For the Defendant:

13                       THE COCHELL LAW FIRM PC
                         BY:  STEPHEN COCHELL
                         5850 San Felipe, Suite 500
14                       Houston, Texas 77057

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              MONDAY, OCTOBER 21, 2024; RIVERSIDE, CALIFORNIA

 2                                -o0o-

 3              THE CLERK:  Calling Item 9, Case No. EDCR 23-21-JGB,

 4    United States of America v. Jason Edward Thomas Cardiff.

 5              Counsel, please make your appearances.              03:13

 6              MS. MAKAREWICZ:  Good afternoon, Your Honor.

 7    Assistant United States Attorney Valerie Makarewicz on behalf

 8    of the Government.

 9              MR. SEBASTIAN:  Good afternoon, Your Honor.  Manu

10    Sebastian with the Department of Justice.                     03:13

11              THE COURT:  Good afternoon.

12              MR. COCHELL:  Good afternoon, Your Honor.  Stephen

13    Cochell appearing on behalf of defendant Jason Cardiff.

14              THE COURT:  Good afternoon.

15              The matter is on calendar for a couple of items.  One  03:13

16    is a motion filed with the defendant seeking to dismiss of --

17    dismissal of Count 2 of the Indictment based on recent Supreme

18    Court authority, and the second is a motion to suppress

19    evidence.  So let's deal with it a little bit backwards.

20              As to the motion to suppress, counsel, you don't     03:14

21    intend to call any witnesses pursuant to the motion to

22    suppress; is that correct?

23              MR. COCHELL:  No, Your Honor.

24              THE COURT:  Very well.  All right.  So let's deal

25    with the motion to dismiss.  My preliminary but probably pretty  03:14
```

```
 1   strong feeling is that the recent Supreme Court decision did
 2   not really change fundamentally the analysis that's to take
 3   place in this case regarding whether or not the charge of
 4   aggravated identity theft is proper and under the facts alleged
 5   in the Indictment.  But you may make your record if you wish.       03:15
 6            MR. COCHELL:  Well, there's an expression about don't
 7   hail a man if he's coming towards you.  I will reserve for any
 8   comments by the Government, Your Honor.
 9            THE COURT:  Okay.  Any comments by the Government?
10            MS. MAKAREWICZ:  I have a different saying but about       03:15
11   the same, Your Honor.  The Government fully believes that this
12   is a garden-variety identity theft case and that the --
13            THE COURT:  It's not so garden, but I see what you
14   mean.  I mean, the garden-variety is somebody steals somebody's
15   mail and then uses a credit card or to get a Social Security       03:15
16   number to get some meth and they steal the identity.  That's
17   garden variety.  This is separated from that.
18            MS. MAKAREWICZ:  Understood, Your Honor.  Major
19   frauds might be a little bit -- garden-variety might be
20   different in major frauds than it might be in general crimes.      03:16
21   But, of course, the Court is familiar that Dubin held when the
22   means of identification itself is used to defraud or deceive,
23   that is squarely within the aggravated identity theft.
24            The small points the Government wants to make is
25   here: Defendant exceeded his authorization.  The period of time    03:16
```

1  for which the Government has charged, as the defendant has

2  agreed to for purposes of this motion, meant that customers who

3  were previous solo personal sale, one-time only sale had their

4  identities, credit card, and debit card used in order to start

5  a brand new transaction.                                    03:16

6          The Court in *Dubin* uses a great analogy of steak with

7  somebody being charged for a flank steak versus a filet mignon.

8  Here we have a matter that a person walks into a restaurant,

9  orders any kind of steak, leaves the restaurant, and a year

10 later gets a shipment of chicken without any indication that   03:17

11 they wanted to continue this.  Same idea here, Your Honor.  The

12 customers had one-time solo instances in which they engaged

13 with the defendant for a product.  They did not choose to have

14 them reordered or continuity plans reinstated and then up to a

15 year later had their cards charged and utilized for products   03:17

16 that they didn't order originally and on a continuity plan that

17 they never agreed to.

18         So this is what the Government believes falls

19 squarely within *Dubin* and exceeds defendant's authorization,

20 and the matter should not be dismissed.                       03:17

21         THE COURT:  Okay.  So I don't know if I misspoke at

22 the beginning.  So the proposed is to deny the motion to

23 dismiss.  So that was the proposal.  Maybe I misspoke.

24         MR. COCHELL:  Okay.

25         THE COURT:  Do you now wish to be heard?              03:18

1          MR. COCHELL:  Yes, Your Honor.

2          MS. MAKAREWICZ:  The Court again is -- its tentative

3     is to deny the motion if --

4          THE COURT:  Right.

5          MS. MAKAREWICZ:  -- I understand.  Thank you, Your          03:18

6     Honor.

7          MR. COCHELL:  I did misunderstand, Your Honor.  Thank

8     you for affording me the opportunity to speak.

9          I have a few points to make.  The *Dubin* case did

10    change the law, but the law in the Ninth Circuit was set out in   03:18

11    *U.S. v. Hong* in 2019.  And *U.S. v. Hong*, just like the *Dubin*

12    case, talked about the fact that there needs to be an

13    impersonation of an identity.  And in this case, Mr. Cardiff or

14    Redwood did not impersonate himself to his clients nor did he

15    take customer information and pretend to be his customers.  No    03:19

16    third parties were deceived.  This was strictly a situation

17    where --

18          THE COURT:  So the way I understand the facts of this

19    case, that these are customers which had previously made a

20    single purchase which was legit, and then sometime thereafter,    03:19

21    the defendant apparently used that information, including the

22    payment information, the name necessary to purchase anything

23    under the Internet, and consummated a second purchase without

24    the person's knowledge or consent.  Is that what you understand

25    the facts to be as alleged?                                       03:19

1          MR. COCHELL:  Yes, Your Honor.  These are

2    pre-existing customers that bought a product, they received the

3    product, they were subsequently placed on continuity using the

4    same information --

5          THE COURT:  So they bought the product initially, but    03:19

6    they never consented to a second purchase of any product,

7    correct?  So it's that second purchase of a product in which

8    the defendant had to represent him or herself as having the

9    consent of the customer to purchase that product, otherwise,

10   that product would not be purchased under that name?    03:20

11         MR. COCHELL:  But -- but when you look at it in a

12   different light --

13         THE COURT:  Okay.

14         MR. COCHELL:  -- take a look at Amazon and Netflix,

15   they have continuity programs and single-purchaser programs.    03:20

16   And -- and the problem that we have with this aggravated

17   identity theft situation is that, whether it's a mistake or

18   whether it's an intentional situation, when people are on

19   continuity and it's fully disclosed, as it was in this --

20         THE COURT:  Are you alleging that its initial    03:20

21   purchase was a continuity contract?

22         MR. COCHELL:  Many of them were.

23         THE COURT:  Okay.

24         MR. COCHELL:  Many of them were.  This is a situation

25   of lost data, and the data was being replaced.    03:20

1           THE COURT:  But many of them weren't by implication?

2           MR. COCHELL:  Sir?

3           THE COURT:  But many of them were not?

4           MR. COCHELL:  Some of them may not have been.

5           THE COURT:  Okay.  So as to the ones that may not          03:21

6   have been, there were no additional obligations which the

7   customer undertook in the initial purchase and after that

8   initial purchase was completed.  As to those people, do you

9   agree that there was, as alleged, aggravated identity theft?

10          MR. COCHELL:  We would not, Your Honor.               03:21

11          THE COURT:  Okay.  Why?

12          MR. COCHELL:  We think that the -- the situations

13  where there's been no impersonation or misrepresentation, the

14  who are still the who.  It doesn't change.  And the issue that

15  the Government is pressing is how the -- you know, or when.     03:21

16  When you get to the "how" or the "when" under *Dubin* and *Hong*,

17  you are no longer falling within the scope of the 1028A.  And

18  for that reason, you know, it -- you know, there are many

19  situations where there could be mistakes made, as with a large

20  company as Amazon, and it's -- it could automatically be        03:22

21  deemed, you know -- you know, identity theft.  And so under

22  these circumstances, the allegations don't fall outside the

23  *Dubin* ruling or the ruling in *Hong* because there's been no

24  impersonation, no assuming of identity, no misrepresentation of

25  identity.  And so the crux of the offense is still, you know,    03:22

1    whether it went from single to continuity, the how and the when

2    are -- are not in the scope.  They are not the crux.  And so

3    under these circumstances, it does fall within the scope of

4    *Dubin* and *Hong*.

5         THE COURT:  So you're saying your argument is because      03:22

6    that transaction that occurred was between the same two parties

7    as the original transaction and there's no third party

8    involved, there's no impersonation of identity to purchase an

9    additional product?

10        MR. COCHELL:  No, there isn't.  And the fact that --       03:23

11   and this is unrebutted.  The fact that the products are sent

12   immediately with a transaction receipt, a packing receipt, and

13   the number of a call that they can make to get a refund, under

14   those circumstances --

15        THE COURT:  Yeah, I don't think that's --                  03:23

16        MR. COCHELL:  -- it's still a visible and transparent

17   transaction.

18        THE COURT:  I don't think that's material.  The fact

19   that the product is sent immediately is not really material if

20   the initial purchase of the product is fraudulent.  Any         03:23

21   response to that?

22        MS. MAKAREWICZ:  Yes, Your Honor.

23        MR. COCHELL:  Just one other comment, Your Honor.

24        THE COURT:  I'm sorry.  Go ahead, sir.

25        MR. COCHELL:  So -- so the facts, as alleged, may          03:23

1    amount to billing fraud, but they don't amount to aggravated

2    identity theft.

3              THE COURT:  I understand the distinction you're

4    trying to draw.

5              MR. COCHELL:  Thank you.

6              MS. MAKAREWICZ:  There was an impersonation.  The

7    impersonation was that the defendant had the authorization of

8    clients to charge their card again.  The impersonation was made

9    to the merchant processer, to their banks, to the CRM.  That's

10   the impersonation.  Those clients, as the Court has seen and

11   what the defendant has not -- he didn't answer your question.

12   The question was there were clients who did not authorize the

13   second, third, fourth charging of their account.  They made one

14   purchase, they walked away from it, and then up to a year

15   later, this defendant stated to the CR -- the CRM, to their

16   banks, and to the processing companies that he got indication

17   from the customer to charge that card when he did not.  That's

18   the impersonation.  He exceeded his authorization.

19             THE COURT:  Very well.  So, I mean, I understand the

20   distinction that is trying to be made here.  I still think that

21   the motion will be denied and I'll issue a written order

22   outlining my reasons.

23             Let's move on to the motion to suppress.  I think

24   this -- you know, this whole thing sounds familiar.  Obviously,

25   I've dealt with this issue before to the extent to which the

03:23

03:24

03:24

03:25

03:25

1   receiver acted or did not act improperly.  It just seems to

2   rehash the previous arguments.  I'm not inclined to grant the

3   motion to suppress because in my view, even though there were

4   some acts by the receiver which the defendant did not like,

5   there's no instance in which I find the receiver exceeded his        03:25

6   authority.  So you may make your record again.

7          MR. COCHELL:  Thank you, Your Honor.

8          This was a case where, as Your Honor mentioned, the

9   USPIS had been investigating Mr. Cardiff for four months and

10  had ample cause to obtain a warrant, but they chose not to do        03:25

11  so.  There was no urgency that could have justified bypassing

12  the warrant requirement, which is a fundamental bedrock

13  requirement of the Fourth Amendment.  The failure to get a

14  warrant violated Mr. Cardiff's right.  Addressing your concern

15  about the receiver --                                                03:26

16         THE COURT:  So assume that they had gotten a warrant,

17  right?  And then they show up and the receiver is there and he

18  says *no, you can't come in.  I have possessory interest of*

19  *these offices,* what would happen then?

20         MR. COCHELL:  I'm sorry, I didn't quite hear the --          03:26

21         THE COURT:  They would obtain a warrant.

22         MR. COCHELL:  Yes, Your Honor.

23         THE COURT:  Okay.  And you are searching his property

24  under the presumption that he has a privacy interest in the

25  property to be searched.  They show up with a warrant.  The          03:26

1  receiver comes out and says *wait, hold on.  He doesn't have any*

2  *possessory interest.  The Court appointed me as the receiver of*

3  *these assets; therefore, your warrant isn't valid.*

4          MR. COCHELL:  Well, that's a --

5          THE COURT:  The warrant is premised on the possessory    03:27

6  interest and the privacy interest of the defendant, of which he

7  has none according to the receiver.

8          MR. COCHELL:  Well, with respect to getting a

9  warrant, we do think it was required.  The -- the order itself,

10  the TRO --                                                      03:27

11          THE COURT:  Who would the warrant say had possessory

12  interest of the places to be searched?

13          MR. COCHELL:  I'm sorry?

14          THE COURT:  Who would the warrant say had possessory

15  interest of the items to be searched?                           03:27

16          MR. COCHELL:  I think it would have said "Jason

17  Cardiff" or should have said "Jason Cardiff."

18          THE COURT:  Even though a receiver had been appointed

19  and he had possessory interest?

20          MR. COCHELL:  A receiver was appointed, he had          03:27

21  possessory interest --

22          THE COURT:  Right.

23          MR. COCHELL:  But in terms of the order itself, that

24  very detailed order did not allow the receiver to exercise

25  the -- the --                                                   03:28

1          THE COURT:  The issue is --

2          MR. COCHELL:  -- ability to waive --

3          THE COURT:  The issue is --

4          MR. COCHELL:  -- the constitutional rights.

5          THE COURT:  -- not that; the issue is whether the          03:28

6     receiver had possessory interest.

7          MR. COCHELL:  Well, but -- but Jason Cardiff also has

8     possessory interest.

9          THE COURT:  If I have possessory interest of

10    something and you want possessory interest of something and          03:28

11    it's my possessory interest, I can say to you, *you know what?*

12    *It's my possession.  You're not entitled to it.*  Right?  So the

13    receiver could have stood in front of the door and said *you're*

14    *not allowed in no matter what warrant you have because I have*

15    *possessory interest.*          03:28

16          MR. COCHELL:  Right.  That would -- that would be an

17    unusual situation --

18          THE COURT:  It definitely would be an unusual --

19          MR. COCHELL:  -- for a receiver.  I would not advise

20    him to do that.          03:28

21          THE COURT:  But I think it highlights the issue here,

22    which is that you say they should have gotten a warrant.

23          MR. COCHELL:  Right.

24          THE COURT:  I say if they got a warrant, what's the

25    legal validity and materiality of the warrant seeking to search          03:28

1    something for which the defendant has no possessory interest?

2           MR. COCHELL:  Well, the Court did leave him with a

3    possessory interest.  The -- the Court said he had full access

4    to the property, which he did exercise, and --

5           THE COURT:  Okay.  He can go in and take his                    03:29

6    computers and take it home?

7           MR. COCHELL:  I'm sorry?

8           THE COURT:  He can go in, grab his computers, and

9    take them home?

10          MR. COCHELL:  Well --                                           03:29

11          THE COURT:  He could not.  He could not.

12          MR. COCHELL:  I don't believe that any of that

13   happened hypothetically.

14          THE COURT:  Right, right, but that highlights the

15   fact that he didn't have full access and possessory interest in     03:29

16   the property and the premises.

17          MR. COCHELL:  Right.  We -- we also contend that the

18   receivership order itself was void ab initio.  In *AMG v. FTC*,

19   the court -- a unanimous court held that there was never any

20   authority, Congress never intended that -- that the FTC have        03:29

21   the opportunity or right to seek monetary relief, i.e., an

22   asset receivership.  Pretty strong stuff from the Supreme

23   Court.  And when you go into the analysis that they engaged in,

24   they found that the -- and particularly Justice Breyer, they

25   were very concerned that the FTC had upset the legislative          03:30

```
 1   balance of Congress and that at the time -- and here's the
 2   conundrum here from -- from our perspective.  At the time his
 3   actions were void ab initio.  The Virginia Tax Board case shows
 4   that that's retroactive to all pending cases at the time.  And
 5   with respect to the TRO, all it said was that Section 13(b)          03:30
 6   is -- is the source of authority by the Court.  Once you throw
 7   out that source of authority, then there's -- everything else
 8   is null and void.  And so to the extent that you have an order
 9   that's void ab initio, any enforcement action that takes place
10   in the context of that order at that time is similarly null and   03:31
11   void.
12           And so we would respectfully submit that under the --
13   to change your hypothetical, if there was going to be a search
14   warrant, it should have been directed to Jason Cardiff as
15   president/CEO of Redwood Scientific.                               03:31
16           THE COURT:  Thank you.
17           Any response to the argument?
18           MR. COCHELL:  If I could also --
19           THE COURT:  Be brief, sir.
20           MR. COCHELL:  Yes, sir.  The -- and so what we have       03:31
21   is the order itself didn't specifically talk about waiver of
22   constitutional rights.  We think it was vague and ambiguous in
23   that regard.  And because you have very detailed orders --
24           THE COURT:  The order appointing a receiver would
25   discuss the constitutional rights of the person who owns the      03:31
```

```
 1    assets to be put in receivership?

 2             MR. COCHELL:  Yes, where he talks about the -- the

 3    access to the property and -- and the fact that --

 4             THE COURT:  Those are necessary functions of the

 5    receiver.  How is the receiver to do his or her job if they        03:32

 6    don't have access to the property?

 7             MR. COCHELL:  But we would respectfully submit it's

 8    improper for a court to delegate constitutional -- the right to

 9    determine constitutional rights to a receiver, particularly on

10    the first day that they walk in the door.                          03:32

11             THE COURT:  Well, I mean, then --

12             MR. COCHELL:  That doesn't seem proper.

13             THE COURT:  -- why not abolish receiverships at all

14    in general?  I mean, that happens in every receivership.  Every

15    receiver has access to the assets which are placed on the         03:32

16    receivership.

17             MR. COCHELL:  But -- but when you talk --

18             THE COURT:  That's what it means.

19             MR. COCHELL:  But in terms of a fundamental right,

20    the right against search and seizure, you know, those are          03:32

21    rights that are typically determined by a U.S. magistrate or

22    judge when a search warrant is -- is obtained.

23             THE COURT:  They're not determined when they say to a

24    receiver *go and take those assets* or *take possession of those*

25    *assets*.  It's not a constitutional analysis of the defendant's   03:33
```

1   rights; it's the rights of the debtors or the court to manage

2   its docket and appoint a receiver to handle those assets.

3              Anyway, I understand your --

4              MR. COCHELL:  Yes, Your Honor.

5              THE COURT:  I understand.

6              MR. COCHELL:  Just two or three more points.  The

7   Ninth Circuit decision in *U.S. v. Anderson* decided several

8   months ago, it took place in the context of inventory searches,

9   but it also covers the kind of administrative search and

10  inventory that the receiver was embarked on on October 12th of

11  2018.  And in that particular decision, it's made very clear

12  that it is bad faith misconduct potentially for a government

13  agent to bypass the proper procedures or ignore them.  And in

14  the instant case, we have a situation where the -- the receiver

15  really was -- didn't grant consent on October 12th.  There is

16  hearsay about it.  We have a government agent, Mr. Hedrick, who

17  submitted a declaration that --

18             THE COURT:  You say "didn't grant consent."  You say

19  "didn't grant consent" to the --

20             MR. COCHELL:  They didn't grant consent.

21             THE COURT:  To who?

22             MR. COCHELL:  To -- to the USPIS to come in and

23  conduct a criminal investigation.  This is clear pretext.

24             THE COURT:  So you're drawing a distinction between

25  "consent" and "allowed"?  He knew they were there.

03:33

03:33

03:34

03:34

03:34

1          MR. COCHELL:  Yeah, but he didn't know why they were

2     there.  There's no evidence whatsoever, admissible evidence to

3     show that he knew that they were there to conduct a criminal

4     search.  None.  And we've submitted detailed notes by him.

5     We've -- we've -- there's absolutely not one shred of evidence          03:34

6     that he ever had contact with USPIS prior to this.  This agent,

7     Mr. Hedrick, in a very conclusory two-page declaration, which

8     is not -- he doesn't state he has personal knowledge.  All he

9     says is that he attended a meeting --

10          THE COURT:  He knew they were USPIS, right?          03:35

11          MR. COCHELL:  I'm sorry?

12          THE COURT:  He knew that they were investigative

13     personnel, correct?

14          MR. COCHELL:  No.  I think he -- what he thought --

15          THE COURT:  Who did he think they were?          03:35

16          MR. COCHELL:  He was -- he was tricked into thinking

17     that they were there just to help keep the peace.

18          THE COURT:  But who did he think they were?  I'm not

19     talking about their function; I'm talking about their identity.

20          MR. COCHELL:  Yeah, I can't -- I can't say what he          03:35

21     actually knew at the time.  We have no declaration from him as

22     to what he knew and when he knew it.

23          THE COURT:  On one side you say he was duped, so that

24     implies that he did know something; now you say you can't tell

25     what he knew or didn't know.          03:35

1      MR. COCHELL:  I'm saying he was duped because there's

2   no -- it's their burden to show consent.  And when -- when we

3   talk about evidence, you know, the conclusory allegation of --

4   of Mr. Hedrick, Agent Hedrick, is not based on personal

5   knowledge.  He doesn't say that.  He says he heard from some          03:36

6   people from the receiver's staff, unidentified people, that

7   this is a peacekeeping mission.  And then he goes on to say

8   that he did not seize any evidence or he didn't see any of it

9   seized.  He doesn't talk about where he was, who the other

10  agents were.  He admits that there was no seizure, but he           03:36

11  doesn't deny that there was a search for criminal evidence.

12      And the issue in a pretext such as this is if -- if

13  you can't prove that the receiver knew that they were there for

14  a criminal search, how could you possibly say *no, wait a*

15  *second, maybe -- maybe we should get a warrant here*?  Or *why*     03:36

16  *are you guys here?  Why isn't there San Bernardino police or*

17  *Upland police?*  They're just as capable as the USPIS to keep

18  the peace if that's what they're truly there for.

19      THE COURT:  Let me hear from the --

20      MR. COCHELL:  Yes, Your Honor.  And then                         03:37

21  lastly there's --

22      THE COURT:  Let me hear from the Government.

23      MR. COCHELL:  Okay.  Yes, Your Honor.

24      MR. SEBASTIAN:  Your Honor, should I start with the

25  most recent or do you want me to go through --                       03:37

1          THE COURT:  Do it any way you want.

2          MR. SEBASTIAN:  Okay.  So in terms of the TRO, the

3    TRO did not give the defendant full access.  According to the

4    report, the receiver went in and changed the locks and all of

5    the passwords.  Defendant's entire last motion was how he

6    didn't have access to anything and that the Government had

7    destroyed material that he didn't have access to.  So this is

8    completely contrary to that.

9          In terms of *AMG*, *AMG* did not invalidate the TRO or

10   the preliminary injunction.  As this Court had found, the TRO

11   was in place to stop future consumer harm and current consumer

12   harm.  And Judge Gee determined that after this Ninth Circuit

13   decision for *VPL* came in, that the 2018 injunction was still in

14   place.  Not only that, post *AMG*, the Ninth Circuit has found in

15   cases like *Noland* that the AMG decision did not undermine the

16   receivership component of the original injunction order.

17         THE COURT:  Yeah, I'm very comfortable and know about

18   that.  The one thing that I do want to address is the

19   allegation by counsel that the receiver did not know either the

20   identity and/or the purpose of the presence of the USPIS

21   personnel at the search.

22         MR. SEBASTIAN:  So I guess the first thing to start

23   with is the FTC is the plaintiff, and the FTC had contacted

24   postal in terms of coming in for reconnaissance for the

25   immediate access.  Once it's filed, postal conducts

03:37

03:37

03:38

03:38

03:38

1    reconnaissance twice, then the TRO is granted, and there's an

2    entire meeting with postal, the receiver, and the FTC staff at

3    the local Upland Police Department prior to the entrance and

4    the immediate access.  That's where Inspector Hedrick explains

5    how the receiver gave everyone instructions and told people    03:39

6    that he would go in first.  The receiver then made entry into

7    the location.  The door was opened.  He literally walked in

8    first and then postal agents came in behind him.

9          This is not a search because a search only occurs if

10   there's a reasonable expectation of privacy.  Cardiff has no    03:39

11   reasonable expectation of privacy because the receiver has come

12   in.  And the receiver organized and worked with postal to gain

13   access because the TRO grants him exclusive custody and control

14   of this location and it also allows him to use postal -- or to

15   use law enforcement to gain access and use reasonable force, if  03:39

16   necessary, in order to gain that access.  And so postal is

17   used.

18         This argument that another law enforcement agency

19   should have been used makes no sense because whether it's

20   postal or local U.S. marshals or anyone else, it's law          03:40

21   enforcement that's there to assist the receiver in gaining

22   access and control of the location.

23         I don't know what else to say in terms of the

24   receiver being duped because the last entire motion was how

25   postal and the DOJ was in a conspiracy with the receiver to go  03:40

1  against the defendant, and now the argument is that the

2  receiver has no idea what postal is doing.  So that flies --

3  it's a total contradiction to the last motion.

4          And in terms of Inspector Hedrick, Hedrick --

5  Inspector Hedrick was at the location with the other five USPIS      03:40

6  agents, and he doesn't discuss the search because there is no

7  search.  This entire argument about *Anderson* and the inventory

8  search is misplaced.  *Anderson* pertains strictly to vehicles

9  that are being impounded post arrest and being inventoried.

10 Here the FTC docket has affidavits from the FTC investigators         03:41

11 who conducted the inventory, and it's detailed.  Their

12 affidavits have full inventories of what they took, pictures

13 that they took, and their entire process.  Postal's entire

14 position here was to enter the location with the receiver and

15 maintain any kind of order in case they were needed with          03:41

16 disgruntled employees or Mr. Cardiff.

17         THE COURT:  Very well.  Yeah, this sounds very

18 familiar, so I've heard enough.

19         MR. SEBASTIAN:  Thank you.

20         THE COURT:  Okay.  So the order will issue shortly on    03:41

21 the motion.  When is this trial set for?  Is there a trial

22 date?

23         MS. MAKAREWICZ:  Yes, the beginning of February,

24 February 4th.

25         THE COURT:  Okay.  Do both of you believe that trial     03:41

 1    will go forward on that date?

 2            MS. MAKAREWICZ:  The Government does.

 3            MR. COCHELL:  I believe so, Your Honor.

 4            THE COURT:  So February 4th you say?  How long do you

 5    expect the Government's case to last?

 6            MS. MAKAREWICZ:  Are you holding me to my time limit?

 7            THE COURT:  No, no.  Just an estimate.

 8            MS. MAKAREWICZ:  I've watched before.

 9            THE COURT:  No.  I don't set time limits in criminal

10    cases.  I can't.  I cannot or else I would.

11            MS. MAKAREWICZ:  There's two things.  We predict

12    probably about two to three days.  Although, we have recently

13    received communication from the defendant that further motions

14    are going to be filed that are also to dismiss parts of this

15    case.  So we are hopeful that it's going to go in February, but

16    that seems a little contrary to what the defense has been

17    saying.

18            THE COURT:  Well, I mean, there's no motion cutoff

19    date.  They can make motions up until the time of -- to be

20    noticed on the date of the pretrial conference date.  So

21    there's plenty of time for that.

22            MR. COCHELL:  Your Honor, if I could just ask the

23    Court for a brief minute.  I would request that the Court take

24    a hard look at Agent Hedrick's declaration.

25            THE COURT:  Yeah, I'm not hearing any more argument

1    on that.

2             MR. COCHELL:  Yes, Your Honor.

3             THE COURT:  I'll take a look at whatever I think I

4    need to take a look at it.

5             But you indicate that you believe that you can be          03:43

6    ready to go to trial on February 4th; is that correct?

7             MR. COCHELL:  Yes, Your Honor.

8             THE COURT:  Very well.  Thank you very much.

9             MR. COCHELL:  Thank you.

10                    (Proceedings concluded.)                            03:43

11                            -o0o-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4          I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME

 5   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 6   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 7   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 8   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

 9   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

10   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

11   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

12   THE UNITED STATES.

13

14

15                    DATED THIS 30TH DAY OF DECEMBER, 2024

16

17

18          /s/ PHYLLIS A. PRESTON

19          _____

20          PHYLLIS A. PRESTON, CSR No. 8701, FCRR

21          FEDERAL OFFICIAL COURT REPORTER

22

23

24

25
```